**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SONTERRA CAPITAL MASTER FUND LTD., on behalf of itself and all others similarly situated,<br><br>               Plaintiff,<br><br>      - against -<br><br>CREDIT SUISSE GROUP AG, JPMORGAN CHASE & CO., THE ROYAL BANK OF SCOTLAND PLC, UBS AG AND JOHN DOE NOS. 1-50,<br><br>               Defendants. | Docket No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |



15 CV    0871

## TABLE OF CONTENTS

INTRODUCTION......................................................................................................................1

JURISDICTION AND VENUE ................................................................................................4

PARTIES ...................................................................................................................................6

SUBSTANTIVE ALLEGATIONS ...........................................................................................9

    I.    Background ..................................................................................................................9

    II.   Defendants Restrained Trade In and Intentionally Manipulated the Prices of
         Swiss Franc LIBOR-Based Derivatives ...................................................................11

       A. Defendants Coordinated Their Swiss Franc LIBOR Submissions Based on the
          Value of Their Swiss Franc LIBOR-Based Derivatives Positions...................................11

       B. Defendants Manipulated Their Own Swiss Franc LIBOR Submissions to Fix the
          Prices of Swiss Franc LIBOR-Based Derivatives for Their Financial Benefit.............15

       C. Defendants Reorganized Their Money Market and Interest Rate
          Derivatives Desks to Facilitate Manipulative Conduct....................................................17

       D. Defendants Fixed and Manipulated the Prices of Swiss Franc LIBOR-Based
          Derivatives for the Express Purpose of Reducing Competition in the
          Swiss Franc LIBOR-Based Derivatives Market ...............................................................18

    III.   Plaintiff Transacted in Swiss Franc LIBOR-Based Derivatives at Artificial
         Prices Proximately Caused by Defendants' Manipulative Conduct ...........................19

TRADE AND COMMERCE.......................................................................................................20

CLASS ACTION ALLEGATIONS............................................................................................21

EQUITABLE TOLLING AND FRADULENT CONCEALMENT..........................................23

CLAIMS FOR RELIEF ...............................................................................................................24

FIRST CLAIM FOR RELIEF......................................................................................................24

SECOND CLAIM FOR RELIEF ................................................................................................25

THIRD CLAIM FOR RELIEF ....................................................................................................27

FOURTH CLAIM FOR RELIEF.................................................................................................27

FIFTH CLAIM FOR RELIEF .....................................................................................................28

SIXTH CLAIM FOR RELIEF.....................................................................................................32

SEVENTH CLAIM FOR RELIEF ..............................................................................................33

PRAYER FOR RELIEF...............................................................................................................34

DEMAND FOR JURY TRIAL....................................................................................................35

Plaintiff Sonterra Captial Master Fund Ltd., complains upon knowledge as to itself and its acts and upon information and belief as to all other matters, against Defendants (defined in ¶¶25-31) as follows:

## INTRODUCTION

1.      This action arises from Defendants' unlawful combination, agreement, and conspiracy to fix and restrain trade in, and the intentional manipulation of the Swiss franc London Inter-bank Offered Rate ("LIBOR") and the prices of Swiss franc LIBOR-based derivatives during the period of at least January 1, 2005 through at least December 31, 2009 ("Class Period"), in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, ("CEA") the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 – 1968 ("RICO"), and common law.

2.      LIBOR is the most widely used benchmark interest rate in the world.

3.      Issued on behalf of the British Bankers' Association ("BBA"), LIBOR is intended to reflect the cost of borrowing funds in the inter-bank market just prior to 11:00 A.M. London time.  During the Class Period, daily LIBORs were published each day for 10 currencies, including Swiss francs, across 15 "tenors," *i.e.*, durations, ranging from overnight to 12 months.

4.      LIBORs for each currency are based on the submissions of a select group of contributor banks.  During the Class Period, each Defendant was a contributor on the BBA's Swiss franc LIBOR panel.  Each trading day, Swiss franc LIBOR was calculated based on the Defendants' submissions, which were supposed to represent the rate at which each Defendant could borrow Swiss francs in the inter-bank money market just prior to 11:00 A.M. London time.

5.      Instead of accurately reporting their borrowing costs, Defendants altered their Swiss franc LIBOR submissions to manipulate the prices of financial instruments that were priced,

1

benchmarked, and/or settled based on Swiss franc LIBOR for their financial benefit.

6.      Defendants' manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives during the Class Period was intentional, persistent, and knowingly unlawful.  Cartel members, including UBS AG ("UBS"), The Royal Bank of Scotland plc ("RBS"), JPMorgan Chase & Co. ("JPMorgan"), and Credit Suisse Group AG ("Credit Suisse") have thus far agreed to historic settlements with government regulators, including the United States Commodity Futures Trading Commission ("CFTC"), United States Department of Justice ("DOJ"), U.K. Financial Services Authority ("FSA"), and European Commission ("EC"), collectively paying in excess of $2 billion in fines and penalties to resolve charges relating to the restraint of trade and manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.

7.      As part of these settlements, Defendants have admitted to certain facts regarding their participation in the manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.  These admissions include, *inter alia*:

8.      **RBS**. As part of its deferred prosecution agreement with the DOJ, RBS admitted that beginning in approximately 2007 and continuing until at least 2009, RBS' Swiss franc LIBOR submitters frequently received and accommodated requests from RBS' Swiss franc derivatives traders to alter RBS' Swiss franc LIBOR submissions to financially benefit their Swiss franc LIBOR-based derivatives positions.

9.      The CFTC also found that RBS coordinated its Swiss franc LIBOR submissions with a former RBS employee located at undisclosed Swiss franc LIBOR panel "Bank E," in order to fix the price of Swiss franc LIBOR based derivatives for their mutual financial benefit.

10.     RBS also coordinated its Swiss franc LIBOR submissions with other unknown co-conspirators.  The FSA found that during the Class Period there were at least 5 written requests

made by external traders at other Swiss franc LIBOR panel banks and interdealer brokers for RBS to alter its Swiss franc LIBOR submission to manipulate the prices of Swiss franc LIBOR-based derivatives for their financial benefit. RBS agreed and took at least these 5 written requests into account when making its Swiss franc LIBOR submissions.

11.      On October 21, 2014, RBS entered into a settlement agreement with the EC related to the manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives. The EC found that between March 2008 and July 2009, RBS and JPMorgan had participated in an illegal cartel aimed at manipulating Swiss franc LIBOR in order to "distort the normal course of the pricing of interest rate derivatives denominated in Swiss Francs."[1]

12.      **UBS**. From at least January 2005 through at least September 2009, UBS' Swiss franc LIBOR trader-submitters regularly adjusted UBS' Swiss franc LIBOR submissions to benefit UBS' trading positions. UBS' Swiss franc LIBOR trader-submitters also accommodated the requests of UBS Swiss franc LIBOR-based derivatives traders, adjusting UBS' submissions to financially benefit their Swiss franc LIBOR-based derivative positions.

13.      **JPMorgan**. On October 21, 2014, JPMorgan entered into a settlement agreement with the EC related to the manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.   The EC found that between March 2008 and July 2009, JPMorgan had participated in an illegal cartel with RBS aimed at manipulating Swiss franc LIBOR in order to "distort the normal course of the pricing of interest rate derivatives denominated in Swiss Francs."[2]

---

[1] *See Antitrust: Commission Settles RBS-JPMorgan Cartel in Derivatives Based on Swiss Franc LIBOR; Imposes €61.6 Million Fine on JPMorgan*, EUROPEAN COMMISSION (Oct. 21, 2014), http://europa.eu/rapid/press-release_IP-14-1189_en.htm.

[2] *Id.*

14.    **RBS, UBS, JPMorgan & Credit Suisse**. The EC also announced on October 21, 2014, that RBS, UBS, JPMorgan and Credit Suisse operated a cartel to fix the price of Swiss franc interest rate derivatives.[3]  The EC found that between May and September 2007, the four Defendants agreed to quote wider bid-ask spreads on certain categories of short term over-the-counter Swiss franc interest rate derivatives to all third parties, while maintaining narrower spreads for trades amongst themselves.  This agreement was designed to, among other things, lower the cartel members' transaction costs and maintain liquidity between them while simultaneously imposing a supracompetitive wider spread on non-member third parties.

15.    This combination was anticompetitive and as the EC found, intended "to prevent other market players from competing on the same terms" as the Defendants, each of which is a major player in the Swiss franc LIBOR-based derivatives market.[4]

16.    Given the persistent and secret nature of the Defendants' wrongdoing, Plaintiff believes that further evidentiary support for the claims alleged herein will be unearthed after a reasonable opportunity for discovery.

## JURISDISCTION AND VENUE

17.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), and pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and § 22 of the Commodity Exchange Act, 7 U.S.C. § 25, in addition to § 1964 of RICO, 18 U.S.C. § 1964, and common law, respectively.

18.    Venue is proper in this District pursuant to, among other statutes, §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, § 1965 of RICO, 18 U.S.C. § 1965, and 28

---

[3] *See Antitrust: Commission Settles Cartel on Bid-Ask Spreads Charged on Swiss Franc Interest Rate Derivatives; Fines Four Major Banks €32.3 million*, EUROPEAN COMMISSION (Oct. 21, 2014), http://europa.eu/rapid/press-release_IP-14-1190_en.htm.

[4] *Id*

4

U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents, and a substantial portion of the affected interstate trade and commerce described in this Complaint has been carried out in this District.

19.     Each Defendant is subject to personal jurisdiction because it transacted business throughout the United States, including in this District, including by transacting in Swiss franc LIBOR-based derivatives that are priced, benchmarked, and/or settled based on Swiss franc LIBOR from within the United States.

20.     Defendants, directly and indirectly, unilaterally and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, specifically through use of electronic messaging and other electronic means of communication transmitted by wire across interstate and international borders in connection with the unlawful acts and practices alleged in this Complaint.

21.     The United States courts have jurisdiction over the claims asserted in this Complaint pursuant to § 22 of the CEA, 7 U.S.C. § 25, §1 of the Sherman Antitrust Act, 15 U.S.C. § 1, §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), § 1964 of RICO, 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337, respectively.  Additionally, Swiss franc LIBOR and Swiss franc LIBOR-based derivatives contracts are each a commodity that trades in U.S. interstate commerce.  Swiss franc LIBOR is a "commodity" and is the "commodity underlying" Swiss franc LIBOR-based derivatives contracts, as those terms are defined and used in Section 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.  More specifically, Swiss franc LIBOR is an "excluded commodity" as that term is defined in Section 1a(19), 7 U.S.C. §§ 1a(19) (formerly 7 U.S.C. §1a(13)).  In the CEA, the term "'excluded commodity' means (i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure . . . ."

5

Excluded commodities are subject to all CFTC anti-manipulation rules, including Section 9(a)(2), which criminalizes the dissemination of false market information.

22.     Defendants' restraints of trade, intentional misreporting, manipulation and agreements to fix the price of Swiss franc LIBOR and manipulation of the prices of Swiss franc LIBOR-based derivatives had direct, substantial and foreseeable effects in the U.S., and on the Swiss franc LIBOR-based derivatives Plaintiff and members of the Class transacted in during the Class Period.  Millions of Swiss franc LIBOR-based derivatives were traded in the U.S. and by U.S. investors during the Class Period.  Defendants, as Swiss franc LIBOR contributor banks and sophisticated market participants, knew that Swiss franc LIBOR rates published and compiled by and on behalf of the BBA are disseminated in the U.S., and are used to price, benchmark, and/or settle Swiss franc LIBOR-based derivatives contracts traded in the United States.  For these reasons, Defendants knew that misreporting Swiss franc LIBOR as well as other manipulative and collusive conduct in the Swiss franc LIBOR-based derivatives market, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including on the prices of Swiss franc LIBOR-based derivatives contracts transacted in the United States.

23.     Defendants' manipulative conduct, as alleged herein, had a direct, substantial, and reasonably foreseeable effect on United States domestic commerce, and such effects give rise to Plaintiff's claims, within the meaning of the Foreign Trade Antitrust Improvements Act.

## PARTIES

24.     Plaintiff Sonterra Capital Master Fund, Ltd., ("Plaintiff" or "Sonterra") is an investment fund headquartered in New York, New York.  Sonterra engaged in U.S.-based transactions of Swiss franc LIBOR-based derivatives, including Swiss franc currency forward agreements, during the Class Period at artificial prices proximately caused by Defendants'

unlawful manipulation and restraint of trade as alleged herein. As a consequence of Defendants' manipulative conduct, Sonterra was damaged and suffered legal injury.

25. Defendant Credit Suisse Group AG is a Swiss banking and financial services company headquartered in Zurich, Switzerland. Credit Suisse provides investment banking, private banking, and asset management for customers located globally. Credit Suisse's private bank offers commercial banking services in this District at 11 Madison Avenue, New York, New York 10010.

26. Defendant JPMorgan Chase & Co. is a Delaware financial holding company headquartered in New York, New York.

27. Defendant The Royal Bank of Scotland plc is a British banking and financial services company headquartered in the United Kingdom. RBS has operations in approximately forty countries and territories around the world, including the United States.

28. As part of its Deferred Prosecution agreement with the DOJ, RBS admitted that "RBS entered into interest rate derivatives transaction tied to . . . Swiss Franc LIBOR . . . with various counterparties, some of which were located in the United States. United States counterparties included banks and other financial institutions in the United States or located abroad with branches in the United States. Those counterparties also included, among others, asset management corporations, business corporations, insurance companies, universities, and non-profit organizations."[5]

29. Defendant UBS AG is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland. UBS provides investment banking, asset management and wealth management services for private, corporate and institutional clients

---

[5] *See* United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Deferred Prosecution Agreement and Attachment A Statement of Facts with The Royal Bank of Scotland plc, (Feb. 6, 2013) at 38 ¶79 (hereinafter "RBS Deferred Prosecution Agreement").

worldwide.  It has operations in over 50 countries, including the United States, with its United States headquarters in New York, New York and Stamford, Connecticut.

30.     During the Class Period, UBS' Rates Division and Short Term Interest Rate ("STIR") desk transacted in interest rate derivatives, such as interest rate swaps whose value depended on LIBOR.[6]  The STIR desk also managed UBS' interest rate risk and short-term cash positon by engaging in interest rate derivative transactions and transactions in the money markets for each currency, including the Swiss franc, through traders located in Connecticut.[7]

31.     John Doe Defendants Nos. 1-50 are other entities or persons, including banks, interdealer brokers, cash brokers, and other co-conspirators whose identities are currently unknown to Plaintiff.  The John Doe Defendants participated in, furthered, and/or combined, conspired or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.

32.     According to the Federal Reserve Bank of New York, each Defendant engaged in interest rate derivatives transactions from within the United States throughout the Class Period. Every three years, the Federal Reserve Bank of New York conducts a survey of the over-the-counter interest rate derivatives and foreign exchange market.[8]  This survey measures the "turnover," or volume of transactions, in interest rate and foreign exchange derivatives within the United States.  The Federal Reserve Bank of New York survey only includes data from dealers located within the United States and transactions that are located within the United States.  Dealers

---

[6] See Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., CFTC Docket No. 13-09 (Dec. 19, 2012) at 8-9 (hereinafter "UBS CFTC Order").

[7] UBS CFTC Order at 9.

[8] For the latest survey, See The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2013, Federal Reserve Bank of New York (Sept. 5, 2013), http://www.newyorkfed.org/markets/pdf/2013triennialreport.pdf.

located outside of the United States report their figures to the central bank where they are located. Defendants Credit Suisse, JPMorgan, RBS and UBS, each participated in the Federal Reserve Bank of New York's survey of interest rate derivatives dealers throughout the Class Period, indicating that they entered into interest rate derivatives transactions from within the United States.

## SUBSTANTIVE ALLEGATIONS

### I.   Background

33.     Swiss franc LIBOR is a benchmark interest rate that is intended to reflect the interest rate at which banks offer to lend unsecured funds denominated in Swiss francs to other banks in the inter-bank money market.

34.     In addition to being used as a benchmark for pricing inter-bank loans, various derivative instruments are priced, benchmarked, and/or settled based on Swiss franc LIBOR. This includes over-the-counter instruments, such as interest rate swaps, forward rate agreements, foreign exchange forwards, cross-currency swaps, overnight index swaps, and tenor basis swaps,[9] as well as exchange-traded futures and options, such as the three-month Euro Swiss franc futures contract traded on the NYSE LIFFE Exchange,[10] and Swiss franc currency futures contract traded on the Chicago Mercantile Exchange ("CME").[11] In total, trillions of dollars in Swiss franc LIBOR-based derivatives contracts were traded within the United States during the Class Period.

---

[9] See Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against The Royal Bank of Scotland plc and RBS Securities Japan Limited, CFTC Docket No. 13-14 (February 6, 201) at 6 (hereinafter "RBS CFTC Order").

[10] Three Month Euro Swiss Franc (EUROSWISS) Futures, ICE, https://globalderivatives.nyx.com/contract/content/29093/contract-specification.

[11] Swiss Franc Futures Contract Specs, CME GROUP, http://www.cmegroup.com/trading/fx/g10/swiss-franc_contract_specifications.html.

9

35.     Swiss franc LIBOR is based on interest rate quotes submitted by a select group of 12 panel banks.  Each trading day, the contributors are asked to submit the rate of interest at which they could borrow funds, if they were to do so, by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11:00 A.M. London time.  Quotes are submitted by each panel bank for 15 tenors, ranging from overnight to twelve months, which reflect the duration of the loan.

36.     To calculate Swiss franc LIBOR, Thomson Reuters, as administrator of the LIBOR fixing, ranks the contributor bank quotes for each tenor in order and averages the middle 50%. This average rate becomes the official Swiss franc LIBOR for that particular tenor and is distributed to the market through Thomson Reuters, Bloomberg and Telekurs, among other financial services platforms.

37.     Throughout the Class Period, Defendants were members of the BBA Swiss franc LIBOR panel and as a result, contributed interest rate quotes that were used to calculate Swiss franc LIBOR.

38.     According to BBA guidelines in place during the Class Period, Swiss franc LIBOR is supposed to be "based on offered inter-bank deposit rates,"[12] which represent the cost of borrowing unsecured funds in the Swiss franc market.[13]  Contributor banks are not permitted to consider factors unrelated to the cost of funding, *e.g.*, the value of their Swiss franc LIBOR-based derivatives positions.

---

[12] *See e.g.*, *The BBA LIBOR Fixing and Definition*, BBA (last visited Sept. 30, 2008) https://web.archive.org/web/20080930203457/http://www.bba.org.uk/bba/jsp/polopoly.jsp?d=225&a=1413&artpage= all.

[13] Deposit rates represent the cost of borrowing funds in the inter-bank market because one way banks borrow money is by issuing certificates of deposit ("CDs").  A CD functions as a short term loan to the bank.  Money is deposited for a certain period of time and is returned to the depositor with interest at maturity. *See* Timothy Q. Cook and Robert K. Laroche, *Instruments of the Money Market*, FEDERAL RESERVE BANK OF RICHMOND, 2 (available at https://www.richmondfed.org/publications/research/special_reports/instruments_of_the_money_market/).

39.     Despite this prohibition, Defendants systematically contributed false Swiss franc LIBOR quotes to the BBA for the purpose of fixing the price of Swiss franc LIBOR-based derivatives for their financial benefit during the Class Period.

## II.     Defendants Restrained Trade In and Intentionally Manipulated the Prices of Swiss Franc LIBOR-Based Derivatives

40.     To date, the Defendants have entered into settlement agreements with multiple global regulatory agencies, including the DOJ, CFTC, FSA, and EC, regarding their intentional manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives. While these settlement agreements provide only a snapshot of select instances of Defendants' manipulative conduct, they demonstrate how Defendants coordinated their Swiss franc LIBOR submissions and trading practices in order to fix the prices of Swiss franc LIBOR-based derivatives for their financial benefit.

### A. Defendants Coordinated Their Swiss Franc LIBOR Submissions Based on the Value of Their Swiss Franc LIBOR-Based Derivatives Positions

41.     During the Class Period, Defendants' derivatives traders frequently used electronic communications, including instant messages and chat rooms, to share information regarding their Swiss franc LIBOR-based derivatives positions and to request Swiss franc LIBOR submissions that would manipulate the prices of those derivatives for their financial benefit.

42.     These electronic chats occurred both internally (among Swiss franc LIBOR-based derivatives traders and Swiss franc LIBOR submitters located at the same bank) as well as externally (among Swiss franc LIBOR-based derivatives traders and submitters located at different, supposedly competing, Swiss franc LIBOR contributor banks).

43.     For example, on May 14, 2009, RBS coordinated its Swiss franc LIBOR submissions with an unidentified Swiss franc LIBOR contributor "Bank E" in order to fix the price of Swiss franc LIBOR-based derivatives for their financial benefit. The following

11

communications occurred between an RBS Swiss franc LIBOR-based derivatives trader and an RBS Swiss franc LIBOR submitter after discussing the need for a more favorable Swiss franc LIBOR submission with a Swiss franc trader, and former RBS employee, now at Bank E:

**May 14, 2009**:

RBS Swiss Franc Trader: pls can we get

RBS Swiss Franc Trader: super high 3m

RBS Swiss Franc Trader: super low 6m

RBS Swiss Franc Trader: PRETTY PLEASE!

RBS Primary Submitter: 41 & 51

RBS Swiss Franc Trader: if u did that

RBS Swiss Franc Trader: I would lvoe u forever

RBS Primary Submitter: 41 & 51 then . . .

RBS Swiss Franc Trader: if u did that i would come over there and make love to you

RBS Swiss Franc Trader: your choice

RBS Primary Submitter: 41+51 it is

RBS Swiss Franc Trader: thought so

RBS Primary Submitter: so shallow

*See* RBS CFTC Order at 28; RBS Deferred Prosecution Agreement at 9.

44.     In a follow up conversation that same day, the RBS Swiss Franc Trader and his co-conspirator at Bank E acknowledge the success of their manipulation:

**May 14, 2009**:

RBS Swiss Franc Trader: we are good!

12

Bank E Swiss Franc Trader: yes[,] look at it now[,] low libor[,] and chf libor good too[14]

RBS Swiss Franc Trader: [RBS Primary Submitter] did be a big favor today[,] he set 41 and 51

Bank E Swiss Franc Trader: sweet

*See* RBS CFTC Order at 28.

45.     This manipulative conduct was far reaching as Defendants coordinated their Swiss franc LIBOR submissions in order to fix the prices of many different types of Swiss franc LIBOR-based derivatives, including Swiss franc currency futures contracts and Swiss franc currency forward agreements.  For example, in the conversation below, the two traders discuss the impact that manipulating three-month Swiss franc LIBOR will have on the "fx basis," or the difference between the "spot," *i.e.* current price of Swiss francs in terms of another currency, and the price of Swiss francs in the future:[15]

**April 15, 2008**:

Bank E Swiss Franc Trader: you know what i hope[,] that libor 3m is not going up

RBS Swiss Franc Trader: Yes…Should not go up.. Just hang here

Bank E Swiss Franc Trader: ok[,] just weird that zurich put it at 2.77 today[16]

RBS Swiss Franc Trader: So fx basis will go negative if 3m usd ever starts to go down

Bank E Swiss Franc Trader: you should tell [RBS Primary Submitter][,] if you can[,] the set it at 2.78

*See* RBS CFTC Order at 28.

46.     On April 15, 2008, consistent with Bank E Swiss Franc Trader's request, RBS set its three-month Swiss franc LIBOR submission at 2.78%.

---

[14] CHF is the ISO 4217 code established by the International Standards Organization to refer to Swiss franc.

[15] *See* John W. Labuszewski, Sandra Ro & David Gibbs, *Understanding FX Futures*, CME Group (Apr. 22, 2013) at 8, http://www.cmegroup.com/education/files/understanding-fx-futures.pdf (explaining basis as the relationship between the spot price and future price of a currency pairing).

[16] UBS' Swiss franc LIBOR submission on April 15, 2008, was 2.77%.

47.     These messages are only a small sample of RBS Swiss Franc Traders'
communications with his co-conspirator at Swiss franc LIBOR panel Bank E.  The CFTC found
that these two traders coordinated their trading through "near daily" Bloomberg chats, during
which they exchanged proprietary information unavailable to other market participants, including
their positions in Swiss franc LIBOR-based derivatives, their preferred Swiss franc LIBOR rates,
the amount they could benefit from manipulating Swiss franc LIBOR and the requests they made
to their respective Swiss franc LIBOR submitters.[17]

48.     Defendants also coordinated their Swiss franc LIBOR submissions with other
currently unknown Swiss franc LIBOR panel banks by using "inter-dealer brokers," *i.e.*,
intermediaries that facilitate transactions between dealer banks in markets where there are no
centralized exchanges, such as the over-the-counter market for Swiss franc LIBOR-based
derivatives.

49.     The FSA found that other panel banks and inter-dealer brokers made requests for
Swiss franc LIBOR submissions to two RBS derivatives traders, one RBS money market trader,
and one primary LIBOR submitter.[18]  RBS' derivatives traders would pass those requests on to the
relevant primary LIBOR submitter who would make LIBOR submissions in accordance with
those requests.[19]  There were at least five requests for Swiss franc LIBOR submissions made by an
external trader and inter-dealer broker that RBS followed during the Class Period.[20]

50.     These coordinated efforts to manipulate Swiss franc LIBOR for the purpose of
fixing and manipulating the prices of Swiss franc LIBOR-based derivatives, mirrors the EC's

---

[17] RBS CFTC Order at 27.

[18] *See* Financial Services Authority Final Notice against The Royal Bank of Scotland plc, FSA Ref. No. 121882 (Feb.
6, 2013) at 16 ¶61 (hereinafter "RBS FSA Final Notice").

[19] *Id.*

[20] *Id.*

findings that between March 2008 and July 2009, RBS and JPMorgan operated a cartel aimed at manipulating Swiss franc LIBOR in order to "distort the normal pricing of interest rate derivatives denominated in Swiss franc."[21]

### B. Defendants Manipulated Their Own Swiss Franc LIBOR Submissions to Fix the Prices of Swiss Franc LIBOR-Based Derivatives for Their Financial Benefit

51.     In addition to coordinating Swiss franc LIBOR submissions with other banks, the Defendants manipulated their own Swiss franc LIBOR submissions to financially benefit their Swiss franc LIBOR-based derivatives positions.  These internal requests for favorable Swiss franc LIBOR submissions occurred obsessively during Class Period, as often as several times each week at RBS.[22]  The practice was so common that Swiss franc derivatives traders often joked with each other and Swiss franc LIBOR submitters about their requests for manipulative Swiss franc LIBOR submissions.  For example, in the conversation below, RBS' primary Swiss franc LIBOR submitter pretends that he will not comply with a trader's request, only to be persuaded by day-old sushi rolls:

<u>December 4, 2008</u>:

<u>Swiss Franc Trader</u>: can u put 6m swiss libor in low pls?

<u>Primary Submitter</u>: NO

<u>Swiss Franc Trader</u>: should have pushed the door harder

<u>Primary Submitter</u>: Whats it worth

<u>Swiss Franc Trader</u>: ive got some sushi rolls from yesterday?

<u>Primary Submitter</u>: ok low 6m, just for u

<u>Swiss Franc Trader</u>: woooooooohooooooo

---

[21] *See Commission Settles RBS-JPMorgan Cartel, supra* note 1.
[22] RBS CFTC Order at 26.

*See* RBS CFTC Order at 26.

52.     This callous manipulative conduct existed at other Defendant banks as well.  For example, UBS' Swiss franc LIBOR-based derivatives traders also requested that UBS alter its Swiss franc LIBOR submissions in order to fix and manipulate the prices of Swiss franc LIBOR-based derivatives for their financial benefit.  For example:

**July 5, 2006**:

UBS Trader: looking for high 1 month fix

UBS Swiss Franc LIBOR Submitter: no problem, will fix 1 month high[23]

53.     That day, UBS made good on this request for a high 1 month Swiss franc LIBOR submission, raising its 1 month Swiss franc LIBOR submission to 1.43%, 1 basis point higher than the previous day.

54.     In addition to honoring specific requests from Swiss franc LIBOR-based derivatives traders, UBS also systematically "rounded" its Swiss franc LIBOR submissions up or down in order to fix the price of Swiss franc LIBOR-based derivatives for its financial benefit.  In the Statement of Facts incorporated into its non-prosecution agreement with the DOJ, UBS admitted that "[s]tarting at least as early as 2001, and continuing until at least September 1, 2009, on each trading day on which UBS had Swiss Franc trading positions, UBS's Swiss Franc LIBOR submitters rounded UBS's Swiss Franc LIBOR submissions to benefit UBS's global Swiss Franc trading positions."[24]

---

[23] *See* United States Department of Justice, Criminal Division, Fraud Section Non-Prosecution Agreement and Appendix A Statement of Facts with UBS AG (Dec. 18, 2012) at 31 ¶¶75-76 (hereinafter "UBS DOJ Non-Prosecution Agreement").
[24] UBS DOJ Non-Prosecution Agreement at 30 ¶73.

**C. Defendants Reorganized Their Money Market and Interest Rate Derivatives Desks to Facilitate Manipulative Conduct**

55.     Defendants restructured their trading desks to encourage Swiss franc LIBOR-based derivatives traders and Swiss franc LIBOR submitters to share information so that the banks' submissions would financially benefit their Swiss franc LIBOR-based derivative positions.

56.     In October 2006, for example, RBS senior management reorganized its trading desks so that derivatives traders and money market traders, some of whom were also LIBOR submitters, would share the same physical location within the firm.[25]  The co-location plan, known as the Short-Term Markets Desk ("STM"), was expressly intended to encourage derivatives and money market traders to share market information that could impact trading and funding decisions.[26]

57.     This new seating arrangement amplified the preexisting conflict of interest between the profit motive of Swiss franc LIBOR-based derivatives traders, whose compensation was directly based on the performance of their trading book, and the responsibility of Swiss franc LIBOR submitters who, according to BBA guidelines, were required to submit RBS' true cost of borrowing in the inter-bank market without any reference to its Swiss franc LIBOR-based derivatives positions.[27]

58.     RBS' Swiss franc LIBOR-based derivatives traders quickly took advantage of this new arrangement, not only sharing their view of market conditions, but also telling RBS' primary LIBOR submitter what their derivatives positions were and encouraging him to make Swiss franc LIBOR submissions that would make those positions more profitable.[28]

---

[25] RBS CFTC Order at 6.

[26] *Id.*

[27] *Id.*

[28] *Id.*

59.     UBS also made similar seating arrangements.  From at least January 2005 through September 2009, derivatives traders on UBS' Short Term Interest Rates ("STIR") desk traded short-term interest rate derivatives and made submissions for all LIBOR currencies, except U.S. Dollar LIBOR and Euro LIBOR.[29]

60.     The STIR desk managed both UBS' interest rate risk and short term cash position, engaging transactions for interest rate derivatives and cash trading in the money markets for each currency, including Swiss francs.[30]

61.     Under UBS' scheme, Swiss franc LIBOR-based interest rate derivatives traders were not just seated next to Swiss franc LIBOR submitters, they actually made the submissions themselves.  By placing Swiss franc LIBOR derivatives traders (whose compensation was directly based on the performance of their trading books) in charge of determining UBS' Swiss franc LIBOR submissions, UBS created a direct conflict of interest between the profit motive of these traders and their responsibility to submit Swiss franc LIBOR quotes that reflected UBS' true cost of borrowing.

## D. Defendants Fixed and Manipulated the Prices of Swiss Franc LIBOR-Based Derivatives for the Express Purpose of Reducing Competition in the Swiss Franc LIBOR-Based Derivatives Market

62.     In addition to manipulating their Swiss franc LIBOR submissions to fix the prices of Swiss franc LIBOR-based interest rate derivatives, Defendants also fixed and manipulated the prices of Swiss franc LIBOR-based derivatives by intentionally quoting artificial Swiss franc LIBOR-based derivatives prices to other market participants.

---

[29] UBS CFTC Order at 8.

[30] *Id.*

63.     The EC found that between May and September 2007, RBS, UBS, JPMorgan and Credit Suisse, all participated in a cartel to fix the prices of Swiss franc LIBOR-based derivatives.[31]

64.     Cartel members agreed to quote wider, collusive "bid-ask spreads," *i.e.*, the difference between the price at which each member was willing to buy (bid) and sell (ask), for certain categories of over-the-counter Swiss franc LIBOR-based derivatives to all non-members, while maintaining narrower spreads for trades amongst themselves.[32]

65.     This agreement had two goals. First, by agreeing to keep the bid-ask spread on trades among cartel members narrow, the cartel members reduced their own transaction costs, which helped to maintain liquidity among cartel members.[33]  Second, by agreeing to quote wider bid-ask spreads to all non-members, the cartel prevented other dealers in the Swiss franc derivatives market from competing on the same terms.[34]

66.     This anti-competitive combination among four of the largest and most sophisticated dealers in the Swiss franc derivatives market caused injury to Class members who engaged in transactions for Swiss franc LIBOR-based derivatives at artificial prices proximately caused by Defendants' manipulative conduct during the Class Period.

## III.     Plaintiff Transacted in Swiss Franc LIBOR-Based Derivatives at Artificial Prices Proximately Caused by Defendants' Manipulative Conduct

67.     During the Class Period, Plaintiff Sonterra engaged in U.S.-based transactions of Swiss franc LIBOR-based derivatives at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade.  As a result, Sonterra was damaged and suffered

---

[31] *See Commission Settles Cartel on Bid-Ask Spreads, supra* note 3.

[32] *Id.*

[33] *Id.*

[34] *Id.*

19

legal injury.  For example, on January 16, 2009, Sonterra entered into a Swiss franc currency forward agreement, agreeing to buy CHF 850,035.79 on February 27, 2009, for $950,000.00.

68.      Communications released as part of RBS' settlement with the CFTC demonstrate that on the same day Sonterra agreed to buy Swiss francs, Defendants were engaged in manipulating Swiss franc LIBOR:

**January 16, 2009:**

Swiss Franc Trader: high 3m libor pls!!!!!!

Swiss Franc Trader: lower 6m libor pls!!!!!!!

*See* RBS CFTC Order at 26.

69.      As alleged in ¶ 34 above, and acknowledged by RBS in its settlement with the CFTC,[35] Swiss franc currency forward agreements are priced based on Swiss franc LIBOR.  As a result, Plaintiff Sonterra suffered legal injury when it entered into a Swiss franc currency forward agreement on January 16, 2009, by agreeing to purchase Swiss francs at an artificial price proximately caused by Defendants' manipulative conduct.

## TRADE AND COMMERCE

70.      Beginning in at least January 1, 2005, and continuing until at least December 31, 2009, Defendants engaged in a continuing contract, conspiracy or combination in restraint of trade in violation of the Sherman Act.

71.      During the Class Period, Defendants sold substantial quantities of Swiss franc LIBOR-based derivatives in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which Defendants produced Swiss franc LIBOR-based derivatives.

72.      The Defendants' business activities that are subject to this Complaint were within

---

[35] RBS CFTC Order at 6.

the flow of and substantially affected interstate trade and commerce.

73.     During the Class Period, the Defendants' conduct and their co-conspirators conduct

occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on its own behalf and as representative of the following Class:[36]

> All persons or entities that engaged in U.S.-based transactions in financial instruments that were priced, benchmarked, and/or settled to Swiss franc LIBOR at any time from at least January 1, 2005, through at least December 31, 2009 (the "Class").

> Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States Government.

75.     The Class is so numerous that individual joinder of all members is impracticable.

While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is

informed and believes that at least thousands of geographically dispersed Class members

transacted in Swiss franc LIBOR-based derivatives worth trillions of dollars during the Class

Period.

76.     Plaintiff's claims are typical of the claims of the other members of the Class.

Plaintiff and the members of the Class sustained damages arising out of Defendants' common

course of conduct in violation of law as complained of herein.  The injuries and damages of each

member of the Class were directly caused by Defendants' wrongful conduct in violation of the

laws as alleged herein.

77.     Plaintiff will fairly and adequately protect the interests of the members of the Class.

Plaintiff is an adequate representative of the Class and has no interest which is adverse to the

---

[36] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, membership criteria and the Class Period.

interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including commodities manipulation and antitrust litigation.

78.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.  These common questions of law and fact include, without limitation:

a.  Whether Defendants and their co-conspirators engaged in a combination or conspiracy to manipulate  Swiss franc LIBOR and the prices of  Swiss franc LIBOR-based derivatives in violation of the Sherman Act;

b.  the identity of the participants in the conspiracy.

c.  the duration of the conspiracy;

d.  the character and nature of the acts performed by the Defendants in furtherance of their conspiracy;

e.  whether Defendants unlawful conduct caused injury to the business and property of Plaintiff and the Class;

f.  whether Defendants were unjustly enriched at the expense of Plaintiff and the Class;

g.  whether Defendants unlawful acts violate RICO;

h.  whether Defendants' unlawful conduct caused cognizable legal injury under the Commodity Exchange Act;

i.  the appropriate measure of damages sustained by Plaintiff and Class members.

79.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in

this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

80.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRADULENT CONCEALMENT

81.     The applicable statute of limitations relating to the claims for relief alleged in ¶¶ 85-134 herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

82.     Affirmative acts of concealment by Defendants used to hide their violations of law from Plaintiff and the Class include, *inter alia*, knowingly submitting (or causing to be submitted) Swiss franc LIBOR quotes that were false, misleading, or inaccurate because they were based in whole or in part on impermissible and illegitimate factors, such as which rate would financially benefit Defendants' Swiss franc LIBOR-based derivatives positions and/or the Swiss franc LIBOR-based derivatives positions of their co-conspirators, and representing that these submissions were a reliable and truthful assessment of borrowing costs in the inter-bank money market.

83.     Many, if not all, of these affirmative acts of concealment were also inherently self-concealing. Defendants engaged in a form of price fixing, which is inherently self-concealing and could not be detected by Plaintiff or other members of the Class.[37] The secret nature of Defendants' conspiracy – which relied on non-public methods of communication, including

---

[37] *See In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, 00 CIV 7804 (LMM), 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004) (recognizing that bid-rigging and price-fixing conspiracies are inherently self-concealing) (citing *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir. 1988)).

private instant messages, to conceal their agreements to manipulate Swiss franc LIBOR -

prevented Plaintiff from uncovering their unlawful conduct.[38]

84.     As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and

self-concealing manipulative acts and could not have discovered same by exercise of due diligence

prior to the time when there were public disclosures reporting Swiss franc LIBOR manipulation.

Plaintiff thus asserts the tolling of the applicable statutes of limitations affecting the rights of the

claims for relief asserted by Plaintiff.  Defendants are also equitably estopped from asserting that

any otherwise applicable limitations period has run.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**(Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act)**

85.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though

fully set forth herein.

86.     Defendants and their unnamed co-conspirators entered into and engaged in a

combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1

of the Sherman Act, 15 U.S.C. § 1, *et seq.*

87.     During the Class Period, Defendants entered into a series of agreements designed to

create profit or limit liabilities amongst themselves by coordinating the manipulation of the prices

and settlement value of Swiss franc LIBOR and Swiss franc LIBOR-based derivatives, by

coordinating their submissions to the BBA and by engaging in other activities designed to

artificially suppress, inflate, maintain, or otherwise alter Swiss franc LIBOR.

88.     This conspiracy to manipulate the prices of Swiss franc LIBOR-based derivatives

---

[38] *See e.g.*, *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 514 (S.D.N.Y. 2003) ("[a]mong the principal allegations against Defendants are assertions that they reported false trade data to entities that collect that information for public dissemination. . . Such activities are inherently self-concealing").

caused injury to both Plaintiff and members of the Class because they were deprived of the benefit of a legitimate and accurate Swiss franc LIBOR that reflected actual market conditions. Plaintiff and members of the Class also were deprived of the ability to accurately price Swiss franc LIBOR-based derivatives entered into during the Class Period and to accurately determine the settlement value of Swiss franc currency forward agreements and other Swiss franc LIBOR-based derivatives by reference to an accurate Swiss franc LIBOR. Plaintiff and members of the Class thus received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts taken in furtherance thereof.

89.     The conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the over-the-counter and exchange traded Swiss franc LIBOR-based derivatives market. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pretextual or could have been achieved by less restrictive means.

90.     As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

91.     Plaintiff and members of the Class seek treble damages for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act.

92.     Plaintiff and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

### (Manipulation in Violation of the Commodity Exchange Act)

### 7 U.S.C. §§ 1, *et seq.*

25

93.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

94.     Each Defendant is liable under §§ 6(c), 9, and 22, of the CEA, codified at 7 U.S.C. §§ 9, 13, and 25 respectively, as well as CFTC Rules 180.1 and 180.2, for the manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives that were priced, benchmarked, and/or settled based on Swiss franc LIBOR.

95.     Defendants had the ability to manipulate Swiss franc LIBOR and Swiss franc LIBOR-based derivatives.  Defendants, through interstate commerce, knowingly submitted or caused to be submitted artificial rate quotes to the BBA.  These submissions were used to determine the official published Swiss franc LIBOR.  By virtue of the Swiss franc LIBOR methodology, the Defendants had the ability to influence and affect the rates that would become the official Swiss franc LIBOR.  Further, because of their market power as major dealers of Swiss franc LIBOR-based derivatives, the Defendants had the ability to influence the actual prices of Swiss franc LIBOR-based derivatives through manipulative trading strategies.

96.     As evidenced by communications revealed to the DOJ, CFTC, and FSA, and additional facts disclosed by EC, the Defendants fully, intentionally, and systematically manipulated Swiss franc LIBOR and Swiss franc LIBOR-based derivatives prices to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) of dollars in illegitimate profits on Swiss franc LIBOR-based derivatives, held by themselves or other co-conspirators, the prices of which (and thus profits or losses) were priced, benchmarked and/or settled to Swiss franc LIBOR.  As an intended and direct consequence of Defendants' knowingly unlawful conduct, the prices of Plaintiff's Swiss franc LIBOR-based derivatives, and those traded by Class members, were manipulated to artificial levels by Defendants.

97.    During the Class Period, Swiss franc LIBOR and the prices of derivatives that were priced, benchmarked, and/or settled based on Swiss franc LIBOR were artificial and did not result from legitimate market information, competition, or supply and demand factors.  Defendants directly caused artificial Swiss franc LIBOR and artificial prices of Swiss franc LIBOR-based derivatives by, *inter alia*, executing manipulative trades among themselves, quoting artificial bid and ask prices for Swiss franc LIBOR-based derivatives, and submitting artificial Swiss franc LIBOR quotes to the BBA.

98.    As a direct result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered actual damages and injury in fact due to artificial Swiss franc LIBOR and prices of derivatives that were priced, benchmarked, and/or settled to Swiss franc LIBOR.

## THIRD CLAIM FOR RELIEF

### (Principal-Agent Liability in Violation of § 2 of the Commodity Exchange Act)

99.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

100.    Each Defendant is liable under § 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

101.    Plaintiff and members of the Class seek the actual damages they sustained in Swiss franc LIBOR-based derivatives for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

### (Aiding and Abetting Liability in Violation of § 22 of the Commodity Exchange Act)

102.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

103. Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's manipulation of Swiss franc LIBOR and willfully intended to assist these manipulations, which resulted in artificial Swiss franc LIBOR-based derivatives prices during the Class Period in violation of § 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

104. Plaintiff and members of the Class seek the actual damages they sustained in Swiss franc LIBOR-based derivatives for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

### (Violation of the Racketeer Influenced and Corrupt Organizations Act)
### 18 U.S.C. §§ 1961 *et seq.*

105. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

106. 18. U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

107. 18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

108. Under 18 U.S.C. § 1961(1), an as applicable to § 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

109. 18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the

effective date of this chapter and at least the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

110.    18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

111.    18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C. § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such a scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

112.    At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including by transmitting false Swiss franc LIBOR submissions or directing other employees to do so among other predicate acts of wire fraud) were "person[s]" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and hierarchy of corporate direction and control.

113.    At all relevant times, Plaintiff was a "person" within the meaning of 18 U.S.C. § 1961(3).

114.    Defendants' collective association, including through their participation together as members of the BBA Swiss franc LIBOR panel, and membership in various other cartels identified by the EC, constitutes the RICO enterprise in this case. Every member of the enterprise participated in the process of transmitting or causing to be transmitted false and artificial Swiss

29

franc LIBOR submissions, and Swiss franc LIBOR-based derivative price quotes, during the Class Period. As alleged herein, each Defendant engaged in the acts of wire fraud in furtherance of the conspiracy and participated as a member of the association in fact enterprise.

115.   Defendants completed all elements of wire fraud within the United States or while crossing United States borders. Defendants did so by: (a) transmitting or causing to be transmitted artificial Swiss franc LIBOR quotes in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (b) transmitting or causing to be transmitted false and artificial Swiss franc LIBOR quotes that were relied on by Thomson Reuters and the BBA in collecting, calculating, publishing, and/or disseminating the daily Swiss franc LIBOR submissions of each Defendant and the daily Swiss franc LIBOR fix that was transmitted, published, and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; (c) coordinating their daily Swiss franc LIBOR submissions and Swiss franc LIBOR-based derivatives positions in electronic chats routed through electronic servers located in the United States; (d) sending trade confirmations based on manipulated Swiss franc LIBOR rates to counterparties in the United States; and (e) transmitting, publishing, and/or disseminating artificial bid and ask price quotes for Swiss franc LIBOR-based derivatives within the United States or while crossing U.S. borders through electronic servers located in the United States.

116.   The common purpose of the enterprise was simple: profiteering. By engaging in the predicate acts alleged including, but not limited to, transmitting or causing false and artificial Swiss franc LIBOR submissions to be transmitted to Thomson Reuters as agent for the BBA, and by exchanging Swiss franc LIBOR-based derivatives positions and prices, Defendants affected the prices of Swiss franc LIBOR-based derivatives, rendering them artificial. This directly resulted in Defendants reaping hundreds of millions (if not billions) of dollars in illicit trading profits on their Swiss franc LIBOR-based derivatives positions.

117.   Defendants each committed far more than two predicate acts of wire fraud.  As alleged in detail herein, Defendants engaged in at least the following predicate acts of wire fraud:

    a.   The transmission of false Swiss franc LIBOR rates to Thomson Reuters in the United States, for further dissemination;

    b.   Causing the transmission and dissemination in the United States of the false Swiss franc LIBOR fix by Thomson Reuters as agent for the BBA;

    c.   Causing the transmission and dissemination in the United States of false Swiss franc LIBOR individual bank quotes by Thomson Reuters;

    d.   The transmission and dissemination of false bid and ask price quotes for Swiss franc LIBOR-based derivatives within the United States;

    e.   Electronic communications and instant messages containing manipulative requests that emanated from within the United States or were routed through electronic servers located within the United States;

    f.   Sending trade confirmations based on manipulated and false Swiss franc LIBOR rates to counterparties within the United States

118.   Defendants' racketeering scheme affected interstate commerce.  Trillions of dollars in Swiss franc LIBOR-based derivatives were traded within the United States during the Class Period including but not limited to, Swiss franc currency forward agreements, Swiss franc currency futures contracts traded on the CME, interest rate swap, and forward rate agreements.

119.   As alleged herein, Plaintiff and members of the Class are direct victims of Defendants wrongful and unlawful conduct.  Plaintiff's and the Class' injures were direct, proximate, forseeable, and natural consequences of Defendants' conspiracy; indeed depriving Plaintiff and the Class of their money relative to their Swiss franc LIBOR-based derivatives contracts was the very purpose of the Defendants' scheme.

120.   Plaintiff and members of the Class seek treble damages for the injuries they have sustained, as well as restitution, cost of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

121.    As a direct and proximate result of the subject racketeering activities, Plaintiff and members of the Class seek an order, in accordance with 18 U.S.C. § 1964(a) enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SIXTH CLAIM FOR RELIEF

### (Violation of the Racketeer Influenced and Corrupt Organizations Act)
### 18 U.S.C. §§ 1961 *et seq.*

122.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

123.    Apart from construction and carrying out the racketeering scheme detailed above, Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. § 1962(d).

124.    The fraudulent scheme, as set forth above, alleges a violation of RICO in and of itself.

125.    Defendants organized and implemented the scheme, and insured it continued uninterrupted, by concealing their manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives from Plaintiff and members of the Class.

126.    Defendants knew their manipulative scheme would defraud participants in the Swiss franc LIBOR-based derivatives market yet each Defendant agreed to participate despite their understanding the fraudulent nature of the enterprise.

127.    As alleged herein, Plaintiff and members of the Class are direct victims of Defendants' wrongful and unlawful conduct.  Plaintiff and the Class' injuries were direct, proximate, forseeable, and natural consequences of Defendants' conspiracy, indeed, those effects were precisely why the scheme was concocted.

128.    Plaintiff and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

129.    As a direct and proximate result of the subject racketeering activity, Plaintiff and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SEVENTH CLAIM FOR RELIEF

### (Unjust Enrichment in Violation of Common Law)

130.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

131.    Defendants and members of the Class, including Plaintiff, entered into Swiss franc LIBOR-based derivatives transactions.  These transactions were either directly priced, benchmarked, and/or settled based on Swiss franc LIBOR, which was supposed to reflect actual market conditions.  Rather than compete honestly and aggressively with each other, Defendants colluded to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives to ensure they had an unfair advantage in the marketplace.

132.    Defendants financially benefited from their unlawful acts described herein, including but not limited to, coordinating the manipulation of Swiss franc LIBOR by taking advantage of the BBA submission process, manipulating the bid-ask spread quoted on Swiss franc LIBOR-based derivatives, or other activities designed to artificially suppress, inflate, maintain, or otherwise alter Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.  These unlawful and inequitable acts caused Plaintiff and Class members to suffer injury, lose money, and otherwise be deprived of the benefit of accurate Swiss franc LIBOR reflecting actual market conditions, as well as the ability to accurately price, benchmark, and/or settled Swiss franc

LIBOR-based derivatives transactions.  As a result, Plaintiff and Class members received, upon execution or settlement of their trades, less in value than they would have received absent Defendants' wrongful conduct.  Plaintiff and the Class' losses correspond to Defendants' unlawful gains.

133.   Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Class.

134.   Plaintiff and members of the Class seek restoration of the monies of which they were unfairly and improperly deprived as described herein.

## PRAYER FOR RELIEF

Plaintiff demands relief as follows:

A.     That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3), of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as Class counsel for the Class;

B.     That the unlawful conduct alleged herein be adjudged and decreed to violate § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C.     That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under §16 of the Clayton Antitrust Act, 15 U.S.C. §26;

D.     That the Court award Plaintiff and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.     That the unlawful conduct alleged here in be adjudged and decreed to be an unlawful enterprise in violation of RICO;

F.      For a judgment awarding Plaintiff and the Class damages against Defendants for their violation of RICO, in an amount to be trebled in accordance with such laws;

G.      That the Court award Plaintiff and the Class damages against Defendants for their violations of the Commodity Exchange Act;

H.      That the Court order Defendants to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiffs and members of the Class;

I.      That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

J.      That the Court award Plaintiff and the Class prejudgment interest at the maximum rate allowable by law; and

K.      That the Court direct such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  February 5, 2015.

Respectfully submitted,

Geoffrey M. Horn
Vincent Briganti
Peter St. Philip
Raymond Girnys
Christian P. Levis
LOWEY DANNENBERG COHEN & HART
P.C.
One North Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email:  ghorn@lowey.com
          vbriganti@lowey.com
          pstphilip@lowey.com
          rgirnys@lowe.com
          clevis@lowey.com

36