**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SONTERRA CAPITAL MASTER FUND LTD.,
FRONTPOINT EUROPEAN FUND, L.P., FRONTPOINT
FINANCIAL SERVICES FUND, L.P., FRONTPOINT
HEALTHCARE FLAGSHIP ENHANCED FUND, L.P.,
FRONTPOINT HEALTHCARE FLAGSHIP FUND, L.P.,
FRONTPOINT HEALTHCARE HORIZONS FUND, L.P.
FRONTPOINT FINANCIAL HORIZONS FUND, L.P.,
FRONTPOINT UTILITY AND ENERGY FUND L.P.,
HUNTER GLOBAL INVESTORS FUND I, L.P.,
HUNTER GLOBAL INVESTORS FUND II, L.P.,
HUNTER GLOBAL INVESTORS OFFSHORE FUND
LTD., HUNTER GLOBAL INVESTORS OFFSHORE
FUND II LTD., HUNTER GLOBAL INVESTORS SRI
FUND LTD., HG HOLDING LTD., HG HOLDINGS II
LTD., and FRANK DIVITTO, on behalf of themselves and
all others similarly situated ,

Case No. 15-cv-00871 (SHS)

Plaintiffs,

*- against -*

CREDIT SUISSE GROUP AG, CREDIT SUISSE AG,
JPMORGAN CHASE & CO., THE ROYAL BANK OF
SCOTLAND PLC, UBS AG, BLUECREST CAPITAL
MANAGEMENT LLP, DEUTSCHE BANK AG, DB
GROUP SERVICES UK LIMITED, and JOHN DOE
NOS. 1-50,

Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND FOR**
**LACK OF SUBJECT MATTER JURISDICTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL ALLEGATIONS ............................................................................................... 3

    A.    Defendants and the LIBOR Process .............................................................. 3

    B.    Swiss Franc LIBOR Financial Instruments .................................................. 4

    C.    Defendants' Alleged Conduct ........................................................................ 5

            1.    Bid-Ask Spread Allegations ............................................................. 5

            2.    Swiss Franc LIBOR Allegations ...................................................... 5

ARGUMENT ........................................................................................................................ 6

I.     PLAINTIFFS DO NOT HAVE STANDING TO BRING ANY OF THEIR
      ALLEGED CLAIMS BECAUSE THERE IS NO INJURY-IN-FACT ........................ 6

    A.    The Products Plaintiffs Allegedly Bought or Sold Are Not Linked to Swiss
           Franc LIBOR .................................................................................................. 6

    B.    The Alleged Bid-Ask Spread Conduct Did Not Cause Plaintiffs Any Injury .............. 7

    C.    The Alleged Swiss Franc LIBOR Conduct Did Not Cause Plaintiffs Any
           Injury............................................................................................................... 9

II.    PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED ......................... 12

    A.    Plaintiffs Fail to Allege Antitrust Injury (Claims I & II) or a Restraint of Trade
           (Claim II) ....................................................................................................... 12

            1.    Claim I: Alleged Bid-Ask Spread Conduct ...................................... 13

            2.    Claim II: Alleged Coordination of Swiss Franc LIBOR Submissions ............. 13

    B.    Plaintiffs Lack Antitrust Standing (Claims I & II) ...................................... 14

    C.    Plaintiffs' Antitrust Claims Are Barred by the FTAIA (Claims I & II) .................... 17

    D.    Plaintiffs Have Not Alleged a Plausible Antitrust Conspiracy ................... 19

            1.    Plaintiffs Have Not Alleged a Plausible Conspiracy to Coordinate Bid-
                 Ask Spreads (Claim I)........................................................................ 19

i

**TABLE OF CONTENTS**
(continued)

**Page**

      2.    Plaintiffs Have Not Pled a Plausible Conspiracy to Coordinate Swiss Franc LIBOR Submissions (Claim II) ................................................................ 20

  E.   Plaintiffs' Antitrust Claims Are Time-Barred ........................................................ 25

III.   PLAINTIFFS' CEA CLAIMS SHOULD BE DISMISSED ............................................. 26

  A.   Plaintiffs' CEA Claims Are Time Barred ............................................................... 27

      1.    Plaintiffs Were on Inquiry Notice Before February 5, 2013 ............................. 28

      2.    Plaintiffs Fail to Plead Fraudulent Concealment ............................................. 29

  B.   Plaintiffs Lack Standing to Bring Claims for Alleged Manipulation of Swiss Franc LIBOR as a Commodity ............................................................................... 30

  C.   Plaintiffs Fail to State a Claim for Price Manipulation .......................................... 31

      1.    Plaintiffs Fail to Adequately Allege Proximate Causation ............................... 32

      2.    Plaintiffs Fail to Adequately Allege Specific Intent ........................................ 34

  D.   Plaintiffs Do Not Have Standing to Bring a Claim for Price Manipulation ............. 35

  E.   Plaintiffs Fail to State a Claim for Vicarious Liability or Aiding and Abetting ........ 37

IV.   PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED ........................................... 38

  A.   Plaintiffs Lack Standing to Assert a RICO Claim Because Their Alleged Injuries Are Too Remote and Speculative ............................................................ 38

  B.   Plaintiffs' RICO Claims Are Impermissibly Extraterritorial ................................... 39

  C.   Plaintiffs Fail to Plead Essential Elements of a RICO Claim .................................. 41

      1.    Plaintiffs Fail to Adequately Plead Predicate Acts of Racketeering with Respect to Each Defendant ............................................................................ 41

      2.    Plaintiffs Fail to Allege Any Fraudulent Scheme or the Existence of an Enterprise .................................................................................................... 43

  D.   Plaintiffs Fail to State a RICO Conspiracy Claim ................................................. 44

  E.   Plaintiffs' RICO Claims Are Time-Barred ........................................................... 45

**TABLE OF CONTENTS**
(continued)

**Page**

V.   PLAINTIFFS' UNJUST ENRICHMENT AND CONTRACT CLAIMS SHOULD
     BE DISMISSED ........................................................................................................ 45

CONCLUSION ................................................................................................................ 50

**TABLE OF AUTHORITIES**

<u>Page(s)</u>

Cases

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
No. 13-cv-981, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015)..........................................13, 14

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009) .......................................................................................47

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
483 U.S. 143 (1987)....................................................................................................................45

*Allen v. Wright*,
468 U.S.737 (1984) .....................................................................................................................10

*Allstate Ins. Co. v. Tanella*,
No. 11-cv-6364, 2012 WL 7188685 (E.D.N.Y. Aug. 28, 2012) ...............................................43

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ...................................................................................................13

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)....................................................................................................................14

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)....................................................................................................................12

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*,
155 F.3d 59 (2d Cir. 1998) .........................................................................................................13

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003) .........................................................................................................6

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................2, 12, 19, 23, 24, 33

*Boritzer v. Calloway*,
No. 10-cv-6264, 2013 WL 311013 (S.D.N.Y. Jan. 24, 2013) .............................................42, 43

*Cantor Fitzgerald Inc.* v. *Lutnick*,
313 F.3d 704 (2d Cir. 2002) .......................................................................................................48

*CFTC v. Erskine*,
512 F.3d 309 (6th Cir. 2008) ......................................................................................................26

# TABLE OF AUTHORITIES
## (continued)

<u>**Page(s)**</u>

*CFTC v. Fleury*,
    479 F. App'x 940 (11th Cir. 2012) ........................................................................ 26

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ................................................................................. 8

*Chanayil v. Gulati*,
    169 F.3d 168 (2d Cir. 1999) ................................................................................ 44

*Corcoran v. N.Y. Power Auth.*,
    202 F.3d 530 (2d. Cir. 1999) ............................................................................... 29

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005) ................................................................................ 14

*DiPlacido v. CFTC*,
    364 F. App'x 657 (2d Cir. 2009) ......................................................................... 32

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
    822 F.2d 1242 (2d Cir. 1987) .............................................................................. 42

*Elsevier Inc. v. W.H.P.R., Inc.*,
    692 F. Supp. 2d 297 (S.D.N.Y. 2010) ................................................................. 45

*European Cmty. v. RJR Nabisco, Inc.*,
    764 F.3d 129 (2d Cir. 2014) ................................................................................ 39

*Fadem v. Ford Motor Co.*,
    No. 02-cv-0680, 2003 WL 22227961 (S.D.N.Y. Sept. 25, 2003) ........................ 8

*FD Prop. Holding, Inc. v. U.S. Traffic Corp.*,
    206 F. Supp. 2d 362 (E.D.N.Y. 2002) ................................................................ 45

*Finn v. Barney*,
    471 F. App'x 30 (2d Cir. 2012) ........................................................................... 25

*Georgia Malone & Co. v. Rieder*,
    19 N.Y.3d 511 (2012) .......................................................................................... 48

*GICC Capital Corp. v. Tech. Fin. Grp., Inc.*,
    67 F.3d 463 (2d Cir. 1995) ................................................................................. 44

v

**TABLE OF AUTHORITIES**

(continued)

<u>Page(s)</u>

*Gordon v. Palumbo*,
    No. 07-cv-6624, 2009 WL 690647 (S.D.N.Y. Mar. 9, 2009)...................................... 39

*Hecht v. Commerce Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990) ...................................................................................... 44

*Hershey v. Energy Transfer Partners L.P.*,
    610 F.3d 239 (5th Cir. 2010) ................................................................................... 35

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    790 F. Supp. 2d 106 (S.D.N.Y. 2011) ..................................................................... 20

*Holmes v. Sec. Inv. Protection Corp.*,
    503 U.S. 258 (1992)............................................................................................. 38, 39

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    12 N.Y.3d 132 (2009)............................................................................................... 49

*In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth I*"),
    587 F. Supp. 2d 513 (S.D.N.Y. 2008) ..................................................................... 38

*In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth II*"),
    612 F. Supp. 2d 376 (S.D.N.Y. 2009) ..................................................................... 34

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*,
    No. 11-md-2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012)................................. 32, 34, 35

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) ....................................................................... 7

*In re Energy Transfer Partners Natural Gas Litig.*,
    No. 07-cv-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) ............................... 33

*In re Ind. Farm Bureau*,
    CFTC No. 75–14, 1982 WL 30249 (C.F.T.C. Dec. 17, 1982) ................................. 34

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) .................................................................................... 22

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    452 F. Supp. 2d 555 (D. Del. 2006)......................................................................... 19

## TABLE OF AUTHORITIES
(continued)

<u>**Page(s)**</u>

*In re Lehman Bros. Sec. & Erisa Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y 2010) ................................................................... 6, 8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"),
   935 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................. 13, 23, 26, 27, 31, 32, 34

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR II*"),
   962 F. Supp. 2d 606 (S.D.N.Y. 2013) ................................................................... 36, 37

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"),
   27 F. Supp. 3d 447 (S.D.N.Y. 2014) ..................................................................... 23, 47

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"),
   No. 11-md-02262, 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) ................................ 14, 23, 48

*In re Optical Disk Drive Antitrust Litig.*,
   No. 10-md-2143 WL 3894376 (N.D. Cal. Aug. 3, 2011) ........................................ 21

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
   541 F. Supp. 2d 487 (D. Conn. 2008) ................................................................... 21

*In re Platinum & Palladium Commodities Litig.*,
   828 F. Supp. 2d 588 (S.D.N.Y. 2011) ................................................................... 32, 34, 37

*In re Polaroid Corp. Sec. Litig.*,
   465 F. Supp. 2d 232 (S.D.N.Y. 2006) ................................................................... 27

*In re Rough Rice Commodity Litig.*,
   No. 11-C-618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012) ........................................ 35

*Invamed, Inc. v. Barr Labs., Inc.*,
   22 F. Supp. 2d 210 (S.D.N.Y. 1998) ..................................................................... 21

*Jerome M. Sobel & Co. v. Fleck*,
   No. 03-cv-1041, 2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) ................................ 44

*Johnson v. Nyack Hosp.*,
   86 F.3d 8 (2d Cir. 1996) ........................................................................................ 25

*Koch v. Christie's Int'l PLC*,
   785 F. Supp. 2d 105 (S.D.N.Y. 2011) ................................................................... 27, 29

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Kolbeck v. LIT Am., Inc.*,
   923 F. Supp. 557 (S.D.N.Y. 1996) ....................................................... 29

*Laydon v. Mizuho Bank Ltd.*,
   No. 12-cv-3419, Dkt. No. 491 (S.D.N.Y. July 24, 2015) ........................ 40

*Laydon* v. *Mizuho Bank, Ltd.*,
   No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)................. 13, 14, 16

*Laydon v. Mizuho Bank, Ltd.*,
   No. 12-cv-3419, 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015)................. 39, 40

*LC Capital Partners v. Frontier Ins. Grp., Inc.*,
   318 F.3d 148 (2d Cir. 2003) ................................................................. 27

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*,
   753 F.3d 395 (2d Cir. 2014) ................................................................ 17, 18

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)............................................................................... 6

*Malmsteen* v. *Berdon, LLP*,
   477 F. Supp. 2d 655 (S.D.N.Y. 2007) .................................................. 46

*Mayfield v. British Bankers' Ass'n*,
   No. 14-cv-4735, Dkt. No. 6 (S.D.N.Y. July 22, 2014) ............................ 13

*Mayor of Balt. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ................................................................. 19, 23

*McLafferty v. Deutsche Lufthansa A.G.*,
   No. 08-cv-1706, 2009 WL 3365881 (E.D. Pa. Oct. 16, 2009) ................ 18, 19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*,
   No. 91-cv-2923, 1994 WL 88129 (S.D.N.Y. Mar. 15, 1994)................... 41, 42

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993) ................................................................ 41, 42

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010)............................................................................. 31

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*,
    420 F. Supp. 2d 253 (S.D.N.Y. 2006) ............................................................... 45

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*,
    392 F.3d 520 (2d Cir. 2004) ............................................................................... 46

*Pappas* v. *Tzolis*,
    20 N.Y.3d 228 (2012) ......................................................................................... 49

*Paradigm Contract Mgmt. Co.* v. *St. Paul Fire & Marine Ins. Co.*,
    No. 10-cv-211, 2011 WL 4348132 (D. Conn. Sept. 16, 2011).............................. 48

*Petróleos Mexicanos v. Sk Eng'g & Constr. Co.*,
    572 F. App'x 60 (2d Cir. 2014) .......................................................................... 39

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    658 F. Supp. 2d 299 (D. Mass. 2009), *aff'd in relevant part and vacated in part*,
    632 F.3d 762 (1st Cir. 2011) ............................................................................... 9

*Pricaspian Dev. Corp.* v. *Total S.A.*,
    397 F. App'x 673 (2d Cir. 2010) ........................................................................ 49

*Reading Indus., Inc.* v. *Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980) ........................................................................... 16, 34

*Sanner v. Bd. of Trade*,
    62 F.3d 918 (7th Cir. 1995) ................................................................................. 6

*Sierra Club v. Morton*,
    405 U.S. 727 (1972)............................................................................................. 7

*Tatum v. Legg Mason Wood Walker, Inc.*,
    83 F.3d 121 (5th Cir. 1996) ............................................................................... 37

*Tomlinson v. Goldman, Sachs & Co.*,
    682 F. Supp. 2d 845 (N.D. Ill. 2009),
    *aff'd in relevant part*, 648 F.3d 533 (7th Cir. 2011 ) ......................................... 29

*Town of West Hartford v. Operation Rescue*,
    915 F.2d 92 (2d Cir. 1990) ................................................................................ 41

*U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*,
    303 F. Supp. 2d 432 (S.D.N.Y. 2004) .......................................................... 41, 44

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States ex rel. Smith v. N.Y. Presbyterian Hosp.*,
  No. 06-cv-4056, 2007 WL 2142312 (S.D.N.Y. July 18, 2007)................................. 47

*United States v. Bari*,
  599 F.3d 176 (2d Cir. 2010) ............................................................................. 8

*United States v. Guadagna*,
  183 F.3d 122 (2d Cir. 1999) ............................................................................ 43

*United States v. Pierce*,
  224 F.3d 158 (2d Cir. 2000) ..................................................................... 41, 43

*United States v. Stitsky*,
  536 F. App'x 98, (2d Cir. 2013) ...................................................................... 43

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
  857 F.2d 55 (2d Cir. 1988) ............................................................................. 14

*Weaver v. James*,
  No. 10-cv-6609, 2011 WL 4472062 (S.D.N.Y. Sept. 27, 2011) ............................ 42

*Williams v. Citigroup, Inc.*,
  No. 08-cv-9208, 2009 WL 3682536 (S.D.N.Y. Nov. 2, 2009),
  *aff'd in part, vacated in part on other grounds*, 433 F. App'x 36 (2d Cir. 2011) ................. 23

*Woori Bank* v. *Merrill Lynch*,
  923 F. Supp. 2d 491 (S.D.N.Y. 2013), *aff'd*, 542 F. App'x 81 (2d Cir. 2013)....................... 48

*Zenith Radio Corp. v. Hazeltine Research Inc.*,
  401 U.S. 321 (1971).......................................................................................... 25

**Statutes**

15 U.S.C. § 15b.................................................................................................. 25

15 U.S.C. § 6a.............................................................................................. 12, 17

18 U.S.C. § 1962(a)–(c)..................................................................................... 41

18 U.S.C. § 1964(c) .......................................................................................... 38

7 U.S.C. § 1(a)(19)............................................................................................ 26

**TABLE OF AUTHORITIES**
(continued)

<u>**Page(s)**</u>

7 U.S.C. § 13(a)(2) ............................................................................................ 31

7 U.S.C. § 25(a)(1) ............................................................................................ 35

7 U.S.C. § 25(a)(1)(D)(ii) .................................................................................. 30

7 U.S.C. § 25(c) ................................................................................................. 27

N.Y. C.P.L.R. § 202 .......................................................................................... 48

N.Y. C.P.L.R. § 213(2) ...................................................................................... 48

N.Y. C.P.L.R. § 214(3) ...................................................................................... 48

**Rules**

Fed. R. Civ. P. 12(b)(1) ....................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 1

Fed. R. Civ. P. 8(a) ........................................................................................... 32

Fed. R. Civ. P. 9(b) .................................................................. 32, 34, 41, 42, 43

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the claims brought by Plaintiffs in the Amended Class Action Complaint ("Amended Complaint" or "Am. Compl.") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)  and for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[1]

## PRELIMINARY STATEMENT

Despite the potential complexity of the financial products at issue and the broad and lengthy allegations of the Amended Complaint, this case is actually quite simple.  While Plaintiffs allege that Defendants coordinated their Swiss Franc LIBOR submissions and conspired to manipulate the bid-ask spread for Swiss Franc LIBOR-referencing derivatives, the products they actually claim to have bought and sold were neither priced, benchmarked nor even settled based on Swiss franc LIBOR.  Because of this, Plaintiffs have not suffered an injury-in-fact and do not have Article III standing to bring any of the claims they assert in the Amended Complaint.

Even if Plaintiffs had Article III standing—which they do not—each of their nine claims would be subject to dismissal for the following additional reasons, among others.

---

[1]  This memorandum of law is submitted on behalf of Defendants Credit Suisse Group AG and Credit Suisse AG (collectively, "Credit Suisse"), Deutsche Bank AG and DB Group Services UK Limited (collectively, "Deutsche Bank"), JPMorgan Chase & Co. ("JPMorgan"), The Royal Bank of Scotland PLC ("RBS"), and UBS AG ("UBS").

Certain foreign bank defendants are concurrently moving this Court to dismiss claims asserted against them for a lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  By submitting this memorandum of law, these defendants do not submit to the personal jurisdiction of this Court, and expressly reserve their rights to challenge the exercise of personal jurisdiction.

*First*, the antitrust claims should be dismissed because—as four judges of this Court have now held—LIBOR-setting was an inherently cooperative process and not a competitive one; as a result, Plaintiffs do not allege any impact on competition, the key requirement of any antitrust claim. Plaintiffs' antitrust claims are also precluded by the statute of limitations and are impermissibly extraterritorial. Plaintiffs concede that the allegedly artificial submissions were all made outside of the United States for aggregation into Swiss franc LIBOR rates published by a British trade association in London. Similarly, the European Commission Settlement regarding the alleged coordination of bid-ask spreads related only to the European Economic Area. Plaintiffs also fail to plead a plausible conspiracy as required under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

*Second*, the CEA claims are time-barred. At a minimum, UBS's publicly announced settlements with the U.S. Department of Justice ("DOJ") and the U.S. Commodity Futures Trading Commission ("CFTC")—which are cited repeatedly in the Amended Complaint—put Plaintiffs on inquiry notice well over two years before they filed their first complaint. The claims should also be dismissed because Plaintiffs have not adequately alleged that Defendants had the specific intent to manipulate Swiss franc futures or that they suffered an actual injury from Defendants' conduct. Nor have Plaintiffs alleged facts that would give them standing to bring their CEA claims.

*Third*, as with the antitrust claims, the RICO claims should be dismissed because they are barred by the statute of limitations, are impermissibly extraterritorial, and Plaintiffs lack standing as their alleged injuries are far too remote and speculative. Further, Plaintiffs have not alleged, as they must to survive a motion to dismiss, that Defendants participated in a scheme that was

directed from (or to) the United States.  Nor have Plaintiffs pled that each defendant engaged in the requisite predicate acts (here, wire fraud).

*Fourth,* the state law claims for breach of the implied covenant of good faith and fair dealing and for unjust enrichment should be dismissed because Plaintiffs offer no legally sufficient basis to conclude that Defendants' alleged conduct directly and proximately caused a breach of contract or unjustly enriched Plaintiffs.  The unjust enrichment claim is also time-barred.

For these reasons, similar claims related to alleged manipulation of U.S. dollar LIBOR, Yen LIBOR, and Euroyen TIBOR have been dismissed after careful and thoughtful analysis by four separate judges of this Court.  This Court should do the same and dismiss the Amended Complaint in its entirety.

## FACTUAL ALLEGATIONS

### A.    Defendants and the LIBOR Process

Defendants are several banks and affiliated entities, and one brokerage firm.  Certain bank defendants were part of a group of twelve banks designated by the British Bankers' Association ("BBA") to contribute submissions used in the determination of Swiss franc LIBOR.[2]  Am. Compl. ¶ 70.  Swiss franc LIBOR is an interest rate benchmark .  *Id.*  ¶ 69.  As directed by the BBA in London, each panel bank submits the hypothetical rate of interest at

---

[2]  JPMorgan Chase & Co. is a financial holding company that was never a member of the panel of banks that submitted or contributed to Swiss franc LIBOR, though its affiliate was a panel bank.  Similarly, Credit Suisse Group AG is a financial holding company that was never a member of the panel of banks that submitted or contributed to Swiss franc LIBOR, though its affiliate, Credit Suisse AG, was a panel bank.   DB Group Services UK Limited is a services company that was never a member of the panel of banks that submitted or contributed to Swiss franc LIBOR, though it is an indirectly-held subsidiary of Deutsche Bank AG, which was a panel bank.

which it believes it can borrow unsecured funds denominated in Swiss francs in a "reasonable market size" from other banks in the London interbank market.  *Id.* ¶ 71.  Each panel bank submits interest rate quotes for 15 different "tenors," reflecting the duration or maturity of the loan.  *Id.* ¶ 72.  The 15 tenors range from overnight to 12 months.  *Id.*

Thomson Reuters, acting as an agent for the BBA, collects the submissions for each tenor and calculates Swiss franc LIBOR by averaging the middle half of the submissions.  *Id.* ¶ 73.  It then publishes the average as the daily Swiss franc LIBOR for each tenor.  *Id.*  All of this is done from London.  A separate Swiss franc LIBOR is published for each of the 15 tenors.  *Id.*  ¶ 73.

### B.    Swiss Franc LIBOR Financial Instruments

Plaintiffs conclusorily refer to a wide swath of over-the-counter financial instruments, such as interest rate swaps, forward rate agreements ("FRA"), foreign exchange ("FX") forwards, cross-currency swaps, overnight index swaps, and tenor basis swaps, and exchange-traded futures and options, under the convenient umbrella term of "Swiss franc LIBOR-based derivatives."  *Id.*  ¶ 75.  This, however, obscures important distinctions between these financial products, some of which do not reference LIBOR whatsoever.  For example, certain interest rate swaps and FRAs are priced and settled by direct reference to Swiss franc LIBOR.  With interest rate swaps, the parties can agree that the interest rate used in the swap will be linked to LIBOR.  *See id.* ¶ 82.  Plaintiffs do not allege that they traded any of these instruments.  Instead, they claim to have bought and sold FX forwards and futures, *id.* ¶¶ 20-27, which are "agreements to buy or sell a certain amount of Swiss francs in terms of another currency*, e.g.*, U.S. dollars, on some future date."  *Id.* ¶ 87.  In other words, two parties enter into a contract to exchange a specified amount of Swiss francs for U.S. dollars (or another currency) at a set date in the future. The exchange rate agreed to at the time of the contract is not linked to Swiss franc LIBOR, and

any changes thereafter in Swiss franc LIBOR do not alter the terms or payments under the contract.

### C.      Defendants' Alleged Conduct

Plaintiffs allege that, for at least ten years, Defendants "conspired to rig the global market for foreign exchange and interest rate derivatives that were priced, benchmarked, and/or settled based on Swiss franc LIBOR." *Id.* ¶ 1.  Plaintiffs allege that Defendants "coordinated their manipulation" in two ways:  "by (1) fixing the bid-ask spread on Swiss franc LIBOR-based derivatives; and (2) manipulating Swiss franc LIBOR." *Id.* ¶ 90.

#### 1.      Bid-Ask Spread Allegations

Plaintiffs allege that five Defendants conspired to fix bid-ask spreads for a five-month period between May and September 2007. *Id.* ¶ 92.  These allegations are based solely on an October 21, 2014 settlement between the European Commission ("EC") and these Defendants, which related to interest rate swaps and FRAs, and not to the FX forwards and futures Plaintiffs allegedly traded. *See* id. ¶¶ 91-98.   A "bid-ask spread" is the difference between the price at which a market maker is willing to sell (the ask price) and buy (the bid price) a given derivative. A market maker therefore generally profits from a wider bid-ask spread, because a wider spread allows the market maker to buy products at a lower bid price and sell products at a higher ask price. *Id.* ¶ 94.  The alleged purpose of this conspiracy was "to quote wider, fixed bid-ask spreads to all non-members for over-the-counter Swiss franc LIBOR-based derivatives, while agreeing to maintain a narrower bid-ask spread for trades amongst themselves." *Id.* ¶ 93.

#### 2.      Swiss Franc LIBOR Allegations

Plaintiffs allege that seven Defendants coordinated their Swiss franc LIBOR submissions. *Id.* ¶ 99.  The alleged purpose of the conduct was to benefit the individual Defendants' own trading positions. *Id*.

<u>ARGUMENT</u>

**I.     PLAINTIFFS DO NOT HAVE STANDING TO BRING ANY OF THEIR ALLEGED CLAIMS BECAUSE THERE IS NO INJURY-IN-FACT**

Under Article III of the Constitution, a party must demonstrate standing to satisfy the "case or controversy" requirement necessary to the exercise of judicial power. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559-60 (1992). "To establish Article III standing, a plaintiff must therefore allege, and ultimately prove, that he has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003). Here, Plaintiffs cannot meet that burden because the conduct they challenge—principally the alleged manipulation of Swiss franc LIBOR and the bid-ask spread of certain Swiss Franc LIBOR derivatives—would not and could not have affected the financial products Plaintiffs allegedly purchased. Because any damages Plaintiffs may have suffered are "not clearly attributable" to Defendants' conduct, Plaintiffs lack standing and all of the claims in the Amended Complaint should be dismissed. *Sanner v. Bd. of Trade*, 62 F.3d 918, 923 (7th Cir. 1995) (dismissing claims where plaintiffs' sales of soybeans were not clearly attributable to a resolution passed by the Chicago Board of Trade).

**A.     The Products Plaintiffs Allegedly Bought or Sold Are Not Linked to Swiss Franc LIBOR**

Plaintiffs allege that Swiss franc LIBOR-based derivatives include several different types of financial products. Am. Compl. ¶ 75. To have standing to bring their claims, however, Plaintiffs must allege that they themselves bought or sold the derivatives that they allege were affected by Defendants' purported conduct. They have not done so. *In re Lehman Bros. Sec. & Erisa Litig.*, 684 F. Supp. 2d 485, 490 (S.D.N.Y 2010) ("As no named plaintiff has alleged that he or she purchased Certificates in any of the other eighty-five offerings, none can have been

injured with respect to those offerings.  None, therefore, has standing to bring claims with respect to these offerings."); *see also Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) (explaining that the "'injury in fact' test requires . . . that the party seeking review be himself among the injured.").

A careful review of the 100-plus page Amended Complaint reveals that Plaintiffs allegedly bought or sold only *two types* of Swiss franc financial instruments:  Swiss franc FX forwards and Swiss franc currency futures contracts traded on the Chicago Mercantile Exchange ("CME").[3]  *See* Am Compl. ¶¶ 20-37.  The reason Plaintiffs gloss over this critical fact and attempt to lump these foreign exchange products with derivatives that actually do reference Swiss franc LIBOR is obvious:  The two products Plaintiffs claim that they bought and sold (*i.e.*, FX forwards and futures) are not linked to Swiss franc LIBOR, and thus under no set of facts could Plaintiffs have been injured by any alleged manipulation of Swiss franc LIBOR.

### B.      The Alleged Bid-Ask Spread Conduct Did Not Cause Plaintiffs Any Injury

Plaintiffs allege that five Defendants conspired to fix the bid-ask spread for Swiss franc LIBOR-based derivatives for a brief five-month period between May and September 2007.  Am. Compl.  ¶ 92.  Plaintiffs premise their allegations related to the bid-ask spread conduct exclusively on a single source—a *press release* regarding an EC settlement.  Am. Compl.  ¶¶ 91-96.  But nowhere does the EC's press release say that Defendants' conduct affected—or was even directed at—the FX forwards and futures Plaintiffs allegedly bought and sold.  Press Release,

---

[3]  To the extent that Plaintiffs conclusorily allege that they traded other unspecified "Swiss franc LIBOR-based derivatives," *see*, *e.g.*, Am. Comp. ¶ 21, their allegations fail to satisfy basic pleading standards.  Plaintiffs fail to provide any details about what kind of instruments were transacted, when these positions were entered into, what parties were involved, what prices the positions were entered into at, or in what way the positions were impacted by any purported artificiality in Swiss franc LIBOR.  *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 402-05 (S.D.N.Y. 2011).

European Comm'n, *Antitrust: Commission Settles Cartel on Bid-Ask Spreads Charged on Swiss franc Interest Rate Derivatives; Fines Four Major Banks €32.3 Million*, (Oct. 21, 2014), http://europa.eu/rapid/press-release_IP-14-1190_en.htm ("EC Press Release") (Sullivan Decl. Ex. 1).[4]  Rather, the press release states the conduct was directed only at "certain categories of short term over-the-counter Swiss franc interest rate derivatives," *id.,* which the EC Statement of Decision specifies was "limited" to only three derivatives:  FRAs, overnight indexed swaps, and interest rate swaps.  European Commission Decision at 5-6, Case AT.39924, *Swiss Franc Interest Rate Derivatives (Bid Ask Spread Infringement)* (Oct. 21, 2014), http://ec.europa.eu/competition/antitrust/cases/dec_docs/39924/39924_1156_3.pdf ("EC Bid-Ask Statement of Decision") (Declaration of Peter Sullivan ("Sullivan Decl."), Ex. 2).[5]  But as explained above, Plaintiffs do not allege that they bought or sold any of these three types of interest rate derivatives.

Plaintiffs do not—and cannot—plausibly allege that the coordination of bid-ask spreads for these three interest rate derivatives had any impact on the bid-ask spreads for Swiss franc FX forwards or futures.  Thus, any alleged harm related to Plaintiffs' transactions in those financial products is not fairly traceable to Defendants' alleged bid-ask spread conduct.  *In re Lehman Bros. Sec. & Erisa Litig.*, 684 F. Supp. 2d at 490 (dismissing claims regarding products plaintiffs

---

[4]  Where, as here, plaintiffs rely on secondary sources in their pleadings, defendants may rely upon them in moving to dismiss, whether or not they are attached to the Amended Complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[5]  "A court may take judicial notice … of a fact that is not subject to reasonable dispute in that it is … capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (internal quotation marks omitted).  This is particularly appropriate here, where Plaintiffs rely on a press release, and the underlying document referred to in the press release is publicly available.  *Fadem v. Ford Motor Co.*, No. 02-cv-0680, 2003 WL 22227961, at *2 (S.D.N.Y. Sept. 25, 2003).

did not purchase for lack of standing); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,* 658 F. Supp. 2d 299, 303 (D. Mass. 2009) (same), *aff'd in relevant part and vacated in part*, 632 F.3d 762 (1st Cir. 2011).

Further, Defendants Deutsche Bank and BlueCrest Capital were neither parties to the EC bid-ask settlement, nor mentioned in it, and, for this reason alone, all claims relating to alleged "bid-ask" spread conduct should be dismissed as to them.

### C. The Alleged Swiss Franc LIBOR Conduct Did Not Cause Plaintiffs Any Injury

Plaintiffs next assert that they were injured by Defendants' alleged manipulation of Swiss franc LIBOR.  This argument cannot save the Amended Complaint from dismissal because the prices of Swiss franc FX forwards and futures traded on the CME were not linked to Swiss franc LIBOR.

Plaintiffs concede that the FX forwards and futures they bought or sold were not settled by reference to Swiss franc LIBOR or any other interest rate benchmark.  Am. Compl. ¶¶ 76-79, 87.  Plaintiffs acknowledge—as they must—that these products are simply "agreements to buy or sell a certain amount of Swiss francs in terms of another currency, *e.g.*, U.S. dollars, on some future date."  Am. Compl. ¶ 87.  That is, the parties transacting in these products agree to exchange Swiss francs for U.S. dollars (or some other currency) in the future at an exchange rate agreed upon at the time of the contract.

Recognizing this fatal flaw, Plaintiffs point to a generic "industry standard formula" found in a basic FX futures tutorial published by the CME in April 2013 (almost a year and a half *after* the end of the purported Class Period).  Am. Compl. ¶ 87 (citing John W. Labuszewski, Sandra Ro & David Gibbs, CME Grp., *Understanding FX Futures* 3, 8 (Apr. 22, 2013), http://www.cmegroup.com/education/files/understanding-fx-futures.pdf  (the "CME

Publication") (Sullivan Decl. Ex. 3)).  Plaintiffs allege that this generic formula was used by market participants to price all Swiss franc forwards and futures traded on the CME during the entire eleven-year Class Period.  Am. Compl. ¶ 87-88.  This is not only implausible and entirely unsupported, it is demonstrably wrong, for several reasons.

First, while the generic formula uses a variable interest rate as one of its inputs, Plaintiffs fail to identify a single text, publication, or other authority to support their allegation that the formula "incorporates Swiss franc LIBOR" as the interest rate.  Am. Compl.  ¶ 86-87.  Indeed, the CME Publication from which Plaintiffs take the formula does not even mention LIBOR, let alone state that Swiss franc LIBOR was used in the formula.[6]

Second, Plaintiffs do not allege that any Defendant (let alone all of them) actually used this generic formula to price the FX forwards and futures that they bought and sold or, perhaps more importantly, that Plaintiffs themselves ever used or relied on the generic formula.  See Allen v. Wright, 468 U.S.737, 759 (1984) (holding that Article III's traceability requirement requires that a plaintiff be able to establish "links in the chain of causation" between the complained of injury and the challenged conduct).

Third, the generic formula uses an interest rate for a period of time equal to the duration of the specific FX forward or future at issue.  CME Publication at 3.  Therefore, for Swiss franc LIBOR to be used in the generic formula to price the instruments Plaintiffs bought or sold, the instruments would have to have a maturity equal to one of the tenors that is set for Swiss franc LIBOR.  But while Swiss franc LIBOR is set for fifteen tenors—overnight, one week, two week,

---

[6]   What is more, Plaintiffs themselves acknowledge that other interest rate benchmarks, such as one compiled by Bloomberg L.P. from actual money market transactions, are also widely used in the market.  Am. Compl. ¶ 181. But Plaintiffs offer no plausible explanation why market participants would not have used the Bloomberg benchmark (or any other alternative benchmark) in the generic formula as opposed to Swiss franc LIBOR.

one month, two month, three month, four month, five month, six month, seven month, eight month, nine month, ten month, eleven month and one year, Am. Compl. ¶ 72—none of the transactions alleged in the Amended Complaint has a maturity that is equal to any of these tenors.[7]  As such, even if the generic formula were used as alleged by Plaintiffs, it would be impossible for Swiss franc LIBOR to be the interest rate used in the formula to price Plaintiffs' transactions.

*Fourth*, the CME Publication in which the formula is found concedes that it is only a generic formula and is not always used to price actual FX forwards.  *CME Publication* at 3.  The CME Publication states that the price calculated using the formula may be different than the prevailing price by "some margin."  *Id.*  But if this formula was always used by all market participants, as Plaintiffs contend, there would never be a difference between the price generated by the formula and actual market prices.

*Finally*, other CME publications establish that prices for FX futures are negotiated between the parties and are not standardized by using a generic formula:  "a futures contract is facilitated through a futures exchange and is standardized according to quality, quantity, delivery time and place.  The only remaining variable is price, which is discovered through an auction-like process that occurs on the Exchange trading floor or via CME Globex, CME Group's electronic trading platform."  CME Grp., *A Trader's Guide to Futures, Thought Leadership with*

---

[7]  Plaintiffs only allege four sets of transactions.  Three of these transactions have maturities of 4, 42, and 77 days.  Am. Compl. ¶¶ 199, 204, 212.  The maturity of the fourth transaction is unclear as FrontPoint European appears to claim in error to have entered into a FX forward on October 21, 2008 for delivery on June 18, 2008.  Am. Compl. ¶ 208.  However, even assuming the transaction and delivery dates are reversed, this transaction has a maturity of four months and three days.

*Global Perspective* 4 (2013), http://www.cmegroup.com/education/files/a-traders-guide-to-futures.pdf (Sullivan Decl. Ex. 4).

## II.   PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED

Plaintiffs assert two separate Sherman Act claims relating to two distinct types of alleged conduct.  Claim I is premised on four Defendants' 2014 settlement with the EC relating to "bid-ask" spreads, *see* Am. Compl. ¶¶ 235-43, and Claim II is premised on allegations of coordination of Swiss franc LIBOR submissions, s*ee id.* ¶¶ 244-51.  Each of these claims fails for four independent reasons:

*First*, Plaintiffs have identified no injury they suffered flowing from a reduction in competition (and, with respect to Claim II, Plaintiffs have further failed to allege even a restraint of trade).  *Second*, even if Plaintiffs alleged antitrust injury—which they have not—the connection between the products Plaintiffs claim to have bought and sold and Defendants' purported conduct is so indirect and attenuated that Plaintiffs lack antitrust standing.  *Third*, Plaintiffs' antitrust claims are impermissibly extraterritorial under the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, and thus do not give rise to claims under the Sherman Act.  *Fourth*, Plaintiffs fail to plead a plausible conspiracy in restraint of trade among all Defendants.  *See generally Twombly*, 550 U.S. 544.

### A.   Plaintiffs Fail to Allege Antitrust Injury (Claims I & II) or a Restraint of Trade (Claim II)

Both of Plaintiffs' antitrust claims should be dismissed because they allege no antitrust injury—an injury flowing "from a competition-*reducing* aspect or effect of the defendant[s'] behavior."  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

### 1.   Claim I: Alleged Bid-Ask Spread Conduct

Plaintiffs' first antitrust claim is based entirely on a settlement with the EC relating to coordination of bid-ask spreads for FRAs, overnight indexed swaps, and interest rate swaps, none of which Plaintiffs allegedly bought or sold.  Accordingly, Plaintiffs have not alleged an injury "in the market where competition is being restrained" and have therefore failed to plead injury-in-fact, much less antitrust injury.  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999); *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 79 (2d Cir. 1998) (plaintiffs must be participants in same market as defendants to allege antitrust injury)

### 2.   Claim II: Alleged Coordination of Swiss Franc LIBOR Submissions

The legal theory underlying Plaintiffs' second antitrust claim—that coordination among panel banks regarding their LIBOR submissions restrained competition and caused Plaintiffs an injury cognizable under the Sherman Act (*see* Am. Compl. ¶¶ 122-39)—has already been considered and rejected by four judges of this Court.[8]  Those decisions recognized that LIBOR-setting was not a competitive process; "[r]ather, it was a cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs to the BBA each day to facilitate the BBA's calculation of an interest rate index."  *LIBOR I*, 935 F. Supp. 2d at

---

[8]   *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666, 687-95 (S.D.N.Y. 2013) (Buchwald, J.); *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *7-*8 (S.D.N.Y. Mar. 28, 2014) (Daniels, J.); *Mayfield v. British Bankers' Ass'n*, No. 14-cv-4735, Dkt. No. 6, slip op. at 4-5 (S.D.N.Y. July 22, 2014) (Preska, J.); *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, No. 13-cv-981, 2015 WL 1514539, at *14-*20 (S.D.N.Y. Mar. 31, 2015) (Gardephe, J.).  Although Plaintiffs' claims here relate to Swiss franc LIBOR, and the decided cases relate to USD LIBOR, Yen LIBOR, and Euroyen TIBOR, each of these interbank offered rates is calculated in a functionally identical manner, and each is susceptible to the same analysis under Section 1 of the Sherman Act.  *Compare, e.g.*, Am. Compl. ¶¶ 69-74, *with Laydon*, 2014 WL 1280464, at *1.

688; *see also, e.g., 7 W. 57th St.*, 2015 WL 1514539, at \*19.  Judge Buchwald recently reiterated

this holding, after a second careful analysis, finding that "plaintiffs' injuries [from alleged

LIBOR manipulation] are not of the sort that stem from anti-competitive conduct."  *In re LIBOR-*

*Based Fin. Instruments Antitrust Litig. ("LIBOR IV")*, No. 11-md-02262, 2015 WL 4634541, at

\*82–\*83 (S.D.N.Y. Aug. 4, 2015).  As such, Claim II should be dismissed because not only have

Plaintiffs failed to allege antitrust injury, *see, e.g., id.*, they have failed to allege any restraint of

trade whatsoever, *see Laydon*, 2014 WL 1280464, at \*10-\*12.

### B.      Plaintiffs Lack Antitrust Standing (Claims I & II)

Plaintiffs' Sherman Act claims should also be dismissed because their alleged injury is

too remote and speculative to allow them to be "efficient enforcer[s] of the antitrust laws," and

they therefore lack antitrust standing.  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443

(2d Cir. 2005) (internal quotation marks omitted).  In determining whether a plaintiff would be

an efficient enforcer of the antitrust laws, courts consider factors including "the directness or

indirectness of the asserted injury" and "the speculativeness of the alleged injury."  *Volvo N. Am.*

*Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988) (quoting *Associated*

*Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540-45 (1983)).

These factors weigh decisively in favor of dismissing Plaintiffs' antitrust claims.

As an initial matter, as explained above, Plaintiffs do not claim to have bought or sold the

products related to the alleged bid-ask spread conduct—rendering any connection to their alleged

FX forwards and futures not merely indirect, but nonexistent.

Further, to the extent there is any relationship at all between Defendants' alleged

manipulation of Swiss franc LIBOR submissions and Plaintiffs' purported injuries, it is too

indirect to support a claim under the Sherman Act.  Plaintiffs allege that a generic formula was

used to price the FX forwards and futures they bought and sold, but as explained above, contrary

14

to Plaintiffs' assertions that Swiss franc LIBOR is "incorporate[d]" into the formula, the formula does not reference LIBOR at all.  The formula does, however, include multiple other independent variables, such as the spot exchange rate, the short-term interest rate applicable to the other currency, and the number of days until the FX forward or future settlement date.  *See* Am. Compl. ¶ 87 fig. 1; *CME Publication* at 3-4.  Each of these variables is a separate link in the causal chain, making the relationship between the alleged conduct and Plaintiffs' purported injury all the more remote.  Another link is market actors' *expectations* regarding future interest rates, which Plaintiffs allege play a role in determining whether to enter into an FX forward or future.  *See id.* ¶ 84 (describing hypothetical FX forward transaction motivated by "an *expected* move in [CHF] LIBOR that [allegedly] increases the value of that currency" (emphasis added)).  Yet another link is the process by which purportedly artificial Swiss franc LIBOR submissions of the panel bank Defendants may (or may not) impact the calculation of the published Swiss franc LIBOR rate.[9]

In total, there are at least nine discrete links between the alleged conduct and Plaintiffs' purported injury, which together make the causal relationship too attenuated to confer antitrust standing:  (1) the allegedly artificial submissions by multiple banks, (2) the spot exchange rate between two currencies, (3) the interest rates applicable to the other currency in the transaction, (4) the maturity of the FX forward or future in question, (5) market actors' expectations of future interest rates and foreign exchange rates, (6) the respective impact of allegedly artificial and untainted submissions on the Swiss franc LIBOR rate, (7) the relative effect of each individual

---

[9]  Panel Bank Defendants allegedly comprised only 42% of the Swiss franc LIBOR panel.  *See* Am. Compl. ¶ 5.  Accepting Plaintiffs' theory, this means that their trading positions should also have been affected by the submissions of the remaining 58% of panel banks, an additional link in the alleged causal chain.

tenor of the Swiss franc LIBOR rate on Plaintiffs' FX forward and futures, (8) the impact of alleged bid-ask spread coordination in the Swiss franc interest derivatives market on those positions, and (9) the Swiss franc LIBOR submissions of panel banks that are not named as defendants.  Plaintiffs are seeking precisely the sort of complex investigation into the actions and motives of multiple third parties and the effects of intervening market variables that the antitrust standing doctrine is intended to avoid.  *See, e.g.*, *Reading Indus., Inc.* v. *Kennecott Copper Corp.*, 631 F.2d 10, 13-14 (2d Cir. 1980); *Laydon*, 2014 WL 1280464, at *9 (Plaintiffs lacked antitrust standing where they alleged "a causal chain with at least four discrete links").

Finally, Plaintiffs' injuries are too speculative to support antitrust standing.  "Analysis of Plaintiff[s'] injury would require the reconstruction of hypothetical 'but-for' [Swiss franc LIBOR] benchmark rates"—*i.e.*, what Swiss franc LIBOR *would have been* absent purported manipulation—"during the period Plaintiff[s] held [their] positions," and then require the Court to "hypothesize the impact of these 'but-for' benchmark rates on the perceptions of the market participants whose activities would have influenced" the prices of Plaintiffs' FX forwards and futures.  *Laydon*, 2014 WL 1280464, at *10.  But Swiss franc LIBOR submissions are *estimates* of the rates at which panel banks could borrow unsecured Swiss francs in a reasonable market size just prior to 11:00 a.m. London time—they are not premised upon any actual transactions. *See* Am. Compl. ¶ 71.  As such, the Court would be placed in the position of trying to reconstruct multiple submissions for up to *fifteen* separate tenors of Swiss franc LIBOR for each day of the eleven-year class period, and then determine the impact of those hypothetical submissions *and* the other relevant market factors Plaintiffs have alleged—including spot exchange rates and prevailing interest rates for other currencies—on the perceptions of buyers and sellers of FX

forwards and futures.  As Plaintiffs' alleged injuries are extremely remote and speculative,

Plaintiffs lack antitrust standing, and their Sherman Act claims should be dismissed.

### C.     Plaintiffs' Antitrust Claims Are Barred by the FTAIA (Claims I & II)

Plaintiffs' antitrust claims are also barred by the FTAIA, which prohibits application of

Section 1 of the Sherman Act to foreign conduct unless it has a "direct, substantial, and

reasonably foreseeable effect" on U.S. trade or commerce.  15 U.S.C. § 6a.  Plaintiffs fail to

plausibly allege that any alleged manipulation of bid-ask spreads or Swiss franc LIBOR

submissions to the BBA in London had a direct effect on U.S. trade or commerce.  *See Lotes*

*Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 404, 413-14 (2d Cir. 2014).

To demonstrate the "directness" required by the FTAIA, a plaintiff must allege that the

challenged foreign conduct had a "reasonably proximate causal nexus" to an alleged domestic

effect, a test "addressing antitrust law's classic aversion to remote injuries."  *Id.* at 411.  But as

explained above, the connection between Plaintiffs' alleged injury and Defendants' alleged

conduct is, at best, extremely remote, depending upon a highly attenuated chain of causation.

The EC Statements of Decision explicitly relate to conduct in and effect on the European

Economic Area, not the U.S.[10]  Further, the allegedly artificial Swiss franc LIBOR submissions

were all made outside of the United States, for aggregation into the Swiss franc LIBOR rates

---

[10]   *See* EC Bid-Ask Statement of Decision 10, ¶ 36 (stating that the conduct at issue was related to "the ST OTC
CHIRD sector within the EEA [European Economic Area].") (Sullivan Decl. Ex. 2); European Commission
Decision, Case AT.39924, *Swiss Franc Interest Rate Derivatives (CHF LIBOR)*, at 9, ¶ 33 (Oct. 21, 2014),
http://ec.europa.eu/competition/antitrust/cases/dec_docs/39924/39924_1155_4.pdf ("EC CHF LIBOR
Statement of Decision") (stating that the conduct at issue was related to "the CHIRD sector within the EEA.")
(Sullivan Decl. Ex. 5).

published by the BBA in London.  *See* Am. Compl. ¶ 69-70, 71, 73.[11]  From there, Plaintiffs'

alleged causal chain includes the incorporation of indeterminate tenors of Swiss franc LIBOR

into a generic formula for calculating the future price of Swiss francs, Am. Compl. ¶ 87; the

impact of spot exchange rates and interest rates applicable to the other currency in the FX

forward or future, *see* Part II.B *supra*; and the alleged use of the formula to calculate the value of

Plaintiffs' alleged trading positions, Am. Compl. ¶¶ 86-88.  All of this, according to Plaintiffs,

eventually resulted in a "negative impact" on their trading positions.  *See id.* ¶¶ 20-37, 89.

Even assuming this last link in the chain is, in fact, a "domestic effect," the entire

sequence of events required to arrive at this point is far too attenuated to establish the

"reasonably proximate" effect required under the FTAIA.  *Lotes*, 753 F.3d at 398.  Plaintiffs'

allegations of supposed conspiracies based in Europe to affect interest rate derivatives and a

benchmark both denominated in a foreign currency mirror those rejected by the court in

*McLafferty v. Deutsche Lufthansa A.G.*, No. 08-cv-1706, 2009 WL 3365881, at *4 (E.D. Pa. Oct.

16, 2009):  "[A] conspiracy hatched in Geneva by four foreign airlines regarding passenger air

travel between Europe and Japan result[ing] in higher prices paid by domestic purchasers who

bought tickets directly from the defendants."  As the *McLafferty* court explained, "[t]he fact that

the supra-competitive prices were paid by persons in the United States does not establish, or even

---

[11]  To the extent Plaintiffs imply that Defendants' Swiss franc LIBOR submissions originated in the United States, *see*, *e.g.*, Am. Compl. ¶¶ 52, 57, any such implication is belied by the settlement agreements referenced in the Amended Complaint, *see*, *e.g.*, U.S. Dep't of Justice, Antitrust Div., Deferred Prosecution Agreement with The Royal Bank of Scotland plc:  Attachment A Statement of Facts  ¶ 12 (Feb. 5, 2013) ("With regard to . . . Swiss Franc, the primary LIBOR submitter was a money market trader based in London.") (Sullivan Decl. Ex. 6); Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against Deutsche Bank AG, at 7, *In re Deutsche Bank AG*, CFTC Dkt. No. 15-20 (Apr. 23, 2015) ("During the relevant period, Deutsche Bank … made Swiss franc LIBOR . . . submissions out of its Frankfurt office.") (Sullivan Decl. Ex. 7).

intimate, that the conspiracy directly affected United States commerce." *Id*.  At most, Plaintiffs

here have described "a foreign effect and a foreign harm that have had ripple effects for the

domestic market, but have not had any direct, substantial and reasonable effect which would give

rise to an antitrust claim [under] the Sherman Act." *In re Intel Corp. Microprocessor Antitrust

Litig.*, 452 F. Supp. 2d 555, 563 (D. Del. 2006).  Such allegations fail to meet the FTAIA's

directness requirement.

     **D.**     **Plaintiffs Have Not Alleged a Plausible Antitrust Conspiracy**

To state a claim, Plaintiffs must do more than invoke labels and assert legal conclusions;

Plaintiffs must instead plead facts sufficient to permit a plausible inference that the alleged

conspiracies in fact existed.  *See Twombly*, 550 U.S. at 556; *Mayor of Balt. v. Citigroup, Inc.*,

709 F.3d 129, 136 (2d Cir. 2013) ("The crucial question in a Section 1 case is whether the

challenged conduct stems from independent decision or from an agreement, tacit or express."

(internal quotation marks omitted)).  To this end, Plaintiffs must either (1) "assert direct evidence

that the defendants entered into an agreement in violation of the antitrust laws," or (2) "present

circumstantial facts supporting the *inference* that a conspiracy existed."  *Baltimore*, 709 F.3d at

136.  Plaintiffs have done neither.

     **1.**     **Plaintiffs Have Not Alleged a Plausible Conspiracy to Coordinate Bid-Ask Spreads (Claim I)**

Plaintiffs identify no evidence that would permit this Court to infer the existence of an

agreement to manipulate bid-ask spreads involving all Defendants across the alleged Class

Period.  *See* Am. Compl. ¶¶ 91-96.  The *only* evidence Plaintiffs identify in support of Claim I is

the EC settlement regarding an infringement of European competition law by five Defendants

during a five-month period in 2007 in connection with the pricing of three interest rate derivatives.[12] *See id.* ¶ 95; *see also* EC Press Release (Sullivan Decl. Ex. 1); EC Bid-Ask Statement of Decision (Sullivan Decl. Ex. 2).  More importantly, nothing in the EC Settlement supports Plaintiffs' allegations of a *decade-long* conspiracy from 2001 through 2011among *all* Defendants to manipulate the bid-ask spread on *all* "Swiss franc LIBOR-based derivatives."  *See Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) (government investigations and guilty pleas alone not sufficient to "replace a plaintiff's independent proffer of facts which would tend to support the illegal conduct alleged").

### 2.   Plaintiffs Have Not Pled a Plausible Conspiracy to Coordinate Swiss Franc LIBOR Submissions (Claim II)

Plaintiffs similarly fail to allege facts sufficient to establish a plausible inference that all eight Defendants engaged in a "continuing" eleven-year agreement to manipulate Swiss franc LIBOR.  According to Plaintiffs, unlawful coordination among Defendants "occurred through two primary means[:]  (1) communications between traders and submitters; and (2) [communications between traders and] inter-dealer brokers."  Am. Compl. ¶ 122.  As to each form of alleged coordination, Plaintiffs' direct evidence consists principally of a smattering of instant messages drawn from some of the Defendants' regulatory settlements.[13]  *See id.* ¶¶ 102-

---

[12]   European competition law is substantially distinct from the Sherman Act and in many cases has a lower evidentiary standard for finding an unlawful agreement or "concerted practice" under Article 101(1).  Indeed, Paragraph 32 of the EC Bid-Ask Statement of Decision highlights this distinction:  "Thus, a conduct may fall under Article 101 of the Treaty and Article 53 of the EEA Agreement as a concerted practice even where the parties have not explicitly subscribed to a common plan defining their action in the market but knowingly adopt or adhere to collusive devices which facilitate the coordination of their commercial behaviour."  (Sullivan Decl. Ex. 2).

[13]   To the limited extent that Plaintiffs rely on the October 21, 2014 EC settlement , it only serves to further illustrate the implausibility of their conspiracy allegations.  *See* EC CHF LIBOR Statement of Decision (Sullivan Decl. Ex. 5).  As an initial matter, the Credit Suisse, UBS, Deutsche Bank, and BlueCrest Defendants

*(Cont'd on next page)*

32.  These communications are insufficient to support Plaintiffs' sweeping assertions.  Indeed, most of the cited communications do not support Plaintiffs' conspiracy allegations at all because they occurred between employees of the same bank, *i.e.*, they involve *internal* and *unilateral*, not cooperative, conduct.  *See, e.g.*, *id.* ¶¶ 102-16.  The remainder suggest—at most—sporadic communications in 2008 and 2009 between a single Swiss franc trader at RBS and a single trader at one other bank, *id.* ¶¶ 124-28 (communications "on certain occasions" between a single RBS trader and a single JPMorgan trader); and a single communication from one BlueCrest employee to a Deutsche Bank employee regarding a single tenor of Swiss franc LIBOR on a single day in 2005, *id.* ¶¶ 131-32.

Plaintiffs have not pleaded facts supporting a plausible inference that each one of the eight Defendants made a "conscious commitment to a common scheme," *Invamed, Inc. v. Barr Labs., Inc.*, 22 F. Supp. 2d 210, 222 (S.D.N.Y. 1998) (internal quotation marks omitted), and they have not provided "specifics with respect to the acts of [each] particular defendant," *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008).  Instead, Plaintiffs ask the Court to extrapolate from a handful of communications referenced in Defendants' settlements the existence of an alleged global, decade-long conspiracy that the allegations in the Amended Complaint are not remotely capable of supporting.  The Court should decline to do so.  *See In re Optical Disk Drive Antitrust Litig.*, No. 10-md-2143, 2011 WL

---

*(Cont'd from previous page)*

were neither parties to this settlement, nor were they even mentioned in the EC's decision.  Further, the decision describes conduct over only an approximately 16-month period (from March 2008 to July 2009) between only two traders who discussed "on certain occasions" Swiss franc LIBOR submissions relating to only certain tenors.  *See id.* at 8, ¶ 24. The EC also made no finding that the traders' conduct had any impact on either banks' LIBOR submissions, let alone the published Swiss franc LIBOR.

3894376, at *9 (N.D. Cal. Aug. 3, 2011) (small number of specific allegations were "a far cry from establishing plausibility for a broad six year continuing agreement among all defendants to fix the prices of all [optical disk drives] sold through innumerable other channels").

As for Plaintiffs' "hub and spoke" theory based on communications between panel banks and interdealer brokers, *see* Am. Compl. ¶ 133, Plaintiffs proffer no specific examples of bank-broker communications relating to Swiss franc LIBOR at all, s*ee id.* ¶¶ 134-36 (describing alleged communications relating to Yen LIBOR), and can point only to a reference in RBS's FSA settlement of five instances of bank-broker communications between 2007 and 2010. *Id.* ¶ 137 (citing Fin. Servs. Auth., Final Notice to The Royal Bank of Scotland plc, FSA Ref. No. 121882, at  16 ¶ 61 (Feb. 6, 2013)).  Such allegations do not come close to providing a sufficient basis for this Court to infer an eleven-year-long agreement among all Defendants and the interdealer brokers who supposedly acted as "hubs" and offer no support for Plaintiffs' claim that Defendants conspired with *each other*.  Courts consistently reject antitrust claims predicated on supposed "hub-and-spoke" conspiracies when plaintiffs fail to establish a horizontal agreement among the competitor "spokes."  *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) ("The critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other." (internal quotation marks omitted)).  The result here should be the same.

Nor is any of the circumstantial evidence that Plaintiffs allege sufficient to make their conspiracy allegations plausible.  As an initial matter, Plaintiffs allege no plausible economic motive for Defendants' participation in the alleged agreement; rather, Plaintiffs' allegations are consistent with each Defendant's separate pursuit of its own economic interests.  Although Plaintiffs conclusorily assert that the purported conspiracy was "designed [by Defendants] to

create profit, or limit liabilities amongst themselves, by coordinating their [alleged] manipulation of the prices and settlement value of Swiss franc LIBOR and Swiss franc LIBOR-based derivatives," Am. Compl. ¶ 246, Plaintiffs fail to plausibly allege that all eight Defendants, each with its own corporate structure, its own business strategy, its own customers and orders, and its own investments, were all so similarly situated that they all benefited from the same upward and downward movements in Swiss franc LIBOR over an eleven-year period.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447, 469 (S.D.N.Y. 2014) ("[I]t is implausible that all defendants would maintain parallel trading positions in the Eurodollar futures market across the Class Period and that those positions, in turn, motivated their daily LIBOR submissions."); *see also LIBOR IV*, 2015 WL 4634541 at *40-*43.  Rather, Plaintiffs' allegations suggest at most that individual derivatives traders episodically and opportunistically attempted to enhance their own positions by attempting to influence Swiss franc LIBOR submissions—*not* that a group of large financial institutions entered into a complicated, decade-long agreement.  *See Twombly*, 550 U.S. at 556-7; *see also Baltimore*, 709 F.3d at 138-39 (allegations as consistent with unilateral action as with conspiracy).  As in the USD LIBOR MDL, where Judge Buchwald concluded that the alleged misconduct "would have been consistent with normal commercial incentives," *LIBOR I*, 935 F. Supp. 2d at 690, the result should be dismissal.  *See also Williams v. Citigroup, Inc.,* No. 08-cv-9208, 2009 WL 3682536, at *4 (S.D.N.Y. Nov. 2, 2009) (dismissing Section 1 claim where plaintiff's allegations "d[id] not suggest a wide-ranging conspiracy but rather unilateral action among the conspirators, each of whom wants to preserve its own market position"), *aff'd in part, vacated in part on other grounds*, 433 F. App'x 36 (2d Cir. 2011).

Plaintiffs' alleged "statistical evidence" is similarly consistent with parallel conduct and raises no plausible inference of conspiracy.  Plaintiffs tellingly do not assert that any observed divergence between Swiss franc LIBOR and the Swiss franc deposit rate resulted from collusion among Defendants.  And their charts (which purport to show a divergence between Swiss franc LIBOR and the Swiss franc deposit rate during the Class Period, but do not provide data for earlier or later periods that might serve as a baseline, *see* Am. Compl. ¶¶ 181-186), are at least as consistent with parallel conduct as with conspiracy.[14]  In fact, the charts suggest strongly that market factors, and not any alleged conspiracy, caused Swiss franc LIBOR and the deposit rate to diverge, as they reflect a much greater divergence following the 2008 financial crisis than during other periods.  These charts are at best consistent with "parallel conduct that could just as well be independent action" and "independent responses to common stimuli," neither of which renders Plaintiffs' conspiracy allegations plausible.  *Twombly*, 550 U.S. at 556 n.4, 557 (internal quotation marks omitted).   As Plaintiffs have pled no plausible conspiracy among all Defendants, both of their antitrust claims should be dismissed.

As to Credit Suisse, the claim based an alleged conspiracy to manipulate Swiss franc LIBOR fails for the additional reason that Plaintiffs fail to allege it was ever involved in even unilateral manipulation of Swiss franc LIBOR.  Moreover, Plaintiffs do not and cannot allege that Credit Suisse was part of the EC settlement regarding the manipulation of Swiss franc LIBOR.  Am. Compl. ¶¶ 55, 139.

---

[14]  Plaintiffs' argument that the difference between Swiss franc Deposit Rate and Swiss franc LIBOR should always be zero, Am. Compl. ¶¶ 180-86, is based on the flawed assumption that they measure the same rates.  However, as Plaintiffs themselves admit, the Swiss franc Deposit Rate is calculated from "actual money market transactions," Am. Compl. ¶ 181, while Swiss franc LIBOR reflects the truncated average of rates at which individual panel banks estimate they can borrow Swiss francs in the London interbank market.  Am. Compl. ¶¶ 71-73.

E.        **Plaintiffs' Antitrust Claims Are Time-Barred**

Finally, Plaintiffs' antitrust claims should be dismissed because they are time-barred.  The statute of limitations applicable to a private action under the Clayton Act is four years running from when the cause of action accrued, *i.e.*, when Plaintiffs suffered an alleged injury resulting from an antitrust violation, and not when the injury was discovered.  15 U.S.C. § 15b, *see also, e.g.*, *Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996) ("An antitrust cause of action accrues as soon is there is injury to competition."  (citing *Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 338 (1971)).

Plaintiffs allege two antitrust claims, both of which are untimely.  The first is premised solely on the EC settlement regarding bid-ask spread coordination in 2007, more than *seven* years prior to their initial complaint, filed on February 5, 2015.  *See* Dkt. No. 1.  The second is based on alleged coordination of Swiss franc LIBOR submissions; however, the last communication between panel banks that Plaintiffs allege occurred was in May 2009, *see* Am. Compl. App'x A, nearly *six* years prior to the filing of their initial complaint.

Further, even if a discovery rule applied (which it does not), Plaintiffs would have been placed on notice of their claims by the numerous articles appearing in the spring and summer of 2008—more than *six* years prior to Plaintiffs' initial complaint—indicating that LIBOR rates, including Swiss franc LIBOR, may have been artificial.[15]  *See* Adam Bradbury, "Mkt Participants Doubt Libor Rates Reflect Mkt Rates – Survey," Dow Jones Capital Markets Report, June 19, 2008 (citing market participants "who agreed that Libor wasn't reflective of market rates" and "pointed to off-market Libor fixings for the Swiss franc") (Sullivan Decl. Ex.

---

[15]  On a motion to dismiss, it is appropriate for a court to take judicial notice of news articles and other publically available documents.  See *Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012).

8); *see also LIBOR I*, 935 F. Supp. 2d at 704 fig. 1 (detailing numerous media accounts, including in the Wall Street Journal, during April and May 2008 indicating concerns with LIBOR).  Similarly, the existence of these media accounts defeat Plaintiffs' assertion that the statute of limitations was tolled by fraudulent concealment.  As explained in Part III.A., *infra*, Plaintiffs admit that they "generally followed public news, the markets, and financial developments," and should have been placed on notice of their alleged injuries.  Am. Comp. ¶ 231.

## III.   PLAINTIFFS' CEA CLAIMS SHOULD BE DISMISSED

Plaintiffs allege that Defendants violated the CEA by the supposed "manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives that were priced, benchmarked and/or settled based on Swiss franc LIBOR."  Am Compl. ¶ 253.  As explained in Part I.A., *supra*, Plaintiffs claim they bought or sold only two types of Swiss franc instruments: Swiss franc FX forwards and futures traded on the CME.  Foreign exchange forwards, however, are expressly excluded from the CEA's purview.  *See, e.g.*, *CFTC v. Erskine*, 512 F.3d 309, 314-15 (6th Cir. 2008) ("Expressly excluded from … CFTC regulation[] is any sale of any cash commodity for deferred shipment or delivery,' commonly referred to as a forward contract.") (quoting 7 U.S.C. § 1(a)(19)); *accord CFTC v. Fleury*, 479 F. App'x 940, 942 (11th Cir. 2012) (per curiam).

Accordingly, Plaintiffs' CEA claims are limited to the Swiss franc futures that one Plaintiff, Frank Divitto, allegedly purchased.  But these claims suffer from several insurmountable legal flaws that require their dismissal.  *First*, Plaintiffs' claims are barred by the CEA's two-year statute of limitations.  *Second*, Plaintiffs lack standing to bring claims based on alleged manipulation of Swiss franc LIBOR because this benchmark is not the commodity underlying the FX futures traded on the CME.  *Third*, Plaintiffs fail to allege the required

proximate causation between Defendants' alleged conduct and the supposedly artificial prices in FX futures.  *Fourth*, Plaintiffs cannot plead that Defendants had the specific intent to manipulate FX futures because Swiss franc LIBOR is not used to price these futures.  *Fifth*, Plaintiffs do not have standing because they have suffered no actual injury.

### A.    Plaintiffs' CEA Claims Are Time Barred

Plaintiffs' claims for alleged manipulation under the CEA must "be brought no later than two years after the date the cause of action arises."  7 U.S.C. § 25(c).  A cause of action arises under the CEA when a party is placed on inquiry notice of an injury.  *LIBOR I*, 935 F. Supp. at 698.  "A plaintiff will be deemed to have inquiry notice when there are 'storm warnings,' i.e., 'when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded.'"  *In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. 2d 232, 241 (S.D.N.Y. 2006) (Stein, J.) (quoting *LC Capital Partners v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003)).  The "amount of public information necessary to start the period of limitations for [CEA claims] is significantly less than the amount" for securities fraud claims. *LIBOR I*, 935 F. Supp. at 698.  The test for inquiry notice "is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings." *Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 114 (S.D.N.Y. 2011) (internal quotation marks omitted).  Here, the Amended Complaint establishes that Plaintiffs were on inquiry notice more than two years before they filed their first complaint, and thus their CEA claims are time-barred.[16]

---

[16]   Plaintiffs filed their initial Complaint on February 5, 2015. Dkt. No. 1.  Therefore, the CEA claims are time-barred because Plaintiffs were on inquiry notice of their claims before February 5, 2013.

### 1.    Plaintiffs Were on Inquiry Notice Before February 5, 2013

Putting aside the myriad public disclosures published in 2008 regarding potential manipulation of LIBOR—including Swiss franc LIBOR—the Amended Complaint makes it clear that, at a minimum, Plaintiffs were on inquiry notice no later than December 18, 2012, the date the DOJ announced a Non-Prosecution Agreement with Defendant UBS, making the CEA claims untimely.  Am. Compl. ¶ 64 n.46.  One day later, on December 19, 2012, the CFTC announced a settlement with UBS.  Am. Compl. ¶ 11 n.12.   Plaintiffs repeatedly cite to these very settlement agreements in the Amended Complaint to support their claims.[17]   For example:

- "UBS has admitted to manipulating Swiss franc LIBOR as early as 2001, 'rounding' it's submissions up or down in a direction that benefited its Swiss franc LIBOR based derivatives positions on every day."  Am. Compl. ¶ 64; *see also id.* ¶ 117.

- "By 'rounding' its Swiss franc LIBOR submissions up or down to reflect the direction that would most benefit its Swiss franc LIBOR-based derivatives positions, UBS intended to skew Swiss franc LIBOR to benefit its entire trading book on every day." Am Compl. ¶ 118.

- "[F]rom at least January 2005 through at least September 2009, UBS' Swiss franc LIBOR trader-submitters who were responsible for making UBS' Swiss franc submissions, as well as making UBS profits on Swiss franc LIBOR based derivatives positions, regularly adjusted UBS' Swiss franc LIBOR submissions to benefit UBS' trading positions." *Id.* ¶ 64.

- "Communications released as part of UBS' settlements with both the CFTC and DOJ demonstrate that on July 5, 2006, at least UBS was engaged in manipulating Swiss franc LIBOR higher in order to benefit its own Swiss franc LIBOR-based derivatives."  Am. Compl.  ¶ 205

These findings are more than the mere "storm warnings" necessary to put Plaintiffs on inquiry notice—they are the very foundation of their CEA claims.  *Tomlinson v. Goldman, Sachs*

---

[17]  For the Court's convenience, the publicly available settlements between UBS and the DOJ and CFTC are provided as Exhibits 9 and 10 of the Declaration of Peter Sullivan, filed concurrent with the Notion of Motion and this Memorandum.

& Co., 682 F. Supp. 2d 845, 847 (N.D. Ill. 2009) ("A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim.") (internal quotation marks omitted), *aff'd in relevant part*, 648 F.3d 533 (7th Cir. 2011 ) (Easterbrook, J.).  As a result, the Amended Complaint is untimely given that it was filed in February 2015, more than two years after the announcement of the UBS settlements in December 2012.

### 2.  Plaintiffs Fail to Plead Fraudulent Concealment

Aware that their CEA claims are time-barred, Plaintiffs allege fraudulent concealment to try to toll the limitations period.  Am. Compl. ¶¶ 231-234.  To establish fraudulent concealment, a plaintiff must allege that "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled."  *Koch*, 785 F. Supp. 2d at 116 (quoting *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d. Cir. 1999)).  These elements must be pleaded with particularity.  *Id.*; *see also Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 565 (S.D.N.Y. 1996).

Plaintiffs cannot plead a fraudulent concealment defense here for one very simple reason: Plaintiffs do not (and cannot) allege that they were unaware of the UBS settlement agreements. *See Koch*, 785 F. Supp. 2d at 117 (fraudulent concealment must actually succeed in depriving plaintiffs of notice).  To the contrary, Plaintiffs admit that they "followed public news, the markets, and financial developments."  Am. Compl. ¶ 231.  The UBS settlements were publicly

available and widely reported on in the press.[18]   It can hardly be disputed that anyone who was paying any attention to "public news" or "financial developments" would not have known of the settlements and the discussion of Swiss franc LIBOR manipulation they contained.

> **B.     Plaintiffs Lack Standing to Bring Claims for Alleged Manipulation of Swiss Franc LIBOR as a Commodity**

Section 22 of the CEA grants a private plaintiff who purchased or sold a futures contract standing to sue for "manipulation of the price of any such contract … or the price *of the commodity underlying such contract*," among other conditions precedent.  7 U.S.C. § 25(a)(1)(D)(ii) (emphasis added).  Plaintiffs allege that Defendants violated the CEA by manipulating Swiss franc LIBOR and ultimately the prices of an unknown number of Swiss franc futures contracts that one Plaintiff purchased from unknown parties at unknown prices. *See, e.g.,* Am. Compl. ¶ 253.  However, Swiss franc LIBOR—the benchmark Plaintiffs allege may have been used in *pricing* commodities—is not the commodity underlying the CME futures contracts Plaintiffs allegedly purchased.  The commodity underlying these futures is a contract to exchange 125,000 Swiss francs for U.S. dollars.  *See* CME Rulebook, Chapter 254, Swiss Franc/U.S. Dollar (CHF/USD) Futures, http://www.cmegroup.com/rulebook/CME/III/250/254/254.pdf (Sullivan Decl. Ex. 14). Accordingly, Plaintiffs lack standing to sue for manipulation of Swiss franc LIBOR.

---

[18]  *See*, *e.g.*, Silla Brush & Phil Mattingly, *UBS $1.5 Billion Libor Settlement Signals More to Come*, Bloomberg, Dec. 19, 2012,  http://www.bloomberg.com/news/articles/2012-12-19/ubs-1-5-billion-libor-settlement-signals-more-to-come (Sullivan Decl. Ex. 11); David Enrich & Jean Eaglesham, *UBS Admits Rigging Rates in 'Epic' Plot*, Wall St. J., Dec. 20, 2012, *available at* http://www.wsj.com/articles/SB10001424127887324407504578188342618724274 (Sullivan Decl. Ex. 12); Ben Protess, *Leniency Denied, UBS Unit Admits Guilt in Rate Case*, N.Y. Times, Dec. 19, 2012, *available at* http://dealbook.nytimes.com/2012/12/19/leniency-denied-ubs-unit-admits-guilt-in-rate-case (Sullivan Decl. Ex. 13).

Judge Buchwald recognized this principle in her dismissal of similar CEA claims in the USD LIBOR MDL, holding that the plaintiffs lacked standing to bring claims for the manipulation of USD LIBOR itself because it is not the commodity underlying Eurodollar futures contracts. *LIBOR I*, 935 F.Supp.2d, at 720-21. Judge Buchwald found that even though the price of the futures contracts were "settled or traded at a value based on LIBOR," the "commodity underlying a Eurodollar contract" is a deposit of U.S. Dollars in a foreign commercial bank with a three-month maturity, and therefore "LIBOR is not the commodity underlying Eurodollar futures contracts, and plaintiffs do not have standing to bring suit against defendants based on the manipulation of LIBOR as a commodity." *Id.* at 697, 720-721. The same reasoning applies here with equal force and therefore Plaintiffs' CEA claims should be dismissed to the extent they are based on the alleged manipulation of Swiss franc LIBOR as a commodity.[19]

### C.     Plaintiffs Fail to State a Claim for Price Manipulation

To state a CEA claim for price manipulation of Swiss franc currency futures traded on the CME, Plaintiff must adequately plead that: (i) Defendants possessed an ability to influence prices of Swiss franc futures traded on the CME; (ii) Defendants specifically intended to manipulate the prices of Swiss franc futures traded on the CME; (iii) an artificial price existed for Swiss franc futures traded on the CME; and (iv) Defendants caused the artificial price.

---

[19]  Even if the Court were to find that Plaintiff has adequately pled standing to pursue claims based upon manipulation of something other than Swiss franc currency futures traded on the CME—and it should not—those claims should be dismissed because the Amended Complaint fails to plead facts that allege any such manipulation falls within the territorial reach of section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2). *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254–55 (2010).

*DiPlacido v. CFTC*, 364 F. App'x 657, 661 (2d Cir. 2009); *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 598 (S.D.N.Y. 2011).

Because Plaintiffs lack standing to bring CEA claims based on alleged manipulation of Swiss franc LIBOR, their only remaining CEA claim is for alleged price manipulation of the Swiss franc futures traded on the CME.  Therefore, Plaintiffs must meet each of the four elements of price manipulation, including proximate causation of an artificial price and a specific intent to cause that artificial price.  However, Plaintiffs' causation allegations are based on a single, implausible and unsupportable claim—that the price of all Swiss franc currency futures traded on the CME is determined using a generic formula.  Nor do Plaintiffs allege that Defendants specifically intended to manipulate the price of Swiss franc futures; in fact, the Amended Complaint does not even allege that Defendants bought or sold Swiss franc futures from Defendants.  Plaintiffs have therefore failed to plausibly plead the elements of causation and specific intent as required under Rule 8(a), let alone with the particularity required by Rule 9(b).[20]

### 1.    Plaintiffs Fail to Adequately Allege Proximate Causation

It is well established that failure to demonstrate a causal relationship between the purportedly manipulative conduct and the alleged artificial price is fatal to a CEA claim.  *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig. ("Silver Futures")*, No. 11-md-2213, 2012 WL 6700236, at *16-18 (S.D.N.Y. Dec. 21, 2012) (dismissing price manipulation claim because "[t]he causation element [of a CEA claim] requires that a defendant be the

---

[20]    CEA manipulation claims that sound in fraud, such as those asserted by Plaintiffs, must comply with the heightened pleading requirements of Rule 9(b).  *LIBOR I*, 935 F. Supp. 2d at 714 (holding that substantially similar allegations made in the USD LIBOR MDL "sound in fraud and thus must be pled with particularity").

proximate cause of the price artificiality"); *see also In re Energy Transfer Partners Natural Gas Litig.*, No. 07-cv-3349, 2009 WL 2633781, at *11 (S.D. Tex. Aug. 26, 2009).

In order to state a claim under the CEA, Plaintiffs must allege facts that support a finding that Defendants' purported manipulation of Swiss franc LIBOR proximately caused artificial prices of Swiss franc futures contracts traded on the CME.  Conclusory and general averments as to causation will not suffice.  Plaintiffs must set forth factual allegations that successfully "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiffs have failed to meet this pleading burden.

Plaintiffs admit that the prices and payment terms of Swiss franc futures contracts traded on the CME are not directly tied to Swiss franc LIBOR.  Am. Compl. ¶ 87.  Thus, Plaintiffs' theory of causation hangs on a single proposition:  that all Swiss franc futures contracts traded on the CME during the eleven-year Class Period were priced using a generic formula found in a basic tutorial on FX forwards.  However, as explained in Part I.C., *supra*, this is not only implausible, it is demonstrably wrong and contradicted by Plaintiffs' own allegations.

At best, Plaintiffs allege that Swiss franc LIBOR may have been one of many factors used by some market participants to price Swiss franc futures traded on the CME from time to time.  If Plaintiff's causation theory were sufficient to state a claim, virtually every market participant could bring a claim for manipulation of any benchmark rate, regardless of whether that benchmark rate directly caused any artificiality in the price of the commodities at issue, based on the sort of ripple effects that Plaintiff asks the Court to imagine.  Such a broad interpretation of causation would effectively nullify the CEA's standing and causation requirements.  Accordingly, courts in the Second Circuit have rejected as "too tenuous and conjectural" similar allegations of correlated prices or inter-market impact in the antitrust

context.  *Reading Indus.*, 631 F.2d at 13-14 (allegation that defendants lowered and rationed the price of copper in one market, causing an inflation of copper prices in another market, was too "tenuous and conjectural" to establish causation); *Silver Futures*, 2012 WL 6700236, at *16 ("the imagination required to link these conditions, without corroborating factual allegations … is tantamount to impermissible speculation on the basis of sheer possibility") (internal quotation marks omitted).

### 2.  Plaintiffs Fail to Adequately Allege Specific Intent

To allege price manipulation under the CEA, Plaintiffs must allege that each Defendant *specifically intended* to influence the price of the Swiss franc futures traded on the CME.  *See LIBOR I*, 935 F. Supp. 2d at 720-721; *Silver Futures*, 2012 WL 6700236, at *10.  This requires a showing that a defendant "acted with the conscious object or purpose of causing an artificial or distorted price."  *In re Ind. Farm Bureau*, CFTC No. 75–14, 1982 WL 30249, *10 (C.F.T.C. Dec. 17, 1982); *see also In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d at 598. Moreover, Rule 9(b)'s heightened pleading standard requires a plaintiff to allege facts "give rise to a *strong inference* of scienter." *In re Amaranth Natural Gas Commodities Litig. ("Amaranth II")*, 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009) (emphasis in original) (internal quotation marks omitted).

To meet this high burden, Plaintiffs offer nothing more than broad and conclusory allegations that Defendants made "false Swiss franc LIBOR submissions with the specific intent to fix the prices of many different types of Swiss franc LIBOR-based derivatives."  Am. Compl. ¶ 126.  But nowhere in the Amended Complaint do Plaintiffs offer any facts to support such generalized allegations or any evidence that the purpose of Defendants' alleged conduct was to influence the price of Swiss franc futures traded on the CME.  In fact, Plaintiffs do not even claim to have bought or sold Swiss franc futures from the Defendants, and therefore fail to

34

demonstrate that Defendants had a motive to manipulate the prices of such contracts.  *See Hershey v. Energy Transfer Partners L.P.*, 610 F.3d 239, 248 (5th Cir. 2010) (holding that plaintiffs had not stated a claim under the CEA because plaintiffs did not have an intent or motive to manipulate the prices of the contracts at issue).

At most, Plaintiffs allege that manipulation of Swiss franc LIBOR *may* have had an indirect impact on Swiss franc futures prices because it *may* have been one of many factors used by some market participants to price these contracts.  In lieu of pleading the requisite specific intent, Plaintiffs claim that any Swiss Franc LIBOR manipulation *may* have had a foreseeable impact on Swiss franc futures prices.  Such allegations, even if true, are insufficient to state a claim under the CEA's specific intent standard.  *Hershey*, 610 F.3d at 248-49 (holding that foreseeable or even inevitable effect on futures contracts insufficient to meet the CEA's specific intent requirement); *Silver Futures*, 2012 WL 6700236, at *10-12 (dismissing claims for failure to allege Defendant took "specific actions which exhibited an actual intent" to manipulate prices);  *In re Rough Rice Commodity Litig.*, No. 11-C-618, 2012 WL 473091, at *7 (N.D. Ill. Feb. 9, 2012) ("Mere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the CEA.").

### D.    Plaintiffs Do Not Have Standing to Bring a Claim for Price Manipulation

Under section 22(a) of the CEA, a plaintiff has standing to bring a commodities manipulation action only if he has suffered "actual damages" as a result of defendant's manipulation.  7 U.S.C. § 25(a)(1).  As explained above, Plaintiffs suffered no actual damages because the Swiss franc futures they allegedly purchased were not directly affected by Swiss franc LIBOR.  But even assuming that the prices of Swiss franc futures could theoretically have been influenced by Swiss franc LIBOR manipulation, Plaintiffs have still failed to demonstrate

that they have standing to sue because they have not alleged that any of the CME Swiss franc futures they purchased were actually impacted.

Plaintiffs allege that Defendants, to benefit their own individual trading positions, attempted to move Swiss franc LIBOR rates up on some days, down on other days, and both up and down on still other days.  While Plaintiffs claim this conduct occurred "continuously" and "routinely," Am. Compl. ¶¶ 102, 106, after combing Defendants' regulatory settlements, they can *only* identify *32 specific days over the eleven-year Class Period*, less than one percent of the entire alleged Class Period, on which Defendants purportedly attempted to manipulate Swiss franc LIBOR.  Am. Compl. at Appendix A.

Judge Buchwald rejected similar claims in the USD LIBOR MDL, holding that to "plead actual damages based on such manipulation, plaintiffs would need to allege the resulting artificiality in LIBOR caused them injury, in light of their trading of Eurodollar futures contract." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR II*")*,* 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013)*.* The Court held that plaintiffs failed to meet this burden because they failed to: "include any allegations that make plausible (1) that they transacted in Eurodollar futures contracts on days on which Eurodollar futures contract prices were artificial as a result of trader-based manipulation of LIBOR or (2) that their positions were such that they were injured."  *Id.* at 620-21.

Here, the Amended Complaint is similarly deficient.  It alleges that one Plaintiff traded an unidentified number of Swiss franc futures, for unidentified maturities, on unidentified dates, for unidentified prices, and that as a result of Defendants' alleged conduct, Plaintiff was "damaged and suffered legal injury, including a net loss on his Swiss franc LIBOR-based derivatives transactions."   Am. Compl. ¶ 37.  This is not sufficient.

Although Judge Buchwald acknowledged that the plaintiffs lacked access to complete information about the defendants' alleged manipulative activity and trades, she nevertheless required them to allege causation.  The Court held that,

> because the alleged trader-based manipulation did not occur on every day of the Class Period, but rather on only a subset of those days—a subset that plaintiffs can, at least in part, identify—and because the alleged manipulation on any given day went in a particular direction—a direction which, again, plaintiffs can, at least in part, identify—and thus would have harmed only those entities with certain positions, the broad allegations plaintiffs have offered are insufficient to allege actual damages.

*LIBOR II*, 962 F. Supp. 2d at 621.  Here, Plaintiffs have already acknowledged that they can identify days on which manipulation allegedly occurred; they have catalogued and submitted communications they claim show manipulation on 32 specific days.  Therefore, "we can expect plaintiffs to allege how their positions were negatively affected by trader-based manipulation." *Id.*  But Plaintiffs have not attempted to make any such allegations with respect to the Swiss franc futures they claim to have bought and sold, and therefore Plaintiffs have not adequately alleged that they have standing.

### E.    Plaintiffs Fail to State a Claim for Vicarious Liability or Aiding and Abetting

Plaintiffs' claims for vicarious liability and aiding and abetting both fail for two reasons. *First*, these claims are foreclosed by Plaintiffs' failure to plead a primary violation for manipulation.  "In order to recover damages from a secondary party in an action for 'aiding and abetting' liability under the [CEA], a plaintiff must first prove that a primary party committed a commodities violation." *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996); *see also In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d at 599 (dismissing aiding and abetting claim as a matter of law where primary manipulation claim

failed).  Because, as explained above, Plaintiffs fail to state a primary claim for manipulation, their vicarious liability and aiding and abetting claims also fail.

*Second*, Plaintiffs' vicarious liability and aiding and abetting claims are not adequately pled.  "[T]o state a claim for vicarious liability [under the CEA], plaintiffs must allege that the principal manifested an intent to grant the agent authority, the agent agreed, and the principal maintain[ed] control over key aspects of the undertaking."  *In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth I*"), 587 F. Supp. 2d 513, 546 (S.D.N.Y. 2008) (internal quotation marks omitted).  To adequately allege aiding and abetting liability, Plaintiffs must establish that "the defendant (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective."  *Id.* at 531.  Plaintiffs have not made any of the requisite allegations to state a claim for a vicarious liability or aiding and abetting violation, instead merely reciting the elements of those claims.[21]

## IV.   PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED

### A.   Plaintiffs Lack Standing to Assert a RICO Claim Because Their Alleged Injuries Are Too Remote and Speculative

A private plaintiff has standing to assert a RICO claim only if that person was "injured in his business or property by reason of a violation of section 1962," 18 U.S.C. § 1964(c), and there must be a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992).  Because "Congress modeled §

---

[21]   To the extent Plaintiffs' aiding and abetting claim is premised upon the allegation that Defendants engaged in a collusive scheme to manipulate the price of Swiss franc futures, it should be rejected for the reasons set forth in Part II.D.2, namely that Plaintiffs have failed to raise the requisite inference of an agreement between Defendants as opposed to independent or parallel action.

1964(c) on the civil-action provision of the federal antitrust laws," the analyses for antitrust and RICO standing are one and the same. *Id.* at 267-69. If the alleged injuries are indirect or speculative, the plaintiff's RICO claims must be dismissed for lack of standing. *See id.*; *Gordon v. Palumbo*, No. 07-cv-6624, 2009 WL 690647, at *9-10 (S.D.N.Y. Mar. 9, 2009).

Here, Plaintiffs' alleged injuries are too indirect and speculative to support standing for their RICO claims for the same reasons that doom their antitrust claims. *See* Part II.B, *supra.*

### B.     Plaintiffs' RICO Claims Are Impermissibly Extraterritorial

Even assuming Plaintiffs have standing, these claims are fatally flawed because they require an impermissible extraterritorial application of the RICO statute. "RICO applies extraterritorially if, and only if, liability or guilt could attach to extraterritorial conduct under the relevant RICO predicate." *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 136 (2d Cir. 2014). Because Plaintiffs' asserted RICO predicate of wire fraud does not apply extraterritorially, Plaintiffs must allege "extensive factual allegations" of domestic conduct in establishing the elements of wire fraud to sustain a RICO claim. *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2015 WL 1515487, at *7–10 (S.D.N.Y. Mar. 31, 2015). Plaintiffs do not (and cannot) make or support allegations of such U.S. conduct.

Plaintiffs' conclusory allegation that "Defendants completed all elements of wire fraud within the United States" is inadequate. Am. Compl. ¶ 274. The Amended Complaint is devoid of any allegations of specific conduct indicating the existence of a domestic scheme to defraud and knowing participation in that scheme. Rather, Plaintiffs only allege some "minimal contacts" with the United States, which are insufficient as a matter of law. *Petróleos Mexicanos v. Sk Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014); *Laydon*, 2015 WL 1515487, at *7-10. In particular, Plaintiffs do not and cannot allege, as they must, that the scheme to defraud "was directed from (or to) the United States." *Petróleos Mexicanos*, 572 F. App'x at 61; *see also*

*Laydon v. Mizuho Bank Ltd.*, No. 12-cv-3419, Dkt. No. 491, slip op. at 3 (S.D.N.Y. July 24, 2015).

Analyzing substantially similar allegations in a case "based on the alleged actions of foreign and international institutions that submitted false [Yen LIBOR submissions] to the BBA . . . in London," Judge Daniels recently denied a plaintiff's motion for leave to amend to add RICO claims because they were impermissibly extraterritorial.  *See Laydon*, 2015 WL 1515487, at \*8-9.  The court found that allegations that Defendants "'coordinat[ed] their daily Yen-LIBOR . . . submissions and their Euroyen-based derivatives trading positions in electronic chats through electronic servers located in the United States'" were "far too attenuated to sufficiently plead that the scheme to defraud came about in the U.S."  *Id.* at \*8.  The plaintiff there failed to demonstrate that "the scheme was allegedly both managed from ***and*** directed at the U.S."  *Id.* at \*9 (emphasis in original).  Thus, the plaintiff failed to "adequately allege that 'defendants hatched schemes to defraud in the United States, and [that] they used the U.S. . . . wires in furtherance of those schemes and with the intent to do so.'"  *Id.* at \*8 (internal quotation marks omitted).  Most of Plaintiffs' allegations are, word for word, the exact same allegations already held insufficient in *Laydon*, where Plaintiffs were also represented by the Lowey Dannenberg Cohen & Hart law firm, and should fare no better here.[22]  *See* Chart in Appendix A (setting forth allegations in both complaints).

---

[22]   In particular, similar allegations that certain defendants pled guilty to criminal wire fraud, Am. Compl. ¶ 273, were rejected in *Laydon*, as criminal informations do not support a private, domestic RICO claim.  *See Laydon*, 2015 WL 1515487, at \*9 n.21.  In addition, the guilty pleas Plaintiffs reference are related to LIBOR in other currencies and have nothing to do with Swiss franc LIBOR.

**C.      Plaintiffs Fail to Plead Essential Elements of a RICO Claim**

Plaintiffs' RICO claim also fails because the Amended Complaint does not adequately

plead several essential elements.  A RICO claim requires factual allegations sufficient to raise a

plausible claim "(1) that the defendant (2) through the commission of two or more acts (3)

constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or

maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect

interstate or foreign commerce."  *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 100

(2d Cir. 1990) (quoting 18 U.S.C. § 1962(a)–(c)).  Several of these essential elements are

inadequately pled.  Moreover, to assert a RICO claim, "[t]he plaintiff must establish individual

actions by defendants that form violations of RICO."  *Merrill Lynch, Pierce, Fenner & Smith,*

*Inc. v. Young*, No. 91-cv-2923, 1994 WL 88129, at *6 (S.D.N.Y. Mar. 15, 1994).  That is, this

Court must engage in a defendant-by-defendant analysis to determine whether the RICO claims

are adequately pled as against each individual Defendant.  *See U.S. Fire Ins. Co. v. United*

*Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 451 (S.D.N.Y. 2004) (the elements of a RICO claim

"must be established as to each individual defendant").

**1.      Plaintiffs Fail to Adequately Plead Predicate Acts of Racketeering**
**with Respect to Each Defendant**

To state a claim under Section 1962(c), the Amended Complaint must adequately allege

that each defendant either committed or aided and abetted at least two acts of wire fraud.  *Merrill*

*Lynch*, 1994 WL 88129, at *6.  The elements of wire fraud are:  (1) a scheme to defraud; (2) to

get money or property; and (3) furthered by the use of interstate wires.  *See United States v.*

*Pierce*, 224 F.3d 158, 165 (2d Cir. 2000).  Wire fraud allegations must also satisfy the

heightened pleading requirements of Rule 9(b).  *See Mills v. Polar Molecular Corp.*, 12 F.3d

1170, 1176 (2d Cir. 1993).  Where a plaintiff claims that wire communications themselves were

41

fraudulent, Rule 9(b) requires allegations showing "the contents of the communications, who was involved, where and when they took place, and explain[ing] why they were fraudulent." *Id.*; *Weaver v. James*, No. 10-cv-6609, 2011 WL 4472062, at *4 (S.D.N.Y. Sept. 27, 2011). Where a plaintiff alleges that the wire communications were used in furtherance of an underlying scheme to defraud, "a detailed description of the underlying scheme and the connection therewith of the . . . wire communications" is required. *Boritzer v. Calloway*, No. 10-cv-6264, 2013 WL 311013, at *9 (S.D.N.Y. Jan. 24, 2013).

Furthermore, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247-48 (2d Cir. 1987) (affirming dismissal where complaint failed to sufficiently link many defendants to alleged fraud); *see also Merrill Lynch*, 1994 WL 88129, at *11. ("sweeping allegations . . . impermissibly collectivize[d] the defendants").

The Amended Complaint offers only generalized allegations of wire fraud, impermissibly lumping all Defendants together. Plaintiffs accuse the collective "Defendants" of "transmitting or causing to be transmitted false and artificial Swiss franc LIBOR quotes in the U.S. or while crossing U.S. borders" (Am. Compl. ¶ 274), but fail to provide details as to why Swiss franc LIBOR submissions were false as to most Defendants for most days during the eleven-year period at issue. Plaintiffs also allege that the collective "Defendants" participated in "electronic chats routed through electronic servers located in the United States," Am. Compl. ¶ 274, but identify no such communications as to some Defendants (Credit Suisse Group AG, Credit Suisse AG and JPMorgan) and fail to allege necessary details as to others. Notably, there is no indication that any of the chats quoted took place within the U.S. or through "the use of interstate

42

wires." *Pierce*, 224 F.3d at 165.  The Amended Complaint is devoid of the type of details—explaining each individual Defendant's alleged role, duration, and extent of participation, knowledge, intent, or acts in furtherance of any alleged scheme or conspiracy—required to plead wire fraud as to every Defendant under Rule 9(b), let alone *two* instances *per* Defendant. Moreover, to the extent that Plaintiffs claim the wires were sent in furtherance of a fraudulent scheme, the Amended Complaint still fails because it offers no "detailed description" connecting the alleged Defendant-wide scheme and the wire communications.  *Boritzer*, 2013 WL 311013, at *9.

### 2. Plaintiffs Fail to Allege Any Fraudulent Scheme or the Existence of an Enterprise

To plead wire fraud, plaintiffs must adequately allege a scheme to defraud, and to plead a RICO claim, Plaintiffs must adequately allege an enterprise.  They fail to allege either.  To establish a scheme to defraud, Plaintiffs must plead:  (1) the existence of a scheme to defraud, (2) the requisite scienter (or fraudulent intent) on the part of the Defendants, and (3) the materiality of the misrepresentations.  *Pierce*, 224 F.3d at 165.  The wire fraud statute's "scheme to defraud" language has been described as requiring "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching."  *Allstate Ins. Co. v. Tanella*, No. 11-cv-6364, 2012 WL 7188685, at *4 (E.D.N.Y. Aug. 28, 2012) (internal quotation marks omitted).  Wire fraud also requires "conscious knowing intent to defraud" a targeted victim.  *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999); *United States v. Stitsky*, 536 F. App'x 98, 108 (2d Cir. 2013) (wire fraud "requires proof that defendant had fraudulent intent and 'contemplated' or 'intended' some harm to victims").  Furthermore, for an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a fraudulent course of

conduct and work together to achieve such purposes." *U.S. Fire Ins. Co.*, 303 F. Supp. 2d at 447 (citations omitted).

Plaintiffs do not adequately allege any plan among the Defendants to make purportedly false Swiss franc LIBOR submissions to the BBA, let alone for the contemplated purpose of depriving Plaintiffs of anything at all.  Plaintiffs' generic allegation that "[e]ach Defendant shared a common purpose in increasing their profits from trading in instruments priced from Swiss franc LIBOR," Am. Compl. ¶ 284, is insufficient to identify any fraudulent scheme.  Such generic allegations do not satisfy Plaintiffs' burden of pleading with particularity that each Defendant knowingly participated in a fraudulent scheme in pursuit of a common purpose.  *See Chanayil v. Gulati*, 169 F.3d 168, 170-71 (2d Cir. 1999) (affirming dismissal of RICO claims for failure to allege each defendant knowingly participated in fraudulent scheme); *U.S. Fire Ins. Co.*, 303 F. Supp. 2d at 447.  Likewise, the Amended Complaint's conclusory assertion that Defendants' purported acts of wire fraud amounted to a continuous "pattern of racketeering activity," as opposed to being "isolated" and "sporadic," lacks the requisite particularity and plausibility.  *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467 (2d Cir. 1995) (internal quotation marks omitted).

### D.    Plaintiffs Fail to State a RICO Conspiracy Claim

The Amended Complaint's RICO conspiracy claim also fails.  A RICO conspiracy claim "must necessarily fail" where, as here, Plaintiffs fail to plausibly allege a substantive RICO violation.  *See Jerome M. Sobel & Co. v. Fleck*, No. 03-cv-1041, 2003 WL 22839799, at *13 (S.D.N.Y. Dec. 1, 2003).  Even assuming that Plaintiffs adequately pled an underlying RICO violation (and they have not), Plaintiffs still fail to allege facts demonstrating each Defendant's "conscious agreement" to commit predicate acts.  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25-26 & n.4 (2d Cir. 1990).  Plaintiffs have not "set forth specific facts tending to show

that each of the defendants entered into an agreement" to manipulate Swiss franc LIBOR, and/or prices of the instruments traded by Plaintiffs over the eleven-year Class Period. *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 313 (S.D.N.Y. 2010); se*e also Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006) (dismissing RICO conspiracy claim where "plaintiff's allegations concerning an agreement among the defendants . . . [we]re entirely conclusory" and failed to explain "how each of the defendants, through words or actions, reached an agreement" to conspire). The Amended Complaint simply fails to "state with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it." *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002).

### E.      Plaintiffs' RICO Claims Are Time-Barred

The four-year statute of limitations applicable to Sherman Act claims also applies to RICO claims. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 150 (1987). Accordingly, Plaintiffs' RICO's claims are time-barred for the same reasons that their antitrust claims are and they should be dismissed. *See* Part II.E, *supra*.

## V.     PLAINTIFFS' UNJUST ENRICHMENT AND CONTRACT CLAIMS SHOULD BE DISMISSED

The unjust enrichment and contract claims are brought by certain FrontPoint plaintiffs ("Transacting Plaintiffs") against only UBS, Credit Suisse Group AG and Credit Suisse AG. For the reasons set forth below, these claims fail as a matter of law and should be dismissed.[23]

---

[23]  The Amended Complaint does not specify the applicable law for plaintiffs' claims or even sufficient facts to determine what law likely applies (e.g., where the alleged dealings occurred, whether all of the Transacting Plaintiffs' dealings with Defendants were governed by contracts and, to the extent contracts exits, if those contracts contained choice of law provisions). For purposes of this motion, Defendants assume New York law

*(Cont'd on next page)*

*First*, Transacting Plaintiffs offer no plausible basis to conclude that Defendants' conduct "*directly and proximately*" caused them any damages. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). As explained above, neither the alleged bid-ask spread conduct nor the Swiss franc LIBOR conduct would have had any impact on the prices of the FX forwards Transacting Plaintiffs claims to have bought and sold. As discussed, Plaintiffs' attempt to get around this fact by proffering a generic formula—which they never even allege to have used—is futile. *See Malmsteen* v. *Berdon, LLP*, 477 F. Supp. 2d 655, 666 (S.D.N.Y. 2007) (contract claims require "allegations of, at a minimum, the terms of the contract, each element of the alleged breach and the resultant damages") (internal quotation marks and citation omitted).

*Second*, even if a generic formula were used, Transacting Plaintiffs have not alleged that Swiss franc LIBOR manipulation would have affected the FX forwards they transacted with Defendants.[24] As explained above, and as Plaintiffs concede, there are fifteen different Swiss franc LIBOR tenors, each set independently based on separate submissions from panel bank members. Am. Compl. ¶¶ 72-73. Plaintiffs admit that the fifteen tenors do not follow one another; indeed, they cite with approval examples where different tenors go in different directions (up or down) on any given day. *See* Am. Compl. ¶ 200. As a result, alleging manipulation of one tenor does not equate to a manipulation of other tenors. This is critical because not one of the contracts described in the Amended Complaint has a maturity equal to a

---

*(Cont'd from previous page)*

governs Transacting Plaintiffs' breach of contract and unjust enrichment claims. Defendants reserve the right to argue for application of a different governing law should Transacting Plaintiffs allege sufficient facts to support a different choice of law.

[24] Plaintiffs' allegations against Credit Suisse are limited to its alleged participation in the bid-ask spread conduct, but this conduct was limited to FRAs and swaps, which Transacting Plaintiffs do not allege to have bought or sold. This is another reason to dismiss the claims as to Credit Suisse.

Swiss Franc LIBOR tenor that Plaintiffs allege was manipulated by Defendants.  For example, Plaintiff FrontPoint Healthcare Enhanced alleges it entered into a 77-day FX forward on July 5, 2006, and further alleges that 1-month Swiss franc LIBOR was manipulated on the same day. Am. Compl. ¶¶ 204-205.  But Plaintiffs do not allege misconduct with respect to a 77-day tenor. In fact, a 77-day Swiss franc LIBOR tenor was not even set by the BBA.  This discrepancy runs throughout all of the contracts alleged to have been breached in the Amended Complaint.

Given this, the breach of contract and unjust enrichment claims alleged in the Amended Complaint are, at best, based on generalized allegations of misconduct.  This is not enough.  *See, e.g., United States ex rel. Smith v. N.Y. Presbyterian Hosp.*, No. 06-cv-4056, 2007 WL 2142312, at *16 (S.D.N.Y. July 18, 2007) ("As a matter of law, a contract claim asserting breach of the implied covenants of good faith and fair dealing does not survive a motion to dismiss when it is based only on generalized allegations and grievances.").  Indeed, it is axiomatic that plaintiffs "must provide specific allegations as to the agreement between the parties, *the terms of that agreement*, and what provisions of the agreement were breached as a result of the acts at issue." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 183 (S.D.N.Y. 2009) (emphasis added) (internal quotation marks omitted).  Since they do not, their claims should be dismissed.

*Third*, Transacting Plaintiffs' claims are deficient because they fail to adequately specify that the alleged manipulation overlapped with any of their particular transactions.  As explained above, the relevant regulatory settlements cover only a defined period of time. *See, e.g.*, Am. Compl. ¶¶ 49, 139.  Yet Transacting Plaintiffs fail to allege that they entered into a single transaction in that time.  Plaintiffs' failure to identify the relevant transactions, contracts and specific losses is fatal to their claims. *See LIBOR III*, 27 F. Supp. 3d at 482*; Georgia Malone &*

*Co. v. Rieder,* 19 N.Y.3d 511, 516-18 (2012).

*Fourth,* Transacting Plaintiffs' unjust enrichment claims are time-barred by New York's three-year limitations period.[25]   The Court must look to New York's choice of law principles to determine what law to apply.  *See, e.g.*, *Woori Bank* v. *Merrill Lynch*, 923 F. Supp. 2d 491, 495 (S.D.N.Y. 2013), *aff'd*, 542 F. App'x 81 (2d Cir. 2013).   New York's borrowing statute, N.Y. C.P.L.R. § 202, states that, where, as here, a cause of action accrues outside of New York, the shorter statute of limitations between New York or the state where the action accrues applies. *See Cantor Fitzgerald Inc.* v. *Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002).   Because the Transacting Plaintiffs all reside in and were allegedly damaged in Connecticut, under New York's borrowing statute, Transacting Plaintiffs' claims accrued in Connecticut.   *Cantor Fitzgerald*, 313 F.3d at 710 (accrual state for purely economic injuries, like those at issue here, is where "the plaintiff resides and sustains the economic impact of the loss" (citation omitted)). Since New York's statute is shorter than Connecticut's six-year period,[26] the New York statute of limitations applies.[27]

---

[25]   New York's three-year limitations period prescribed by N.Y. C.P.L.R. § 214(3) governs Transacting Plaintiffs unjust enrichment claims because those claims rest upon alleged economic injuries.  *See, e.g.*, *LIBOR IV*, 2015 WL 4634541, at *160 (finding New York's three-year statute of limitations applied to substantially similar unjust enrichment claims).  Even if a six-year limitations period applied—and it does not—the majority of Transacting Plaintiffs' unjust claims would still be time-barred.  Transacting Plaintiffs allege Defendants' manipulation occurred between January 1, 2001 and January 31, 2011.  The Original Complaint was not filed until February 5, 2015. To the extent Transacting Plaintiffs' claims accrued before February 5, 2009, those claims would be time-barred.  The same applies to Plaintiffs' breach of the implied covenant of good faith and fair dealing, which is subject to a six-year limitations period.  N.Y. C.P.L.R. § 213(2).

[26]   *See Paradigm Contract Mgmt. Co.* v. *St. Paul Fire & Marine Ins. Co.,* No. 10-cv-211, 2011 WL 4348132,  at *7 n.3 (D. Conn. Sept. 16, 2011).

[27]   Defendants preserve the right to assert a shorter statute of limitations in the event additional facts come to light concerning the contracts at issue.

48

In New York, the statute of limitations for unjust enrichment accrues "upon the occurrence of the wrongful act giving rise to a duty of restitution." *See Pricaspian Dev. Corp.* v. *Total S.A.,* 397 F. App'x 673, 675 (2d Cir. 2010). Transacting Plaintiffs allege Defendants' manipulation of Swiss franc LIBOR occurred through January 31, 2011, which makes January 31, 2011 the latest date on which Defendants could have enriched themselves and the latest date on which the time to bring unjust enrichment claims could have started to run. To be timely under New York law, Transacting Plaintiffs' claims must have been filed by January 31, 2014. The Original Complaint was not filed until February 5, 2015, more than a year after Transacting Plaintiffs' unjust enrichment claims became stale.[28] Accordingly, Transacting Plaintiffs' unjust enrichment claims are time-barred.

*Fifth*, To the extent that Transacting Plaintiffs' contract claims are held to be valid, Transacting Plaintiffs are precluded as a matter of law from asserting a claim for unjust enrichment. As explained by the New York Court of Appeals, "[a] party may not recover in . . . unjust enrichment where the parties have entered into a contract that governs the subject matter" of their dispute. *Pappas* v. *Tzolis,* 20 N.Y.3d 228, 234 (2012) (alteration in original) (citation omitted) (dismissing unjust enrichment claims where the "sale of interests in the LLC was controlled by contracts" without examining whether failure to disclose a previously "surreptitiously negotiated" sale of an asset belonging to the LLC was specifically addressed by the contract); *see also IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 137, 141-42 (2009). Here, the relevant transactions and requested remedy are at least as traceable—if not more so—to the underlying contracts as those in *Pappas* and *IDT.* Transacting Plaintiffs'

---

[28] Plaintiffs cannot plead fraudulent concealment as they were on inquiry notice no later than June 19, 2008. *See supra* Part II.E.

only claim for "unjust enrichment" is based on the alleged obligations under their Swiss franc forwards.  Payments under those agreements are what Transacting Plaintiffs claim they were contractually entitled to receive.  Applying the same approach as employed by the New York Court of Appeals, Transacting Plaintiffs' unjust enrichment claims should be dismissed.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Amended Complaint with prejudice.


Dated: August 18, 2015                                     Respectfully Submitted,


/s/ Peter Sullivan_____          /s/ Thomas C. Rice_____
Peter Sullivan                                            Thomas C. Rice
Lawrence J. Zweifach                               Paul C. Gluckow
                                                              Shannon P. Torres
                                                              Omari L. Mason
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue                                       SIMPSON THACHER & BARTLETT LLP
New York, New York 10166-0193            425 Lexington Avenue
Telephone: (212) 351-4000                       New York, New York 10017
psullivan@gibsondunn.com                      Telephone: (212) 455-2000
lzweifach@gibsondunn.com                      trice@stblaw.com
                                                              pgluckow@stblaw.com
                                                              storres@stblaw.com
Joel S. Sanders (*admitted pro hac vice*)     omason@stblaw.com
Joshua D. Dick
555 Mission Street, Suite 3000
San Francisco, California 94105                *Attorneys for Defendant JPMorgan Chase & Co.*
jsanders@gibsondunn.com
jdick@gibsondunn.com


*Attorneys for Defendant UBS AG*

/s/ Joel Kurtzberg            
Herbert S. Washer
Elai Katz
Joel Kurtzberg

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com

*Attorneys for Defendant Credit Suisse
Group AG and Credit Suisse AG*


/s/ Fraser L. Hunter, Jr.         
Fraser L. Hunter, Jr.
David S. Lesser
Jamie Dycus

WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
fraser.hunter@wilmerhale.com
david.lesser@wilmerhale.com
jamie.dycus@wilmerhale.com

*Attorneys for Defendant The Royal Bank of
Scotland plc*

/s/ Moses Silverman             
Moses Silverman
Andrew C. Finch
Michael J. Biondi

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3355
msilverman@paulweiss.com
afinch@paulweiss.com
mbiondi@paulweiss.com

*Attorneys for Defendants Deutsche Bank AG and
DB Group Services UK Limited*