UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SONTERRA CAPITAL MASTER FUND
LTD., FRONTPOINT EUROPEAN FUND,
L.P., FRONTPOINT FINANCIAL
SERVICES FUND, L.P., FRONTPOINT
HEALTHCARE FLAGSHIP ENHANCED
FUND, L.P., FRONTPOINT
HEALTHCARE FLAGSHIP FUND, L.P.,
FRONTPOINT HEALTHCARE
HORIZONS FUND, L.P., FRONTPOINT
FINANCIAL HORIZONS FUND, L.P.,
FRONTPOINT UTILITY AND ENERGY
FUND L.P., HUNTER GLOBAL
INVESTORS FUND I, L.P., HUNTER
GLOBAL INVESTORS FUND II, L.P.,
HUNTER GLOBAL INVESTORS
OFFSHORE FUND LTD., HUNTER
GLOBAL INVESTORS OFFSHORE FUND
II LTD., HUNTER GLOBAL INVESTORS
SRI FUND LTD., HG HOLDINGS LTD.,
HG HOLDINGS II LTD., and FRANK
DIVITTO, on behalf of themselves and all
others similarly situated,

                              Plaintiffs,

        -against-

CREDIT SUISSE GROUP AG, CREDIT
SUISSE AG, JPMORGAN CHASE & CO.,
THE ROYAL BANK OF SCOTLAND PLC,
UBS AG, BLUECREST CAPITAL
MANAGEMENT LLP, DEUTSCHE BANK
AG, DB GROUP SERVICES UK LIMITED,
AND JOHN DOE NOS. 1-50,

                              Defendants.

1:15-cv-00871 (SHS)

<u>OPINION & ORDER</u>

Table of Contents

I. Background ...................................................................................... 7
   A. Summary of CHF LIBOR .......................................................... 8
   B. Relationship between CHF LIBOR and Swiss Franc
      Derivatives ............................................................................. 8
   C. The Parties and the Types of Swiss Franc Derivatives ......... 9
   D. Alleged CHF LIBOR Manipulation ........................................ 11
      1. Daily Fixes and Longer-Term Bias ................................. 12
      2. Specific Instances of Manipulation ............................... 12
         a. Intra-Defendant Manipulation ................................. 13
         b. Inter-Defendant Collusion ...................................... 13
      3. Systemic Nature of Manipulation ................................. 15
   E. Bid-Ask Manipulation ........................................................... 16
   F. Regulatory Investigations and Settlements with
      Defendants ............................................................................. 17
   G. The Complaint, Plaintiffs' Claims, and the Proposed
      Class ....................................................................................... 18
II. Article III Standing ......................................................................... 19
   A. Standard ................................................................................. 19
   B. Plaintiffs Lack Article III Standing to Bring Their
      Bid-Ask Spread Claims .......................................................... 20
   C. Plaintiffs Have Article III Standing to Bring Their CHF
      LIBOR Manipulation Claims with Respect to CHF
      Futures and FX Forwards ...................................................... 23
   D. Plaintiffs Have Class Standing to Bring Their CHF
      LIBOR Manipulation Claims with Respect to Interest
      Rate Swaps and NYSE LIFFE Exchange Futures
      Contracts ................................................................................ 27
III. Standard of Review for Motion to Dismiss for Failure to
    State a Claim ................................................................................ 29
IV. Antitrust Claim (Count Two) ......................................................... 31
   A. Conduct in Violation of Section One ..................................... 32
      1. The Alleged Conduct Constitutes a Restraint of
         Trade .............................................................................. 32
      2. Plaintiffs Allege a Plausible Antitrust Conspiracy
         Against Only RBS ........................................................... 33
   B. Antitrust Standing ................................................................. 40

     1.    Plaintiffs Adequately Allege Antitrust Injury ................. 40

     2.    Only the Direct Transaction Plaintiffs Are Efficient
           Enforcers ........................................................................ 42

        a.   Directness of Causation of the Injury ........................... 43

        b.   Existence of More Direct Victims ................................. 48

        c.   Speculative Damages ...................................................... 50

        d.   Duplicative Recovery and Complex
            Apportionment ................................................................ 53

  C.    Statute of Limitations ............................................................. 54

     1.    The Complaint Fails to Allege Antitrust Violations
         Within the Four-Year Statute of Limitations ................... 55

     2.    Count Two is Timely Because the Statute of
         Limitations is Tolled by the Fraudulent Concealment
         Doctrine ............................................................................ 56

  D.    The FTAIA Does Not Bar Count Two ................................. 59

V.  CEA Claims (Counts Three, Four, and Five) ............................... 60

  A.    The CEA Does Not Cover CHF FX Forwards ..................... 61

  B.    Counts Three, Four, and Five Fail Because Plaintiffs
      Lack CEA Standing ................................................................. 61

  C.    While Plaintiffs Lack CEA Standing, They Have
      Plausibly Alleged Manipulation by the Deutsche Bank
      Defendants, RBS, and UBS ..................................................... 64

  D.    While Plaintiffs Lack CEA Standing, They Have
      Plausibly Alleged Principal-Agent Liability Against the
      Deutsche Bank Defendants, RBS, and UBS ......................... 67

  E.    While Plaintiffs Lack CEA Standing, They Have
      Plausibly Alleged Aiding and Abetting Liability
      Against RBS ............................................................................. 68

  F.    The CEA Claims Are Timely Against All Defendants
      Except UBS ............................................................................... 68

VI.  RICO Claims (Counts Six and Seven) ......................................... 70

  A.    Plaintiffs Have RICO Standing ............................................. 71

  B.    The Complaint Adequately Alleges Conduct that
      Violates RICO  Only as to RBS ............................................. 72

     1.    The Complaint Adequately Alleges an Association-in-
         Fact RICO Enterprise Only as to RBS .............................. 72

    2.    The Complaint Adequately Alleges Two Predicate
        Acts of Wire Fraud by RBS ................................................ 73

    3.    The Complaint Adequately Alleges that RBS Engaged
        in a Pattern of Racketeering Activity ............................... 75

 C.    The Complaint Adequately Alleges a RICO Conspiracy
      Only as to RBS ........................................................................ 76

 D.    The RICO Claims Are Dismissed in Full as
      Impermissibly Extraterritorial ............................................. 76

 E.    Plaintiffs' RICO Claims Are Timely ..................................... 81

VII.  The Court Declines to Exercise Supplemental Jurisdiction
     over the State Law Claims (Counts Eight and Nine) .............. 82

VIII. Personal Jurisdiction ................................................................... 83

 A.    Defendants' Operations and U.S. Connections ................... 84

    1.    BlueCrest ................................................................................. 84

    2.    The Credit Suisse Defendants ............................................. 84

    3.    Deutsche Bank AG ................................................................ 85

    4.    DB Group Services ................................................................ 85

    5.    RBS ........................................................................................... 85

    6.    UBS .......................................................................................... 85

 B.    Personal Jurisdiction Standard ............................................. 86

 C.    No Defendant Has Consented to the Court's General
      Jurisdiction ................................................................................ 86

 D.    Specific Jurisdiction ................................................................ 89

    1.    Standard .................................................................................. 90

    2.    The National Contacts Test Applies to Plaintiffs'
        Federal Claims ....................................................................... 91

    3.    Bloomberg Chats Transmitted Through Servers in
        New York Do Not Constitute Meaningful Contacts
        with the Forum ..................................................................... 92

    4.    Defendants Causing Thomson Reuters To Disseminate
        False CHF LIBOR into the United States Does Not
        Itself Create Sufficient Contacts ......................................... 93

    5.    The Court Has Personal Jurisdiction Over RBS, UBS,
        the Credit Suisse Defendants and Deutsche Bank AG
        Because Manipulating CHF LIBOR for the Purpose of
        Profiting from Transactions in CHF LIBOR-Based

         Derivatives within the United States Constitutes
         Purposeful Availment of the Forum ................................. 94

     6.   The Court Lacks Personal Jurisdiction Over DB Group
         Services and  BlueCrest Because They Are Not
         Plausibly Alleged to Have Transacted in CHF
         LIBOR-Based Derivatives in the United States.............. 102

     7.   RBS's Conspiracy from Abroad with JPMorgan in the
         Forum Reinforces the Conclusion that RBS Is Subject
         to the Court's Jurisdiction................................................. 103

  E.    Fair Play and Substantial Justice ......................................... 106
  F.    Jurisdictional Discovery ...................................................... 106

IX. Leave to Replead .......................................................................... 107

X.  Conclusion.................................................................................... 108

SIDNEY H. STEIN, U.S. District Judge.

This putative class action is based primarily on allegations that defendants unlawfully manipulated the Swiss franc London InterBank Offered Rate ("CHF LIBOR"), a daily interest rate benchmark designed to reflect the cost at which large banks are able to borrow Swiss francs. According to plaintiffs' First Amended Complaint (the "Complaint"), changes in CHF LIBOR affect the prices of numerous Swiss franc currency derivatives, such as Swiss franc foreign exchange forwards ("CHF FX forwards") and Swiss franc futures contracts ("CHF futures contracts"). The Complaint alleges that from at least January 1, 2001 through at least December 31, 2011 (the "Class Period") defendants – eight large financial institutions – conspired to manipulate CHF LIBOR, and thereby the prices of those derivatives, to benefit their own trading positions in Swiss franc currency derivatives.  The essence of plaintiffs' claims is that they and others similarly situated were on the losing end of that manipulation, transacting in Swiss franc derivatives with defendants and third parties during the Class Period on terms made less favorable by (1) defendants' fixing of CHF LIBOR and (2) certain defendants' collusion to increase the "bid-ask spread" on transactions in those derivatives.  Based on this alleged misconduct, the Complaint asserts claims against all defendants under the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, the Commodities

Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, as well as state law claims against defendants Credit Suisse AG, Credit Suisse Group AG, and UBS AG for unjust enrichment and breach of the implied covenant of good faith and fair dealing.

The Complaint draws its allegations largely from the statements of fact accompanying numerous settlements, for an aggregate value of over $7 billion, that defendants have reached with U.S. and European regulators arising from their alleged manipulation of LIBOR for Swiss francs and several other currencies. Allegations of LIBOR manipulation, and the resulting regulatory investigations and settlements, have received widespread media coverage. In recent years, several purported class actions have also been filed in this judicial district alleging similar manipulation of LIBOR rates for other currencies. *See, e.g., In re: LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666 (S.D.N.Y. 2013) (U.S. dollars); *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) (Yen); *Sullivan v. Barclays PLC*, No. 13-cv-2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) (Euros).

Currently before the Court are defendants' motions to dismiss the Complaint.[1] While these motions were pending, plaintiffs and defendant JPMorgan Chase & Co. ("JPMorgan") executed an agreement to settle all claims against JPMorgan on a class-wide basis. *See* Doc. 146. Accordingly, the motions to dismiss are deemed withdrawn as to JPMorgan without prejudice to refiling in the event the Court does not approve the class settlement with JPMorgan, and allegations against JPMorgan will be recounted only as relevant to the remaining defendants. Each of the remaining seven defendants move to dismiss the Complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state

---

[1] Two separate motions are addressed in this opinion: (1) the motion of Credit Suisse Group AG, Credit Suisse AG, The Royal Bank of Scotland PLC, UBS AG, Deutsche Bank AG, and DB Group Services UK Limited to dismiss for lack of subject matter jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1), (b)(2), and (b)(6) [Doc. 63]; and (2) the motion of BlueCrest Capital Management Group, LLP, to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1), (b)(2), and (b)(6) [Doc. 74].

a claim.  *See* Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6).  These motions encompass a variety of challenges to the Complaint: ranging from standing, timeliness, extraterritoriality, and personal jurisdiction to nearly each element of every claim.

The Court concludes that the Complaint fails to state any claim for which relief can be granted.  As an initial matter, plaintiffs lack Article III standing to sue for the manipulation of bid-ask spreads because they have not alleged that they were injured by that manipulation.   With respect to plaintiffs' antitrust claim for manipulation of CHF LIBOR, the Complaint fails to plausibly allege an antitrust conspiracy against any defendant except RBS.  While the Complaint makes numerous detailed allegations that several defendants independently manipulated CHF LIBOR, it is devoid of specific or plausible allegations that defendants other than RBS conspired with each other to do so.  Moreover, plaintiffs' antitrust claim against RBS fails for lack of antitrust standing because plaintiffs did not transact in CHF LIBOR-based derivatives with RBS and therefore are not "efficient enforcers" of the antitrust laws.   Plaintiffs' CEA claims fail because they have not provided sufficient details about their transactions to plausibly allege that they were injured by defendants' alleged manipulation of CHF LIBOR.  Plaintiffs' RICO claims are dismissed as impermissibly extraterritorial because the alleged scheme to manipulate CHF LIBOR was, with limited exceptions, centered in Europe and touched the United States only as part of a global scheme.  Because the Complaint fails to state a viable claim under federal law, the Court declines to exercise its supplemental jurisdiction over the state law claims.

For these reasons and those provided below, defendants' motions to dismiss are granted, and plaintiffs' claims are dismissed in full with leave to replead.

## I.    BACKGROUND

The following facts are as alleged in the Complaint and are taken as true solely for the purpose of these motions.

A.      **Summary of CHF LIBOR**

CHF LIBOR is determined and disseminated by the British Bankers Association ("BBA") in London.  To set CHF LIBOR, each trading day twelve "contributor panel banks" – including five of the eight defendants in this case – submit to the BBA the interest rate at which they could borrow Swiss francs "in a reasonable market size just prior to 11:00 A.M. London time." Compl. ¶ 71.  The twelve contributor banks submit quotes for fifteen different borrowing durations, or "tenors," ranging from overnight to twelve months.  *Id.* ¶ 72.  Acting as an agent for the BBA, Thomson Reuters calculates CHF LIBOR for each tenor by ranking the quotes in numerical order and then averaging the middle 50% of the quotes, disregarding the bottom 25% and top 25%.[2]  The resulting number, referred to as the "fix," becomes the official CHF LIBOR for each tenor and is disseminated globally, along with each bank's submission, by Thomson Reuters and other financial services platforms, including into the United States through U.S. wires.  *Id.* ¶ 73.  To ensure the integrity of the rate setting process, BBA guidelines require that contributor banks submit quotes without regard for any factor unrelated to their cost of borrowing Swiss francs.

B.      **Relationship between CHF LIBOR and Swiss Franc Derivatives**

The Complaint identifies several types of Swiss franc currency derivatives as "Swiss franc LIBOR-based derivatives" that it maintains are each "priced, benchmarked, and/or settled using a mathematical formula that incorporates Swiss franc LIBOR as one of its terms." Compl. ¶ 86. Because of this incorporation, the Complaint alleges, the values of these derivatives are manipulated when CHF LIBOR is manipulated.  For example, both CHF futures contracts and CHF FX forwards "are agreements to buy or sell a certain amount of Swiss francs in terms of another currency, *e.g.*, U.S. Dollars, on some future date," and the "cost of

---

[2]  For example, if all twelve contributor banks submitted quotes, the bottom three and top three quotes would be discarded, with CHF LIBOR set as the average of the middle six quotes.

buying or selling Swiss francs in the future is determined using an industry standard formula that incorporates Swiss franc LIBOR." *Id.* ¶ 87. According to the Complaint, a decline in CHF LIBOR causes an increase in the future price of Swiss francs, which increases the value of CHF futures contracts and CHF FX forwards. *See id.* ¶¶ 194-95.

The Complaint purports to demonstrate that CHF LIBOR was artificial throughout the Class Period through a statistical analysis comparing CHF LIBOR to the rate of borrowing Swiss francs in "actual money market transactions." *Id.* ¶ 181. While there should have been little to no difference between CHF LIBOR and the actual cost of borrowing, plaintiffs allege, their analysis revealed a substantial discrepancy.

## C. The Parties and the Types of Swiss Franc Derivatives

Five of the defendants – UBS AG ("UBS"), The Royal Bank of Scotland PLC ("RBS"), JPMorgan Chase & Co. ("JPMorgan"), Credit Suisse Group AG ("Credit Suisse Group"), and Deutsche Bank AG (collectively, the "Contributor Bank Defendants") – are among the twelve "contributor banks" whose quotes set CHF LIBOR.[3] Compl. ¶ 4. Defendants Credit Suisse AG and DB Group Services UK Limited ("DB Group Services") are subsidiaries of Credit Suisse Group[4] and Deutsche Bank AG,[5] respectively. The last defendant, BlueCrest Capital Management LLP ("BlueCrest"), is an investment advisory services firm alleged to have requested that Deutsche Bank AG submit an artificial CHF LIBOR quote.

---

[3] According to defendants, "JPMorgan Chase & Co. is a financial holding company that was never a member of the panel of banks that submitted or contributed to Swiss franc LIBOR, though its affiliate was a panel bank. Similarly, Credit Suisse Group AG is a financial holding company that was never a member of the panel of banks that submitted or contributed to Swiss franc LIBOR, though its affiliate, Credit Suisse AG, was a panel bank." Doc. 73 at 3 n.2.

[4] Credit Suisse Group AG and Credit Suisse AG are collectively referred to as the "Credit Suisse Defendants."

[5] Deutsche Bank AG and DB Group Services UK Limited are collectively referred to as the "Deutsche Bank Defendants."

JPMorgan is a Delaware financial holding company with its headquarters in New York, NY. Each of the other defendants are headquartered and incorporated in Europe but are alleged to have substantial operations within the United States or affiliates and/or subsidiaries with substantial operations within the United States (the "Foreign Defendants"). *See id.* ¶¶ 38-66.

Plaintiffs are investment funds, financial services companies, and one individual who allege that during the Class Period they suffered injury by entering into U.S.-based transactions for two types of Swiss franc LIBOR-based derivatives – (1) Swiss franc currency futures contracts, and (2) Swiss franc FX forwards – at artificial prices caused by defendants' manipulation of CHF LIBOR. While plaintiffs themselves transacted in only these two types of derivatives, they seek to represent a class of those who transacted in any type of "Swiss franc LIBOR-based derivatives," defined to encompass "over-the-counter instruments, such as interest rate swaps, forward rate agreements, foreign exchange forwards, cross-currency swaps, overnight index swaps, and tenor basis swaps, as well as exchange-traded futures and options, such as the three-month Euro Swiss franc futures contract traded on the NYSE LIFFE Exchange and the Swiss franc currency futures contract traded on the CME." *Id.* ¶ 75.

Plaintiff Frank Divitto, an Ohio resident, alleges that he transacted in Swiss franc currency futures contracts traded on the Chicago Mercantile Exchange ("CME"). *Id.* ¶ 37. The Complaint does not provide any details of these transactions, beyond stating that they occurred "[d]uring the Class Period." *Id.* According to the Complaint, Swiss franc futures contracts are "standardized bilateral agreements that call for the purchase or sale of an underlying commodity on a certain future date." *Id.* ¶ 76. "For example, a June 2015 CME Swiss franc currency futures contract is an agreement for the purchase or sale of CHF 125,000 in exchange for U.S. Dollars on the third Wednesday of June 2015. This futures contract is 'standardized' and trades in accordance with the rules specified by the CME, a Designated Contract Market pursuant to Section 5 of the CEA (7 U.S.C. § 7)." *Id.* For a futures contract traded on an exchange such as the CME the exchange functions as the intermediary, and there is no identifiable counterparty, as there would be for an "over the counter" ("OTC") transaction.

Aside from Divitto, each plaintiff claims to have transacted in Swiss franc FX forwards. Whereas Swiss Franc futures contracts are traded on an exchange, other types of Swiss franc based derivatives trade over the counter in transactions directly between private parties. A CHF FX forward agreement is "the OTC equivalent to a currency futures contract," under which the parties "agree to buy or sell a custom amount of Swiss francs at a specified price on a certain date." *Id.* ¶ 81. FX forwards can be attractive because they provide "similar functionality to the standardized exchange-traded contracts but with greater flexibility, allowing the parties to customize certain terms such as duration of their agreement, the 'notional amount,' i.e., total value, of the contract, and the settlement date." *Id.*

Plaintiffs FrontPoint Healthcare Flagship Enhanced Fund, L.P., FrontPoint Healthcare Flagship Fund, L.P., and FrontPoint Healthcare Horizons Fund, L.P. (the "Direct Transaction Plaintiffs") allege that they transacted in FX forwards "directly with Defendants UBS and Credit Suisse." *Id.* ¶¶ 23-25. According to the Complaint, the Direct Transaction Plaintiffs entered into "over 400 Swiss franc currency forwards with Credit Suisse and over 1,300 Swiss franc currency forwards with UBS." *Id.* ¶ 310. The Complaint provides specific dates and amounts for some of these transactions, in contrast with the Divitto allegations. *See id.* ¶¶ 202-04.

The remaining plaintiffs allege that they transacted in Swiss franc FX forwards with third parties at prices that were artificial due to defendants' manipulation. According to the Complaint, trillions of dollars in Swiss franc LIBOR-based derivatives were traded within the United States during the Class Period. *Id.* ¶ 80.

### D. Alleged CHF LIBOR Manipulation

Plaintiffs allege that defendants abused their control over CHF LIBOR to move the price of these Swiss franc LIBOR-based derivatives in whatever direction benefited their own trading positions or those of their coconspirators. According to the Complaint, "[t]he Contributor Bank Defendants made false Swiss franc LIBOR submissions in response to requests from their own Swiss franc LIBOR-based derivatives traders, including traders in the United States, as well as those made by co-

conspirator banks, hedge funds, and inter-dealer brokers, some of which are based in the United States." Compl. ¶ 99.

### 1.    Daily Fixes and Longer-Term Bias

The Complaint alleges two forms of CHF LIBOR manipulation. First, defendants' traders allegedly requested "fixings" on specific "days where one or more of the Defendants had a Swiss franc LIBOR-based derivatives position that was going to be priced, benchmarked and/or settled based on Swiss franc LIBOR." Compl. ¶ 100. Second, "Defendants also requested false Swiss franc LIBOR submissions to inject a certain 'bias' into the Swiss franc LIBOR fixing, permanently manipulating specific tenors higher or lower by making false submissions over long periods of time." *Id*. ¶ 101.

As will be significant in assessing the plausibility of the alleged conspiracy, both the "daily fixes" and the longer-term "bias" are alleged to have manipulated CHF LIBOR "higher or lower" depending on which would profit whatever defendants' derivatives positions were at that time, rather than in any consistent direction. *Id*. ¶¶ 101, 129. This is in contrast to some of the other recent cases alleging LIBOR manipulation based on a theory of persistent suppression, in which contributor banks made "submission[s] reporting an artificially low cost of borrowing" in order to "project financial health." *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 766 (2d Cir. 2016).

### 2.    Specific Instances of Manipulation

The Complaint provides specific examples of defendants' requests for manipulation taken from government regulators' statements of fact accompanying their settlements with defendants. These examples include both requests to a defendant to submit false LIBOR quotes made by a defendant's own trader (which the Court will refer to as "intra-defendant manipulation") and requests to a defendant to submit false LIBOR quotes made by a different defendant (which the Court will refer to as "inter-defendant collusion"). Because the distinction between intra-defendant manipulation and inter-defendant collusion will be quite significant for

plaintiffs' antitrust and RICO claims, the specific allegations concerning the two are summarized separately.

### a.    Intra-Defendant Manipulation

With respect to intra-defendant manipulation, the Complaint is replete with specific instances of UBS, RBS, and Deutsche Bank AG manipulating their own submissions to benefit their own trading positions. For example, on July 5, 2006, a UBS submitter agreed to a UBS Swiss franc derivative trader's request "for high 1 month fix." Compl. ¶ 103. Similarly, on October 3, 2008, a Deutsche Bank AG submitter agreed to a Deutsche Bank AG trader's request for "very low 1 month please." *Id.* ¶ 109. And on October 21, 2008, the "primary submitter" for RBS accommodated an RBS Swiss franc trader's request that "we need that libor down fast." *Id.* ¶ 191.

These specific instances are alleged to be emblematic of a systemic pattern of conduct throughout the Class Period. The Complaint claims that, "[s]tarting at least as early as 2001, and continuing until at least September 1, 2009, on each trading day on which UBS had Swiss franc trading positions, UBS's Swiss franc LIBOR submitters rounded UBS's Swiss franc LIBOR submissions to benefit UBS's global Swiss franc trading positions." *Id.* ¶ 117. According to the Complaint, Deutsche Bank AG "had a similar policy in place, focused on policing the 'spread' or difference between certain tenors of LIBOR, including Swiss franc LIBOR." *Id.* ¶ 119. "Deutsche Bank's LIBOR submitters, including those who made Swiss franc LIBOR submissions, routinely built this spread 'bias' into Deutsche Bank's LIBOR submissions, pushing the spread between different tenors of LIBOR wider, even in the absence of written communications from traders requesting a specific false rate." *Id.* ¶ 120. And the Complaint alleges that RBS traders requested false CHF LIBOR submissions "continuously during Class Period . . . as often as several times each week." *Id.* ¶ 102.

### b.    Inter-Defendant Collusion

Turning to the claims of inter-defendant collusion, the specific allegations as to several defendants are sparse. Indeed, the Complaint

itself characterizes these allegations as the "handful of examples of inter-Defendant communications released in the government settlements to date."[6] Compl. ¶ 123. BlueCrest – which was not a contributor bank and therefore would have had to collude with a contributor bank in order to manipulate CHF LIBOR – is alleged to have requested a false one-month CHF LIBOR submission from Deutsche Bank AG on February 10, 2005, stating: "Can't you ask your fft to contribute 1m chf libor very low today?? I have 10 yr of fix, 8 of which against ubs, and they're getting on my nerves." *Id.* ¶ 131. The Complaint does not allege that Deutsche Bank AG responded to this request, much less that it submitted a false CHF LIBOR quote in response to the request. And, in something of a hybrid of intra-defendant manipulation and inter-defendant collusion, the Complaint alleges that Deutsche Bank AG manipulated CHF LIBOR at the request of derivative traders at DB Group Services, its affiliate. *See id.* ¶¶ 111-13.

The allegations of inter-defendant collusion are strongest against RBS. The Complaint contains multiple specific allegations of RBS traders discussing manipulation of CHF LIBOR with an unidentified "Bank E." *Id.* ¶¶ 124, 213, & App'x. Additionally, the European Commission found that "RBS and JPMorgan operated a cartel aimed at manipulating Swiss franc LIBOR to 'distort the normal pricing of interest rate derivatives denominated in Swiss franc.'" *Id.* ¶ 139. In a supplemental brief, plaintiffs allege that documents JPMorgan recently produced pursuant to its settlement of this action further corroborate that a JPMorgan trader in New York conspired with an RBS trader in Europe to repeatedly manipulate CHF LIBOR.

The Complaint also alleges that RBS manipulated CHF LIBOR through a "hub and spoke" conspiracy in which "inter-dealer brokers" accepted "requests for false LIBOR submissions from panel banks and

---

[6] The Complaint attempts to supplement this "handful" through instances of defendants manipulating LIBOR for other currencies, such as Yen. *See, e.g.*, Compl. ¶ 136. But plaintiffs cannot rely on manipulation of a separate currency to make out their claims here. *See In re Libor-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"), No. 11-MDL-2262, 2015 WL 4634541, at *38 (S.D.N.Y. Aug. 4, 2015).)

other market participants and coordinated the submissions of other panel members to move the market in the agreed upon direction." *Id.* ¶¶ 133-34. The Complaint cites a United Kingdom Financial Services Authority finding of "at least five requests for Swiss franc LIBOR submissions made by an external trader and inter-dealer broker that RBS followed during the Class Period." *Id.* ¶ 137. The Complaint alleges generally that other defendants participated in this "hub and spoke" conspiracy as well, but lacks any specific allegations because "the banks and brokers on the other side of these requests have not been identified and the communications associated with these requests for false submissions have not been released." *Id.*

The Complaint contains no specific allegations that UBS colluded with any other entity to manipulate Swiss franc LIBOR submissions or that the Credit Suisse Defendants manipulated CHF LIBOR at all, either alone or through collusion.

### 3. Systemic Nature of Manipulation

Plaintiffs maintain that these specific instances of manipulation were not isolated incidents or the actions of a few rogue traders, but rather part of a widespread scheme that was facilitated and encouraged by defendants as institutions. The Complaint alleges that defendants facilitated their LIBOR manipulation through various structural decisions, such as "(1) making structural changes to their money markets and LIBOR-based derivatives trading desks to create an environment where LIBOR manipulation, including the coordination of requests for false submissions between traders and submitters, was encouraged; [and] (2) implementing lax compliance standards that failed to detect any misconduct." Compl. ¶ 140.

As with the allegations of specific instances of manipulation, the adequacy of the allegations of systemic facilitation of manipulation varies widely from defendant to defendant. The Complaint alleges that Deutsche Bank AG and UBS allowed CHF LIBOR derivative traders, who had a financial stake in CHF LIBOR, to submit quotes, and that RBS reorganized its trading desk to place CHF derivative traders next to CHF LIBOR submitters for the express purpose of allowing traders to share financial

positions with the submitters. *See id.* ¶¶ 141, 146, 150. Deutsche Bank AG allegedly "even held weekly meetings to ensure that its Swiss franc LIBOR-based derivative traders and submitters were on the same page and manipulated the rate in a direction that helped the bank." *Id.* ¶ 110. According to the Complaint, RBS, UBS, and Deutsche Bank AG failed to conduct investigations of misconduct or placed submitters themselves in charge of such investigations. *See id.* ¶¶ 154, 160, 164. The Complaint is devoid of any allegations that BlueCrest, DB Group Services, or the Credit Suisse Defendants engaged in any similar structural facilitation of CHF LIBOR manipulation.

E. **Bid-Ask Manipulation**

The Complaint alleges that defendants, in addition to manipulating CHF LIBOR, colluded during the Class Period to increase the "bid-ask spread" that they charged as market makers in the over-the-counter LIBOR-based derivatives market. Compl. ¶ 90. The bid-ask spread is the difference between the "bid" price at which a market maker, such as the defendants, offers to buy LIBOR-based derivatives, and the "ask" price at which the market maker will sell that same derivative. *Id.* ¶ 3. The alleged purpose of this conspiracy was "to quote wider, fixed bid-ask spreads to all non-members for over-the-counter Swiss franc LIBOR-based derivatives, while agreeing to maintain a narrower bid-ask spread for trades amongst themselves." *Id.* ¶ 93. Essentially, widening the bid-ask spread would increase defendants' profits on every transaction "because it allows them to buy derivatives from Class members at an artificially lower bid price and then resell them to other Class members at an artificially higher ask price." *Id.* ¶ 94.

While the Complaint at times suggest that this conspiracy included "defendants" collectively, its only specific allegations are based on a settlement between the European Commission and RBS, UBS, JPMorgan, and Credit Suisse Group AG – referred to in the Complaint as the "EC Cartel Defendants." The EC Commission's decision accompanying the settlement found that the EC Cartel Defendants manipulated bid-ask spreads for specific types of Swiss franc currency derivatives between May and September 2007. The Complaint does not individually accuse any

defendant other than the EC Cartel Defendants of participating in the bid-ask spread conspiracy.

**F.      Regulatory      Investigations      and      Settlements      with
         Defendants**

As noted, defendants' alleged manipulation of CHF LIBOR and the bid-ask spreads for certain types of CHF LIBOR-based derivatives led to a number of enforcement actions and settlements between defendants and regulators in the United States and Europe, and the findings of those actions provide the core allegations to the Complaint.  The first of these actions was made public on December 18 and 19, 2012, when UBS reached settlements with the U.S. Department of Justice ("DOJ"), the U.S. Commodities Futures Trading Commission ("CFTC"), and the United Kingdom's Financial Services Authority ("FSA") for widespread manipulation of CHF LIBOR.

The second round of these actions was made public on February 2, 2013, when RBS likewise reached settlements with the DOJ, CFTC, and FSA for repeated manipulation of CHF LIBOR between 2006 and 2010. And on October 21, 2014, RBS and JPMorgan reached a settlement with the European Commission for, in the words of the statement accompanying the settlement, colluding to "distort the normal course of pricing of interest rate derivatives denominated in Swiss franc" between March 2008 and July 2009.  *Id.* ¶ 55.  Also on October 21, 2014, the EC Cartel Defendants reached a settlement with the European Commission for manipulation of the bid-ask spread for certain Swiss franc currency derivatives between May 2007 and September 2007.  *Id.* ¶ 92.

Last, on April 23, 2015, Deutsche Bank AG reached settlements with the DOJ, CFTC, the United Kingdom's Financial Conduct Authority, and the New York State Department of Financial Services.  The DOJ statement of facts accompanying the settlement states that "[f]rom at least 2003 through at least 2010, DB derivatives traders requested and obtained benchmark interest rate submissions that benefited their trading

positions."[7]  DB Group Services likewise entered a settlement with the DOJ on April 23, 2015, based partly on its employment of traders in London requesting false CHF LIBOR quotes.  *See id.* ¶ 53.

### G. The Complaint, Plaintiffs' Claims, and the Proposed Class

On February 5, 2015, plaintiffs filed a complaint against Credit Suisse Group AG, JPMorgan Chase & Co., RBS, UBS AG, and John Doe Nos. 1-50.  On June 19, 2015, plaintiffs filed their First Amended Complaint (again, the "Complaint") to add Credit Suisse AG, the Deutsche Bank Defendants, and BlueCrest as defendants, as well as additional allegations.  Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 and seek to represent "[a]ll persons or entities that engaged in U.S.-based transactions in financial instruments that were priced, benchmarked, and/or settled to Swiss franc LIBOR at any time from at least January 1, 2001, through at least December 31, 2011 (the 'Class')."  Compl. ¶ 224.

The Complaint asserts nine causes of action.  Plaintiffs bring two antitrust claims against all defendants for violations of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.* – one based on collusion to manipulate Swiss franc derivative bid-ask spreads ("Count One"), and one based on collusion to manipulate CHF LIBOR ("Count Two").  Plaintiffs also assert three claims against all defendants under the CEA, 7 U.S.C. §§ 1, *et seq.* – one for violations of the CEA based on manipulation of CHF LIBOR ("Count Three"), one for principal-agent liability for those violations ("Count Four"), and one for aiding and abetting other defendants' violations ("Count Five").  Next, plaintiffs assert claims against each defendant for violation of RICO, 18 U.S.C. §1962(c) ("Count Six") based on their intentional manipulation of CHF LIBOR through the use of U.S. wires, and for RICO conspiracy in violation of 18 U.S.C. § 1962(d), ("Count Seven").  Last, plaintiffs assert state law claims of unjust enrichment ("Count Eight") and breach of the implied covenant of good faith and fair dealing ("Count Nine") against the Credit Suisse Defendants and UBS for

---

[7]  DOJ Deferred Prosecution Agreement and Attachment A Statement of Facts with Deutsche Bank AG at 9, *USA v. Deutsche Bank AG,* No. 15-cr-61, Dkt. No. 6 (D. Conn. Apr. 23, 2015); *see also* Compl. ¶ 106.

transacting with plaintiffs in Swiss franc FX forwards at artificial prices caused by their manipulation.

## II. Article III Standing

Defendants move to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that plaintiffs have not alleged an injury in fact and therefore lack Article III standing to bring their claims. With respect to the claims based on the alleged manipulation of bid-ask spreads (the "Bid-Ask Spread Claims"), defendants contend that plaintiffs have failed to allege that plaintiffs transacted in the types of derivatives they allege were affected. With respect to claims based on the alleged manipulation of CHF LIBOR (the "CHF LIBOR Manipulation Claims"), defendants argue that plaintiffs have not plausibly alleged that any manipulation of CHF LIBOR affects the price of the Swiss franc currency derivatives, and that plaintiffs lack standing to sue for manipulation of types of Swiss franc currency derivatives in which they did not themselves transact. For the reasons below, the Court concludes that plaintiffs have standing to pursue their CHF LIBOR Manipulation Claims, with certain exceptions, but not their Bid-Ask Spread Claims.

### A. Standard

"Standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). As the parties invoking federal jurisdiction, plaintiffs bear the burden of establishing standing to bring their claims, and thus the Court's jurisdiction to hear those claims. *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015). "To establish Article III standing, a plaintiff must . . . allege, and ultimately prove, that he has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003). The alleged injury in fact must be "concrete and

particularized, actual or imminent, and fairly traceable to the challenged action." *WC Capital Mgmt., LLC v. UBS Secs., LLC*, 711 F.3d 322, 329 (2d Cir. 2013) (citations omitted).

Article III's "injury in fact" requirement "is a low threshold." *Ross*, 524 F.3d at 222. The alleged injury "need not be capable of sustaining a valid cause of action" to establish standing, so long as it is "likely redressable by a favorable decision." *Id.* "When we assess a lack-of-standing argument on the basis of the pleadings, moreover, we take as true the factual allegations contained in the complaint." *WC Capital Mgmt., LLC*, 711 F.3d at 329.

Ordinarily, standing requires that a plaintiff "personally suffered an injury" from the challenged conduct. *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche, LLP*, 549 F.3d 100, 107 (2d Cir. 2008). However, "in a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."[8] *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (internal quotation marks, alterations, and citations omitted). This "class standing" "does not turn on whether [plaintiffs] would have statutory or Article III standing." *Id.* at 158.

**B.** **Plaintiffs Lack Article III Standing to Bring Their Bid-Ask Spread Claims**

With respect to the alleged "bid-ask spread" conspiracy, defendants emphasize that the European Commission decision on which all of the Complaint's allegations are based states that the "specific types" of derivatives "concerned by the infringement were limited to: (i) forward

---

[8] "*NECA*'s two-part test, which derives from constitutional standing principles, is … distinct from the criteria that govern whether a named plaintiff is an adequate class representative under Rule 23(a)." *Ret. Bd. Of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 161 (2d Cir. 2014).

rate agreements (referenced to Swiss Franc LIBOR) and (ii) swaps, which include overnight index swaps (referenced to the Swiss Franc TOIS) and interest rate swaps (referenced to Swiss Franc LIBOR)."[9]  But plaintiffs claim to have transacted in only two types of CHF currency derivatives – Swiss franc FX forwards and Swiss franc currency futures contracts. Compl. ¶¶ 20-37.  That is, plaintiffs have not alleged that they transacted in any of the specific types of derivatives covered by the European Commission settlement – forward rate agreements, overnight index swaps, and interest rate swaps.   Instead, the Complaint seeks to lump all of these derivatives together under the umbrella definition of "Swiss franc LIBOR-based derivatives." *See id*. ¶ 75.   It then alleges that defendants manipulated the "bid-ask spread" for "Swiss franc LIBOR-based derivatives" generally without ever alleging manipulation for Swiss franc FX forwards and Swiss franc currency futures contracts specifically.  Thus, defendants argue, plaintiffs have failed to allege that they were injured by any bid-ask spread manipulation.

Tellingly, plaintiffs do not contradict defendants' observation that the Complaint fails to allege bid-ask spread manipulation for the specific types of derivatives in which plaintiffs transacted.  Instead, plaintiffs seek to excuse that failure by protesting that "[l]ittle can be judged at the pleading stage concerning why the EC limited its bid-ask findings to a specified period and specified instruments," and nakedly asserting that "it is plausible that Defendants' misconduct extended well beyond the bounds of their deal with the EC."  Doc. 86 at 33-34.  But mere speculation that defendants' misconduct extended beyond the scope of the European Commission settlement does not satisfy plaintiffs' burden to allege such conduct.   The only attempt to show such manipulation is a cryptic comment in plaintiffs' briefing that "these instruments . . . constituted one integrated Swiss franc LIBOR-based derivatives market."[10]  Doc. 86 at 22-

---

[9]  European Commission Decision at 5-6, Case AT.39924, Swiss Franc Interest Rate Derivatives (Bid Ask Spread Infringement) (Oct. 21, 2014), http://ec.europa.eu/competition/antitrust/cases/dec_docs/39924/39924_1156_3.pdf.

[10]  The conclusory suggestion in plaintiffs' brief (not the Complaint) that the various derivatives constitute "one integrated . . . market" as to bid-ask spreads – presumably to imply that manipulation of the spread for one derivative will affect the spread of

23. That vague, isolated assertion in the briefing is no substitute for a clear allegation that the bid-ask spreads for plaintiffs' derivatives were affected by defendants' manipulation.

Absent such an allegation, plaintiffs cannot show an injury in fact and therefore lack standing to sue on behalf of the proposed class for manipulation of other types of derivatives. As explained in *NECA-IBEW Health & Welfare Fund*, a plaintiff has standing to pursue class members' separate injuries implicating "the same set of concerns" only if it "personally has suffered some actual injury as a result of the putatively illegal conduct." 693 F.3d at 162 (internal quotation marks and alterations omitted).[11] Accordingly, Count One is dismissed for lack of standing, and no other claim can be supported by allegations relating to bid-ask spread manipulation.[12]

---

the others – is far from evident. Unlike CHF LIBOR, which the Complaint alleges is a price input for every derivative, the bid-ask spreads are essentially alleged to be a transaction fee for the market making of specific derivative products. These derivatives are alleged to be distinct products that are sold separately, and the Complaint does not explain why manipulating the spread for one of these products necessarily or even plausibly manipulates the spread as to other separately sold types.

[11] Nor can plaintiffs bootstrap any harm suffered through CHF LIBOR manipulation into standing to represent a class affected by bid-ask spread manipulation, because the Complaint does not plausibly allege that these two alleged patterns of manipulation were part of the same conspiracy. That is, a group of defendants could have agreed to fix bid-ask spreads regardless of the CHF LIBOR rate, and vice versa, and there is no indication that the two conspiracies were part of one interwoven plot, as opposed to two separate sets of misconduct allegedly committed by the same entities.

[12] The Court reads the Complaint to allege bid-ask spread manipulation only in support of Count One, one of its two antitrust claims. But to the extent plaintiffs seek support from these allegations for their other claims as well, they lack standing to do so. And because plaintiffs lack Article III standing to sue for bid-ask spread manipulation, their arguments that this Court has personal jurisdiction over defendants likewise cannot be based on allegations of bid-ask spread manipulation. *See Sunward Electronics, Inc. v. McDonald,* 362 F.3d 17, 24 (2d Cir. 2004) ("A plaintiff must establish the court's jurisdiction with respect to *each* claim asserted."); *In re LIBOR-Based Financial Instruments Antitrust Litigation,* ("*LIBOR VI*"), No. 11-mdl-2262, 2016 WL 7378980, at *3 (S.D.N.Y. Dec. 20, 2016) ("The first step in evaluating personal

**C.** **Plaintiffs Have Article III Standing to Bring Their CHF LIBOR Manipulation Claims with Respect to CHF Futures and FX Forwards**

Defendants also contend that plaintiffs lack Article III standing to pursue their CHF LIBOR Manipulation Claims because they have failed to plausibly allege a connection between CHF LIBOR and the price of the derivatives in which they transacted. Without such a connection, no injury in fact would exist that is fairly traceable to defendants' alleged manipulation. (This argument is also central to defendants' claims that plaintiffs have not adequately pleaded a cognizable injury under the Sherman Act, the CEA, or RICO.)

According to the Complaint, "[t]he cost of buying or selling Swiss francs in the future is determined using an industry standard formula that incorporates Swiss franc LIBOR" which "applies to both CME Swiss franc futures contracts and OTC Swiss franc foreign exchange forwards." Compl. ¶¶ 87-88. The "industry standard formula" that the complaint references is drawn from an FX futures tutorial published by the CME in April 2013. This formula is:

$$\text{Future Price} = \text{Spot Price} \times \left( \frac{1 + [\text{Rterm} \times (d / 360)]}{1 + [\text{Rbase} \times (d / 360)]} \right)$$

The formula "involves taking the 'spot price' of Swiss francs for immediate delivery, and adjusting it to account for the 'cost of carry,' *i.e.*, the amount of interest paid or received on Swiss franc deposits, for the duration of the agreement. Swiss franc LIBOR, the benchmark rate of interest for Swiss franc deposits, is incorporated into the formula as either 'Rbase' or 'Rterm' depending on whether Swiss francs are being purchased or sold in the transaction." *Id.* ¶ 88. Thus, if the CHF LIBOR input is manipulated, "so is the cost of buying or selling Swiss francs in the future and the prices of both CME Swiss franc currency futures contracts and

---

jurisdiction in a conspiracy case is to define the scope of the conspiracy, because only acts taken pursuant to that conspiracy are jurisdictionally relevant.").

OTC Swiss franc foreign exchange forwards." *Id.* Because the pricing formula incorporates CHF LIBOR, the Complaint asserts, "the CFTC classifies Swiss franc foreign exchange forwards as LIBOR-based derivatives." *Id.*

Defendants raise a number of issues with the Complaint's reliance on this "industry standard formula" to establish that CHF LIBOR is a component of the price of Swiss franc futures and FX forwards. First, defendants note that the CME tutorial does not use the term "LIBOR," let alone state that LIBOR is used in the formula. Second, they emphasize that the Complaint does not allege that defendants actually used the generic formula to price FX forwards and futures or that plaintiffs actually used or relied on the generic formula in buying or selling the derivatives. Third, because the generic formula uses an interest rate for a period of time equal to the duration of the forwards or futures contracts, defendants argue that CHF LIBOR cannot be mechanically used to price these derivatives because they do not have a maturity equal to any of the CHF LIBOR tenors. Indeed, the four specific futures or forwards transactions alleged in the Complaint had maturities of 4, 42, and 77 days, which are not equal to any of the LIBOR tenors, thus plaintiffs could not have mechanically applied CHF LIBOR in pricing their derivatives. *See* Compl. ¶¶ 199, 204, 212. Last, defendants point to other CME publications which state that prices of FX futures are negotiated through an auction process, and therefore one cannot simply assume that plaintiffs relied on or incorporated an industry standard formula for their specific transactions.

As an initial matter, the Court doubts that Article III standing is the correct framework for evaluating defendants' argument. At the pleading stage, the Court assumes the truth of the Complaint's factual allegations when assessing a standing challenge. *WC Capital Management, LLC*, 711 F.3d at 329. The Complaint alleges that CHF LIBOR affects the price of certain Swiss franc currency derivatives according to a standard mathematical formula, and that defendants used their control over CHF LIBOR to manipulate the price of those derivatives to plaintiffs' financial disadvantage. Taking those allegations as true, plaintiffs have clearly alleged an injury in fact. Indeed, defendants do not contend otherwise; they merely dispute that those allegations have been plausibly made. But

that challenge collapses the standing and Rule 12(b)(6) analyses. Under defendants' approach, a plaintiff would lack Article III standing any time the connection between defendants' conduct and plaintiffs' harm had been inadequately alleged. This conflating of the standing analysis with the *Twombly* plausibility analysis is improper because allegations of an injury "need not be capable of sustaining a valid cause of action" to demonstrate standing. *Ross*, 524 F.3d at 222 (citation omitted).

In any event, whether evaluated as a standing challenge or a Rule 12(b)(6) challenge in the guise of a standing challenge, defendants' argument fails because plaintiffs have adequately alleged at the pleading stage a link between CHF LIBOR and the price of Swiss franc futures and FX forwards. Notably, an order by the CFTC accompanying its settlement with defendant RBS states "Swiss franc derivatives traders traded various derivatives instruments that were *priced based on . . . Swiss franc LIBOR . . .* includ[ing] . . . foreign exchange 'FX' forward." Compl. ¶ 88 n. 63 (emphasis added). And defendants do not dispute plaintiffs' assertion that FX forwards and futures are priced in the same manner for our purposes. Moreover, the Complaint offers a detailed, non-conclusory theory of the relationship between CHF LIBOR and the price of Swiss franc futures and FX forwards, including a statistical analysis purporting to show how this relationship and defendants' manipulation affected derivative prices throughout the Class Period. Whatever holes defendants may poke in this theory cannot be resolved at the pleading stage. *See Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) ("[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury.").

Last, a plausible connection between CHF LIBOR and the price of Swiss franc currency derivatives is supported by the alleged words and conduct of defendants themselves. For example, in a July 24, 2007 conversation an RBS trader tells another trader "[I] moaned too . . . they had 6m libor at 85. I was gonna lose 1.25 bps on 2k futs." Compl. App'x at 2. And in another conversation between an RBS Swiss franc derivative trader and a trader at an unidentified bank, a request for a manipulated CHF LIBOR quote immediately follows a discussion of "fx" (apparently foreign exchange forwards) basis. *Id.* ¶ 189. Indeed, it is hard to make

sense of defendants' traders' specific requests to raise or lower CHF LIBOR quoted in the Complaint without concluding that the traders believed that CHF LIBOR affected the value of the traders' derivative positions.

Of course, none of this definitively establishes a connection between CHF LIBOR and the price of plaintiffs' derivatives. As Judge P. Kevin Castel recently explained in rejecting this precise challenge by the defendants in a similar case concerning Euribor manipulation, "[i]f defendants are correct and the Complaint inaccurately describes [LIBOR's] role in these transactions, the issue could likely be resolved through a summary judgment motion at the proper juncture." *Sullivan*, 2017 WL 685570, at *9 (S.D.N.Y. Feb. 21, 2017). But at the pleading stage, plaintiffs have adequately alleged injury from the alleged manipulation of CHF LIBOR with respect to CHF futures and FX forwards. [13]

---

[13]  Plaintiffs argue in their briefing, but fail to allege in the Complaint, that CHF LIBOR, if nothing else, provided a "starting point" from which the interest rates used in the "generic formula" and negotiated between the contracting parties were calculated. Doc. 109 at 6. A similar argument was recently accepted by the Second Circuit in vacating and remanding a decision that plaintiffs who had transacted in various LIBOR-based securities had failed to allege antitrust injury based on the defendants' LIBOR manipulation. *See Gelboim v. Bank of Am.*, 823 F.3d 759, 776 (2d Cir. 2016). There, "the district court observed that LIBOR did not necessarily correspond to the interest rate charged for any actual interbank loan." *Id*. (citation omitted). The Second Circuit concluded that "[t]his is a disputed factual issue that must be reserved for the proof stage," but reasoned that "even if none of the appellants' financial instruments paid interest *at* LIBOR" they might nonetheless suffer antitrust injury "based on the influence that a conspiracy exerts on the starting point for prices." *Id*. Thus, showing that LIBOR is not a mechanical and inflexible input into the price of a derivative does not necessarily foreclose a sufficient link between the LIBOR rate and the price of a derivative. But because this "baseline" theory was not advanced in the Complaint, and because the Court finds that a relationship between CHF LIBOR and the price of plaintiffs' derivatives has been adequately alleged without reference to that theory, the Court need not consider it here.

**D.**     **Plaintiffs Have Class Standing to Bring Their CHF LIBOR Manipulation Claims with Respect to Interest Rate Swaps and NYSE LIFFE Exchange Futures Contracts**

Having concluded that plaintiffs have standing to bring CHF LIBOR Manipulation Claims for the types of Swiss franc currency derivatives in which they transacted – currency futures and FX forwards – the Court must now consider whether that standing extends to the other types of "Swiss franc LIBOR-based derivatives" identified in the Complaint in which plaintiffs did not transact – "interest rate swaps, forward rate agreements, . . . cross-currency swaps, overnight index swaps, and tenor basis swaps . . . as well as exchange-traded futures and options, such as the three-month Euro Swiss franc futures contract traded on the NYSE LIFFE Exchange." Compl. ¶ 75.

As noted, plaintiffs may have standing to sue on behalf of a class for injuries they did not personally suffer, so long as they have "suffered some actual injury as a result of the putatively illegal conduct" and that "conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund*, 693 F.3d at 162 (internal quotation marks and alterations omitted). Plaintiffs have alleged injury from defendants' CHF LIBOR manipulation by alleging a mathematical relationship between CHF LIBOR and the price of the CHF currency futures and FX forwards in which they transacted. That standing would extend to other types of Swiss franc currency derivatives in which plaintiffs did not transact if plaintiffs allege that those other derivatives were affected in a similar way by defendants' manipulation of CHF LIBOR, because defendants' conduct would then implicate the same set of concerns for both categories. *See Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 373 (S.D.N.Y. 2016) (plaintiffs had standing because "if defendants' systematic conduct is tortious with respect to one fund, it is also tortious with respect to another fund, and does not depend on the individualized circumstances of each Fund").

But it is not clear from the Complaint that CHF LIBOR affects the price of each of the "Swiss franc LIBOR-based derivatives" in the same

way. To be sure, the Complaint generally alleges that the price of each of these types of derivatives is affected by CHF LIBOR. However, the "industry standard formula" discussed above is alleged to apply only to Swiss franc FX forwards and Swiss franc currency futures. It is incumbent on plaintiffs to provide at least some minimal description of these other derivatives and how CHF LIBOR factors into their pricing before the Court can conclude that they implicate the same set of concerns as those derivatives in which plaintiffs transacted.

Plaintiffs have met that burden with respect to interest rate swaps and NYSE LIFFE Exchange Futures Contracts by making non-conclusory allegations that the prices of these derivatives would be affected by manipulation of CHF LIBOR in a manner similar to that of Swiss franc futures and FX forwards, by providing the following descriptions:

- *Interest Rate Swaps:*

  [A]n interest rate swap is an over-the-counter Swiss franc LIBOR-based derivative in which one party agrees to pay the other a fixed rate of interest (*e.g.*, 5%) on some underlying notional amount (*e.g.*, CHF 1,000,000) in exchange for receiving payments based on a "floating" or "variable" interest rate, *i.e.*, a specific tenor Swiss franc LIBOR. Every fixing date, *e.g.*, once every three months, the fixed interest rate owed by one party is compared to the specific tenor of Swiss franc LIBOR referenced in the contract.

Compl. ¶ 82.

- *NYSE LIFFE Exchange Futures Contracts:*

  [T]he LIFFE three-month Euro Swiss franc futures contract, which trades on the NYSE LIFFE Exchange, represents the rate of interest paid on a three-month deposit of CHF 1,000,000. The price and settlement values of this futures contract are equal to 100 minus three-month Swiss franc LIBOR. Because of this formulaic pricing relationship, if

Swiss franc LIBOR is artificial and does not reflect the rate of interest being paid on three-month inter-bank deposits of Swiss francs, the price of this futures contract will also be artificial.

*Id.* ¶ 86.[14]

But there is no comparable description for the remaining types of "Swiss franc LIBOR-based derivatives": forward rate agreements, cross-currency swaps, overnight index swaps, and tenor basis swaps. Indeed, the Complaint makes no effort whatsoever to define these derivatives or explain how they are affected by CHF LIBOR. The Court therefore cannot conclude that these derivatives implicate the same concerns as the Swiss franc futures and FX forwards in which plaintiffs transacted.

In summary, plaintiffs have Article III standing to pursue their CHF LIBOR Manipulation Claims with respect to Swiss franc futures, FX forwards, interest rate swaps, and NYSE LIFFE Exchange futures contracts, but have failed to demonstrate standing as to forward rate agreements, cross-currency swaps, overnight index swaps, and tenor basis swaps.

## III. Standard of Review for Motion to Dismiss for Failure to State a Claim

Defendants move to dismiss each of the counts for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).[15] When ruling on such a motion,

---

[14] Plaintiffs' description of these derivatives is cursory, and just as additional information may cast doubt on plaintiffs' claim that CHF LIBOR affects the price of CHF futures and FX forwards, so too may it undermine plaintiffs' claim that the different types of derivatives are affected by CHF LIBOR in similar ways and thus implicate the same set of concerns. But that is a question for another day. *See Fernandez*, 222 F. Supp. 3d at 373.

[15] As noted, the Foreign Defendants also move to dismiss the Complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). Courts "traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim," but "that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues." *ONY, Inc. v. Cornerstone*

a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (internal quotation marks omitted). To survive a motion to dismiss, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," meaning there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

On a motion to dismiss, the court "do[es] not look beyond facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

---

*Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013). Here, as in *Sullivan v. Barclays*, "[d]efendants' arguments as to personal jurisdiction turn in part on the substance of their motion to dismiss for failure to state a claim." 2017 WL 685570, at *11 (S.D.N.Y. Feb. 21, 2017). For example, whether plaintiffs have plausibly alleged that the Foreign Defendants conspired within the United States bears on not only the personal jurisdiction analysis, but also whether an antitrust claim has been adequately stated and whether plaintiffs' RICO claims are impermissibly extraterritorial. Moreover, the Court has received full briefing on the motions to dismiss for both lack of personal jurisdiction and failure to state a claim. Many of the Complaint's deficiencies on both fronts may possibly be corrected through an opportunity to amend, and it would be a waste of judicial resources for such opportunity to be afforded as to personal jurisdiction without any analysis on the other issues presented for the Court's consideration. Accordingly, the Court addresses both the personal jurisdiction and 12(b)(6) arguments, and concludes that the analysis is better structured by tackling the latter first.

## IV.    Antitrust Claim (Count Two)

Count Two alleges that defendants colluded to manipulate CHF LIBOR, and thereby the price of CHF LIBOR based derivatives, in violation of section one of the Sherman Act, which provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  Section 4 of the Clayton Act provides a private right of action, with recovery of treble damages, to "any person who [has been] injured in his business or property by reason of anything forbidden in the antitrust laws," including section one of the Sherman Act.    15 U.S.C. § 15(a); *see also Concord Associates, L.P. v. Entertainment Properties Trust*, 817 F.3d 46, 52 (2d Cir. 2016).

To survive a motion to dismiss this claim, plaintiffs must (1) allege anticompetitive conduct by defendants that violates section one, and (2) demonstrate antitrust standing, which depends on a showing of antitrust injury and that plaintiffs are "efficient enforcers" of the antitrust laws. *Gelboim*, 823 F.3d at 770-72.

Defendants argue that plaintiffs have fallen short at each of these steps.    According to defendants, the Complaint fails to allege anticompetitive conduct in violation of section one because setting CHF LIBOR was a cooperative, not competitive, process, and in any event there has been no plausible showing of a conspiracy among defendants to manipulate CHF LIBOR.  Further, defendants contend that plaintiffs have not suffered antitrust injury because plaintiffs have not shown a connection between CHF LIBOR and the price of their derivatives, or because any such connection is too attenuated to give rise to a cognizable injury under the antitrust laws.  Defendants also maintain that plaintiffs are not efficient enforcers of these alleged violations because, among other reasons, damages would be highly speculative and difficult to calculate. Last, defendants assert that plaintiffs' claim is barred by the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a, and by the statute of limitations.

Count Two is dismissed against all defendants because the Complaint alleges a plausible antitrust conspiracy only as to RBS, yet the

plaintiffs have antitrust standing to sue only UBS and the Credit Suisse Defendants, those defendants with whom they directly transacted.

### A.  Conduct in Violation of Section One

#### 1.  The Alleged Conduct Constitutes a Restraint of Trade

In their briefing, defendants maintain that plaintiffs have not alleged any competition-reducing conduct because "LIBOR-setting was an inherently cooperative process and not a competitive one," and thus any manipulation did not constitute "any restraint of trade whatsoever."  Doc. 73 at 2, 14.  However, this argument has been essentially disclaimed in subsequent letters due to intervening developments in the case law.

Whether benchmark manipulation constitutes anticompetitive conduct was a question that formerly divided courts in this district,[16] but the Second Circuit resolved that question last year in *Gelboim v. Bank of America*, 823 F.3d 759 (2d Cir. 2016).  *Gelboim* involved an appeal from a dismissal of antitrust claims based on, inter alia, a finding that LIBOR setting was not a competitive process and thus any collusion in that process could not support a Section One claim. The Second Circuit reversed the district court, holding that such collusion constitutes a per se "illegal anticompetitive practice" of horizontal price fixing by distorting a "joint process . . . into collusion."  823 F.3d at 775.  That holding applies here, and accordingly the Court concludes that collusion to manipulate CHF LIBOR constitutes anticompetitive conduct that could give rise to a claim under section one of the Sherman Act.

---

[16] *Compare LIBOR I*, 935 F. Supp. 2d at 687-96 (dismissing antitrust claim for lack of competitive injury because LIBOR is a cooperative process); *Laydon*, 2014 WL 1280464, at *7-8 (same), *with In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 596 (S.D.N.Y. 2015) (rejecting motion to dismiss on this ground).

## 2. Plaintiffs Allege a Plausible Antitrust Conspiracy Against Only RBS

Defendants next argue that Count Two fails because the Complaint fails to allege a plausible antitrust conspiracy. "In order to establish a conspiracy in violation of § 1 . . . proof of joint or concerted action is required; proof of unilateral action does not suffice." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). To allege a conspiracy sufficient to survive a motion to dismiss, a plaintiff must "allege enough facts to support the inference that a conspiracy actually existed," which can be done in two ways. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). "First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws." *Id.* But because "this type of 'smoking gun' can be hard to come by, especially at the pleading stage," a complaint may instead "present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.* "The line separating conspiracy from parallelism is indistinct, but may be crossed with allegations of interdependent conduct, accompanied by circumstantial evidence and plus factors. These plus factors include: (1) a common motive to conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications." *Gelboim*, 823 F.3d at 781 (internal quotation marks omitted).

"Collusion within a bank will not support a claim pursuant to section 1 of the Sherman Act." *In re Libor-Based Financial Instruments Antitrust Litig.* ("*LIBOR IV*"), No. 11-mdl-2262, 2015 WL 4634541, at *39 (S.D.N.Y. Aug. 4, 2015) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)). Nor will collusion between a parent and a wholly-owned subsidiary. *Copperweld*, 467 U.S. at 771.

At the pleading stage, "the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or

a trial." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (citations omitted). Instead, "[b]ecause plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible," and the "choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id*. at 184-85 (citations omitted).

"[E]ach defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose. Mere generalizations as to any particular defendant – or even defendants as a group – are insufficient." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 377, 384 (S.D.N.Y. 2016) (citation omitted).

In defendants' view, the Complaint's specific allegations consist of a "smattering of instant messages drawn from some of the Defendants' regulatory settlements" and are entirely insufficient to support an inference that defendants engaged in a widespread, decade-long conspiracy. Doc. 73 at 20-21. Moreover, defendants emphasize, most of the specific allegations of manipulation do not demonstrate collusion because they are between employees of the same bank and thus involve unilateral conduct. Indeed, the specific allegations of inter-defendant collusion consist of communications between RBS and an unidentified bank in 2008 and 2009 and a single request from BlueCrest to Deutsche Bank AG for a single tenor on a single day that may never have been responded to, let alone acted upon.

Plaintiffs respond that this "smattering" of messages is itself sufficient to plead an antitrust claim, as each act could itself constitute a violation, and that plaintiffs are not required to demonstrate the precise scope and duration of market manipulation at the pleading stage. Further, plaintiffs contend that it is plausible to infer that this handful of communications is just the tip of the iceberg, given the alleged structural steps defendants took to facilitate this conduct.

*Gelboim* and Judge Naomi Buchwald's decisions that preceded and followed it are highly relevant to the antitrust claims here and especially to the adequacy of the conspiracy allegations, and accordingly are recounted

at some length. In *LIBOR I*, from which the *Gelboim* appeal arose, plaintiffs alleged that several banks "collusively and systematically suppressed LIBOR" between 2007 and 2010, motivated by a desire (1) "to portray themselves as economically healthier than they actually were" and (2) "to pay lower interest rates on LIBOR-based financial instruments that Defendants sold to investors." 935 F. Supp. 2d at 679. It bears immediate emphasis that those plaintiffs alleged persistent suppression of LIBOR; that is, during the relevant period, all manipulation was in the same direction – down. The district court, while dismissing the antitrust claims for lack of antitrust injury, suggested that an antitrust conspiracy had not been plausibly alleged because "each defendant, acting independently, could rationally have submitted false LIBOR quotes to the BBA." *Id.* at 691.

Judge Buchwald also addressed similar claims in *LIBOR IV*, 2015 WL 4634541. As in *LIBOR I*, the plaintiffs alleged that defendant banks manipulated the U.S. Dollar LIBOR rate for two separate purposes. The first motive, as in the instant case, was "trader-based manipulation," in which a "derivatives trader ask[ed] a LIBOR submitter to alter the bank's LIBOR quote to suit the trader's book." 2015 WL 4634541, at *37. The district court found that an antitrust conspiracy had been adequately alleged against one defendant, Barclays, based on sporadic examples of Barclays submitting manipulated LIBOR rates to benefit traders at another (unidentified) financial institution and asking submitters at other institutions to submit manipulated LIBOR rates to benefit Barclays traders. But as to the remaining defendants, the allegations did not support the existence of a broad-based conspiracy. The second motive, "persistent suppression" of LIBOR in order to convey financial soundness, likewise did not support the existence of a conspiracy because "parallel conduct need not imply a conspiracy, and certainly not where each supposed conspirator independently had the same motive (namely, to protect its own reputation for creditworthiness) to engage independently in the same misconduct." *Id.* at 41.

On appeal from *LIBOR I* but also explicitly referencing *LIBOR IV*, the Second Circuit in *Gelboim* concluded that an antitrust conspiracy had been adequately alleged, stating that "close cases abound on this issue, but

this is not one of them." 823 F.3d at 781. The Second Circuit found that the "allegations evince a common motive to conspire — increased profits and the projection of financial soundness — as well as a high number of interfirm communications" and "plus factors plausibly suggesting a conspiracy." *Id*. at 781-82. While "pack behavior" might have been "equally consistent with parallelism," at the motion to dismiss stage plaintiffs "must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation." *Id*. at 782. As for the profit based conspiracy, the Second Circuit noted that the defendant banks "operated not just as borrowers but also as lenders in transactions that referenced LIBOR," and thus it "seems strange that this or that bank (or any bank) would conspire to gain, as a borrower, profits that would be offset by a parity of losses it would suffer as a lender." *Id*. at 783. But "the potential of a wash" required factual development and could not be resolved on a motion to dismiss. *Id*.

In *LIBOR VI*, on remand from *Gelboim*, the district court interpreted the Second Circuit's conclusion of an adequately alleged antitrust conspiracy to extend only to a suppression-based conspiracy to project financial soundness and that any profit was incidental from the financial soundness goal. *In re LIBOR-Based Financial Instruments Antitrust Litig.* ("*LIBOR VI*"), No. 11-mdl-2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016). Judge Buchwald wrote that "[i]t is far from clear that *Gelboim* should be read to mean that plaintiffs have sufficiently alleged 'increased profits' as a goal independent of a conspiracy to 'project financial soundness.'" *Id*. at *2. But in any case, Judge Buchwald found, "the premise that the primary goal of the conspiracy was to increase profits by lowering the interest rate the banks had to pay when they were in the role of borrower is not plausible," because, as *Gelboim* noted, banks are lenders in LIBOR-based transactions as well as borrowers. *Id*. Thus, *LIBOR VI* reasoned, "[t]he only conclusion to be drawn is that the Circuit meant 'increased profits and the projection of financial soundness' to describe collectively a single, reputation-based motive to conspire, where increased profits followed from a positive reputation." *Id*. at *5 (quoting *Gelboim*, 823 F.3d at 782). "If, as plaintiffs suggest, the conspiracy were profit-motivated, it would have required all of the sixteen panel banks to have made a parallel

decision to be net borrowers of money over the suppression period in the LIBOR-based lending market." *Id*. at *3. While the circuit in *Gelboim* stated that the conspiracy allegations could not be dismissed because the record was undeveloped, the district court on remand concluded that the record had been developed and did not support a profit-based conspiracy even after extensive discovery.

Here, plaintiffs allege only one of the two theories at issue in *Gelboim* and the LIBOR district court opinions – namely, "trader based" manipulation, rather than "financial soundness" suppression. As noted in *LIBOR VI* and suggested in *Gelboim*, it is harder to infer a conspiracy from individual acts of trader-based manipulation because large financial institutions are both buyers and sellers of derivative products, and thus any changes may well offset each other. But assuming that an upward or downward shift would provide a net increase in profit to a particular bank, one would need to further assume that the same shift would benefit each member of the conspiracy. Unless the banks are similarly situated in this respect, there would be no evident common motive to conspire. And this particularly undermines the inference of a conspiracy when the simpler explanation is that the banks may have been independently engaging in intra-defendant manipulation by submitting false CHF LIBOR quotes through requests from their own traders to those in the same bank who submit the quote to the BBA.

At least in the case of the goal of "persistent suppression" that was at issue in *Gelboim* and the district court decisions, where LIBOR rates are consistently manipulated downward, the banks would all conceivably know which way LIBOR would be manipulated into the future and could plan accordingly. Here, the case of a shared motive is far weaker because plaintiffs do not allege a conspiracy to manipulate CHF LIBOR in any consistent direction, but rather a conspiracy to "suppress, inflate, maintain, or otherwise alter Swiss franc LIBOR." Compl. ¶ 246. In other words, not only must we assume that conspirators would all benefit from the same change in CHF LIBOR, but that those directions would change for defendants at the same time.

Such a scenario is hardly plausible.  *See In re LIBOR Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447, 469 (S.D.N.Y. 2014) ("[I]t is implausible that all defendants would maintain parallel trading positions in the Eurodollar futures market across the Class Period and that those positions, in turn, motivated their daily LIBOR submissions.").  Simply put, the Complaint offers no reason whatsoever to believe that the defendant banks' interests would consistently align such that defendants would all benefit from manipulation in a given direction.  Without such an explanation, it is not plausible that defendants shared a motive to conspire.  *See id.*  ("[I]f defendants held different positions, then it is implausible that their motives regarding the Eurodollar futures market were uniformly aligned.")  It is far more likely that the defendant Contributor Banks independently manipulated their own CHF LIBOR submissions based on what would be most advantageous for their own trading positions, which cannot support claims of an antitrust conspiracy.

The implausibility of a conspiracy involving all defendants over the Class Period is well illustrated by one of the Complaint's few specific examples of inter-bank manipulation.  On February 10, 2005 a BlueCrest trader allegedly asked a Deutsche Bank AG trader to request a false one-month Swiss franc LIBOR submission, asking "Can't you ask your fft to contribute 1m chf libor very low today??  I have 10 yr of fix, 8 of which against ubs, and they're getting on my nerves." Compl. ¶ 131.  Leaving aside that the Complaint does not provide a response from Deutsche Bank AG, this at first glance supports plaintiffs' claims of a conspiracy.  But notably, the counterparty identified in the BlueCrest position is *fellow codefendant* UBS.  In other words, every supracompetitive profit earned by BlueCrest from the manipulation would come at the expense of UBS, a supposed coconspirator.  This specific instance of inter-defendant collusion – one of the few that the Complaint alleges – illustrates the fundamental flaw with plaintiffs' theory of the conspiracy.  With no consistent preference between a higher and a lower CHF LIBOR rate, plaintiffs fail to explain why it is plausible to think that defendants would consistently share a preference at any given time, particularly over the course of a decade, and why one defendant's interests might not be adverse to another's.

The above analysis rejects plaintiffs' attempts to shoehorn each of defendants into a broad-based antitrust conspiracy even in the absence of detailed allegations of collusion. For instance, plaintiffs assert Count Two against UBS and the Credit Suisse Defendants without a single communication indicating that they conspired with another defendant to manipulate CHF LIBOR (or that the Credit Suisse Defendants manipulated CHF LIBOR at all, for that matter). Given the lack of a coherent explanation for each defendants' participation in the alleged conspiracy, an antitrust claim can stand only against those defendants as to whom the Complaint offers some specific, individual showing of CHF LIBOR manipulation through collusion with third parties. The Court now turns to the few specific instances of such collusion alleged in the Complaint.

The Complaint adequately alleges an antitrust conspiracy as to RBS.[17] First, RBS allegedly colluded with an unidentified bank on multiple occasions to lower CHF LIBOR submissions. *See* Compl. ¶¶ 127, 192. This sort of collusion with an unidentified bank was found sufficient to state a conspiracy involving Barclays in *LIBOR IV*, where the court stated, "[i]f the other bank in each of these instances can be identified through discovery, then both Barclays and the other bank will be jointly liable for both banks' manipulation of LIBOR on these dates." 2015 WL 4634541, at *39. Second, RBS and JPMorgan settled with the European Commission for "participat[ing] in an illegal bilateral cartel aimed at influencing the Swiss franc Libor benchmark interest rate between March 2008 and July 2009."[18] Plaintiffs' claims of collusion between RBS and JPMorgan have been further supported by communications produced by JPMorgan pursuant to

---

[17] While these allegations do not cover the entire Class Period, with respect to RBS, questions of "the conspiracy's scope may be raised later in litigation, but do not merit dismissal at this phase." *See In re Foreign Exchange Benchmark Rates Antitrust Litig.* ("*FOREX*"), No. 13-cv-7789, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016).

[18] *See* Press Release, European Commission, Antitrust: Commission Settles RBS-JPMorgan Cartel In Derivatives Based on Swiss franc LIBOR; Imposes €61.6 million fine on JPMorgan (Oct. 21, 2014), http://europa.eu/rapid/press-release_IP-14-1189_en.htm.

its settlement agreement with plaintiffs and submitted to the Court in plaintiffs' supplemental memorandum addressing personal jurisdiction.

The only specific inter-defendant communication involving a defendant other than RBS is BlueCrest's alleged request to Duetsche Bank. But that allegation amounts ultimately to a single isolated request to manipulate CHF LIBOR for one tenor on one day, for which no response is provided in the Complaint, much less an indication that Deutsche Bank AG submitted a false quote in response to the request, and still less that the false quote actually affected the "fix" for that day. That sole allegation is simply insufficient to support a claim against BlueCrest and is even less sufficient with respect to Deutsche Bank AG.[19]

In sum, because an overarching CHF LIBOR manipulation conspiracy involving all defendants has not been plausibly alleged and specific instances of inter-bank collusion have been offered only as to RBS, a plausible antitrust conspiracy has been alleged only against RBS.

## B. Antitrust Standing

In addition to constitutional standing, a plaintiff asserting a claim under the Sherman Act must show antitrust standing. *Gelboim*, 823 F.3d at 770. "Two issues bear on antitrust standing: (1) have [plaintiffs] suffered an antitrust injury?" and "(2) are [plaintiffs] efficient enforcers of the antitrust laws?" *Id.* at 772. Defendants contend that plaintiffs have failed to satisfy either requirement.

### 1. Plaintiffs Adequately Allege Antitrust Injury

"Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Gelboim*, 823 F.3d at 772 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489

---

[19] The Complaint also alleges that Deutsche Bank submitted artificial quotes at the request of traders at DB Group Services, but a section one violation cannot be based on collusion between a parent and a subsidiary. *See Copperweld,* 467 U.S. at 771.

(1977)). "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

Defendants first maintain that plaintiffs have failed to allege antitrust injury because they have not shown any plausible connection between CHF LIBOR and the price of the derivatives in which they transacted, and thus have not alleged any injury whatsoever. That argument fails for the reasons provided in the Article III standing analysis.

Second, defendants argue that, even assuming plaintiffs have alleged a sufficient connection between CHF LIBOR on the one hand, and the price of their derivatives to confer Article III standing on the other, that connection remains too attenuated to constitute a cognizable antitrust injury because there are numerous links between the alleged conduct and plaintiffs' purported injury, including several other inputs into plaintiffs' mathematical equation and any price negotiation between the parties. Doc. 73 at 15.

*Gelboim* precludes this argument on a motion to dismiss. There, the Second Circuit held that plaintiffs had adequately alleged an antitrust injury by maintaining – as plaintiffs do here – that LIBOR manipulation caused them to transact in LIBOR-based derivatives on artificial, less favorable terms by "warping of market factors affecting the prices for LIBOR-based financial instruments." 823 F.3d at 776. This was so even though the plaintiffs "remained free to negotiate the interest rates attached to particular financial instruments," so long as LIBOR provided a "starting point" for those negotiations. *Id*. at 773.

The reasoning of *Gelboim* applies here: plaintiffs have alleged an antitrust injury by claiming that they received worse prices for their CHF LIBOR-based derivatives due to defendants' manipulation. The fact that many other factors also affect the price of these derivatives, or the possibility that parties might deviate to some degree from the CHF LIBOR input, does not compel a different result. Defendants may, at the appropriate stage, renew their argument that any causal relationship between CHF LIBOR and these derivatives is too removed to be

actionable, but that is not a basis to defeat plaintiffs' claim at the pleading stage.

###     2.     Only the Direct Transaction Plaintiffs Are Efficient Enforcers

Even if plaintiffs have alleged conduct that violates section 1 and an antitrust injury arising from that conduct, that is not the end of the inquiry. To have standing to sue under the antitrust laws, private plaintiffs must be "efficient enforcers," which turns on: "(1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury." *Gelboim*, 823 F.3d at 772. These factors reflect a "concern about whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." *Gatt Commc'ns v. PMC Assocs., L.L.C.*, 711 F.3d 68, 80 (2d Cir. 2013) (internal quotation marks omitted). This test is not mechanical, and "the weight to be given the various factors will necessarily vary with the circumstances of particular cases." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005).

According to defendants, plaintiffs fail the efficient enforcer test. As argued under the antitrust injury prong, defendants assert that any damages suffered from the alleged CHF LIBOR manipulation are indirect and inherently speculative, given the number of other factors that influence the price of currency derivatives. Moreover, defendants argue, assessing damages would be incredibly complex, placing the Court "in the position of trying to reconstruct multiple submissions for up to *fifteen* separate tenors of Swiss franc LIBOR for each day of the eleven-year class period, and then determine the impact of those hypothetical submissions *and* the other relevant market factors Plaintiffs have alleged." Doc. 73 at 16. Plaintiffs respond that the directness of their injuries and the complexity of quantifying them are not appropriate issues for resolution on the pleadings.

Again, *Gelboim* provides the most applicable and recent appellate guidance on the efficient enforcer analysis. Because the district court in *LIBOR I* dismissed the antitrust claims for lack of antitrust injury and did not reach the "efficient enforcer" issue, *Gelboim* remanded for the district court's consideration in the first instance. However, the Second Circuit discussed at length how the four factors might apply and left a strong hint that the efficient-enforcer requirement would pose a tall hurdle on remand.

As set forth below, the Court concludes that the Direct Transaction Plaintiffs are efficient enforcers but that the remaining plaintiffs are not. Conferring antitrust standing on those plaintiffs who did not transact directly with defendants would open the door to highly speculative and difficult to calculate damages that would far exceed the wrongful profit made or harm caused by defendants, whereas the Direct Transaction Plaintiffs' damages would be more easily calculated and proportional to the misconduct. However, the Direct Transaction Plaintiffs claim to have transacted only with the Credit Suisse Defendants and UBS, and the Complaint has alleged a plausible conspiracy only against RBS. Accordingly, Count Two fails to state a claim because plaintiffs have not alleged an antitrust violation by any defendant for which they have antitrust standing to sue.

### a. Directness of Causation of the Injury

Under the first efficient-enforcer factor, the Court considers "whether the violation was a direct or remote cause of the injury." *Gelboim*, 823 F.3d at 772. This question "requires evaluation of the chain of causation linking [plaintiffs'] asserted injury and the [defendants'] alleged price fixing." *Id.* at 778 (quotation marks omitted). "One consideration in determining causation is whether plaintiffs transacted with defendants directly." *In re LIBOR-Based Financial Instruments Antitrust Litigation ("LIBOR VI")*, No. 11-mdl-2262, 2016 WL 7378980, at *15 (S.D.N.Y. Dec. 20, 2016) (citing 2A Areeda & Hovenkamp, *Antitrust Law* ¶ 335c(3) (2014) ("Beyond the actual customers, most other plaintiffs would be classified as 'remote' and denied standing even though they have suffered injury-in-fact.")). However, "[t]he antitrust laws do not require a plaintiff to have

purchased directly from a defendant in order to have antitrust standing." *In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), No. 13-cv-7789, 2016 WL 5108131, at *9 (S.D.N.Y. Sept. 20, 2016). "Plaintiffs who purchased products from non-defendants but allege that defendants' actions raised their prices are called 'umbrella purchasers.'" *LIBOR VI*, 2016 WL 7378980, at *15.

In *Gelboim* the Second Circuit observed that "at first glance . . . there appears to be no difference in the injury alleged by those who dealt in LIBOR denominated instruments, whether their transactions were conducted directly or indirectly with the [defendant] Banks." 823 F.3d at 779. But while the injury of the direct and indirect transactions may be the same, "if the [defendant] Banks control only a small percentage of the ultimate defined market," imposing liability for transactions to which they were not a party would result in "damages disproportionate to wrongdoing." *Id*. This posed a special concern given the scale of the ultimate defined market: "Requiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap would, if appellants' allegations were proved at trial, not only bankrupt 16 of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated." *Id*. Applying this word of caution, Judge Castel in *Sullivan* observed that "[d]amages theoretically could accrue into the trillions of dollars," and reasoned that "[s]uch extraordinary sums weigh heavily on the causation analysis and the importance that plaintiffs function as efficient enforcers." 2017 WL 685570, at *16.

The same concerns are present in this case. Plaintiffs seek to represent a class that includes "[a]ll persons or entities that engaged in U.S.-based transactions in financial instruments that were priced, benchmarked, and/or settled to Swiss franc LIBOR" over a ten-year period. Compl. ¶ 224. According to the complaint, "trillions of dollars in Swiss franc LIBOR-based derivatives were traded over-the-counter within the United States during the Class Period." *Id.* ¶ 80. The damages could be truly astronomical, and an unknown but undoubtedly large percentage of those damages would arise from transactions to which defendants were

not a party. In every transaction in CHF LIBOR based derivatives to which defendants were not a party, one side would benefit from an artificially high or low CHF LIBOR, and one side would be harmed. Under plaintiffs' theory, defendants would owe damages to every party harmed, without any offset or contribution from the equally large number of third parties who benefited from the CHF LIBOR manipulation.

When addressing the issue of proportionality – as well as for some other "efficient enforcer" factors – it is useful to conceive of plaintiffs as falling into one of three categories: (1) the "Direction Transaction Plaintiffs," who transacted in CHF FX forwards directly with UBS and the Credit Suisse Defendants; (2) plaintiffs who transacted in CHF FX forwards directly with third parties other than defendants; and (3) Divitto, who transacted in CHF currency futures on the CME, and thus has no identifiable counterparty.

The first of these groups, the Direct Transaction Plaintiffs, are obviously the most efficient enforcers of the three. They present little concern of disproportionate damages because any losses suffered from defendants' manipulation would have resulted in wrongful profits to defendants. *See FOREX*, 2016 WL 5108131, at *7 (noting that these direct transactions "do not pose the same threat of indirect and therefore disproportionate liability" addressed in *Gelboim*). Moreover, if some of the plaintiffs happened to benefit from the manipulation as to certain transactions, that amount could be netted against the losses, further reducing the possibility of damages disproportionate to defendants' benefit. Unfortunately for plaintiffs, as explained above, the Complaint fails to allege a plausible antitrust conspiracy as to the Credit Suisse Defendants and UBS, the two defendants with whom plaintiffs directly transacted.

The second of these groups, who transacted with identifiable counterparties other than defendants, is most poorly positioned to serve as an efficient enforcer. This group is at the core of the concerns expressed in *Gelboim* regarding potentially astronomical damages totally untethered from any wrongful profits made by defendants. As to this group, plaintiffs seek to impose liability for transactions for which defendants did

not control and of which they were likely not even aware.  *See Sullivan*, 2017 WL 685570, at *17 ("A defendant may have had no knowledge of the existence of a particular transaction, and the plaintiff may have had no dealings with the defendant, but, provided the derivative product incorporated [LIBOR] as a price term, it would fall within the scope of plaintiffs' claims.").  And it bears repeating that the net effect of any manipulation would be neutral as to two transacting third parties.

This group distinction was made in *LIBOR VI*, which "dr[ew] a line between plaintiffs who transacted directly defendants and those who did not."  2016 WL 7378980, at *16.  This line was drawn on two related bases.  First, plaintiffs and third parties could "easily incorporate LIBOR into a financial transaction without any action by defendants whatsoever," and that "independent decision to do so breaks the chain of causation between defendants' actions and a plaintiff's injury."  *Id*.  Second, to hold defendants trebly responsible for "transactions, over which defendants had no control, in which defendants had no input, and from which defendants did not profit . . . would result in 'damages disproportionate to wrongdoing.'"  *Id*. (quoting *Gelboim*, 823 F.3d at 779).  Thus, "where a plaintiff's counterparty is reasonably ascertainable and is not a defendant bank, a plaintiff is not an efficient enforcer."  *Id.*  That reasoning was adopted in *Sullivan*, which also found that conferring standing on plaintiffs who transacted with third parties would "enlarge[] the scope of private antitrust enforcement beyond the Sherman Act's intent."  2017 WL 685570, at *17.

This Court too adopts that reasoning, finding that the first efficient enforcer factor favors the Direct Transaction Plaintiffs but strongly disfavors those plaintiffs who transacted with an identifiable third party.  As a practical matter, the effect on all third parties who did not transact with defendants is neutral.  For each party that was harmed by CHF LIBOR manipulation, their counterparty benefited commensurately.  But here defendants would have to compensate each loser without any setoff for the winners.  As discussed above, considering the scale of the market – trillions of dollars in transactions over an eleven-year period – the potential damages appear astronomical and disproportional to the cumulative harm caused by defendants' conduct.

The last group, who transacted on an exchange without an identifiable counterparty, presents a more difficult question. The framework of dividing plaintiffs between those who transacted with defendants and those who did not in OTC transactions "is not readily transferable to the . . . futures market," because a clearinghouse such as the CME, rather than any identifiable third party, serves essentially as the counterparty. *LIBOR VI*, 2016 WL 7378980 at *16. Thus, there is simply no way to tailor the standing analysis to those who dealt directly with defendants, thereby rendering plaintiffs' recovery essentially proportional to defendants' ill-gotten gains. In a sense, the choice is between under-enforcement and over-enforcement (at least as to private enforcement).

As explained in two recent derivative manipulation cases, which of these imperfect options is preferable depends primarily on the extent of defendants' control of the market for the product traded on the exchange. In *FOREX*, Judge Lorna Schofield found that the efficient-enforcer analysis favored the plaintiffs because the defendant banks allegedly "dominated the FX market with a combined market share of over 90% as significant participants in both OTC and exchange transactions." 2016 WL 5108131, at *9. Thus, there was "little difference regarding the proportionality of damages suffered by the OTC Class, which dealt directly with Defendants, and the Exchange Class, which did not," because "[i]n both cases, the damages allegedly occurred in markets Defendants controlled and as a direct result of their collusive activities." *Id*.

Judge Buchwald adopted the *FOREX* approach in *LIBOR VI*, reasoning that control of an exchange-based market "may be viewed as a proxy for the question of direct causation" and as a way of ensuring that damages would not be greatly disproportionate to wrongdoing. 2016 WL 7378980, at *16. In *LIBOR VI*, the plaintiffs attempted to show this control by alleging that each of the 16 defendant banks was a "large trader" of Eurodollar futures and options and that together "large traders" controlled 70-90% of that market. *Id*. at *17. That argument was not very convincing to Judge Buchwald because over 2,900 entities fell within the definition of "large trader." Although the court was "skeptical that the Exchange-Based plaintiffs can ultimately show that the defendant [banks] controlled the market," the defendant banks were "some of the world's

largest financial institutions," and at that early stage of the litigation there was "simply not a sufficient record on the issue of market control." *Id*. at *17.

This Court similarly follows the "market control" standard as consistent with *Gelboim* and the most sensible means of determining whether conferring standing on plaintiffs would best vindicate the antitrust laws. The Complaint makes no detailed allegations regarding defendants' control of the market, let alone the control of RBS itself – the only defendant against whom plaintiffs have alleged a plausible antitrust conspiracy. The Complaint does allege that defendants, including RBS, are "some of the largest market makers in the foreign exchange and interest rate derivatives markets," some of the "largest and most sophisticated participants in the Swiss franc LIBOR-based derivatives market," and "some of the world's largest banks." Compl. ¶¶ 1, 92, 96.

If plaintiffs had adequately alleged an antitrust conspiracy involving all or nearly all of defendants, the extent of defendants' control of the exchange markets for Swiss franc currency futures would require factual development and would not be a basis for dismissal. But the only plausibly alleged antitrust conspiracy involves RBS, and there is simply no basis in the Complaint to infer that RBS singlehandedly controls a sufficient share of the market to warrant holding them responsible for the harms of all derivatives traded on those markets. Accordingly, the first efficient enforcer factor favors standing only as to the Direct Transaction Plaintiffs and not as to the umbrella plaintiffs, either OTC or exchange-traded.

### b.  Existence of More Direct Victims

The second efficient-enforcer factor is whether there exist "more direct victims of the alleged conspiracy." *Gelboim*, 823 F.3d at 778. "This consideration seems to bear chiefly on whether the plaintiff is a consumer or a competitor, and in this litigation appellants allege status as consumers." *Id*. at 779. Here, as in *Gelboim*, plaintiffs bring their antitrust claims as consumers, making them a superior enforcer compared to a competitor. "But consumer status is not the end of the inquiry; the efficient enforcer criteria must be established irrespective of whether the

plaintiff is a consumer or a competitor." *Id*. That is because the inquiry recognizes "that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Id*. In *Gelboim*, the Second Circuit concluded that "directness may have diminished weight" in the LIBOR manipulation context because "one peculiar feature of this case is that remote victims (who acquired LIBOR-based instruments from any of thousands of non-defendant banks) would be injured to the same extent and in the same way as direct customers of the Banks." *Id*.

As in *Gelboim*, plaintiffs who did not transact with defendants would have been affected in the same way by defendants' LIBOR manipulation as those plaintiffs who did transact with defendants. Thus, relying solely on a distinction between consumers and competitors would undermine the warning in *Gelboim* that holding the banks liable for transactions between third parties could result in disproportionate liability. In *LIBOR VI*, Judge Buchwald followed *Gelboim* in affording this factor less weight, reasoning that "[a]ny other result would vitiate the first prong of causation" by failing to distinguish between transactions involving defendants and transactions between third parties. 2016 WL 7378980, at *17.

One could also conceive of the Direct Transaction Plaintiffs as a "more direct" victim than the umbrella plaintiffs, even assuming both groups suffered the same harm from the manipulation. In *Sullivan*, Judge Castel concluded that plaintiffs who transacted directly with defendants "were in the immediate impact zone of the defendant's unlawful conduct," whereas the "other plaintiffs who had no such dealings with a defendant [were] not." 2017 WL 685570, at *18.

In either case, the second factor favors the Direct Transaction Plaintiffs but provides little support for the umbrella plaintiffs, as either this factor should be assigned reduced weight in this context or the umbrella plaintiffs should be categorized as less direct victims.

### c.       Speculative Damages

The third efficient-enforcer factor is "whether the damages would necessarily be 'highly speculative.'" *Gelboim*, 823 F.3d at 780 (quoting *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 542 (1983)). "[S]ome degree of uncertainty stems from the nature of antitrust law," *id.*, and "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created," *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) (alteration and internal quotation marks omitted). At the same time, "highly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *Gelboim*, at 823 F.3d at 779. And calculating damages caused by LIBOR manipulation for derivatives transactions "presents some unusual challenges" – namely, "[t]he disputed transactions were done at rates that were negotiated, notwithstanding that the negotiated component was the increment above LIBOR. And the market for money is worldwide, with competitors offering various increments above LIBOR, or rates pegged to other benchmarks, or rates set without reference to any benchmark at all." *Id*. at 780. For this reason, the Second Circuit found it "difficult to see how [plaintiffs] would arrive at such an estimate [of damages], even with the aid of expert testimony." *Id*.

Damages claims may also be too speculative where: (1) "the damages claim is conclusory"; (2) "the injury is so far down the chain of causation from defendants' actions that it would be impossible to untangle the impact of the fixed price from the impact of intervening market decisions"; or (3) "due to external market factors, there is no relationship between the fixed price the price that the plaintiffs ultimately paid." *LIBOR VI*, 2016 WL 7378980, at *17-18. (The second of these factors helps explain why the speculative damages analysis is closely intertwined with the causation analysis.)

While a computation of antitrust damages always entails the reconstruction of a hypothetical market absent the unlawful manipulation, the task in this case would be particularly daunting. Even assuming plaintiffs are able to show a clear and predictable causal relationship between CHF LIBOR and the price of their derivatives, calculating

damages would require hypothesizing the manipulation-free submissions of several banks for fifteen different tenors over thousands of days. Given that the Complaint offers only a handful of specific instances of manipulation and alleges that the manipulation was varied and episodic, even determining the days on which manipulation occurred at all may prove quite difficult. Moreover, any damages would need to be netted out as to each plaintiff to offset any benefit from defendants' manipulation in other transactions.[20]

District courts assessing similar LIBOR antitrust claims have disagreed as to whether these difficulties deprive plaintiffs of efficient enforcer status. In the context of Yen LIBOR-based derivatives, Judge George Daniels dismissed plaintiffs' claims as "too remote and speculative" because they "would require the reconstruction of hypothetical 'but-for' . . . LIBOR benchmark rates" during the relevant period and then require the court to "hypothesize the impact of these 'but-for' benchmark rates on the perceptions of the market participants whose activities would have influenced" the prices of plaintiffs' derivatives contracts. *Laydon*, 2014 WL 1280464, at *10. The court therefore concluded that the plaintiffs were not "efficient enforcers" of antitrust law, noting that the "speculative nature of the derivatives market, based on what the interest rate is and where it will be in the future, compounded with consumers' own beliefs of where they expect the interest will be in the future make the but-for test difficult." *Id*.

In *LIBOR VI*, Judge Buchwald confronted the same concerns but concluded they were insufficient to warrant dismissal. That court emphasized that the speculative damages factor is "not one of damages calculation" but instead whether the plaintiff is a proper party to vindicate the public interest in antitrust enforcement. 2016 WL 7378980, at *18. The task of "reconstruct[ing] but-for LIBOR" was "the job of the parties'

---

[20] "[P]laintiffs may ultimately recover only to the extent of their net injury, given that plaintiffs may well have benefited from LIBOR suppression in the same transaction or in a different transaction." *LIBOR VI*, 2016 WL 7378980, at *18. "[I]f benefits accrued to [a plaintiff] because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct." *Id*. (quoting *Minpeco S.A. v. Conticommodity Servs., Inc.,* 676 F. Supp. 486, 489 (S.D.N.Y. 1987)).

competing experts," and although that task "might involve more relevant numbers than most . . . that is not a sufficient reason to deem the damages speculative." *Id*.

Here, the Court concludes that the speculative damages factor weighs strongly against the standing of the umbrella plaintiffs but less strongly as to the Direct Transaction Plaintiffs. Where "the damages would be determined based on transactions with non-parties, the calculation and apportionment of damages would be exceptionally complex and have aspects that can fairly be described as speculative." *Sullivan*, 2017 WL 685570, at *15. Thus, those plaintiffs who transacted with non-parties fall short under the efficient enforcer analysis under both the causation and the speculative damages factors. The decision to incorporate CHF LIBOR absent any participation by defendants not only arguably breaks the chain of causation and leads to disproportionate damages, but it also makes it even harder to determine what role, if any, LIBOR played in the ultimate price.[21] The admittedly still difficult effort will be simplified considerably by confining it to those transactions in which defendants actually took part.

As *Gelboim* noted, determining the effect of market manipulation may be particularly challenging for claims of this kind. But, to some extent, reconstructing a hypothetical manipulation-free market is routinely required in antitrust litigation. "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981). Where a mathematical relationship between the manipulated CHF LIBOR rate and the price of the derivative has been plausibly alleged, and where plaintiffs and defendants transacted with each other in those derivatives, the difficulty of

---

[21] Plaintiffs do not even explain where this information would come from. They seek to sue on behalf of a class of every entity who bought trillions of dollars' worth of Swiss franc derivatives over the span of a decade through numerous different channels, including countless direct transactions that involved neither the named plaintiffs nor the defendants. It is not clear how information for all these transactions would either be gathered or analyzed to determine the effect of defendants' alleged manipulation.

calculating damages is not itself sufficient to deprive plaintiffs of antitrust standing.  The Direct Transaction Plaintiffs "ought to be able to identify specific transactions in which a . . . defendant was a counterparty and that defendant, based on its own records, ought to be able to intelligently respond."  *Sullivan*, 2017 WL 685570, at *19.  At the same time, the efficient-enforcer factors are not mechanical, and the difficulty of calculating damages, while not alone disqualifying, is still highly relevant to the overall analysis.

### d.     Duplicative     Recovery     and     Complex Apportionment

The final efficient-enforcer factor is "whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury."  *Gelboim*, 823 F.3d at 772.  The Second Circuit in *Gelboim* stated that it was "unclear" how this factor could be assessed on the record before it, but it noted that the "transactions that are the subject of investigation and suit are countless," and "[s]ome of those government initiatives may seek damages on behalf of victims . . . fines, injunctions, disgorgement, and other remedies."  823 F.3d at 780.  While government fines and other penalties would not necessarily lead to duplicative damages, *Gelboim* still strongly suggested that these "other enforcement mechanisms" were relevant to the efficient enforcer analysis, stating that the fact that the defendants' alleged manipulation was "under scrutiny by government organs, bank regulators and financial regulators . . . bears upon the need for [the plaintiffs] as instruments for vindicating the Sherman Act."  *Id*. at 778.

There is no indication that any of defendants' settlement payments to regulators relating to CHF LIBOR manipulation have flowed to plaintiffs or others who bought or sold CHF LIBOR-based derivatives. Thus, there is no apparent risk of duplicative recovery.  And "[c]ourts are not traditionally concerned with . . . whether governments have conducted investigations concerning the conduct at issue."  *LIBOR VI*, 2016 WL 7378980, at *23.  Yet in this context, particularly in light of *Gelboim*, it is relevant to the efficient enforcer inquiry that other "enforcement

mechanisms" – i.e., government regulators – can (and indeed, have) policed the alleged misbehavior. *See Sullivan*, 2017 WL 685570, at *20 (finding that "actions of government regulators lessen the need for plaintiffs to function as private attorneys general and vindicators of the public interest"). Defendants' alleged manipulation of LIBOR for various currencies has already been the subject of at least five government investigations in the United States and Europe and has led to over $7 billion in fines.

To be sure, regulatory fines and other punishments do not necessarily foreclose the possibility of recovery by injured private plaintiffs. But the entire purpose of the efficient enforcer analysis is to determine whether a plaintiff – even one who has alleged a cognizable injury – is a "proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." *Gatt Commc'ns*, 711 F.3d at 75 (citations omitted). This inquiry rests on the premise that not every antitrust violation demands a private remedy. Where, as here, plaintiffs' injuries appear likely to be extraordinarily difficult to calculate and could lead to benumbing damages amounts that far exceed the aggregate harm to third parties, it is appropriate to consider whether the alleged misconduct would be better redressed and deterred through regulatory action.[22] This consideration does not eliminate antitrust standing for the Direct Transaction Plaintiffs, but it does reinforce the conclusion that the remaining plaintiffs are not efficient enforcers of the antitrust laws.

C.     Statute of Limitations

Count Two fails because plaintiffs are not efficient enforcers to sue for the only antitrust violation that they have adequately alleged because they did not transact directly with RBS. Therefore, it is not strictly necessary to evaluate defendants' argument that Count Two is also barred

---

[22] While the Court does not assign substantial weight to this fact, it is notable also that the Complaint essentially piggybacks on regulatory settlements and statements of fact. Plaintiffs are manifestly not uncovering misconduct that went undiscovered or unaddressed by public enforcement mechanisms.

by the statute of limitations and the FTAIA. Nevertheless, the Court considers these arguments for the sake of completeness.

### 1. The Complaint Fails to Allege Antitrust Violations Within the Four-Year Statute of Limitations

Defendants argue that the antitrust claims are untimely. "The lapse of a limitations period is an affirmative defense that a defendant must plead and prove," *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008), but dismissing claims on statute of limitations grounds at the pleading stage "is appropriate only if a complaint clearly shows the claim is out of time," *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999).

A four-year statute of limitations applies to private antitrust actions. *See* 15 U.S.C. § 15b. "Antitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotation marks omitted). "But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Id.*

Plaintiffs filed this lawsuit on February 5, 2015. Leaving aside issues relating to continuing violations or tolling, conduct occurring on or after February 5, 2011 would fall within the four-year statute of limitations. The Complaint alleges that the CHF LIBOR manipulation conspiracy continued "through at least December 31, 2011." Compl. at 1. Thus, crediting that allegation, at least the last approximately eleven months of the Class Period would fall within the statute of limitations.

Defendants correctly maintain that the Complaint does not plausibly allege an antitrust conspiracy that continued until at least February 5, 2011. For the reasons discussed above, the allegations in the Complaint do not support the inference that a conspiracy existed between

all defendants throughout the Class Period.  Plaintiffs provide no coherent explanation of why defendants' incentives would all align such that they would all benefit from the same manipulation, and as to some of defendants they offer not a single detailed allegation of inter-bank manipulation.

Without support for an overarching conspiracy throughout the decade-long Class Period encompassing all of defendants, plaintiffs can only base their antitrust claims on narrower acts of collusion for which there are detailed supporting allegations.  As defendants emphasize, the last specific instance of inter-defendant collusion alleged in the complaint occurred on May 14, 2009, between RBS and unidentified "Bank E."  *See* Compl. App'x.   And the settlement agreement with the European Commission cited in the Complaint covers a similar timeframe, stating that RBS and JPMorgan colluded to manipulate CHF LIBOR "from at least March 2008 through at least July 2009."  *Id.* ¶ 55.  Indeed, the Complaint does not even explain why December 31, 2011 – nearly two and a half years after the last specific allegation of collusion – should mark the end of the alleged antitrust conspiracy.   Thus, the timeliness of the antitrust claims turns on plaintiffs' argument that defendants' fraudulent concealment tolled the statute of limitations.

### 2. Count Two is Timely Because the Statute of Limitations is Tolled by the Fraudulent Concealment Doctrine

Plaintiffs contend that, even if the Complaint fails to allege an antitrust violation within the four-year statute of limitations, their claims are nevertheless timely under the fraudulent concealment doctrine.  Plaintiffs maintain that, while they "generally followed public news, the markets, and financial developments," Compl. ¶ 231, they could not have known of defendants' manipulation until it was brought to light by disclosure of the various regulatory investigations and settlements.

"[A]n antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point

within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). Fraudulent concealment may be alleged by "showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Id.*

In *Hendrickson*, the Second Circuit found that a bid-rigging conspiracy was "an inherently self-concealing fraud" and that, therefore, "proof of the conspiracy itself sufficed to prove concealment by the co-conspirators." *Id.* at 1084. That reasoning applies here because "plaintiffs have plausibly alleged that the alleged conspiracy was inherently self-concealing, for by its very nature, the conspiracy could not succeed unless kept a secret." *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16-cv-5263, 2017 WL 3600425, at *13 (S.D.N.Y. Aug. 18, 2017). The Contributor Banks were supposed to make honest submissions, and it is not obvious how market participants could have known that the Contributor Banks were not doing so. Indeed, while defendants make a one-sentence assertion that there should be no "discovery" rule here at all, they primarily dispute at what point plaintiffs were on notice.

Defendants argue that plaintiffs were put on notice of facts to support their claims "by the numerous articles appearing in the spring and summer of 2008 . . . indicating that LIBOR rates, including Swiss franc LIBOR, may have been artificial." Doc. 73 at 25. While defendants allude to "numerous articles" from 2008, they reference only one in particular: a Dow Jones Capital Markets report dated June 19, 2008 stating that market participants "agreed that Libor wasn't reflective of market rates" and "pointed to off-market Libor fixings for the Swiss franc." *Id.* (quoting Sullivan Decl. Ex. 8). Defendants also rely heavily on *LIBOR I*, in which Judge Buchwald found that plaintiffs were put on inquiry notice for their CEA claims once "seven articles published in prominent national news sources, along with one report referenced in several of those articles, suggested that LIBOR had been at artificial levels" for nearly a year. 935 F. Supp. 2d at 700. While Judge Buchwald acknowledged that "none of the articles definitively established that LIBOR was being manipulated," they

were found sufficient "to suggest to a person of ordinary intelligence the probability that LIBOR had been manipulated." *Id*. at 704.

As an initial matter, the notice analysis in *LIBOR I* is of limited relevance because it addressed claims brought under the CEA, for which intra-defendant manipulation could suffice, rather than under the Sherman Act, which requires a showing of inter-defendant collusion. That is, reports of "inaccurate" LIBOR submissions would more easily provide notice that banks were themselves submitting false quotes than that they were coordinating with each other to do so. Even supposing notice that the Contributor Banks were submitting manipulated LIBOR rates, that would not necessarily establish an antitrust conspiracy if the banks were merely acting in parallel, as defendants themselves repeatedly emphasize.

The one article specifically referenced in defendants' briefing is wholly insufficient to put plaintiffs on inquiry notice, whether of inter-defendant collusion or intra-defendant manipulation. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 170 (2d Cir. 2005) (finding, in securities fraud context, that "numerous generic articles on the subject of structural conflicts appear[ing] in the financial press" were insufficient to trigger inquiry notice). CHF LIBOR is based on the Contributor Banks' estimates and predictions, so unreliability is not necessarily indicative of manipulation. For this reason, the Court doubts whether even multiple reports of "off-market Libor fixings for the Swiss franc" would suffice, but in this case, only one such report is cited. That one report is insufficient to put plaintiffs on inquiry notice.

There is a breathtaking inconsistency in defendants maintaining that plaintiffs should have known to bring their claims upon the first scent of CHF LIBOR inaccuracy in a market report, while at the same time asserting that defendants' numerous and substantial regulatory settlements, entered into years after the supposed notice of the 2008 Dow Jones report, still do not raise a plausible inference that defendants conspired to manipulate CHF LIBOR. Based on the materials cited by the parties, the Court finds that plaintiffs were on inquiry notice of their antitrust claims no earlier than December 18, 2012, when the first regulatory settlement against a defendant (UBS, specifically) was

announced. Because plaintiffs have satisfied the three factors for fraudulent concealment under *Hendrickson*, the statute of limitations was tolled, and the antitrust claims are timely because they were brought within four years of the date on which that tolling ceased.

### D. The FTAIA Does Not Bar Count Two

Defendants argue that Count Two is barred by the FTAIA because the alleged misconduct lacks a sufficient nexus to the United States. The FTAIA "lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach." *F. Hoffmann–La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004). "It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'give rise to a [Sherman Act] claim.'" *Id.* (quoting 15 U.S.C. §§ 6a(1), (2)) (alterations omitted). "[F]oreign anticompetitive conduct can have a statutorily required 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic or import commerce even if the effect does not follow as an immediate consequence of the defendant's conduct, so long as there is a reasonably proximate causal nexus between the conduct and the effect." *Lotes Co., Ltd. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 398 (2d Cir. 2014) (citation omitted). "In adopting the FTAIA, Congress expressly endorsed an extraterritorial application of the Sherman Act." *Sullivan*, 2017 WL 685570, at *22.

Defendants emphasize that the alleged CHF LIBOR manipulation is centered abroad. Except for JPMorgan, which has entered into a settlement agreement with plaintiffs, the defendants are each based in Europe; the Contributor Bank Defendants submitted their quotes to the BBA in London, from where CHF LIBOR fixes are disseminated; and the alleged manipulation concerned a foreign currency. Even assuming the alleged manipulation had some effect on the price of plaintiffs' derivatives in the United States, defendants maintain that "the entire sequence of events required to arrive at this point is far too attenuated to establish the

'reasonably proximate' effect required under the FTAIA." Doc. 73 at 18. Plaintiffs respond that the manipulation, wherever it occurred, was intended to, and had the foreseeable effect of, generating wrongful profits within the United States, including by transacting directly with plaintiffs in the United States.

The FTAIA does not bar plaintiffs' antitrust claim because the Class is limited to "U.S. based transactions." Compl. ¶ 224. The FTAIA has been held to bar claims of LIBOR manipulation brought by plaintiffs for trades occurring on an overseas exchange or between two parties operating abroad. *See In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 599-601 (S.D.N.Y. 2015). But notably, none of the numerous decisions in this district addressing LIBOR manipulation have invoked the FTAIA to bar claims based on transactions occurring in the United States. *See, e.g., FOREX*, 2016 WL 5108131, at *11 (bank defendants did "not challenge the Sherman Act's reach over transactions in the United States or on a U.S. exchange"). "In a situation where a U.S. entity operating in the United States trades FX with a foreign desk of a Defendant, the FTAIA does not apply and the claim is not barred because of the statute's import commerce exclusion (or exception)." *Id*. at *13.

The contention that the causal relationship between defendants' manipulation and plaintiffs' harm is too attenuated fares no better in this context than in the constitutional and antitrust standing contexts, where it has already been rejected. And, as Judge Castel explained in rejecting a similar challenge under the FTAIA, "[d]efendants also point to the Europe-based *conduct* of defendants, even though the FTAIA's express language and the decisions applying it focus on the anti-competitive *effects* within the United States." 2017 WL 685570, at *22. There can be no serious dispute that the manipulation of a benchmark that is globally disseminated and serves as a pricing component of derivatives sold widely in the United States, as plaintiffs have plausibly alleged, would have a foreseeable effect within the United States.

## V.     CEA Claims (Counts Three, Four, and Five)

Count Three asserts that each defendant violated sections 6(c), 9, and 22 of the CEA, 7 U.S.C. §§ 9, 13, and 25, based on their "manipulation

of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives that were priced, benchmarked, and/or settled based on Swiss franc LIBOR," Compl. ¶ 253. Plaintiffs also bring claims against each defendant in Count Four for principal-agent liability for these violations under section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and in Count Five for aiding and abetting other defendants' violations under section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

### A.    The CEA Does Not Cover CHF FX Forwards

Plaintiffs appear to be asserting violations of the CEA for both types of derivatives in which they transacted: Divitto's transactions in CHF currency futures and the remaining plaintiffs' transactions in CHF FX forwards. But FX forwards are excluded from regulation under the CEA. *See, e.g., CFTC v. Erskine*, 512 F.3d 309, 314-15 (6th Cir. 2008) ("Expressly excluded from … CFTC regulation[] is 'any sale of any cash commodity for deferred shipment or delivery,' commonly referred to as a forward contract.") (*quoting* 7 U.S.C. § 1(a)(19)). Thus, plaintiffs' CEA claims may only be based on Divitto's transacting in CHF futures on the CME.

### B.    Counts Three, Four, and Five Fail Because Plaintiffs Lack CEA Standing

"In order to avoid dismissal, the plaintiffs 'not only must allege the elements of a commodities manipulation claim, but also must show that they have standing to sue.'" *Harry v. Total Gas & Power N. Am., Inc.*, No. 15-cv-9689, 2017 WL 1134851, at *6 (S.D.N.Y. Mar. 27, 2017) (quoting *LIBOR I*, 962 F. Supp. 2d at 620). "Under section 22(a) of the CEA, a plaintiff has standing to bring a commodities manipulation action only if he has suffered 'actual damages' as a result of defendant's manipulation." *Id*. (quoting 7 U.S.C. § 25(a)(1)). "The term 'actual damages' has been applied by courts in a straightforward manner to require a showing of actual injury caused by the violation." *Id*. (citation omitted).

Divitto lacks CEA standing because the Complaint fails to plead facts that would support a reasonable inference that he suffered actual damages by transacting at times when defendants manipulated CHF LIBOR. The Complaint alleges only that "[d]uring the Class Period,

[Divitto] engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss Franc currency futures contracts traded on the [CME] at artificial prices proximately caused by Defendants' unlawful manipulation." Compl. ¶ 37. No other details are provided; no specific dates, no number of transactions, not whether Divitto bought or sold, not which direction of CHF LIBOR manipulation allegedly harmed him. For all that can be gleaned from the Complaint, Divitto may have sold only one CHF futures contract on the CME on January 2, 2001. Meanwhile, the Complaint makes specific allegations of manipulation for only 32 days out of the approximately 4,000 days in the Class Period.

Divitto's failure to identify the specific dates of his transactions is especially problematic because the Complaint's stronger allegations of CHF LIBOR manipulation are concentrated in certain portions of the Class Period. Indeed, the earliest of the 32 specific acts of alleged manipulation occurs in February 2005 – four years after the Class Period began and when Divitto conceivably made his only CHF futures transaction. *See id.* App'x. And while the various regulatory settlements referenced in the Complaint cover a wider period of time than the 32 specific acts, those periods similarly do not cover the entirety of the Class Period as to most defendants. As the Complaint notes, UBS entered a settlement with the DOJ for repeatedly manipulating CHF LIBOR "as early as 2001" and continuing until at least 2009.[23] *Id.* ¶ 64. But, as will be discussed below, Divitto's CEA claims against UBS are untimely. The settlement agreements as to the other defendants appear to cover conduct occurring no earlier than 2003.[24] Thus, again assuming that Divitto sold only one

---

[23] The DOJ Statement of Facts states that "[s]tarting at least as early as 2001, and continuing at least until September 1, 2009, on each trading day on which UBS had Swiss Franc trading positions, UBS's Swiss Franc LIBOR submitters rounded UBS's Swiss Franc LIBOR submissions to benefit UBS's global Swiss Franc trading positions." United States Department of Justice, Criminal Division, Fraud Section Non-Prosecution Agreement and Appendix A Statement of Facts with UBS AG (Dec. 18, 2012) at 30.

[24] *See* DOJ Deferred Prosecution Agreement and Attachment A Statement of Facts with Deutsche Bank AG, *USA v. Deutsche Bank AG*, No. 15cr61, Dkt. No. 6 (D. Conn. Apr. 23, 2015).

CHF futures contract on the CME on January 2, 2001, none of the regulatory settlements with those defendants against whom Divitto may have a timely claim covers misconduct during the time of Divitto's transaction.

Last, even assuming manipulation occurred during periods in which Divitto transacted, without any details of his transactions it is just as likely he was a beneficiary of defendants' misconduct – substantially reducing the already questionable likelihood of harm from manipulation on the dates of Divitto's transactions. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620-21 (S.D.N.Y. 2013) (finding CEA claims inadequate where plaintiffs made no "allegations that make plausible (1) that they transacted in . . . futures contracts on days on which . . . futures contract prices were artificial as a result of trader-based manipulation of LIBOR, or (2) that their positions were such that they were injured").

To be sure, at the pleading stage Divitto need "not trace the dates of defendants' alleged manipulations to each of plaintiffs' individual transactions." *Sullivan*, 2017 WL 685570, at *31. However, he must at minimum provide some details regarding his transactions that are within his knowledge and bear on the plausibility that the alleged manipulation caused actual damage to his trading positions. *See Harry*, 2017 WL 1134851, at *9; *LIBOR II*, 962 F. Supp. 2d at 620. Where plaintiffs seek to sue over an eleven-year class period, based on episodic acts of manipulation in varying directions that are concentrated in certain subsets of the class period, the unelaborated allegation that plaintiffs transacted in the affected market at some point during the class period is not sufficient to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. [25]

---

[25] Section 22 of the CEA grants a private plaintiff who purchased or sold a futures contract standing to sue for "manipulation of the price of any such contract . . . or the price of the commodity underlying such contract." 7 U.S.C. § 25(a)(1)(D)(ii). Defendants argue that Divitto lacks standing to sue because the CHF LIBOR "is not the commodity underlying the CME futures contracts;" rather, the "commodity underlying these futures is a contract to exchange 125,000 Swiss francs for U.S.

Divitto's lack of standing is fatal to each of plaintiffs' CEA claims as to all defendants because he is the only plaintiff who claims to have transacted in a derivative covered by the CEA. Counts Three, Four, and Five are therefore dismissed on this ground alone, and it is not strictly necessary to address the parties' remaining arguments. Nevertheless, given the parties' full briefing of the issues and the fact that plaintiffs may well plead additional facts regarding Divitto's transactions in a second amended complaint, the Court will proceed to address the other grounds for dismissal urged in defendants' motions.

### C. While Plaintiffs Lack CEA Standing, They Have Plausibly Alleged Manipulation by the Deutsche Bank Defendants, RBS, and UBS

Count Three asserts that each defendant is liable under the CEA for manipulating the price of CHF LIBOR and thereby the price of derivatives priced based on CHF LIBOR, including CHF futures traded on the CME. "While the CEA itself does not define the term, a court will find manipulation where (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (internal quotation marks omitted).

Although Divitto lacks standing to sue for any manipulation under the CEA because he has not plausibly alleged actual injury, the Complaint adequately alleges manipulation of the price of CHF futures contracts in violation of the CEA by the Deutsche Bank Defendants, RBS, and UBS. As recounted above, the Complaint plausibly alleges that CHF LIBOR affects

---

dollars." Doc. 73 at 30. But that is of no matter because standing may be conferred based on not only manipulation of "the price of the commodity underlying such contract," but also on "manipulation of the price of any such contract" itself. 7 U.S.C. § 25(a)(1)(D)(ii). Had Divitto adequately alleged that he was injured by manipulation of the price of the CHF FX futures contract through manipulation of CHF LIBOR, he would have standing under the CEA. *See LIBOR I*, 935 F. Supp. 2d at 715 ("Plaintiffs have stated a [CEA] claim for commodities manipulation based on manipulation of the price of Eurodollars futures contracts.").

the price of CHF futures contracts and that the Deutsche Bank Defendants, RBS, and UBS abused their ability to influence CHF LIBOR for the purpose of profiting from their CHF derivative positions, including CHF futures contracts. The Complaint contains multiple detailed instances of the Deutsche Bank Defendants, RBS, and UBS manipulating CHF LIBOR submissions at the request of derivative traders. Further, allegations in the Complaint regarding structural facilitation of this conduct support the inference that these detailed instances are not the full extent of the manipulation.[26] At the pleading stage, such allegations suffice to claim that the Deutsche Bank Defendants, RBS, and UBS with specific intent caused an artificial price for CHF futures on the CME.

In arguing to the contrary, defendants first maintain that plaintiffs have not alleged that any manipulation of CHF LIBOR proximately caused artificial prices of CHF futures contracts traded on the CME. *See In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11-md-2213, 2012 WL 6700236, at *16-18 (S.D.N.Y. Dec. 21, 2012) (dismissing price manipulation claim because "[t]he causation element [of a CEA claim] requires that a defendant be the proximate cause of the price artificiality"). This argument has essentially already been rejected under the Article III standing and antitrust analyses. While proximate cause may pose a higher bar than a standing requirement, in this case the same response answers both: plaintiffs have plausibly alleged a relationship between CHF LIBOR and the price of CHF futures contracts, and the argument that such a relationship is not supported by the evidence or is insufficiently direct to find proximate causation cannot be resolved at the pleading stage.

Next, defendants contend that the Complaint fails to allege that any manipulation was undertaken with specific intent to manipulate the price of CHF futures traded on the CME. "[I]n order to prove the intent element of a manipulation . . . it must be proven that the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a

---

[26] The Complaint fails to plausibly allege manipulation in violation of the CEA against the Credit Suisse Defendants or BlueCrest because it does not plausibly allege that these defendants caused any manipulated CHF LIBOR submission, and thereby artificial prices of CHF futures contracts.

price or price trend in the market that did not reflect the legitimate forces of supply and demand." *In the Matter of Indiana Farm Bureau Coop. Assoc.*, No. 75-14, 1982 CFTC LEXIS 25, at *17 (C.F.T.C. Dec. 17, 1982). "Plaintiffs may demonstrate scienter either (a) by alleging facts to show that Defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Laydon*, 2014 WL 1280464, at *5. Rule 9(b)'s heightened pleading standard "is generally relaxed in the context of manipulation-based claims, where the complaint must simply specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 566 (S.D.N.Y. 2016).

The specific intent element is not a basis for dismissal at this stage. Plaintiffs have met the requirements for manipulation-based claims by alleging what manipulative acts were performed and by whom, and how those acts affected CHF futures. Plaintiffs have alleged defendants' motive to manipulate CHF LIBOR to profit their derivative positions and opportunity to do so through their influence on the rate-setting process. *See Laydon*, 2014 WL 1280464, at *5 ("On motive, the Complaint contains sufficient allegations that Defendants stood to gain tremendous profits from manipulating Euroyen TIBOR and Yen–LIBOR."). The Complaint also alleges structural facilitation by RBS, UBS, and Deutsche Bank AG – such as rearranging desks to place traders next to submitters and oversight failures – suggestive of recklessness or conscious misbehavior.

The entire thrust of plaintiffs' claims is that defendants manipulated CHF LIBOR for the precise purpose of affecting the prices of CHF LIBOR-based derivatives, including CHF futures. And this specific intent is further supported by defendants' own statements, with an RBS trader stating, "i moaned too.. they had 6m libor at 85.. i was gonna lose 1.25 bps on 2k futs." Compl. App'x at 2.[27]

––––––––––––––––––––

[27] Defendants also urge that specific intent has been inadequately alleged because "Plaintiffs do not even claim to have bought or sold Swiss franc futures from the Defendants, and therefore fail to demonstrate that Defendants had a motive to

### D. While Plaintiffs Lack CEA Standing, They Have Plausibly Alleged Principal-Agent Liability Against the Deutsche Bank Defendants, RBS, and UBS

Count Four claims that each defendant is liable for the CEA violations of its employees.  Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), "a claim for principal-agent liability requires that the agent was acting in the capacity of an agent when he or she committed the unlawful acts and that the agent's actions were within the scope of his or her employment." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 571 (S.D.N.Y. 2016).  "[P]laintiffs must allege that the principal manifested an intent to grant the agent authority, the agent agreed, and the principal maintain[ed] control over key aspects of the undertaking." *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 546 (S.D.N.Y. 2008) (internal quotation marks omitted).

That claim fails against all defendants because plaintiffs lack standing to sue for manipulation under the CEA and thus for principal-agent liability based on that manipulation.  However, to the extent that plaintiffs have sufficiently alleged primary CEA violations by the Deutsche Bank Defendants, RBS, and UBS, they have likewise sufficiently alleged principal-agent liability for those violations.  "There is no indication, at this stage, that these employees acted on a lark or in any way outside the scope of their employment." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d at 571; *see also FOREX*, 2016 WL 5108131, at

---

manipulate the prices of such contracts."  Doc. 73 at 34-35.  That argument is specious because – as defendants are well aware, and as discussed above – these derivatives were traded on an exchange instead of directly with any counterparty.  As plaintiffs note, accepting defendants' position would mean that "no plaintiff could bring a CEA manipulation claim, as '[b]uyers and sellers of commodity futures do not deal directly with each other, but instead interact with a commodities exchange, which serves as a clearing house.'"  Doc. 86 at 43 (quoting *In re Natural Gas*, 337 F. Supp. 2d 498, 502 (S.D.N.Y. 2004)).  Defendants cite no support for this proposition; rather, their own authorities confirm that CEA claims may be based on manipulation of derivatives sold on an exchange.  *See Hershey v. Energy Transfer Partners L.P.*, 610 F.3d 239, 249 (5th Cir. 2010) (holding that evidence defendants intended to "impact the NYMEX natural gas futures market" would be sufficient to establish manipulative intent).

*25 (principal-agent CEA claims could proceed where there was no indication that "any trader was operating outside the scope of his employment when engaging in the alleged conduct"). Indeed, the Complaint alleges that defendants manipulated CHF LIBOR to increase their institutions' global profits and that this misconduct was systemic.

### E.    While Plaintiffs Lack CEA Standing, They Have Plausibly Alleged Aiding and Abetting Liability Against RBS

Count Five alleges that defendants aided and abetted other defendants' CEA violations by colluding to manipulate CHF LIBOR and thereby the price of derivatives priced based on CHF LIBOR, including CHF futures traded on the CME. "To recover on an aiding and abetting claim under the CEA, a Plaintiff must prove that the Defendant (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective." *Laydon*, 2014 WL 1280464, at *4. To recover against a secondary party for aiding and abetting a CEA violation, "a plaintiff must first prove that a primary party committed a commodities violation." *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996).

Again, Count Five fails against all defendants because plaintiffs lack standing to sue for manipulation under the CEA and thus for secondary aiding and abetting liability based on that primary manipulation. Moreover, as discussed in the antitrust analysis, RBS is the only defendant plausibly alleged to have manipulated CHF LIBOR through collusion with another party. Thus, even apart from the question of plaintiffs' standing, Count Five would fail against all defendants except RBS for failure to show defendants "committed some act in furtherance of the principal's objective." *Laydon*, 2014 WL 1280464, at *4.

### F.    The CEA Claims Are Timely Against All Defendants Except UBS

Defendants argue that plaintiffs' CEA claims should be dismissed as untimely. A claim under the CEA must "be brought no later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). "A cause of action 'arises' under the CEA when a party is placed on inquiry notice of

the violation." *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 512 (S.D.N.Y. 2004). "A plaintiff will be deemed to have inquiry notice when there are 'storm warnings,' i.e., 'when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded.'" *In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. 2d 232, 242 (S.D.N.Y. 2006) (quoting *LC Capital Partners v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003)). Thus, for the CEA claims to be timely, plaintiffs must have been on inquiry notice no earlier than February 5, 2013 – two years before the original complaint was filed.

Defendants first reiterate their antitrust statute of limitations argument that plaintiffs were put on inquiry notice of their claims by news articles in 2008 reporting that LIBOR rates, including in one case CHF LIBOR, had ceased to reflect the actual cost of borrowing. This argument fares somewhat better in the CEA context than in the antitrust context, because the Sherman Act requires a showing of collusion whereas the CEA does not. Nevertheless, this handful of articles merely notes a discrepancy between LIBOR and actual borrowing rates, most of which did not even specifically mention CHF LIBOR. This is simply insufficient to trigger inquiry notice. *See Sullivan*, 2017 WL 685570, at *28.

Next, defendants argue that plaintiffs were on inquiry notice as to all defendants no later than December 18, 2012, the date that the DOJ announced a non-prosecution agreement with UBS. That agreement stated that, "[s]tarting at least as early as 2001, and continuing at least until September 1, 2009, on each trading day on which UBS had Swiss Franc trading positions, UBS's Swiss Franc LIBOR submitters rounded UBS's Swiss Franc LIBOR submissions to benefit UBS's global Swiss Franc trading positions." Doc. 77-10, Sullivan Decl., Ex. 9, at ¶ 73.

The Court agrees that the non-prosecution agreement provided plaintiffs with inquiry notice as to UBS and thus plaintiffs' CEA claims against UBS are time barred. A statement in a government settlement of frequent and systemic manipulation of CHF LIBOR is clearly sufficient to put plaintiffs on notice of claims based on this precise misconduct, and

indeed the Complaint draws its detailed allegations against UBS in large part from this non-prosecution agreement.[28] *See, e.g.*, Compl. ¶ 64.

However, the UBS non-prosecution agreement did not put plaintiffs on inquiry notice with respect to CEA claims against defendants other than UBS. With respect to Swiss francs, the agreement states only that UBS "would round [their] proposed submission up or down by ¼ to ½ a basis point to benefit the entire global Swiss Franc desk's daily net position in the Swiss Franc LIBOR-related derivatives markets," and that on a "handful of occasions in between July 2006 and May 2007, a Zurich-based UBS Group Treasury employee asked the Swiss Franc LIBOR submitters to contribute LIBOR submissions to benefit his/her trading book of derivatives tied to Swiss Franc LIBOR." Doc. 77-10, Sullivan Decl., Ex. 9, at ¶¶ 73, 75. Nothing in the CHF LIBOR manipulation discussion indicates that other parties participated in UBS's misconduct. Accordingly, the CEA claims are timely as to all defendants except UBS.[29]

## VI. RICO Claims (Counts Six and Seven)

Count Six asserts that each defendant violated RICO §1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "RICO recognizes a private right of action

---

[28] At oral argument on the motions to dismiss, plaintiffs maintained that the UBS non-prosecution agreement did not put them on inquiry notice for CEA violations occurring after September 1, 2009, the last date covered by the agreement. But a non-prosecution agreement based on frequently recurring misconduct over a more than eight-year period is clearly sufficient to alert an investor of ordinary intelligence that the misconduct might have continued beyond the period covered by the agreement. This is only reinforced by the agreement's statement that this misconduct "continued *at least* until September 1, 2009." Doc. 77-10, Sullivan Decl., Ex. 9, at ¶ 73 (emphasis added).

[29] The first regulatory settlement concerning CHF LIBOR manipulation by a defendant other than UBS was not announced until February 6, 2013, which falls within the two-year CEA statute of limitations.

when a defendant commits a predicate act that is 'indictable' under specified federal criminal statutes." *Sullivan*, 2017 WL 685570, at *32. Here, the RICO claims are based solely on alleged violations of the wire fraud statute. *See* 18 U.S.C. § 1343. Specifically, the Complaint alleges that defendants formed an association-in-fact enterprise that engaged in a pattern of racketeering through predicate acts of wire fraud by making false CHF LIBOR submissions and sending confirmations into the United States for derivatives transactions incorporating manipulated CHF LIBOR. Count Seven alleges that each defendant conspired to violate RICO based on this same misconduct. *See* 18 U.S.C. § 1962(d).

Defendants move to dismiss these claims on the grounds that the Complaint does not adequately allege that plaintiffs have RICO standing, that defendants formed a RICO enterprise or conspired to do so, that each defendant either committed or aided and abetted at least two RICO predicate acts, or that the alleged predicate acts constitute a pattern of racketeering activity. Further, defendants argue that the RICO claims are impermissibly extraterritorial and untimely.

The RICO claims are dismissed in full as impermissibly extraterritorial because the Complaint does not allege a sufficient connection between the alleged acts of wire fraud and the United States. Moreover, the RICO claims fail against each defendant except RBS because only RBS has been plausibly alleged to have joined a RICO enterprise.

### A.    Plaintiffs Have RICO Standing

A private plaintiff has standing to assert a RICO claim only if the plaintiff was "injured in his business or property by reason of a violation of section 1962," 18 U.S.C. § 1964(c). To satisfy this requirement, there must be a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992). Because "Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws," the same requirements of proximate causation to establish standing apply to both types of claims. *Id*. at 267-69. According to defendants, plaintiffs' alleged injuries are too indirect and speculative to support standing for their RICO claims. That argument fails for the reasons given in the antitrust standing analysis above.

**B.** **The Complaint Adequately Alleges Conduct that Violates RICO Only as to RBS**

A plaintiff asserting a RICO claim under § 1962(c) must plausibly allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990) (quoting 18 U.S.C. § 1962(a)–(c)). These elements "must be established as to each individual defendant." *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 451 (S.D.N.Y. 2004). Here, they are established only as to RBS.

1. **The Complaint Adequately Alleges an Association-in-Fact RICO Enterprise Only as to RBS**

The RICO statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). "While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Id.*

The Complaint alleges that defendants formed an association-in-fact enterprise by systemically colluding to manipulate CHF LIBOR for the common purpose of increasing their CHF LIBOR-based derivative profits. That allegation suffers from the same deficiency as plaintiffs' allegation that defendants formed an antitrust conspiracy for the same purpose. As discussed in the antitrust analysis, the Complaint alleges that CHF LIBOR was manipulated sometimes upward and other times downward, but does not explain why each defendant would profit from manipulation in the same direction at the same time. Further, the Complaint contains specific allegations of inter-defendant collusion only against RBS. Without an explanation of how defendants' incentives would align or references to

72

specific instances of collusion, it is not plausible to infer that defendants shared a common purpose to conspire to manipulate CHF LIBOR. Accordingly, only RBS has been adequately alleged to have joined an association-in-fact enterprise to manipulate CHF LIBOR.[30]

### 2. The Complaint Adequately Alleges Two Predicate Acts of Wire Fraud by RBS

To state a claim under section 1962(c), plaintiffs must adequately allege that "a defendant personally committed or aided and abetted the commission of two predicate acts." *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 537 (S.D.N.Y. 2014) (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992)). Plaintiffs allege that defendants committed the predicate act of wire fraud on numerous occasions by coordinating their manipulation through the Bloomberg chat terminals that use U.S. wires, by causing the transmission of false CHF LIBOR fixes on a daily basis to the U.S. financial markets through U.S. wires, and by transacting in CHF LIBOR-based derivatives in the United States through U.S. wires at prices they manipulated through their control of the CHF LIBOR setting process.

Because plaintiffs' RICO claims are based on wire fraud predicates, the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993). "[A]llegations of predicate . . . wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." *Id.* The elements of a wire fraud claim are: "(1) the formation of a scheme to defraud victims (2) of money or other property (as the object of the scheme), and (3) the use of . . . interstate or foreign wire communications in furtherance of the scheme." *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 249 (S.D.N.Y. 2012). "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged

---

[30] While the Complaint alleges that the Deutsche Bank Defendants colluded to manipulate CHF LIBOR, a RICO association-in-fact enterprise generally cannot be comprised of solely a parent and a subsidiary. *See U1IT4less, Inc. v. FedEx Corp.*, 157 F. Supp. 3d 341, 350-52 (S.D.N.Y. 2016).

participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

As an initial matter, only RBS may be adequately alleged to have committed predicate acts in furtherance of an enterprise because only it has been adequately alleged to have joined an association-in-fact enterprise at all. The Complaint contains at least two specific instances of each of UBS and the Deutsche Bank Defendants manipulating CHF LIBOR, but only through intra-defendant manipulation and not through the inter-defendant collusion that could occur as part of an association in fact. As for Blue Crest and the Credit Suisse Defendants, the Complaint lacks two specific allegations of CHF LIBOR manipulation of either sort. With respect to RBS, the Complaint identifies two specific instances of its collusion with unidentified "Bank E" to manipulate CHF LIBOR on April 15, 2008 and May 14, 2009, *see* Compl. ¶¶ 124-26, which as to RBS satisfies the requirement to identify two wire fraud predicate acts with particularity.

Defendants also contend that the Complaint fails to allege a "scheme to defraud," an element of a wire fraud claim that "has been construed liberally to include any plan consummated by the use of" interstate or foreign wire communications "in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property." *Chevron*, 871 F. Supp. 2d at 249 (internal quotation marks omitted). Plaintiffs "must demonstrate that the defendant had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the victim." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (alterations and internal quotation marks omitted).

While defendants contend that the Complaint fails to show a "purpose of depriving Plaintiffs of anything at all," Doc. 73 at 44, the Complaint plausibly alleges that RBS manipulated CHF LIBOR in order to benefit its derivatives positions, which would necessarily come at the expense of others transacting in the CHF LIBOR-based derivative markets. This suffices to allege that RBS abused its influence over the CHF LIBOR rate to deprive those transacting in CHF LIBOR-based derivatives of

something of value through deceit.[31]  And RBS is alleged to have colluded with Bank E through the use of Bloomberg chats, which plaintiffs allege on information and belief, based on the structure of the Bloomberg network, "are located within the United States and were transmitted into the United States, crossing U.S. wires, through servers located in the United States." Compl. ¶ 123 n.101.

### 3. The Complaint Adequately Alleges that RBS Engaged in a Pattern of Racketeering Activity

To constitute a "pattern of racketeering activity," the two or more predicate acts "must be related, and either amount to or pose a threat of continuing criminal activity." *Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (internal quotation marks and alterations omitted).  According to defendants, the Complaint fails to adequately plead that the purported acts of wire fraud amounted to a continuous pattern of racketeering activity, rather than isolated or sporadic acts.  But the Complaint plausibly alleges that the two specific instances of collusion between RBS and "Bank E" are merely a "small sample" of their CHF LIBOR manipulation.  Compl. ¶ 128.  Plaintiffs note that a CFTC order found that RBS and Bank E colluded through "near daily" Bloomberg chats.  *Id.*  The Complaint also points to the European Commission's finding that between March 2008 and July 2009, RBS and JPMorgan colluded to "distort the normal pricing of interest rate derivatives denominated in Swiss franc" by manipulating CHF LIBOR.  *Id.* ¶ 139. That collusion is further supported by allegations in plaintiffs' supplemental memorandum regarding personal jurisdiction that draw from documents produced by JPMorgan pursuant to its settlement agreement with plaintiffs.  Taken together, these allegations suffice to plead the requisite continuity to constitute a pattern of racketeering activity, and any challenge to the sufficiency of the scheme's relatedness and duration cannot be resolved at the pleading stage.

---

[31]  Allegations that defendants other than RBS manipulated CHF LIBOR to profit from their transactions in CHF LIBOR-based derivatives at the expense of other market participants would also suffice to allege a scheme to defraud as to those defendants to the extent that the other elements of a RICO claim had been adequately pled.

C.    **The Complaint Adequately Alleges a RICO Conspiracy Only as to RBS**

Section 1962(d) provides for a separate RICO violation against any person who conspires to violate Section 1962(c).  *See* 18 U.S.C. § 1962(d). To state a RICO conspiracy claim, plaintiffs must allege "the existence of an agreement to violate RICO's substantive provisions" – that is, that defendants "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 244 (2d Cir. 1999) (internal quotation marks omitted).  The parties treat the question of a RICO conspiracy as essentially dependent on the substantive RICO claim, with the same allegations and arguments at issue for both.  Because the Complaint sufficiently pleads a substantive RICO violation only against RBS, it similarly pleads a RICO conspiracy claim only against RBS.

D.    **The RICO Claims Are Dismissed in Full as Impermissibly Extraterritorial**

Under the presumption against extraterritoriality, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. National Australia Bank Ltd*., 561 U.S. 247, 255 (2010). "Congress's incorporation of . . . extraterritorial predicates into RICO gives a clear, affirmative indication that § 1962 applies to foreign racketeering activity – but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2102 (2016).  Accordingly, a RICO claim may be based on foreign racketeering activity only if its predicate acts apply extraterritorially.

Here, plaintiffs' RICO claims are based on predicate acts of wire fraud.  In *European Community v. RJR Nabisco*, the Second Circuit held that Congress had not "manifested an intent that the wire fraud statute" apply extraterritorially, and thus the presumption against extraterritorial application had not been overcome.  764 F.3d 129, 140-41 (2d Cir. 2014), *rev'd and remanded on other grounds*, 136 S. Ct. 2090.  Thus, to state a RICO

claim based on wire fraud, plaintiffs must allege that the racketeering activity was domestic in nature.

In *RJR Nabisco*, the defendant RJR was alleged to have "essentially orchestrated a global money laundering scheme from the United States by sending employees and communications abroad" to sell cigarettes to crime organizations, with the "proceeds ultimately being returned to RJR in the United States." 764 F.3d at 141-42 (internal quotation marks and alteration omitted). The complaint further alleged that the money laundering scheme was "intertwined with organized crime and narcotics trafficking in New York City, that much of the money laundering through cigarette sales occurs in New York City, and that millions of dollars' worth of real estate have been purchased within New York in conjunction with the scheme." *Id*. at 142. The Second Circuit found these allegations sufficient to state a domestic RICO claim based on wire fraud predicates, explaining that "[i]f domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside the United States." *Id.*

By contrast, the Second Circuit's summary order in *Petroleos Mexicanos v. SK Engineering & Const. Co. Ltd.* concluded that limited connections to the United States were insufficient to support domestic application for a RICO claim based on wire fraud predicates. 572 F. App'x 60 (2d Cir. 2014). There, a foreign oil company, Pemex, brought a RICO claim against its contractors for bribing Pemex executives to approve certain cost overruns for a project outside the United States. Pemex alleged three contacts between the bribery scheme and the United States: "the financing was obtained here, the invoices were sent to the bank for payment, and the bank issued payment." 572 F. App'x at 61. But Pemex did not allege "that the scheme was directed from (or to) the United States," and the "activities involved in the alleged scheme – falsifying the invoices, the bribes, the approval of the false invoices – took place outside of the United States." *Id*. Given the foreign focus of the alleged scheme, the Second Circuit ruled that "simply alleging that some domestic conduct occurred cannot support a claim of domestic application." *Id*. (citing *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010)).

Applying the holdings of *RJR Nabisco* and *Petroleos Mexicanos*, three courts in this district have recently dismissed similar RICO claims based on wire fraud predicates relating to LIBOR manipulation as impermissibly extraterritorial. *See FrontPoint Asian Event Driven Fund*, 2017 WL 3600425, at *14-15; *Sullivan*, 2017 WL 685570, at *33; *Laydon*, 2015 WL 1515487, at *8-9. In those cases, as here, the alleged U.S. connections included transmitting false quotes through servers located in the United States, causing Thomson Reuters and the BBA to publish manipulated LIBOR fixes into the United States, coordinating their derivative positions with their LIBOR submissions in electronic chat rooms through servers located in the United States, and sending trade confirmations based on manipulated LIBOR rates to counterparties in the United States.[32] In each case, those contacts were found to create only a minimal nexus to the United States that was insufficient to overcome the presumption against extraterritoriality because manipulative communications occurred between defendants located abroad and the manipulated LIBOR quotes were submitted to an organization abroad. These cases contrasted with *RJR Nabisco*, "where the scheme was allegedly both managed from and directed at the U.S." *Laydon*, 2015 WL 1515487, at *8.

In arguing that their RICO claims are not extraterritorial, plaintiffs rely entirely on *United States v. Hayes*, a criminal prosecution for wire fraud. There, a former UBS trader alleged to have manipulated Yen-LIBOR moved to dismiss the indictment on the ground that, as "a foreign national charged with conspiring to manipulate a foreign financial benchmark, for a foreign currency, while working for a foreign bank, in a foreign country, he lacks a sufficient nexus to the United States and did not have constitutionally adequate notice that his alleged conduct was criminal." 99 F. Supp. 3d 409, 412 (S.D.N.Y. 2015) (internal quotation marks and alterations omitted), *adopted in part* 118 F. Supp. 3d 620 (S.D.N.Y. 2015). That argument was rejected because "the co-conspirators purportedly caused the manipulated LIBOR to be published to servers in the United States and used United States wires to memorialize trades

---

[32] Indeed, as defendants demonstrate in Appendix A to their memorandum in law in support of their motion to dismiss, many of the allegations track almost verbatim the allegations found insufficient in *Laydon*. *See* Doc. 73 App'x A.

affected by that rate" and "culpable conduct underlying the substantive count therefore occurred in the United States." *Id*. at 421. "The presumption against extraterritoriality [was] thus irrelevant to both the wire fraud and the conspiracy." *Id*.

According to plaintiffs, the logic of *Hayes* applies here: because defendants "purportedly caused the manipulated LIBOR to be published to servers in the United States and used United States wires to memorialize trades affected by that rate," their conduct "occurred in the United States" and thus the wire fraud claims are not extraterritorial. *Id*. But *Hayes* itself took pains to distinguish the reach of the criminal wire fraud laws from questions of civil law and personal jurisdiction, noting that "criminal law and civil law serve different purposes and have different sources and constraints." *Id*. at 423 n.4. As Judge Daniels explained in rejecting a similar invocation of *Hayes,* "[t]o be 'within the domestic reach of the wire fraud statute' is not the same as overcoming the presumptions against extraterritoriality in the RICO context." *Laydon v. Mizuho Bank, Ltd.,* No. 12-cv-3419, Doc. No. 491, at *3 n.3 (S.D.N.Y. July 24, 2015) (internal quotation marks omitted); *see also FrontPoint Asian Event Driven Fund*, 2017 WL 3600425, *15 ("Plaintiffs' reliance on criminal RICO cases is unfounded, for extraterritorial application of RICO in civil cases presents distinct considerations absent in the criminal context."). Plaintiffs contend that causing a manipulated rate LIBOR to be broadcast worldwide, including through U.S. wires, from abroad overcomes the presumption against extraterritoriality. That contention is plainly inconsistent with the Second Circuit's determination that "[s]imply alleging that some domestic conduct occurred cannot support a claim of domestic application" of RICO. *Petroleos Mexicanos*, 572 F. App'x at 61 (citing *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010)).

Plaintiffs' RICO claims are dismissed as impermissibly extraterritorial. As in *FrontPoint Asian Event Driven Fund*, *Laydon*, and *Sullivan*, defendants are based abroad, their allegedly manipulated quotes were submitted from abroad to a banking association located abroad, and the LIBOR rate at issue is the LIBOR rate for a foreign currency. That the alleged goal of the conspiracy was to increase *worldwide* profits, including

profits generated in the United States, cannot render "domestic" a scheme that was otherwise centered abroad. Nor can the fact that the CHF LIBOR fixes were distributed *worldwide*, including into the United States, or that defendants carried out their manipulation from abroad through servers that happened to route their communications in the United States. The Supreme Court doggedly underscored this point when it wrote that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 561 U.S. at 266.

Further, the only acts of wire fraud alleged with the particularity required by Rule 9(b) are Bloomberg chat messages that appear to have been between parties outside the United States whose only connection to the United States is the happenstance of allegedly being routed through computer servers into New York. Such minimum contacts do not constitute the sort of "direct[ion] from (or to) the United States" that is required to render plaintiffs' RICO claims domestic in nature. *Petroleos Mexicanos*, 572 F. App'x at 61; *see also FrontPoint Asian Event Driven Fund*, 2017 WL 3600425, at *14 (RICO claims impermissibly extraterritorial where the "only well-plead allegation concerning defendants' use of U.S. wires to manipulate [LIBOR] is that defendants submitted rates to Thomson Reuters, which then disseminated the daily rate throughout the United States"). While *RJR Nabisco* explained that a RICO claim may be sufficiently domestic even if it includes conduct abroad, so long as "domestic conduct satisfies every essential element," 764 F.3d at 142, that requirement has not been met here. Accordingly, plaintiffs' RICO claims are dismissed in full.

The question of extraterritoriality becomes more complex as to RBS in light of plaintiffs' supplemental brief regarding personal jurisdiction that makes detailed allegations, based on documents received from JPMorgan pursuant to their settlement agreement, that RBS conspired to manipulate CHF LIBOR with a JPMorgan trader based in New York.[33]

---

[33] The new documents affect the analysis only as to RBS because only RBS was alleged to have colluded with JPMorgan in New York to manipulate CHF LIBOR, and, as explained above, the Complaint does not plausibly allege that the remaining

However, those detailed allegations, based on recently discovered documents, were not included in the Complaint. And although the Court granted plaintiffs leave to include those allegations in a supplemental brief, that brief addressed solely whether this Court has personal jurisdiction over defendants and did not so much as mention RICO extraterritoriality. The parties (including plaintiffs) will be better served by the Court reserving analysis on what implications these new allegations have on the RICO extraterritoriality issue until they are incorporated into an amended complaint and the parties have had an opportunity to fully brief the Court.

### E.    Plaintiffs' RICO Claims Are Timely

The four-year statute of limitations applicable to Clayton Act claims also applies to civil RICO claims. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987); *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013). The statute of limitations for RICO claims "may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) the plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 36-37 (2d Cir. 2002) (internal quotation marks omitted), *overruled on other grounds by Slayton v. American Exp. Co.*, 460 F.3d 215 (2d Cir. 2006).

Plaintiffs' RICO claims are timely because the statute of limitations was tolled pursuant to the fraudulent concealment doctrine until within four years of plaintiffs filing this lawsuit. As discussed for the antitrust claims, defendants' alleged collusion and manipulation by its very nature was concealed from the public, which prevented plaintiffs from having notice of their claims until at earliest December of 2012.

---

defendants joined any conspiracy between RBS and JPMorgan to manipulate CHF LIBOR.

## VII. The Court Declines to Exercise Supplemental Jurisdiction over the State Law Claims (Counts Eight and Nine)

The Direct Transaction Plaintiffs also assert in Count Eight a common-law claim for unjust enrichment and in Count Nine, in the alternative, a common-law claim for breach of the implied covenant of good faith and fair dealing against UBS and the Credit Suisse Defendants. According to the Complaint, the Direct Transaction Plaintiffs "entered into over 400 Swiss franc currency forwards with Credit Suisse and over 1,300 Swiss franc currency forwards with UBS." Compl. ¶ 310. The Complaint alleges that these transactions were made pursuant to contracts between the Direct Transaction Plaintiffs and UBS and the Credit Suisse Defendants, but it does not provide any relevant details regarding the terms of those contracts. The Direct Transaction Plaintiffs essentially argue that, in entering these contracts, they "reasonably expected Swiss franc LIBOR to be set according to BBA guidelines," Doc. 86 at 52, and thus defendants by manipulating CHF LIBOR either breached their implied warranty of good faith and fair dealing (if this misconduct fell within the scope of the contract) or were unjustly enriched (if this misconduct fell outside the scope of the contract).

The Complaint itself does not specify which state's law governs Counts Eight and Nine, but plaintiffs' briefing utilizes New York law in its analysis. Defendants also brief these claims under New York law, but contend that the Complaint lacks "sufficient facts to determine what law likely applies (e.g., where the alleged dealings occurred, whether all of the Transacting Plaintiffs' dealings with Defendants were governed by contracts and, to the extent contracts exist, if those contracts contained choice of law provisions." Doc. 73 at 45 n.23.

"District courts have jurisdiction over state-law claims that are 'so related to claims in the action within [the district court's] original jurisdiction that they form part of the same case or controversy.'" *Sefovic v. Memorial Sloan Kettering Cancer Center*, 2017 WL 3668845, at *8 (S.D.N.Y. Aug. 23, 2017) (citing 28 U.S.C. § 1367(a)). A district court may decline to exercise that supplemental jurisdiction over a state-law claim where it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. §

1367(c)(3). "[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 103 (2d Cir. 1998).

As discussed above, the Complaint has failed to adequately state a federal claim against any defendant. The Court declines to exercise its supplemental jurisdiction over Counts Eight and Nine, and they are accordingly dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3).

## VIII.   Personal Jurisdiction

Each defendant moves to dismiss the Complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). Defendants emphasize that they are each based in Europe, that they are alleged to have submitted false CHF LIBOR quotes in Europe, and that the Complaint does not allege that their traders and submitters involved in the alleged manipulation acted from the United States. Thus, defendants contend, any connection between the alleged manipulation and the United States – including defendants' transactions of CHF LIBOR-based derivatives in the United States – is insufficient to subject them to suit in the Southern District of New York.

In response, plaintiffs argue that defendants are subject to suit here because they manipulated CHF LIBOR in part for the purpose of profiting from transactions in CHF LIBOR-based derivatives within the forum and conspired with JPMorgan within the forum. Further, plaintiffs contend that defendants conducted their scheme through U.S. wires by using Bloomberg chat terminals and by causing Thomson Reuters to distribute manipulated CHF LIBOR quotes into the United States. Last, plaintiffs urge that Credit Suisse AG, Deutsche Bank AG, RBS, and UBS have consented to jurisdiction by registering under federal or state banking laws.

The Court concludes that it may exercise personal jurisdiction over Deutsche Bank AG, RBS, UBS, and the Credit Suisse Defendants because their alleged manipulation of CHF LIBOR for the purpose of profiting

from transactions for CHF LIBOR-based derivatives within the United States constitutes suit-related purposeful availment of the forum. But personal jurisdiction is lacking as to DB Group Services and BlueCrest because there is no allegation that either of them transacted in CHF LIBOR-based derivatives in the United States, and thus no allegation that such transactions were the aim of their alleged manipulation.

## A. Defendants' Operations and U.S. Connections

### 1. BlueCrest

BlueCrest is an investment advisory services limited liability partnership formed under the laws of England and Wales. Compl. ¶ 38. BlueCrest operates within the United States through various sub-entities, including BlueCrest Capital Management (New York) LP, a Delaware limited partnership with its principal place of business in New York. The Complaint does not allege that BlueCrest itself has operations in the United States. *Id.*

### 2. The Credit Suisse Defendants

Credit Suisse Group is a Swiss banking and financial services company incorporated in Switzerland. Compl. ¶ 42. One of its six primary offices is located in New York. *Id.* Credit Suisse AG, a wholly owned subsidiary of Defendant Credit Suisse Group, also maintains an office in New York. *Id.* ¶ 43. Referring to Credit Suisse Group and Credit Suisse AG collectively as "Credit Suisse," the Complaint alleges that Credit Suisse in 2013 "ranked first in overall fixed income trading in the United States" and that "Credit Suisse's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps, priced, benchmark and/or settled based on Swiss franc LIBOR." *Id.* ¶ 44. Additionally, during the Class Period Credit Suisse "directly transacted Swiss franc LIBOR-based derivatives with U.S. counterparties, including the FrontPoint Plaintiffs, which are located in Greenwich, Connecticut." *Id.* ¶ 47.

### 3. Deutsche Bank AG

Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany with U.S. headquarters located in New York. Compl. ¶¶ 50-51. Its New York branch employs more than 1,700 people and is licensed, supervised, and regulated by the NYSDFS to do business in New York. *Id.* ¶ 51. "From 2006 through 2011, Deutsche Bank AG operated its Global Finance and Foreign Exchange ('GFFX') desk – which includes its Global Finance FX Forwards ('GFF') and foreign exchange ('FX') units – from several offices around the world, including in New York." *Id.*

### 4. DB Group Services

DB Group Services is a wholly owned subsidiary of Deutsche Bank AG incorporated in and with its principal place of business in the United Kingdom. Compl. ¶ 53. The Complaint does not allege that DB Group Services has any operations in the United States.

### 5. RBS

RBS is a British banking and financial services company headquartered in the United Kingdom. Compl. ¶ 56. It operates a New York branch that is licensed, supervised, and regulated by the NYSDFS to do business in New York. *Id.* "RBS' U.S.-based dealers trade in the over-the-counter foreign exchange and interest rate derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps," and "RBS transacted in Swiss franc LIBOR-based derivatives with U.S.-based counterparties during the Class Period." *Id.* ¶ 58.

### 6. UBS

UBS is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland. Compl. ¶ 61. UBS maintains branches in several U.S. states, including New York, and has its U.S. headquarters in New York and Stamford, Connecticut. During the class period, UBS traders in Stamford "managed UBS' interest rate risk

and short-term cash position by engaging in interest rate derivative transactions and transactions in the money markets for each currency, including the Swiss franc." *Id.* ¶ 63. Also during the class period, "UBS directly transacted Swiss franc LIBOR-based derivatives with U.S. counterparties, including the FrontPoint Plaintiffs, which are located in Greenwich, Connecticut." *Id.* ¶ 65.

### B. Personal Jurisdiction Standard

On a Rule 12(b)(2) motion, plaintiffs must allege facts that, if true, would support a prima facie case of personal jurisdiction "notwithstanding any controverting presentation by the moving party." *Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (emphasis omitted). A prima facie showing entails (1) proper service – which is not in dispute here – (2) a statutory basis for personal jurisdiction; and (3) that "the exercise of personal jurisdiction . . . comport[s] with constitutional due process principles." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012). Pleadings and affidavits should be construed "in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester*, 722 F.3d at 85.

Personal jurisdiction over a defendant may be general or specific. *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "Specific personal jurisdiction exists when a forum exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum; a court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.* at 673-74 (alterations and internal quotation marks omitted). "A plaintiff must establish the court's jurisdiction with respect to *each* claim asserted." *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004).

### C. No Defendant Has Consented to the Court's General Jurisdiction

Plaintiffs disclaim any argument that defendants have sufficient contacts to be "essentially at home" in this forum and thus subject to

general personal jurisdiction in this forum under *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014). *See* Doc. 89 at 2. Rather, plaintiffs contend that Credit Suisse AG, Deutsche Bank AG, RBS, and UBS consented to general personal jurisdiction in this forum by registering under federal or state banking laws.

Plaintiffs contend that Credit Suisse AG, Deutsche Bank AG, and RBS consented to personal jurisdiction in New York for "any action" by registering with the New York State Department of Financial Services pursuant to New York Banking Law §§ 200 and 200-b. Under that statute, to do business in New York a branch of a foreign bank must file a written instrument with the office of the superintendent "appointing the superintendent and his or her successors its true and lawful attorney, upon whom all process in *any action* or proceeding against it on a cause of action arising out of a transaction with its New York agency or agencies or branch or branches . . . may be served." N.Y. Banking Law § 200(3) (McKinney 2006) (emphasis added).

An identical argument has been rejected by five courts in this district addressing similar LIBOR claims against foreign banks, and for good reason. *See FrontPoint Asian Event Driven Fund*, 2017 WL 3600425, at *4; *Sullivan*, 2017 WL 685570, at *40; *In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-mdl-2262, 2016 WL 1558504, at *7 (S.D.N.Y. Apr. 15, 2016); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 1268267, at *2 (S.D.N.Y. Mar. 31, 2016); *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13-cv-981, 2015 WL 1514539, at *11 (S.D.N.Y. Mar. 31, 2015). Section 200(3) provides for service of process "on a cause of action arising out of a transaction with [the foreign bank's] New York agency or agencies or branch or branches." N.Y. Banking Law § 200(3) (McKinney 2006). "[T]he most natural reading of the provision does not provide general jurisdiction," *In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1558504, at *7, but rather "is limited to claims arising out of transactions with the [defendants'] New York agencies or branches," *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 1268267, at *2. Moreover, an

interpretation allowing general jurisdiction "would likely raise serious due process concerns." *Sullivan*, 2017 WL 685570, at *40.[34]

Similarly, plaintiffs maintain that UBS has consented to general personal jurisdiction in New York by registering to do business under the International Banking Act of 1978 ("IBA"), which provides that a foreign bank operating a federal branch or agency shall conduct those operations "with the same rights and privileges as a national bank at the same location and shall be subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a national bank doing business at the same location." 12 U.S.C. § 3102(b) (2015).  The rules promulgated by the Comptroller of the Currency provide that a "foreign bank operating at any Federal branch or agency is subject to service of process at the location of the Federal branch or agency." 12 C.F.R. § 28.21.  Hence, plaintiffs argue, a foreign bank is subject to service of process at any federal branch or agency.

But that text deals only with where process may be served and says nothing as to the type of suits that a foreign bank may be required to answer in a forum.  And the statute's aim of placing foreign banks on an equal footing with domestic banks would not be served by allowing general jurisdiction anywhere a foreign bank operates, as national banks are not subject to such broad general jurisdiction.  *See Freedman v. Suntrust*

---

[34]  Plaintiffs rely primarily on *Matter of B&M Kingstone, LLC v. Mega Int'l Commercial Bank Co., Ltd.*, 15 N.Y.S.3d 318 (1st Dep't App. Div. 2015), in which a bank with a New York branch agreed to provide information with respect to that branch in response to an information subpoena, but refused to produce similar information as to its branches outside of New York.  The First Department held that "the court's general personal jurisdiction over the bank's New York branch permits it to compel that branch to produce any requested information that can be found through electronic searches performed there." *Id*. at 267.  While plaintiffs seize on the First Department's use of the phrase "general personal jurisdiction," *B&M Kingstone* explicitly recognized that "New York does not have general jurisdiction over [a registered bank's] worldwide operations." 15 N.Y.S.3d at 264.  *B&M* held simply that a New York branch may be required to provide information available through that branch, not that New York Banking Law § 200(3) provides a court with general jurisdiction over a foreign bank.  *See In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1558504, at *7.

*Banks, Inc.*, 139 F. Supp. 3d 271, 279 (D.D.C. 2015). Tellingly, plaintiffs fail to cite a single case holding that a foreign bank by registering under the IBA consents to general personal jurisdiction anywhere in the United States. Moreover, as with New York Banking Law § 200(3), adopting plaintiffs' interpretation of the IBA would raise serious due process concerns. The Second Circuit's decision in *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014), stands for the proposition that "mere operation of a branch office in a forum — and satisfaction of any attendant licensing requirements — is not constitutionally sufficient to establish general jurisdiction." *Motorola Credit Corp. v. Uzan*, 132 F. Supp. 3d 518, 521 (S.D.N.Y. 2015). In sum, no defendant has consented to the Court's general jurisdiction.

### D. Specific Jurisdiction

Having failed to show that the Court has general jurisdiction over defendants, plaintiffs must instead demonstrate specific jurisdiction if they are to prevail on the issue of personal jurisdiction. "[S]pecific jurisdiction cases are limited to those involving issues deriving from, or connected with, the very controversy that establishes jurisdiction." *In re Roman Catholic Diocese Inc.*, 745 F.3d 30, 38 (2d Cir. 2014) (internal quotation marks omitted).

Plaintiffs contend that specific jurisdiction may be exercised over defendants because they used U.S. wires to manipulate CHF LIBOR, directed their manipulation at the United States by causing Thomson Reuters to disseminate the manipulated CHF LIBOR rate into the United States, purposefully availed themselves of the forum by transacting in CHF LIBOR-based derivatives within the forum after manipulating CHF LIBOR to affect those transactions, and conspired with JPMorgan within the forum.

The Court concludes that it has personal jurisdiction over RBS, UBS, Deutsche Bank AG, and the Credit Suisse Defendants based on allegations that they manipulated CHF LIBOR for the purpose of profiting from transactions for CHF LIBOR-based derivatives within the United States. However, the Court lacks personal jurisdiction over BlueCrest and DB Group Services. Because the Complaint fails to allege that BlueCrest

and DB Group Services transacted in CHF LIBOR-based derivatives in the forum, it has failed to allege that any manipulation by BlueCrest or DB Group Services has an adequate connection to the forum, and the plaintiffs' other arguments for personal jurisdiction as to BlueCrest and DB Group Services are unavailing.

### 1. Standard

"Determining personal jurisdiction over a foreign defendant in a federal-question case such as this requires a two-step inquiry." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013). The Court first looks to whether jurisdiction will lie under the law of the forum state. *Id*. Second, if jurisdiction lies, the Court considers whether the "exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution." *Id*.

New York's long-arm statute states in relevant part that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. 302(a)(1). Defendants "do not separately address the New York long-arm statute" because, they contend, "the exercise of personal jurisdiction here is incompatible with [constitutional] due process." Doc. 64, at 6 n.3. Because defendants do not dispute jurisdiction under New York law, the Court need address only their constitutional due process challenge.

The specific jurisdiction due process inquiry proceeds in two steps. First, the Court evaluates the "quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (internal quotation marks omitted). The "exercise of specific jurisdiction depends on in-state activity that 'gave rise to the episode-in-suit.'" *Waldman v. Palestine Liberation Org.*, 835 F. 3d 317, 331 (2d Cir. 2016) (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 923 (2011)). "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014).

There are two "independent, if conceptually overlapping, methods of demonstrating minimum contacts." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007). The first is through "purposeful availment," in which "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci*, 732 F.3d at 170 (citation omitted). The second is through "purposeful direction," in which "the defendant took intentional, and allegedly tortious, actions  expressly aimed at the forum." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) (citation and alteration omitted). The "purposeful direction" test is also referred to as the "effects test," which is a "theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173. "In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id*.

Second, "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Licci*, 732 F.3d at 170 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). The factors considered in assessing the reasonableness of exercising personal jurisdiction include: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).

### 2. The National Contacts Test Applies to Plaintiffs' Federal Claims

The Court concludes that, when evaluating the extent of defendants' contacts as to the Clayton Act, CEA, and RICO claims, the relevant forum is the United States as a whole, rather than New York in particular. Each of these statutes permits nationwide service of process. *See* 15 U.S.C. § 22 (Clayton Act); 7 U.S.C. § 25(c) (CEA); 18 U.S.C. § 1965(d) (RICO). The Second Circuit, while "not yet [having] decided th[e] issue," has observed that several other circuits hold that "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014). And several courts in this district addressing federal claims with national service of process – including claims based on alleged LIBOR manipulation – have applied the "national contacts" test. *See, e.g., Sullivan*, 2017 WL 685570, at *42; *LIBOR IV*, 2015 WL 4634541, at *18; *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515358, at *1 (S.D.N.Y. Mar. 31, 2015); *In re Amaranth Nat. Gas. Commod. Litig.*, 587 F. Supp. 2d 513, 526 (S.D.N.Y. 2008). "The rationale underlying this 'national contacts' approach is that '[w]hen the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation.'" *LIBOR IV*, 2015 WL 4634541, at *18 (quoting *In re Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1294 (7th Cir. 1992)).

### 3. Bloomberg Chats Transmitted Through Servers in New York Do Not Constitute Meaningful Contacts with the Forum

According to plaintiffs, defendants have sufficient contacts with the forum partly because they coordinated their manipulation of CHF LIBOR through Bloomberg terminal electronic communications transmitted through servers located in New York. But the happenstance that the electronic communications of defendants acting abroad were routed through a server in the United States cannot substantially contribute to a finding of sufficient contacts with the United States. Such contacts would be merely "random, fortuitous, or attenuated contacts." *Walden*, 134 S. Ct. at 1123 (internal quotation marks omitted). "There is no basis to conclude that any of the [defendants] . . . took actions 'expressly aimed' at the United States by passively connecting to the United States via internet

protocol ("IP") addresses." *Laydon*, 2015 WL 1515358, at *3 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)). "To contend that this highly attenuated connection constitutes 'purposeful availment' is unreasonable." *Id*. (alterations omitted); *see also In re Platinum and Palladium Antitrust Litig.*, 2017 WL 1169626, at *44 (S.D.N.Y. Mar. 28, 2017).

4. **Defendants Causing Thomson Reuters To Disseminate False CHF LIBOR into the United States Does Not Itself Create Sufficient Contacts**

Plaintiffs also contend that defendants purposefully aimed and directed their misconduct at the forum by submitting false CHF LIBOR quotes to Thomson Reuters with the knowledge that Thomson Reuters would then distribute those quotes and the CHF LIBOR fixes worldwide, including into the United States. Because defendants knew that these fixes would be distributed into the United States and relied on to price CHF LIBOR-based derivatives traded in the United States, plaintiffs argue, defendants' manipulation had direct and reasonably foreseeable effects in the United States.

The knowledge that these rates would be disseminated worldwide, including into the United States, is not enough by itself to support specific personal jurisdiction because "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *Laydon*, 2015 WL 1515358, at *2 (quoting *WorldWide Volkswagen Corp v. Woodson*, 444 U.S. 286, 295 (1980)); *see also Waldman*, 835 F.3d at 339 ("[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant."). It is "incontrovertible that the importance of LIBOR was its universal significance, not its projection into any particular state." *LIBOR IV*, 2015 WL 4634541 at *25. Thus, allowing the foreseeable dissemination of LIBOR into a forum alone to establish personal jurisdiction over defendants "would improperly create *de facto* universal jurisdiction." *Id*. at *25 (internal quotation marks omitted).

Mere foreseeability that CHF LIBOR fixes would be distributed into the United States and there affect the prices of CHF LIBOR-based derivatives likewise would not be sufficient even for those defendants who

transacted in CHF LIBOR-based derivatives in the United States. The effect on CHF LIBOR derivative prices in the United States cannot be merely incidental or foreseeable. *See LIBOR VI*, 2016 WL 7378980, at *8 (finding no personal jurisdiction based on foreseeable effects in the United States for defendants who transacted in derivatives because the effect on those derivatives was not the purpose of the manipulation). Rather, plaintiffs "must allege specific facts that plausibly suggest that the Foreign Defendants entered into [CHF LIBOR-based derivative] transactions with counterparties based in the United States, and that those transactions had a nexus to the benchmark interest rate manipulation at issue in this lawsuit." *FrontPoint Asian Event Driven Fund*, 2017 WL 3600425, at *7.

> **5. The Court Has Personal Jurisdiction Over RBS, UBS, the Credit Suisse Defendants and Deutsche Bank AG Because Manipulating CHF LIBOR for the Purpose of Profiting from Transactions in CHF LIBOR-Based Derivatives within the United States Constitutes Purposeful Availment of the Forum**

However, plaintiffs do not allege merely that dissemination of CHF LIBOR into the United States and its effects on CHF LIBOR-based derivatives in the United States were *foreseeable*; they claim that those effects were the *purpose* of defendants' manipulation. According to plaintiffs, defendants manipulated CHF LIBOR in order to wrongfully profit from their worldwide CHF LIBOR-based derivative transactions, including in the United States. Plaintiffs argue that that conduct constitutes "purposeful availment" of the forum and that defendants "directed the aim and effect of their anticompetitive conduct on the United States." Doc. 89 at 1. In essence, plaintiffs maintain that the jurisdictional analysis cannot focus solely on the front-end of the misconduct (the manipulation of CHF LIBOR, which based on the Complaint occurred almost entirely abroad), without examining the back-end of the misconduct (profiting from that manipulation through transactions in CHF-LIBOR based derivatives, including in the United States). The Court agrees that transacting in CHF LIBOR-based derivatives in the United States after manipulating CHF LIBOR for the purpose of wrongfully

increasing the profits of those transactions constitutes "purposeful availment" of the forum.

"The first step in evaluating personal jurisdiction in a conspiracy case is to define the scope of the conspiracy, because only acts taken pursuant to that conspiracy are jurisdictionally relevant." *LIBOR VI*, 2016 WL 7378980, at *3. Applying this principle, Judge Buchwald in *LIBOR VI* concluded that the fact that certain alleged LIBOR manipulators transacted in LIBOR-based financial products in the United States was not jurisdictionally relevant because "the object of the conspiracy . . . [was] the projection of financial soundness." *Id*. Thus, while "a conspiracy with such an object would . . . have an impact on price" of LIBOR-based financial products in the United States, that impact did not give rise to personal jurisdiction because "such an object is not sufficiently directed to the United States." *Id*. Any transactions in the United States were "not meaningful in a jurisdictional analysis because they were not within the scope of the conspiratorial agreement," since "defendants need not engage in any market transactions at all to affect the LIBOR fix" for the object of projecting financial soundness. *Id*. at *8 (alterations and internal quotation marks omitted). Judge Buchwald contrasted such a "financial soundness" conspiracy with a price-fixing conspiracy, in which the "goal of the conspiracy – the raising and maintenance of high prices – . . . necessarily involved selling price-manipulated products into the jurisdiction." *Id*. (citing *Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)). In the latter case, "[s]ales of price-fixed products [would be] therefore jurisdictionally relevant to the conspiracy." *Id*. at *4.

Here, the object of the alleged LIBOR manipulation is not to project financial soundness – as it was in *LIBOR VI* – but rather to increase profits from CHF LIBOR-based derivative transactions. Where the goal of the manipulation is to profit wrongfully from transacting in a product, the places where those transactions occur (not just the places where the price manipulation took place) are jurisdictionally relevant. *See Socony-Vacuum Oil Co.*, 310 U.S. at 253. Plaintiffs allege that the Credit Suisse Defendants, RBS, UBS, and Deutsche Bank AG transacted in CHF LIBOR-based derivatives from within the United States, including, in the case of UBS and the Credit Suisse Defendants, with the Direct Transaction Plaintiffs.

*See* Compl. ¶¶ 15, 23, 67. Defendants' argument that "these alleged transactions . . . are not 'suit-related,' i.e., they do not form the basis of Plaintiffs' claims," Doc. 64 at 16, is unavailing because the transactions are alleged to have motivated the misconduct for which plaintiffs sue. Defendants are alleged to have systematically manipulated CHF LIBOR in whichever direction benefitted their global CHF LIBOR-based derivative positions, which would necessarily include their positions in the United States. *See, e.g.*, Compl. ¶ 117 ("[O]n each trading day on which UBS had Swiss franc trading positions, UBS's Swiss franc LIBOR submitters rounded UBS's Swiss franc LIBOR submissions to benefit UBS's global Swiss franc trading positions."). Where a defendant transacted in the United States at prices it manipulated in order to profit from those transactions, the "Defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there," *Licci*, 732 F.3d at 170, even if the manipulation itself occurred abroad.

Two recent decisions in this district addressing derivatives manipulation support that conclusion. In *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, the plaintiffs alleged that the foreign defendants "conspired to fix benchmark rates" of FX contracts "for their own profit" through the use of chat rooms from unknown locations. No. 13-cv-7789, 2016 WL 1268267, at *5 (S.D.N.Y. Mar. 31, 2016). Judge Schofield concluded that personal jurisdiction could be exercised over the two foreign defendants that had "extensive U.S.-based FX operations" because the complaint "plausibly allege[d] suit-related conduct that either took place in the United States, or had effects expressly aimed inside the country due to the . . . [d]efendants' substantial FX businesses here." *Id.* at *6. However, the court found no personal jurisdiction as to the foreign defendant that did not have U.S.-based FX operations. *Id.* at *7.

Similarly, in *In re North Sea Brent Crude Oil Futures Litigation*, the plaintiffs alleged that the defendants manipulated trading data for the Brent crude oil market conveyed to a price reporting agency "in order to benefit their [Brent crude oil] derivatives positions." No. 13-md-2475, 2017 WL 2535731, at *7 (S.D.N.Y. June 8, 2017). Judge Andrew L. Carter, Jr. ruled that the court had jurisdiction over a foreign defendant that

participated in the manipulation because its "employees directed futures and derivatives trading on NYMEX [the New York Mercantile Exchange] that could have benefited from the alleged manipulative activity," since that benefit in the forum was allegedly "a primary purpose of their participation in the manipulative physical trading." *Id*. at *11. Based on this alleged purpose of the manipulation, the court concluded that the plaintiffs had adequately alleged that that defendant "intended the effects of its alleged conduct [abroad] to be felt in the United States, particularly on NYMEX, where its employees executed trades." *Id*. But the court held that personal jurisdiction was lacking over another foreign defendant that did not trade those derivatives in the United States. *Id*. at *8.

Here, as in *In re Foreign Exchange Benchmark Rates Antitrust Litigation* and *In re North Sea Brent Crude Oil Futures Litigation*, defendants are alleged to have engaged in manipulation for the purpose of profiting their substantial derivatives operations in the United States. Here, as in those cases, that alleged purpose creates a substantial connection between defendants' alleged manipulation and their derivatives trading activity in the forum to establish specific personal jurisdiction.

In arguing for a contrary result here, defendants rely primarily on the Supreme Court's decision in *Walden v. Fiore*, which held that the "relationship must arise out of contacts that the 'defendant *himself*' creates with the forum," and that the contacts must be "with the forum State itself, not the defendant's contacts with persons who reside there." 134 S. Ct. at 1122 (emphasis in original) (citation omitted). According to defendants, under *Walden* specific jurisdiction cannot be based on the foreseeability of harm to the plaintiffs in the forum, even where defendants are alleged to have harmed plaintiffs in order to profit from trading in these same derivatives in the forum.

In *Walden*, the plaintiff sued a law enforcement agent in Nevada based on the agent's search of the plaintiff at an airport in Georgia. While the agent knew that the plaintiff was traveling from Georgia to Nevada, it was "undisputed that no part" of the agent's "course of conduct occurred in Nevada." *Id*. at 1124. The agent "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id*.

The Supreme Court held that the defendant's knowledge of the *plaintiff's* connections to Nevada did not give rise to personal jurisdiction over the defendant in Nevada because "the relationship must arise out of contacts that the 'defendant himself' creates with the forum State." *Id*. at 1122.

But *Walden* differs from our case in a crucial respect. Here, plaintiffs do not allege merely that their injury in the forum was foreseeable from an act that took place entirely outside the forum. Unlike in *Walden*, where the agent conducted no activities within the forum, here it is alleged that the Credit Suisse Defendants, Deutsche Bank AG, RBS and UBS manipulated CHF LIBOR in order to profit from their transactions in the forum, and that plaintiffs themselves were harmed in the forum by transacting with the Credit Suisse Defendants and UBS in the forum. *Walden* simply says nothing about a defendant whose business activities within the forum (here, the purchase or sale of CHF FX forwards) are alleged to have provided the impetus for the very wrongdoing (here, the manipulation of CHF LIBOR) that caused plaintiffs' injuries in the forum.

In their supplemental brief, defendants also rely heavily on the Second Circuit's decision in *Waldman v. Palestinian Liberation Org.*, which directs a court to consider the "relationship of the defendants, the forum, and the defendant's suit-related conduct." 835 F.3d at 337 (citing *Walden*, 134 S. Ct. at 1121). *Waldman* held that the Palestinian Liberation Organization ("PLO") was not subject to suit under the Anti-Terrorism Act ("ATA") in New York for its alleged support of terrorist attacks in Israel that killed or wounded American citizens. While the PLO had some contacts in the United States – such as a diplomatic presence, lobbying operations, and limited commercial transactions – those contacts were "insufficiently 'suit-related conduct' to support specific jurisdiction." *Id.* at 344 (citing *Walden*, 134 S. Ct. at 1121, 1123). "The relevant 'suit-related conduct' by the defendants was the conduct that could have subjected them to liability under the ATA," which "[o]n its face" occurred in Israel and "did not involve the defendants' conduct in the United States." *Id*. at 335. Thus, "[t]he plaintiffs' claims did not arise from the defendants' purposeful contacts with the forum." *Id*. at 343.

Here, defendants argue that their presence in the forum, including their transactions in CHF LIBOR-based derivatives, is not sufficiently suit-related to support personal jurisdiction because, as in *Waldman*, the misconduct giving rise to plaintiffs' claims occurred abroad. But unlike in *Waldman*, here plaintiffs allege that defendants' in-forum conduct motivated their manipulation abroad and that defendants' activities in the forum harmed plaintiffs in the forum (i.e., transacting in CHF LIBOR-based derivatives at artificial prices). Defendants contend that "Plaintiffs must demonstrate that the Foreign Defendants' suit-related conduct creates minimum contacts with New York, however, not simply that the Foreign Banks have a presence here or conduct business activities here in general." Doc. 64 at 16 (quoting *7 57th Street West Realty Co.*, 2015 WL 1514539, at *10). That is correct as a statement of the law, but it is of no avail to defendants. Plaintiffs do not merely allege that defendants "have a presence" in the United States or "conduct business activities here in general," but that defendants committed their wrongful conduct abroad in part to profit from their activities within the forum, *see* Compl. ¶¶ 99, 289, 290, creating a substantial connection between the forum and the harm that was absent in *Waldman*.[35]

---

[35] Defendants note that *Waldman* also held the PLO was not subject to suit in the forum under the "effects test," even though the alleged misconduct "continuously hit Americans," because it could not be said that "the United States [was] the focal point of the torts alleged." 835 F.3d at 338. Here, defendants argue, the "focal point" of the manipulation was abroad, and thus specific jurisdiction is lacking. As an initial matter, in *Waldman* the Second Circuit found that the attacks were "indiscriminate" and "random," and thus "were not expressly aimed at the United States." *Id.* at 337. Here, by contrast, the alleged harm is not "random" and "indiscriminate" because defendants are aware of where they transact in CHF LIBOR-based derivatives, and thus where counterparties would be harmed by entering into such transactions. Moreover, plaintiffs allege that their harm in the forum was not merely foreseeable, but that profiting from transactions in the forum was in part the motivation for defendants' manipulation. Thus, there is a far stronger case here for finding that the wrongful conduct was "expressly aimed at the United States" than there was in *Waldman*. In any event, plaintiffs need not establish personal jurisdiction under the "effects test," – which is "typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff," *Licci*,

As defendants emphasize, their CHF LIBOR manipulation is not alleged to be aimed at the United States exclusively, but at the United States in addition to everywhere else defendants transacted in these derivatives. But the fact that defendants sought to benefit from foreign transactions as well as domestic ones does not negate that they purposefully availed themselves of this forum by transacting in CHF LIBOR-based derivatives affected by CHF LIBOR they manipulated to increase their profits in those transactions at their counterparties' expense. Such transactions are "suit-related conduct" that "create a substantial connection with the forum." *Walden*, 134 S. Ct. at 1121. And notably, plaintiffs seek only to represent a Class that "engaged in U.S.-based transactions," Compl. ¶ 224, meaning that the United States is the "nucleus of the harm" alleged. *Waldman*, 835 F.3d at 340.

While several recent decisions in this district have concluded that manipulation of a benchmark abroad did not give rise to specific jurisdiction in New York, those decisions are distinguishable. As already set forth, in Judge Buchwald's LIBOR decisions the alleged goal of the manipulation was to project financial health; thus, the defendants' transactions in the United States in affected financial products were outside the scope of the conspiracy and therefore were not jurisdictionally relevant. *See LIBOR VI*, 2016 WL 7378980, at *8. In *Laydon v. Mizuho Bank, Ltd.*, cited by defendants (Doc. 64 at 1), the moving defendants had no operations in the United States and were not alleged to have participated in the manipulation in order to benefit from transactions in financial products in the United States. *See* 2015 WL 1515358, at *4-6. And in *7 West 57th Street Realty Co.*, also cited by defendants (Doc. 64 at 1), the fact that a decrease in the value of plaintiff's municipal bond in New York was a

---

732 F.3d at 173 – because personal jurisdiction has been established under the "purposeful availment" test based on the alleged conduct in the forum. In *Waldman*, the jurisdictionally relevant conduct occurred entirely abroad, and thus specific jurisdiction could only be established under the "effects test." Here, the jurisdictionally relevant conduct is not simply the manipulation of CHF LIBOR abroad but the transacting in CHF LIBOR-based derivatives within the forum that was allegedly the purpose of the manipulation.

foreseeable result of the defendants' LIBOR manipulation was found to be an insufficient basis for personal jurisdiction, but – unlike this case – there appears to be no clear allegation that the purpose of defendants' manipulation was to increase its profits from transactions in that type of municipal bond also in New York. *See* 2015 WL 1514539, at *10-11.

Last, this past month Judge Alvin Hellerstein found there was no personal jurisdiction over foreign defendants alleged to have manipulated the Singapore Interbank Offer Rate ("SIBOR") from abroad where there were no plausible allegations that the foreign defendants engaged in U.S. transactions for affected financial products. *See Frontpoint Asian Event Driven Fund*, 2017 WL 3600425, at *6. As Judge Hellerstein wrote, "Plaintiffs must do more than infer that the Foreign Defendants likely were participants in the U.S. derivatives markets. They must allege specific facts that plausibly suggest that the Foreign Defendants entered into [SIBOR-based] transactions with counterparties based in the United States, and that those transactions had a nexus to the benchmark interest rate manipulation at issue in this lawsuit." *Id*. at *7. That is precisely what plaintiffs have alleged here.

To the extent that a district court decision can be read to hold that a foreign defendant that manipulates a benchmark for the purpose of profiting from financial transactions in the forum is not subject to suit in the forum – either because the manipulation itself occurred abroad or because the manipulation was for the purpose of profiting from transactions outside the forum as well as in the forum – the Court respectfully disagrees. Accordingly, personal jurisdiction over RBS, UBS, Deutsche Bank AG, and the Credit Suisse Defendants is proper because the Complaint alleges that they manipulated CHF LIBOR for the purpose of profiting from transactions for CHF LIBOR-based derivatives within the forum.[36]

---

[36] This conclusion does not conflict with the Court's conclusion that plaintiffs' RICO claims are impermissibly extraterritorial. The specific jurisdiction inquiry is satisfied if a defendant has purposefully availed himself of the forum such that he "could foresee being haled into court there," *Licci*, 732 F.3d at 170. This is a less demanding

6. **The Court Lacks Personal Jurisdiction Over DB Group Services and BlueCrest Because They Are Not Plausibly Alleged to Have Transacted in CHF LIBOR-Based Derivatives in the United States**

Plaintiffs broadly allege that "[e]ach defendant" transacted in CHF LIBOR-based derivatives "from within the United States and with U.S. counterparties." Compl. ¶ 15. But plaintiffs offer no plausible allegations that either BlueCrest or DB Group Services did so.

The Complaint says nothing about DB Group Services's activities in the United States. And DB Group represents that it is a service company with its headquarters and sole place of business in the United Kingdom, whose "principal business is to supply the services of its employees to Deutsche Bank AG and its subsidiaries in the United Kingdom." Bagshaw Decl., Doc. 72, ¶ 4. It "does not provide banking services or engage in the trading of financial instruments" and "at all relevant times . . . did not have any operations in the United States." *Id*. ¶¶ 4, 6.

The Complaint alleges that "BlueCrest operates within the United States, including within this District through various sub-entities, including BlueCrest Capital Management (New York) LP ('BlueCrest New York')." Compl. ¶ 38. But no BlueCrest "sub-entity" is named as a defendant, and the Complaint does not identify any operations by BlueCrest itself within the forum. Plaintiffs make no showing why any U.S. contacts of its subsidiaries should be imputed to BlueCrest under an alter-ego theory, particularly where the subsidiaries are not claimed to have engaged in any manipulation. *See In re North Sea Brent Crude Oil Futures Litigation*, 2017 WL 2535731, at *8; *Laydon v. Mizuho Bank, Ltd*., 2015 WL 1515358, at *4 (citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120–22 (2d Cir. 1984)).

Of course, by failing to plausibly allege that DB Group Services or BlueCrest transacted in CHF LIBOR-based derivatives within the United States, the Complaint has failed to plausibly allege that profiting from such

inquiry than the RICO extraterritoriality analysis, which requires that the scheme have a domestic focus. *See Petroleos Mexicanos*, 572 F. App'x at 61.

transactions was the purpose of any manipulation by them. *See In re North Sea Brent Crude Oil Futures Litigation*, 2017 WL 2535731, at *8 (no personal jurisdiction over foreign defendant not alleged to have transacted in the affected derivatives within the United States); *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2016 WL 1268267, at *7. (same). Thus, DB Group Services and BlueCrest are not subject to this Court's jurisdiction under a purposeful availment theory.

### 7. RBS's Conspiracy from Abroad with JPMorgan in the Forum Reinforces the Conclusion that RBS Is Subject to the Court's Jurisdiction

Plaintiffs also allege that Credit Suisse Group, UBS, and RBS are subject to specific jurisdiction in this forum based on their conspiracy with JPMorgan, a corporation headquartered in New York. The only non-conclusory allegations that Credit Suisse Group and UBS conspired with JPMorgan pertain to the manipulation of bid-ask spreads. As explained, plaintiffs lack constitutional standing to assert claims based on bid-ask spread manipulation, and allegations relating to that manipulation therefore cannot provide a basis for exercising personal jurisdiction over Credit Suisse Group and UBS with respect to claims relating to the separate manipulation of CHF LIBOR. *See Sunward Electronics,* 362 F.3d at 24 ("A plaintiff must establish the court's jurisdiction with respect to each claim asserted.").

RBS is the only defendant that has been plausibly alleged to have conspired with JPMorgan to manipulate CHF LIBOR. While the Complaint referenced a European Commission finding that "RBS and JPMorgan operated a cartel aimed at manipulating Swiss franc LIBOR to 'distort the normal pricing of interest rate derivatives denominated in Swiss franc,'" Compl. ¶ 139, the parties disputed whether the Complaint plausibly alleged that this collusion involved any JPMorgan traders operating from New York. According to plaintiffs' supplemental brief regarding personal jurisdiction, documents produced by JPMorgan as part of its settlement with plaintiffs now make clear that RBS colluded with a JPMorgan trader in New York to manipulate CHF LIBOR. The supplemental brief includes specific alleged communications appearing to

show collusion to manipulate CHF LIBOR and alleges that an RBS trader referred to himself and his JPMorgan counterpart in New York collectively as "royal chasebankscotland ny." This suffices to plausibly allege that RBS from abroad willfully colluded with JPMorgan inside the forum.

Plaintiffs maintain that RBS, by conspiring with a JPMorgan trader located in New York, "reached into the forum" and created contacts that subject it to suit in the forum, particularly when coupled with allegations that the effects of the manipulation were also directed at the forum.

"The underlying rationale for exercising personal jurisdiction on the basis of conspiracy is that, because co-conspirators are deemed to be each other's agents, the contacts that one co-conspirator made with a forum while acting in furtherance of the conspiracy may be attributed for jurisdictional purposes to the other co-conspirators." *LIBOR IV*, 2015 WL 6243526, at *29. Defendants point to Judge Daniels' observation in *Laydon* that "[c]ourts have been increasingly reluctant to extend this theory of jurisdiction beyond the context of New York's long-arm statute." 2015 WL 1515358, at *3. And several courts in this district recently have rejected conspiracy-jurisdiction arguments in benchmark manipulation cases. *See, e.g., Front Point Asian Event Driven Fund, L.P.*, 2017 WL 3600425, at *8; *LIBOR VI*, 2016 WL 7378980, at *3; *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *49; *Laydon*, 2015 WL 1515358, at *3.

But notably, in many of these cases the plaintiffs had failed to plausibly allege that any act by *any* party in furtherance of the conspiracy took place in the forum. *See, e.g., Front Point Asian Event Driven Fund, L.P.*, 2017 WL 3600425, at *8 (rejecting conspiracy jurisdiction where the plaintiffs had "not alleged that any defendant – including those who do not contest jurisdiction – committed any act in furtherance of the conspiracy from within the United States or purposefully directed its misconduct at the United States"); *LIBOR VI*, 2016 WL 7378980, at *3 ("Because plaintiffs have failed to establish that any defendant committed an act in furtherance of the conspiracy in or directed at the United States . . . the conspiracy jurisdiction argument has no purchase."); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *49 (no conspiracy

jurisdiction where "Plaintiffs failed to allege that any conduct relevant to the alleged price manipulation took place in New York").

That is quite different from the conspiracy alleged here: that the defendant acting abroad conspired with someone it knew to be committing the wrongful conduct within the forum. Indeed, *Laydon* also noted that to establish conspiracy jurisdiction a plaintiff must "show that the defendant's co-conspirator committed a tort in the forum.'" 2015 WL 1515358, at *3 n.6 (quoting *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 805 (S.D.N.Y.2005)) (alteration omitted). Here, RBS's co-conspirator is alleged to have committed a tort in the forum in furtherance of the conspiracy with RBS's knowledge and participation.

On this issue, defendants again rely primarily on *Walden*, and again that reliance is dubious. Defendants emphasize that under *Walden* personal jurisdiction must be based upon contacts that the "defendant *himself* creates with the forum State . . . not the defendant's contacts with persons who reside there." 134 S. Ct. at 1122. But in *Walden* the defendant never "contacted anyone in, or sent anything or anyone" into the forum. *Id*. at 1124. *Walden* simply held that personal jurisdiction was lacking over a defendant who acted entirely outside the forum but knew that the plaintiff had connections within the forum. It did not address whether jurisdiction may be exercised over a defendant who from outside the forum contacts a coconspirator inside the forum. *Walden* would be far more analogous if plaintiffs were asserting "conspiracy jurisdiction" over RBS based on its collusion with a JPMorgan trader located outside the forum, on the ground that JPMorgan has extensive contacts within the forum. But plaintiffs assert that RBS itself willfully and repeatedly reached into the forum by conspiring with JPMorgan.

The Court need not decide whether specific jurisdiction over RBS would be appropriate based solely on its contacts with a coconspirator in the forum. That is because the Court evaluates the "quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test." *Licci*, 732 F.3d at 170. Here, RBS is alleged not only to have conspired with a JPMorgan trader located in the forum, but also to have conspired for the purpose of benefitting its trading positions that

include transactions within the forum.  As explained above, this Court has concluded that a defendant that manipulates the price of a product outside the forum for the purpose of profiting from transactions in that product within the forum has "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* (citation omitted).  That conclusion is only bolstered as to RBS by its alleged collusion with a coconspirator within the forum to achieve its purpose.

### E.    Fair Play and Substantial Justice

Having concluded that the Credit Suisse Defendants, Deutsche Bank AG, RBS and UBS have purposefully established minimum contacts with the forum, the Court must now "determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Licci*, 732 F.3d at 170 (internal quotation marks omitted).  That question need not detain us for long.  Each of these defendants is alleged to be among the world's largest financial institutions and to maintain a substantial and ongoing presence in the forum.  To the extent that defendants are alleged to have purposefully availed themselves of the forum by manipulating CHF LIBOR in order to wrongfully profit from CHF LIBOR-based derivatives, including in the forum, their answering for that alleged misconduct in the forum clearly comports with fair play and substantial justice.

### F.    Jurisdictional Discovery

Plaintiffs argue in the alternative that, to the extent that the Court finds the Complaint's allegations supporting personal jurisdiction over defendants to be insufficient, "the Court should defer ruling, and grant leave to take limited jurisdictional discovery."  Doc. 89 at 24.  The Court has already denied plaintiffs' request for jurisdictional discovery and ruled that "the jurisdictional issues will be decided on a pre-discovery basis." Doc. 81.  Plaintiffs offer no persuasive reason to stray from that ruling.

Where a plaintiff fails to establish a prima facie case that the Court has jurisdiction over a defendant, whether to allow jurisdictional discovery is within the Court's discretion.  *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d

181, 186 (2d Cir. 1998). Exercising that discretion, "[d]istrict courts in this circuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a prima facie case of jurisdiction." *Laydon*, 2015 WL 1515358, at *7. Here, while plaintiffs claim to seek "limited" discovery, an examination of what they hope to uncover shows that their request is in fact quite broad. For example, plaintiffs contend that discovery will reveal "the degree of collusion between the Bank Defendants" and the "Bank Defendants' knowledge that they sent false Swiss franc LIBOR quotes to Thomson Reuters in the U.S., or outside the U.S. with knowledge the quotes would be disseminated in the U.S." Doc. 89 at 25. This is far from a narrow request aiming to resolve, say, a question of whether a defendant maintains an office in the forum, but constitutes instead an attempt to gain broad discovery that goes as much to the heart of plaintiffs' claims on the merits as it does the jurisdictional issues. Jurisdictional discovery is not appropriate in these circumstances and plaintiffs' request is therefore denied.

## IX.    Leave to Replead

At oral argument on these motions to dismiss, plaintiffs requested leave to replead in the event that the Court finds their claims to be inadequately stated. While plaintiffs have already once amended their complaint, this is their first request to replead in response to a motion to dismiss. "It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Fed. R. Civ. P. 15(a)(2) provides that the "court should freely give leave [to amend] when justice so requires." Under the "liberal spirit of Rule 15," the question of whether amendment would be futile is a "key issue." *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 191 (2d Cir. 2015) (internal quotation marks omitted). Here, many of the deficiencies identified in the Complaint may be cured by additional pleading, and there is no reason to deny plaintiffs that opportunity based on other relevant factors such as "bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal quotation marks omitted). Plaintiffs may amend the Complaint.

## X.    Conclusion

For the foregoing reasons, defendants' motions to dismiss each count in the Complaint are granted. Specifically, Count One is dismissed for lack of constitutional standing because plaintiffs have not alleged that they were injured by defendants' bid-ask spread manipulation. Count Two is dismissed as to each defendant because plaintiffs lack antitrust standing to sue RBS, the only defendant that has been plausibly alleged to have violated the antitrust laws. Counts Three, Four, and Five are dismissed as to each defendant because the Complaint fails to plausibly allege that Divitto suffered actual injury from defendants' alleged manipulation. Counts Six and Seven are dismissed as to each defendant as impermissibly extraterritorial. Counts Eight and Nine are dismissed because the Court declines to exercise supplemental jurisdiction over these state law claims. In addition to plaintiffs' failure to state a claim upon which relief can be granted, defendants' motion to dismiss for lack of personal jurisdiction is granted as to DB Group Services and BlueCrest, but denied as to the Credit Suisse Defendants, Deutsche Bank AG, RBS, and UBS.

If plaintiffs intend to file a second amended complaint, the last date to do so is October 16, 2017. Defendants must answer or otherwise respond to that complaint on or before October 30, 2017. If plaintiffs do not file a second amended complaint by October 16, 2017, their claims will be dismissed with prejudice.

Dated:  New York, New York
        September 25, 2017

SO ORDERED:

Sidney H. Stein, U.S.D.J.