## CAHILL GORDON & REINDEL LLP
EIGHTY PINE STREET
NEW YORK, NY 10005-1702

| | | | | |
|---|---|---|---|---|
| ROBERT A. ALESSI | CHARLES A. GILMAN | TELEPHONE: (212) 701-3000 | GEOFFREY E. LIEBMANN | MICHAEL A. SHERMAN |
| HELENE R. BANKS | ARIEL GOLDMAN | WWW.CAHILL.COM | BRIAN T. MARKLEY | DARREN SILVER |
| ANIRUDH BANSAL | JASON M. HALL | | MEGHAN N. McDERMOTT | JOSIAH M. SLOTNICK |
| DAVID L. BARASH | WILLIAM M. HARTNETT | | WILLIAM J. MILLER | RICHARD A. STIEGLITZ JR. |
| LANDIS C. BEST | NOLA B. HELLER | 1990 K STREET, N.W. | NOAH B. NEWITZ | ROSS E. STURMAN |
| BRADLEY J. BONDI | CRAIG M. HOROWITZ | WASHINGTON, DC 20006-1181 | MICHAEL J. OHLER | SUSANNA M. SUH |
| BROCKTON B. BOSSON | DOUGLAS S. HOROWITZ | (202) 862-8900 | DAVID R. OWEN | ANTHONY K. TAMA |
| JAMES J. CLARK | TIMOTHY B. HOWELL | | JOHN PAPACHRISTOS | JONATHAN D. THIER |
| CHRISTOPHER W. CLEMENT | DAVID G. JANUSZEWSKI | CAHILL GORDON & REINDEL (UK) LLP | LUIS R. PENALVER | SEAN P. TONOLLI* |
| AYANO K. CREED | ELAI KATZ | 24 MONUMENT STREET | KIMBERLY PETILLO-DÉCOSSARD | JOHN A. TRIPODORO |
| SEAN M. DAVIS | BRIAN S. KELLEHER | LONDON EC3R 8AJ | SHEILA C. RAMESH | GLENN J. WALDRIP, JR. |
| STUART G. DOWNING | RICHARD KELLY | +44 (0)20 7920 9800 | MICHAEL W. REDDY | HERBERT S. WASHER |
| ADAM M. DWORKIN | CHÉRIE R. KISER* | | OLEG REZZY | MICHAEL B. WEISS |
| ANASTASIA EFIMOVA | JOEL KURTZBERG | | JAMES ROBINSON | DAVID WISHENGRAD |
| JENNIFER B. EZRING | TED B. LACEY | WRITER'S DIRECT NUMBER | THORN ROSENTHAL | COREY WRIGHT |
| HELENA S. FRANCESCHI | MARC R. LASHBROOK | | TAMMY L. ROY | JOSHUA M. ZELIG |
| JOAN MURTAGH FRANKEL | ALIZA R. LEVINE | (212) 701-3120 | JONATHAN A. SCHAFFZIN | DANIEL J. ZUBKOFF |
| JONATHAN J. FRANKEL | JOEL H. LEVITIN | | | |

*ADMITTED IN DC ONLY

April 5, 2019

Re:  *Sonterra Capital Master Fund Ltd., et al.* v. *Credit Suisse Group AG, et al.*, Case No. 15-CV-0871 (SHS)

Dear Judge Stein:

We represent Defendants Credit Suisse Group AG and Credit Suisse AG and write on behalf of the Bank Defendants[1] to inform the Court of supplemental authority that supports the Bank Defendants' pending motions to dismiss the Second Amended Complaint ("SAC") (Dkt. No. 223). After briefing was complete, Judge Torres decided *Fire & Police Pension Association of Colorado* v. *Bank of Montreal*, 2019 WL 1344412 (S.D.N.Y. Mar. 14, 2019) ("*CDOR*") (attached as Exhibit A), which dismissed Sherman Act and state common law claims regarding the supposed manipulation of the Canadian Dollar Offered Rate ("CDOR"). *CDOR* supports dismissal of the SAC.

### I.  *CDOR* Confirms that All Claims Asserted Against the Foreign Defendants Should Be Dismissed for Lack of Personal Jurisdiction

In *CDOR*, Judge Torres held, relying on *Charles Schwab Corp.* v. *Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018), which was issued after this Court's decision in *Sonterra Capital Master Fund Ltd.* v. *Credit Suisse Group AG*, 277 F. Supp. 3d 521 (S.D.N.Y. 2017) ("*Sonterra*"), that Plaintiffs cannot rely on allegations that are not plausible on their face to support personal jurisdiction. *CDOR*, 2019 WL 1344412, at *8. This reasoning confirms that *Schwab* requires reconsideration of this Court's personal jurisdiction holdings in *Sonterra*. In *Sonterra*, this Court

---

[1] Bank Defendants are Credit Suisse Group AG, Credit Suisse AG, Deutsche Bank AG, DB Group Services (UK) Ltd., The Royal Bank of Scotland plc, and UBS AG. Except where otherwise noted, defined terms are the same as those set forth in the Table of Abbreviations included in Defs' Merits Reply (Dkt. 282) at vi–viii; Foreign Defs.' Personal Jurisdiction Reply Br. (Dkt. 281) at iv–vi.

held that it could exercise personal jurisdiction over a Foreign Defendant based on Plaintiffs' allegations that that Defendant traded CHF LIBOR-based derivatives in the United States, regardless of whether Plaintiff had adequately alleged that that Defendant intended to profit from those trades. *Compare Sonterra*, 277 F. Supp. 3d at 541 ("[t]he Complaint contains no specific allegations that . . . the Credit Suisse Defendants manipulated CHF LIBOR at all, either alone or through collusion"), *with id.* at 592 (holding that personal jurisdiction could be exercised over defendants, including the Credit Suisse Defendants, based on defendants' alleged in-forum trading). *CDOR* confirms that, after *Schwab*, that analysis is erroneous because to establish jurisdiction over either the bid-ask spread claims or the CHF LIBOR manipulation claims, the Court must first consider whether Plaintiffs plausibly alleged that the Defendant engaged in either course of alleged manipulation while "intend[ing] to profit" from its U.S.-based trading activities.[2] 2019 WL 1344412 at *10. As set forth in Foreign Defendants' briefs, Plaintiffs have come nowhere close to plausibly alleging that the Foreign Defendants manipulated the bid-ask spread or CHF LIBOR every day for an eleven-year period, let alone that they furthered an alleged conspiracy to do so through trades in the U.S. PJ Br. at 24-27; PJ Reply Br. at 2-7.

*CDOR* also confirms that claims against the Venue Defendants[3] must be dismissed. *CDOR* notes that "the Second Circuit has interpreted 15 U.S.C. § 22, the Clayton Act's service provision, to allow nationwide service of process 'only in cases in which its venue provision is satisfied.'" 2019 WL 1344412, at *6, n.11 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005)). While defendants in *CDOR* did not challenge venue, *see id.*, here Venue Defendants have, and Plaintiffs have failed to allege, as required, that Venue Defendants are "found" or "transact[] business" in this District, and therefore cannot assert jurisdiction.[4] PJ Br. at 37-38, PJ Reply Br. at 14-15.

## II. *CDOR* Confirms that Plaintiffs Fail to Plausibly Allege an Antitrust Conspiracy

*CDOR* also confirms that Plaintiffs here have failed to plausibly allege an antitrust conspiracy. The plaintiff in *CDOR* alleged a profit-based motive to manipulate the benchmark at

---

[2] Because *CDOR* held that the plaintiff did not plausibly allege a "profit-motivated conspiracy," it expressly did not reach the issue of whether trading CDOR-based instruments in the forum would be enough to establish jurisdiction based on such an alleged conspiracy. *CDOR*, 2019 WL 1344412, at *8. This Court need not reach this issue because Plaintiffs here have also failed to plausibly allege that Foreign Defendants' alleged trading of CHF LIBOR derivatives in the forum was part of the alleged conspiracy. However, if the Court were to reach this issue, it would not be enough to establish jurisdiction for the reasons set forth in the Bank Defendants' briefs. *See* PJ Br. at 23, 28-29; PJ Reply Br. at 7-11.

[3] Venue Defendants are Credit Suisse Group AG and DB Group Services (UK) Ltd.

[4] While *CDOR* applies a "nationwide contacts" approach to determine personal jurisdiction, Judge Torres recognized that the Second Circuit has yet to rule on whether such an approach is consistent with due process, *see CDOR*, 2019 WL 1344412, at *6, and Foreign Defendants respectfully submit it is not, especially given the Supreme Court's recent jurisdiction decisions. PJ Br. at 6 n.6; *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). In any event, as to the Venue Defendants, Plaintiffs' failure to allege venue under the Clayton Act precludes the application of a "nationwide contacts" approach as to them. PJ Br. at 37-38; PJ Reply Br. at 14-15.

issue in that case. Following other courts in this Circuit, including this Court's previous opinion, Judge Torres noted the inherent difficulty in plausibly alleging a profit-motivated scheme that depends on defendants maintaining the same position for the entire class period, given that the banks both buy and sell derivative products. *CDOR*, 2019 WL 1344412, at *8; *see also Sonterra*, 277 F. Supp. 3d at 554-55 ("[I]t is harder to infer conspiracy from individual acts of trader-based manipulation because large financial institutions are both buyers and sellers of derivatives products, and thus any changes may well offset each other."). Judge Torres held that the *CDOR* plaintiff failed to plausibly allege such a profit-motivated scheme because it did not allege that defendants individually and collectively held a net-short exposure to CDOR. *CDOR*, 2019 WL 1344412, at *8. Similarly, Plaintiffs here have alleged no facts that render the alleged conspiracy to coordinate CHF LIBOR submissions plausible. *See* Bank Defendants' merits brief (Dkt. 228) at 18-21. Instead, Plaintiffs have asked the Court to conclude from sporadic communications between two banks and general chatter about market conditions among other banks that the banks coordinated to manipulate CHF LIBOR every day for an eleven-year period without alleging any facts about how the banks' interests would align.

### III. *CDOR* Confirms that Plaintiffs Fail to Plausibly Allege Fraudulent Concealment

Finally, *CDOR* also confirms that Plaintiffs' claims were not tolled due to fraudulent concealment and thus are untimely. Applying the Second Circuit's three-prong test for fraudulent concealment, Judge Torres found that the *CDOR* plaintiff satisfied the first prong by adequately alleging concealment, *CDOR*, 2019 WL 1344412, at *13, but failed to satisfy the second or third prongs. In particular, Judge Torres found that the plaintiff failed to allege the required due diligence merely by alleging that it "had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence." *Id.* Judge Torres also found that the *CDOR* plaintiff failed to explain plausibly "why it waited until 2018 to bring this lawsuit when all of the information it relies upon in its complaint has been publicly available since 2013." *Id.* at *14. The same rationale applies here. First, as is the case in *CDOR*, Plaintiffs here "fail to adequately plead the second prong of fraudulent concealment with particularity because the complaint does not specify when Plaintiff became aware of the violations." *Id.* at *13; *see also* SAC ¶¶ 540-543. Further, Plaintiffs' allegations about their lack of knowledge of the allegedly manipulative acts are nearly identical to the allegations found to be deficient in *CDOR*. *See* SAC ¶ 543 ("Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by exercise of due diligence prior to the time when there were public disclosures reporting Swiss franc LIBOR manipulation."). And, like the *CDOR* plaintiff, Plaintiffs here implausibly contend that they remained ignorant of the alleged facts underlying their claims, even as they rely on economic data that became publicly available long before the limitations period expired. SAC ¶ 450. Moreover, as further explained in Defendants' December 13, 2018 Letter (Dkt. No. 323), Plaintiffs' ignorance is not plausible given the number of publicly-available annual reports that disclosed investigations into

CAHILL GORDON & REINDEL LLP

- 4 -

purported LIBOR manipulation.[5] Thus, *CDOR* further supports dismissal of Plaintiffs' claims on the grounds that they are wholly, or at least partially, time-barred.

Respectfully submitted,

Joel Kurtzberg

The Honorable Sidney H. Stein
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

BY HAND DELIVERY

Enclosure

cc:  All counsel of record (by ECF)

---

[5] *See, e.g.*, UBS 2010 Annual Report at 318 (emphasis added), available at https://tinyurl.com/ycmu3x7h (Dkt. 323-6) (disclosing that UBS had received subpoenas from multiple government agencies in the United States and Japan "in connection with investigations regarding submissions to the British Bankers' Association, which sets LIBOR rates. UBS understands that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times"); Credit Suisse Group AG 2011 Annual Report at 340 (filed March 23, 2012) (Dkt. 323-7) (disclosing that "[o]n February 3, 2012, following related investigations in the US and in the UK by the respective authorities, the Swiss Competition Commission commenced an investigation involving twelve banks and certain other financial intermediaries, including the [Credit Suisse] Group, concerning alleged collusive behavior among traders to affect the bid-ask spread for derivatives tied to the LIBOR and TIBOR reference rates fixed with respect to certain currencies. The investigation also relates to alleged collusive agreements to influence these reference rates."); UBS 2011 Annual Report at 346 (filed March 15, 2012) (Dkt. 323-8) (disclosing an investigation by the Swiss Competition Commission into "possible collusion relating to LIBOR . . . and certain derivatives transactions" and disclosing that the Swiss Competition Commission granted UBS "conditional immunity" in connection with potential competition law violations related to submissions for Swiss franc LIBOR and certain transactions related to Swiss franc LIBOR); JPMorgan Chase 2011 Annual Report at 293 (filed March 30, 2012) (Dkt. 323-9) (disclosing investigations by numerous regulators, including the European Commission and Swiss Competition Commission, into the process by which LIBOR rates were submitted to the BBA); The Royal Bank of Scotland plc 2011 annual report at 268 (filed March 23, 2012) (Dkt. 323-10) (disclosing that "The RBS Group continues to receive requests from various regulators investigating the setting of LIBOR and other interest rates, . . .The authorities are seeking documents and communications related to the process and procedures for setting LIBOR and other interest rates, together with related trading information"); Deutsche Bank AG 2011 Annual Report at 315 (filed March 16, 2012) (Dkt. 323-11) (disclosing that "Deutsche Bank AG has received various subpoenas and requests for information from certain regulators and governmental entities in the United States and abroad. . . .in connection with setting interbank offered rates for various currencies. These inquiries relate to various periods between 2005 and 2011").