# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUND LIQUIDATION HOLDINGS LLC, as assignee and successor-in-interest to SONTERRA CAPITAL MASTER FUND LTD., FRONTPOINT EUROPEAN FUND, L.P., FRONTPOINT FINANCIAL SERVICES FUND, L.P., FRONTPOINT HEALTHCARE FLAGSHIP ENHANCED FUND, L.P., FRONTPOINT HEALTHCARE FLAGSHIP FUND, L.P., FRONTPOINT HEALTHCARE HORIZONS FUND, L.P., FRONTPOINT FINANCIAL HORIZONS FUND, L.P., FRONTPOINT UTILITY AND ENERGY FUND L.P., HUNTER GLOBAL INVESTORS FUND I, L.P., HUNTER GLOBAL INVESTORS OFFSHORE FUND LTD., HUNTER GLOBAL INVESTORS SRI FUND LTD., HG HOLDINGS LTD., HG HOLDINGS II LTD., RICHARD DENNIS, and the CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM on behalf of themselves and all others similarly situated, | Docket No. 15-cv-00871 (SHS) |
| | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| - against - | **JURY TRIAL DEMANDED** |
| CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, JPMORGAN CHASE & CO., NATWEST MARKETS PLC, UBS AG, DEUTSCHE BANK AG, DB GROUP SERVICES UK LIMITED, TP ICAP PLC, TULLETT PREBON AMERICAS CORP., TULLET PREBON (USA) INC., TULLETT PREBON FINANCIAL SERVICES LLC, TULLETT PREBON (EUROPE) LIMITED, COSMOREX AG, ICAP EUROPE LIMITED, ICAP SECURITIES USA LLC, NEX GROUP LIMITED, INTERCAPITAL CAPITAL MARKETS LLC, GOTTEX BROKERS SA, VELCOR SA AND JOHN DOE NOS. 1-50, | |
| Defendants. | |

FILED UNDER SEAL

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

JURISDICTION AND VENUE ............................................................................ 8

PARTIES .............................................................................................................. 10

    A.    The Credit Suisse Defendants ............................................................ 18

    B.    The Deutsche Bank Defendants ......................................................... 21

    C.    Defendant JPMorgan ......................................................................... 25

    D.    Defendant RBS .................................................................................. 26

    E.    Defendant UBS .................................................................................. 32

    F.    The TP ICAP Defendants ................................................................. 35

    G.    The NEX Group Defendants .............................................................. 39

    H.    Defendant Gottex ............................................................................... 41

    I.    Defendant Velcor ............................................................................... 42

    J.    John Doe Defendants ......................................................................... 42

    K.    U.S. Market Activity ......................................................................... 43

FACTUAL ALLEGATIONS ................................................................................ 44

I.    Swiss Franc LIBOR ................................................................................. 44

II.    Swiss Franc LIBOR-Based Derivatives ................................................. 46

    A.    The Market ......................................................................................... 46

    B.    Pricing Swiss Franc-LIBOR Based Derivatives ............................... 50

    C.    Defendants Dominated the Market for Swiss Franc LIBOR-Based Derivatives During the Class Period. .................................................. 55

III.    Defendants Agreed to and did Restrain Trade in, and Intentionally Manipulated the Prices Of Swiss Franc LIBOR-Based Derivatives ....................................................... 65

    A.    Bid-Ask Spread Conspiracy: Defendants Agreed to and Did Fix the Bid-Ask Spread on OTC Swiss Franc LIBOR-Based Derivatives, Overcharging Class Members for Purchases and Underpaying Class Members for Sales of Such Derivatives. .......................................................................................... 66

    B.    Swiss Franc LIBOR Manipulation Conspiracy: Defendants Agreed to and Did Manipulate Swiss Franc LIBOR to Artificial Levels for Their Financial Gain and to the Detriment of Plaintiffs and Other Market Participants. .............................. 83

    C.    Defendants Conspired to Manipulate Swiss Franc LIBOR and the Spreads Between Different Tenors of Swiss Franc LIBOR to Financially Benefit Their Swiss Franc LIBOR- and TOIS-Based Derivatives Positions. ........................... 157

i

FILED UNDER SEAL

D.   Defendants Had a High Degree of Interfirm Communication and Conspired to Fix Swiss Franc LIBOR-Based Derivatives Prices Using Unrecorded Means ......... 173

E.   Defendants Shared Proprietary Information About Their Swiss Franc LIBOR-Based Derivatives Positions to Align Financial Interests ................................... 183

IV.   Defendants' Pervasive Conspiratorial And Manipulative Conduct Deprived Class Members Of The Benefit Of Competition And Rendered Swiss Franc LIBOR And The Prices Of Swiss Franc LIBOR-Based Derivatives Artificial During The Class Period . 192

A.   Swiss Franc LIBOR was Artificial Throughout the Class Period ..................... 193

B.   Defendants Manipulated the Prices of Swiss Franc LIBOR-Based Derivatives to Artificial Levels During the Class Period ............................................ 197

C.   The Conspiracy to Fix the Bid-Ask Spread on the OTC Swiss Franc LIBOR-Based Derivatives, and the Conspiracy to Manipulate Swiss Franc LIBOR Furthered One Another and Worked Together to Injure Competition ............... 203

V.   Plaintiffs Transacted In Swiss Franc LIBOR-Based Derivatives At Artificial Prices Proximately Caused By Defendants' Manipulative Conduct ......................................... 204

A.   Sonterra ..................................................................................................... 204

B.   FrontPoint Entities ..................................................................................... 205

C.   Hunter Entities .......................................................................................... 211

D.   Plaintiff Dennis ......................................................................................... 215

E.   Plaintiff CalSTRS ...................................................................................... 216

F.   All Plaintiffs .............................................................................................. 219

TRADE AND COMMERCE ........................................................................................ 221

CLASS ACTION ALLEGATIONS ............................................................................... 221

EQUITABLE TOLLING AND FRADULENT CONCEALMENT ........................................ 223

CLAIMS FOR RELIEF ............................................................................................... 225

FIRST CLAIM FOR RELIEF ...................................................................................... 225

SECOND CLAIM FOR RELIEF .................................................................................. 227

THIRD CLAIM FOR RELIEF ..................................................................................... 229

FOURTH CLAIM FOR RELIEF .................................................................................. 231

FIFTH CLAIM FOR RELIEF ...................................................................................... 231

SIXTH CLAIM FOR RELIEF ...................................................................................... 232

A.   Defendants Engaged in Conduct Actionable Under RICO ............................... 232

B.   Defendants Conducted the Affairs of a RICO Enterprise .................................. 233

C.   Defendants Have Conducted the Affairs of an Enterprise Through a Pattern of Racketeering Activity ................................................................................. 237

FILED UNDER SEAL

D.    The Pattern of Racketeering Activity was Directed to, and did Affect, Interstate Commerce ........................................................................ 238

E.    Plaintiffs Suffered Injury Proximately Caused by the Pattern of Racketeering Activity ........................................................................ 239

F.    Defendants Racketeering Activity Was Domestic In Nature ............................ 239

SEVENTH CLAIM FOR RELIEF ........................................................................ 242

EIGHTH CLAIM FOR RELIEF ........................................................................ 244

NINTH CLAIM FOR RELIEF ........................................................................ 245

PRAYER FOR RELIEF ........................................................................ 247

DEMAND FOR JURY TRIAL ........................................................................ 248

Fund Liquidation Holdings LLC, as assignee and successor-in-interest to Sonterra Capital Master Fund Ltd., FrontPoint European Fund, L.P., FrontPoint Financial Services Fund, L.P., FrontPoint Healthcare Flagship Enhanced Fund, L.P., FrontPoint Healthcare Flagship Fund, L.P., FrontPoint Healthcare Horizons Fund, L.P., Front Point Financial Horizons Fund., L.P., FrontPoint Utility and Energy Fund, L.P., Hunter Global Investors Fund I, L.P., Hunter Global Investors Offshore Fund Ltd., Hunter Global Investors SRI Fund Ltd., HG Holdings Ltd., and HG Holdings II Ltd., as well as Richard Dennis and the California State Teachers' Retirement System (collectively, "Plaintiffs"), complain upon knowledge as to themselves and their own acts and upon information and belief as to all other matters, against Defendants (defined in the Parties section, below)[1] for their violations of law from at least January 1, 2001 through at least December 31, 2011 ("Class Period") as follows:

## INTRODUCTION

1.      For at least ten years, Defendants, some of the world's largest banks and brokers, conspired to rig the global market for foreign exchange and interest rate derivatives that were priced, benchmarked, and/or settled based on Swiss franc LIBOR ("Swiss franc LIBOR-based derivatives"), increasing their profits at the expense of Plaintiffs and the Class.

2.      Defendants are horizontal competitors. They compete to provide market making services for Swiss franc LIBOR-based derivatives, purchasing, selling, and transacting in those same derivatives, in addition to competing in other aspects of their business. However, instead of competing during the Class Period, Defendants agreed to fix prices and engaged in other

---

[1] For the purposes of this Complaint, Plaintiffs adopt the personal jurisdiction ruling of the Court's September 25, 2017 Order ("September 25 Order") and have removed BlueCrest Capital Management LLP as a Defendant. *See* ECF No. 170 at 102. Additionally, Plaintiffs have removed UBS from the Commodity Exchange Act ("CEA") manipulation claim based on the Court's statute of limitations ruling. *See* ECF No. 170 at 70. These changes to the Complaint based on the September 25 Order are made without prejudice to Plaintiffs' right to appeal. Plaintiffs respectfully reserve the right to appeal any adverse rulings from the September 25 Order at the appropriate time.

unlawful acts which injured competition. Defendants' agreement involved a comprehensive strategy aimed at manipulating the prices of Swiss franc LIBOR-based derivatives both at the outset of each transaction when these financial instruments were purchased or sold, and later when their prices were "reset" at predetermined intervals (*e.g.*, every three months) based on Swiss franc LIBOR.

3.     The European Commission ("EC") fined four Defendants, UBS AG ("UBS"), The Royal Bank of Scotland plc (now known as Natwest Markets PLC) ("RBS"), JPMorgan Chase & Co. ("JPMorgan"), and Credit Suisse Group AG ("Credit Suisse"), for anti-competitively operating a cartel to fix the "bid-ask spread," the difference between prices at which they offered to buy and sell Swiss franc LIBOR-based derivatives[2]— a scheme akin to *In re NASDAQ Market-Makers Antitrust Litigation*.[3] Conspiring to create a wider spread generated increased profits for these market makers by systematically overcharging Class members for purchases and systematically underpaying Class members for sales of Swiss franc LIBOR-based derivatives.

4.     The Swiss Competition Commission ("COMCO") also fined UBS, RBS, JPMorgan, and Credit Suisse in December 2016 for operating a cartel to fix the bid-ask spread on over-the-counter ("OTC") Swiss franc LIBOR based derivatives, finding that these Defendants "agreed to quote wider to third-parties, fixed bid-ask spreads. . . whilst maintain[ing] narrower spreads for trades amongst themselves."[4]

5.     In addition to defrauding their counterparties in the purchase or sale of Swiss

---

[2] *See Antitrust: Commission Settles Cartel on Bid-Ask Spreads Charged on Swiss franc Interest Rate Derivatives; Fines Four Major Banks €32.3 million*, EUROPEAN COMMISSION (Oct. 21, 2014), http://europa.eu/rapid/press-release_IP-14-1190_en.htm (hereinafter "EC Bid-Ask Spread Cartel Settlement").

[3] 894 F. Supp. 703 (S.D.N.Y. 1995) (upholding claim for agreement to fix prices against market makers who, as here, widened the bid-ask spread).

[4] *See COMCO Fines Swiss Franc Spread Cartel*, (Dec. 21, 2016) https://www.weko.admin.ch/weko/en/home/latest-news/press-releases/nsb-news.msg-id-65053.html (hereinafter "COMCO Bid-Ask Settlement").

franc LIBOR-based derivatives, UBS, RBS, JPMorgan, Credit Suisse, and Deutsche Bank, which each held a seat on the British Bankers Association ("BBA") Swiss franc LIBOR panel (collectively the "Contributor Bank Defendants"), generated additional illicit profits by coordinating their efforts to rig Swiss franc LIBOR, the interest rate used to price, benchmark and/or settle these same financial instruments. By rigging Swiss franc LIBOR, Defendants controlled the prices of Swiss franc LIBOR-based derivatives throughout the Class Period, allowing Defendants to further injure competition by tipping the market in their favor every trading day, to the detriment of their counterparties.

6.     Defendants rigged Swiss franc LIBOR by exploiting the mathematical nature of the Swiss franc LIBOR fixing. Swiss franc LIBOR was calculated each day at 11 A.M. London time based on what twelve Swiss franc LIBOR panel banks said they would need to pay in interest to attract deposits of Swiss francs. Instead of making accurate submissions, Contributor Bank Defendants, who controlled 42% of the seats on the panel, agreed to fix their submissions at artificial levels that did not reflect the competitive rate of interest offered on Swiss franc deposits. By coordinating their submissions, Defendants caused the composite, published Swiss franc LIBOR to reflect their needs, rather than forces of competition, manipulating the rate in a direction that financially benefited their own Swiss franc LIBOR-based derivatives positions.

7.     Contributor Bank Defendants also conspired with several interdealer brokers to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives by disseminating false pricing information to the market. As Swiss franc LIBOR panel banks, the Contributor Bank Defendants knew that traders and submitters relied on information from interdealer brokers to determine their Swiss franc LIBOR submissions and prices of derivatives transactions. The Contributor Bank Defendants capitalized on this by paying brokers to distribute

false pricing lists, known as "run thrus," and display false prices on screens published to customers to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.

8.      Defendants manipulated Swiss franc LIBOR with such precision that at least one Defendant, Deutsche Bank, maintained a pre-programmed spreadsheet to calculate the exact impact of its false Swiss franc LIBOR submissions. Given the high "notional value," or amount of Swiss francs underlying each Swiss franc LIBOR-based derivative, even small manipulations of Swiss franc LIBOR resulted in massive profits for the Defendants.[5] During the Class Period, Deutsche Bank used its spreadsheet as a tool to optimize its false submissions, fine tuning their effect on Swiss franc LIBOR to squeeze every illegitimate dollar possible from its trades.

9.      By conspiring, these competitors generated exponentially more revenue than they would have through honest competition, directly causing substantial damages to Class members. As one RBS derivatives trader put it, "its just amazing how libor fixing can make you that much money."[6] After implementing their scheme, revenue from RBS's Swiss franc LIBOR-based derivatives trading increased by 420%.[7] Revenue from Deutsche Bank's Money Market Derivatives ("MMD") desk, which also traded Swiss franc LIBOR-based derivatives, more than quadrupled, increasing from €399 million in 2007 to over €1.9 billion, or roughly 14% of the

---

[5] For example, a change in LIBOR of just 1 basis point, *i.e.*, one one-hundredth of one percent, could be worth more than $125,000 in illicit profits. *See* Anjuli Davies, *Ex-Trader Dropped Plan to Recruit Step Brother in London Libor Case*, REUTERS (May 27, 2015) , http://uk.reuters.com/article/2015/05/27/uk-trial-libor-hayes-idUKKBN0OC1ON20150527.

[6] Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against The Royal Bank of Scotland plc and RBS Securities Japan Limited, CFTC Docket No. 13-14 (February 6, 2013) at 2 (hereinafter "RBS CFTC Order").

[7] *See id.* at 25 n.20.

bank's *total* revenue, in 2008.[8] Cartel member UBS enjoyed the same benefits, as revenues from

its rates business increased, "driven mainly by structured LIBOR derivatives,"[9] while hedge fund

BlueCrest Capital Management, an identified Deutsche Bank co-conspirator, prolonged a

decade-long winning streak with no annual losses for its two largest funds.[10]

10.     Fueled by greed, Defendants built their business around manipulation. They

rearranged their Swiss franc LIBOR-based derivatives desks to encourage cooperation among

traders, whose compensation was directly determined by their Swiss franc-LIBOR based

derivatives portfolio's performance, and the Swiss franc LIBOR submitters, whose quotes to the

BBA determined the daily Swiss franc LIBOR fix. For example, desk managers at Defendant

Deutsche Bank held weekly meetings to educate traders about which manipulative strategies they

should implement, while Defendant UBS made it a company policy to "round" its Swiss franc

LIBOR submissions *every day* to financially benefit the bank's derivatives positions.

11.     In true Wall Street fashion, the best manipulators were promoted and paid like

rock stars. Christian Bittar, a trader and later a manager at Deutsche Bank who executed the

LIBOR manipulation strategy across multiple currencies, received an individual performance

bonus of £90 million, or roughly $136 million, for his contributions to Deutsche Bank's bottom

line in 2008 alone.[11] Bittar eventually ended up at BlueCrest Capital Management, a large hedge

---

[8] *See* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against Deutsche Bank AG, at 9 n. 16 CFTC Docket No. 15-20 (Apr. 23, 2015) (hereinafter "Deutsche Bank CFTC Order").

[9] *See* UBS Form 20-F, at 28 (Dec. 31, 2006).

[10] *See* Jesse Westbrook, *Man Who Said No to Soros Builds BlueCrest Into Empire*, BLOOMBERG L.P. (Dec. 19, 2013) http://www.bloomberg.com/news/articles/2013-12-20/man-who-said-no-to-soros-builds-bluecrest-into-empire.

[11] *See* DOJ Deferred Prosecution Agreement and Attachment A Statement of Facts with Deutsche Bank AG at 22-23, ¶39, *USA v. Deutsche Bank AG,* No. 15cr61, Dkt. No. 6 (D. Conn. Apr. 23, 2015) (hereinafter "Deutsche Bank DOJ Statement of Facts").

fund, despite being publicly fired from Deutsche Bank for his involvement in multiple schemes to rig several benchmark interest rates.[12]

12.     Beyond plausible, this case is grounded in the factual findings of six government regulators, guilty pleas to criminal acts of wire fraud, testimony from the ongoing criminal trials of LIBOR-based derivative traders, and admissions of fact from Defendants themselves. In what Judge Rakoff has called "one of the . . . largest frauds in history,"[13] Defendants have already paid in excess of $7 billion in fines and penalties to resolve charges relating to their admitted restraint of trade and manipulation of LIBOR, including Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.

13.     Plaintiffs additionally incorporate factual allegations based on more than 124,000 documents and audio files that JPMorgan, RBS, and Deutsche Bank produced as part of the cooperation provisions in their Settlement Agreements with Plaintiffs (collectively, the "Cooperation Materials"). The Cooperation Materials provide new direct, "smoking gun" evidence (not included in Defendants' government settlements) of their conspiracy to fix Swiss franc LIBOR-based derivatives prices throughout the Class Period by manipulating Swiss franc LIBOR and artificially widening the bid-ask spread charged in the OTC derivatives market. These documents also demonstrate that the conspiracy was led in substantial part by Patrick Bisig, a Swiss franc foreign exchange forward trader based in JPMorgan's New York offices.

14.     Defendants knew what they were doing was unlawful and evaded detection by actively concealing their wrongdoing from the public. For example, they communicated in secret

---

[12] *See* Lindsay Fortado & Suzi Ring, *Christian Bittar is Said to Leave Firm*, BLOOMBERG L.P. (Oct. 9, 2014). http://www.bloomberg.com/news/articles/2014-10-09/bluecrest-trader-christian-bittar-is-said-to-leave-firm.

[13] *See USA v. Paul Robson*, No. 1:14-cr-00272, Dkt. No. 21, at 23 (S.D.N.Y. Sept. 2, 2014).

electronic chat rooms using code words like "arbi" to signal a request for a false submission[14] or "curry" to indicate a bribe.[15] To further hide the substance of their communications, Defendants intentionally took them "offline," using mobile phones or meeting in person to avoid detection and to conspire secretly. In what is the most brazen act of fraudulent concealment revealed to date, Deutsche Bank repeatedly lied to the U.K. Financial Conduct Authority ("FCA"), misrepresenting the extent of its compliance measures and refusing to turn over documents demonstrating its misconduct, falsely stating to the FCA that BaFin, the German financial regulator, prohibited it from providing that data.[16] These statements were knowingly false; they were made by Deutsche Bank's senior managers and compliance officers to mislead government regulators and to hide the extent of their wrongdoing.

15.     Given the persistent, pervasive, and secret nature of Defendants' wrongdoing, as well as: (a) Defendants' success in covering up such wrongdoing for over a decade; (b) the negotiated nature of their government settlement agreements; and (c) the amount of previously unavailable communications included in the Cooperation Materials, in addition to further forthcoming cooperation materials, Plaintiffs believe that even more substantial evidentiary

---

[14] For example, UBS derivatives traders frequently used the code words "arbitrage," "arb," or "arbi" to disguise their requests for false LIBOR submissions. *See* Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., CFTC Docket No. 13-09 (Dec. 19, 2012) at 22 n. 15 (hereinafter "UBS CFTC Order").

[15] At least one UBS derivatives trader offered to supply "copious amounts of curry," *i.e.*, bribes in the form of sham commission payments, to inter-dealer brokers in exchange for their assistance manipulating LIBOR. *See* Euan McLelland, *Citi trader accused of being 'ringmaster' in Libor-rigging fraud boasted: 'You want every little bit of money you can possibly get,'* THE DAILY MAIL (May 26, 2015), available at http://www.dailymail.co.uk/news/article-3097327/City-trader-accused-ringmaster-Libor-rigging-fraud-boasted-want-little-bit-money-possibly-get.html.

[16] FCA Final Notice to Deutsche Bank, Reference No. 150018, at 12 (hereinafter "Deutsche Bank FCA Final Notice").

support for the claims alleged herein will be unearthed after a reasonable opportunity for

discovery.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a),

and pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and § 22 of the CEA,

7 U.S.C. § 25, in addition to § 1964 of RICO, 18 U.S.C. § 1964, respectively.

17.     Venue is proper in this District pursuant to, among other statutes, Section 22 of

the CEA, 7 U.S.C. § 25(c), §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, §

1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1391(b), (c), and (d). One or more of the

Defendants resided, transacted business, were found, or had agents in this District and a

substantial portion of the affected interstate trade and commerce described in this Complaint was

carried out in this District.

18.     Each Defendant is subject to personal jurisdiction because it transacted business

throughout the United States, including in this District, by transacting in Swiss franc LIBOR-

based derivatives that are priced, benchmarked, and/or settled based on Swiss franc LIBOR from

within the United States and with U.S. counterparties. Defendants Credit Suisse, Deutsche Bank,

and RBS consented to the personal jurisdiction of the United States courts by registering their

New York City branch offices with the New York State Department of Financial Services

("NYSDFS") under New York State Banking Law §§ 200 and 201. Defendant UBS consented to

personal jurisdiction in the United States by registering with the Connecticut Department of

Banking under Sections 36a-428g of the Connecticut General Statutes.

19.     Defendants, directly and indirectly, unilaterally and in concert, made use of the

means and instrumentalities of transportation or communication in, or the instrumentalities of,

interstate commerce, specifically through use of electronic messaging and other electronic means

of communication transmitted by wire across interstate and international borders in connection with the unlawful acts and practices alleged in this Complaint. For example, through their daily electronic transmission of false Swiss franc LIBOR submissions, Defendants themselves transmitted and caused Thomson Reuters (the BBA's agent who collected and calculated Swiss franc LIBOR during the Class Period) to transmit a false and misleading Swiss franc LIBOR fix (as well as Defendants' own Swiss franc LIBOR submissions) from within the United States to U.S. investors who transacted in Swiss franc LIBOR-based derivatives.

20.     The United States courts have jurisdiction over the claims asserted in this Complaint pursuant to § 22 of the CEA, 7 U.S.C. § 25, §1 of the Sherman Antitrust Act, 15 U.S.C. § 1, §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), § 1964 of RICO, 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337, respectively. Additionally, Swiss franc LIBOR and Swiss franc LIBOR-based derivatives contracts are each a commodity that trades in U.S. interstate commerce. Swiss franc LIBOR is a "commodity" and is the "commodity underlying" Swiss franc LIBOR-based derivatives contracts, as those terms are defined and used in Section 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively. More specifically, Swiss franc LIBOR is an "excluded commodity" as that term is defined in Section 1a(19), 7 U.S.C. §§ 1a(19) (formerly 7 U.S.C. §1a(13)). In the CEA, the term "'excluded commodity' means (i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure . . . ." Excluded commodities are subject to all CFTC anti-manipulation rules, including Section 9(a)(2), which criminalizes the dissemination of false market information.

21.     Defendants' restraints of trade, intentional misreporting, manipulation, and agreements to fix the price of Swiss franc LIBOR, and manipulation of the prices of Swiss franc

LIBOR-based derivatives had direct, substantial, and foreseeable effects in the United States, and

on the Swiss franc LIBOR-based derivatives Plaintiffs and members of the Class transacted in

during the Class Period. Millions of Swiss franc LIBOR-based derivatives were traded in the

United States and by U.S. investors during the Class Period. Defendants, as Swiss franc LIBOR

contributor banks and sophisticated market participants, knew that Swiss franc LIBOR was

published and compiled by and on behalf of the BBA, that Swiss franc LIBOR was disseminated

in the United States, and that Swiss franc LIBOR was used to price, benchmark, and/or settle

Swiss franc LIBOR-based derivatives contracts traded in the United States. For these reasons,

Defendants knew that misreporting Swiss franc LIBOR as well as other manipulative and

collusive conduct, such as fixing the bid-ask spread in the Swiss franc LIBOR-based derivatives

market, would, and did, have direct, substantial, and reasonably foreseeable effects in the United

States, including on the prices of Swiss franc LIBOR-based derivatives contracts transacted in

the United States.

     22.    Defendants' manipulative conduct, as alleged herein, had a direct, substantial, and

reasonably foreseeable effect on U.S. domestic commerce, and such effects give rise to

Plaintiffs' claims, within the meaning of the Foreign Trade Antitrust Improvements Act.

**PARTIES**

     23.    Sonterra Capital Master Fund, Ltd. ("Sonterra"), a Cayman exempted company,

was an investment fund with its principal place of business in New York. Sonterra engaged in

U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign

exchange forwards, during the Class Period at artificial prices proximately caused by

Defendants' unlawful manipulation and restraint of trade as alleged herein. As a consequence of

Defendants' manipulative conduct, Sonterra was damaged and suffered injury when it was

overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

24.     Prior to voluntarily winding up its operations, Sonterra unconditionally and irrevocably assigned, and transferred all rights, title, and interests in certain of its assets to Plaintiff Fund Liquidation Holdings, LLC ("FLH"), a Delaware limited liability company, on August 3, 2012. The assets conveyed included, without limitation, all monetary, legal and other rights with respect to claims related to Sonterra's ownership of or transactions in any financial products listed in Sonterra's Trade Data. The Trade Data contained transactions in various derivatives, such as swaps and FX forwards, including Swiss franc LIBOR-based derivatives transactions. Sonterra granted FLH the right to take any steps to recover on Sonterra's claims including, but not limited to, selling the claims, filing claims, and commencing suit. Sonterra further granted FLH an irrevocable power of attorney that included, among other powers, the right, power, and authority to sue in Sonterra's name. That power of attorney survives Sonterra's winding up and dissolution under Cayman law. Accordingly, FLH initially brought this action in Sonterra's name. FLH now understands that it can and must assert these claims in its own name, as the real party in interest and owner of Sonterra's claims.

25.     FrontPoint European Fund, L.P. ("FrontPoint European") was a Delaware limited partnership with its principal place of business in Greenwich, Connecticut. During the Class Period, FrontPoint European engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange forwards, directly with Defendant UBS at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, FrontPoint European was

damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

26.     FrontPoint Financial Services Fund, L.P. ("FrontPoint Financial Services") was a Cayman limited partnership with its principal place of business in Greenwich, Connecticut. During the Class Period, FrontPoint Financial Services engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange forwards, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, FrontPoint Financial Services was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

27.     FrontPoint Healthcare Flagship Enhanced Fund, L.P. ("FrontPoint Healthcare Enhanced") was a Cayman limited partnership with its principal place of business in Greenwich, Connecticut. During the Class Period, FrontPoint Healthcare Enhanced engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange forwards, directly with Defendants UBS and Credit Suisse at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, FrontPoint Healthcare Enhanced was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

28.     FrontPoint Healthcare Flagship Fund, L.P. ("FrontPoint Healthcare Flagship") was a Delaware limited partnership with its principal place of business in Greenwich, Connecticut. During the Class Period, FrontPoint Healthcare Flagship engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange

forwards, directly with Defendants UBS and Credit Suisse at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, FrontPoint Healthcare Flagship was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

29.    FrontPoint Healthcare Horizons Fund, L.P. ("FrontPoint Healthcare Horizons") was a Delaware limited partnership with its principal place of business in Greenwich, Connecticut. During the Class Period, FrontPoint Healthcare Horizons engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange forwards, directly with Defendants UBS and Credit Suisse at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, FrontPoint Healthcare Horizons was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

30.    FrontPoint Financial Horizons Fund, L.P. ("FrontPoint Financial Horizons") was a Delaware limited partnership with its principal place of business in Greenwich, Connecticut. During the Class Period, FrontPoint Financial Horizons engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange forwards, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, FrontPoint Financial Horizons was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

13

31.     FrontPoint Utility and Energy Fund, L.P. ("FrontPoint Utility") was a Delaware limited partnership with its principal place of business in Greenwich, Connecticut. During the Class Period, FrontPoint Utility engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange forwards, directly with Defendants UBS and Credit Suisse at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, FrontPoint Utility was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

32.     Collectively, FrontPoint European, FrontPoint Financial Services, FrontPoint Healthcare Enhanced, FrontPoint Healthcare Flagship, FrontPoint Healthcare Horizons, FrontPoint Financial Horizons, and FrontPoint Utility are referred to as "FrontPoint" or "the FrontPoint Entities."

33.     Prior to voluntarily winding up their operations, each of the FrontPoint Entities unconditionally and irrevocably assigned and transferred all rights, title, and interests in certain of their assets to FLH, in July and September 2011. The assets conveyed included, without limitation, all monetary, legal and other rights with respect to certain types of claims related to the FrontPoint Entities' ownership of or transactions in any financial products listed in the FrontPoint Entities' Trade Data. The Trade Data contained transactions in various derivatives, such as swaps and FX forwards, including Swiss franc LIBOR-based derivatives transactions. The FrontPoint Entities granted FLH the right to take any steps to recover on each of the FrontPoint Entities' claims including, but not limited to, selling the claims, filing claims, and commencing suit. The FrontPoint Entities further granted FLH an irrevocable power of attorney that included, among other powers, the right, power, and authority to commence suit in each

FrontPoint Entity's name. These powers of attorney survive each FrontPoint Entity's winding up and dissolution under Cayman and Delaware law. Accordingly, FLH initially brought this action in the FrontPoint Entities' names. FLH now understands that it can and must assert these claims in its own name, as the real party in interest and owner of the FrontPoint Entities' claims.

34.     Hunter Global Investors Fund I L.P. ("Hunter Global I") was a Delaware limited partnership, which had its principal place of business in New York. During the Class Period, Hunter Global I engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange forwards, at artificial prices proximately caused by the Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, Hunter Global I was damaged and suffered injury.

35.     Hunter Global Investors Fund Offshore Fund Ltd. ("Hunter Global Offshore I"), a Cayman exempted company, was an investment fund with its principal place of business in New York. During the Class Period Hunter Global Offshore I engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange forwards, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, Hunter Global Offshore I was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

36.     Hunter Global Investors SRI Fund Ltd. ("Hunter Global SRI"), a Cayman exempted company, was an investment fund with its principal place of business in New York. During the Class Period Hunter Global SRI engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange forwards, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged

15

herein. As a result of Defendants' manipulative conduct, Hunter Global SRI was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

37.     HG Holdings Ltd. ("HG Holdings I"), a Cayman exempted company, was an investment fund with its principal place of business in New York. During the Class Period HG Holdings I engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, HG Holdings I was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

38.     HG Holdings II Ltd. ("HG Holdings II"), a Cayman exempted company, was an investment fund with its principal place of business in New York. During the Class Period HG Holdings II engaged in U.S.-based transactions for Swiss franc LIBOR-based derivatives, including Swiss franc foreign exchange forwards, at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, HG Holdings II was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period.

39.     Collectively, Hunter Global I, Hunter Global Offshore I, Hunter Global SRI, HG Holdings I, and HG Holdings II are referred to as "Hunter" or the "Hunter Entities."

40.     Prior to voluntarily winding up their operations, the Hunter Entities unconditionally and irrevocably assigned, and transferred all rights, title, and interests in certain of their assets to FLH, on January 12, 2012. The assets conveyed included, without limitation, all

monetary, legal and other rights with respect to claims related to the Hunter Entities' ownership

of or transactions in financial products listed in the Hunter Entities' Trade Data.  The Trade Data

contained transactions in various derivatives, such as FX forwards, including Swiss franc

LIBOR-based derivatives transactions.  The Hunter Entities granted FLH the right to take any

steps to recover on each of the Hunter Entities' claims including, but not limited to, selling the

claims, filing claims, and commencing suit. The Hunter Entities further granted FLH an

irrevocable power of attorney that included, among other powers, the right, power, and authority

to commence suit in each Hunter Entity's name. These powers of attorney survive each Hunter

Entity's winding up and dissolution under Cayman and Delaware law. Accordingly, FLH

initially brought this action in the Hunter Entities' names. FLH now understands that it can and

must assert these claims in its own name, as the real party in interest and owner of the Hunter

Entities' claims.

  41. Plaintiff Richard Dennis ("Dennis") is a natural person and resident of Chicago,

Illinois. During the Class Period, Dennis engaged in U.S.-based transactions for Swiss franc

LIBOR-based derivatives, including thousands of Swiss Franc currency futures contracts traded

on the CME, at artificial prices proximately caused by Defendants' unlawful manipulation and

restraint of trade as alleged herein. As a result of Defendants' manipulative conduct alleged

herein, Plaintiff Dennis was damaged and suffered injury, including losses on his Swiss franc

LIBOR-based derivatives transactions.

  42. Plaintiff California State Teachers' Retirement System ("CalSTRS") is the largest

teachers' retirement fund in the United States, with approximately $288.6 billion in assets as of

September 2022 and close to one million members. CalSTRS engaged in hundreds of U.S.-based

transactions for Swiss franc LIBOR-based derivatives during the Class Period, including Swiss

franc foreign exchange forwards, that were priced based on Swiss franc-LIBOR. CalSTRS entered these transactions directly with Defendants Credit Suisse, JPMorgan, UBS, Deutsche Bank and RBS at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a result of Defendants' manipulative conduct, CalSTRS was damaged and suffered injury when it was overcharged and/or underpaid in its Swiss franc LIBOR-based derivatives transactions during the Class Period. CalSTRS asserts claims against all defendants, with the exception of the UBS Defendant (defined below).

### A. The Credit Suisse Defendants

43.    Defendant Credit Suisse Group AG ("Credit Suisse Group") is a Swiss banking and financial services company incorporated in Switzerland. Credit Suisse Group provides a broad range of services to individual and corporate clients, such as investment banking, private banking, and asset management for customers located globally. Of its six primary offices, one is located in this District at 11 Madison Avenue, New York, New York 10010. Together with its subsidiaries, Credit Suisse Group employs over 8,000 people in the United States, 7,840 of whom are in New York.[17]

44.    Defendant Credit Suisse AG, a wholly owned subsidiary of Defendant Credit Suisse Group, maintains an office at 11 Madison Avenue New York, NY 10010. Credit Suisse AG is licensed, supervised, and regulated by the NYSDFS to do business in this state. Credit Suisse AG is also licensed and supervised by the Board of Governors of the Federal Reserve System. Defendant Credit Suisse AG operates a branch in New York.[18]

---

[17] Decl. of Pierre Schreiber in Support of Credit Suisse Group AG's Mot. to Dismiss, Case No. 11-02262, ECF 765.

[18] Credit Suisse Global Recovery and Resolution Plan, at p. 1-10 (Sept. 30, 2013), available at (https://www.federalreserve.gov/bankinforeg/resolution-plans/credit-suisse-1g-20131001.pdf).

45.     Collectively, Defendants Credit Suisse Group and Credit Suisse AG are referred to as "Credit Suisse."

46.     In 2013, Credit Suisse ranked first in overall fixed income trading in the United States with the largest market share of all dealers.[19] Credit Suisse's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps, priced, benchmarked and/or settled based on Swiss franc LIBOR.[20] Credit Suisse's Investment Banking Department houses its Rate Products Team, which is a global market maker in cash and derivatives markets and a primary dealer in the United States, trading, *inter alia*, interest rate swaps and options and other risk management structures and forms.

47.     During the Class Period, Credit Suisse was a BBA Swiss franc LIBOR contributor panel bank. In Credit Suisse's Form 20-F filed annually with the U.S. Securities Exchange Commission, Credit Suisse lists numerous securities that are listed on the New York Stock Exchange ("NYSE") and other U.S. exchanges. Credit Suisse also operates in the United States through direct and indirect subsidiaries, including Credit Suisse Holdings (USA), Inc., Credit Suisse (USA), Inc., Credit Suisse Securities (USA), Inc., Credit Suisse Securities (USA) LLC and Credit Suisse International, which all have offices in New York. Credit Suisse's wholly-owned subsidiary, Credit Suisse Securities (USA) LLC ("CSSU"), is headquartered in New York. During the Class Period, CSSU was a Clearing Firm on several of the CME Group's

---

[19] *See* Greenwich Associates, *2013 Greenwich Leaders: U.S. Fixed Income*, at 1.

[20] *See* Federal Reserve Bank of New York, *The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States*, *April 2007*, at 12, 16-17 (Credit Suisse participated in the survey by submitting data on its U.S.-based transactions in Swiss franc LIBOR-based derivatives) (hereinafter "Federal Reserve Bank of New York 2007 Survey").

Exchanges, including the CME, NYMEX, Chicago Board of Trade ("CBOT"), and Commodities Exchange Inc. ("COMEX").

48.     The global head of investment banking for Credit Suisse, James Armine, is based in New York. Also, the global head of Mergers and Acquisitions at Credit Suisse, Scott Lindsay, is based in New York. Mike Paliotta, Credit Suisse's co-head of U.S. Equities, is a senior manager based in New York. Dan Mathisson, the head of U.S. cash and subsequently equities trading and execution, and Timothy O'Hara, the global head of equities, likewise are based in the United States, with O'Hara based in New York. Another senior manager, Colin Lovemason, the head of market risk and quantitative analytics at Credit Suisse Group, is based in New York. Credit Suisse Group also disclosed in its Resolution Plan that it operates a global structure in four separate regions, which includes the "Americas." The Chief Executive Officer of Credit Suisse Americas from 2007 until at least 2015 was Robert Shafir, a citizen of the United States, and Mr. Shafir served as the Chief Executive Officer of Asset Management for Credit Suisse and also served as a member of Credit Suisse's Executive Boards from 2007 until at least 2015.[21]

49.     Credit Suisse Group's U.S.-based dealers actively trade in the over-the-counter foreign exchange and interest rate derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[22] During the Class Period, Credit Suisse directly transacted Swiss franc LIBOR-based derivatives with U.S. counterparties, including the FrontPoint Plaintiffs, which were located in Greenwich,

---

[21] *See* Credit Suisse Group AG & Credit Suisse AG 2014 Annual Report, at 188, available at https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financial-disclosures/financial-reports/csgag-csag-ar-2014-en.pdf; Credit Suisse Group AG & Credit Suisse AG 2015 Annual Report, at 206, available at https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financial-disclosures/financial-reports/csg-ar-2015-en.pdf.

[22] *See id.* at 12, 16-17 (Credit Suisse participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction.").

Connecticut, and Plaintiff CalSTRS, at artificial prices proximately caused by Defendants' manipulative conduct as alleged herein.

50.     According to testimony that Credit Suisse's managing director, Daniel Mathisson, provided to the U.S. Senate Banking Housing, Urban Affairs committee on October 28, 2009, regarding trading and market structure issues, Credit Suisse's U.S. broker-dealer subsidiary has been operating continuously in the United States since 1932, when the First Boston Corporation was founded. Credit Suisse's Advanced Execution Services is a team of approximately 200 financial and technological professionals based in New York that executes trades electronically on behalf of mutual funds, pension funds, hedge funds, and other broker-dealers.

51.     Credit Suisse acknowledged that it directly participated in a collusive agreement, and concerted practice to form a cartel, and anticompetitive conduct through online chats on Bloomberg or Reuters platforms, e-mails, and telephone contacts with respect to Swiss franc Libor-based with a maturity of up to 24 months during May 7, 2007 through September 25, 2007, with Defendants RBS, UBS, and JPMorgan.[23] At all relevant times, Credit Suisse acted as a market maker. Credit Suisse also acknowledged that it exercised decisive influence over its subsidiaries and is jointly and severally liable for their conduct for the whole duration of their participation in the anticompetitive conduct and agreement.

**B.  The Deutsche Bank Defendants**

52.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany. During the Class Period, Deutsche Bank was a member of the BBA Swiss franc LIBOR panel.

---

[23] *See* EC Bid-Ask Spread Cartel Settlement, *supra* note 3.

53.     Defendant Deutsche Bank AG maintains a branch in New York that conducts significant trading of derivatives ("primarily interest rate-related derivatives") and cash financial products.[24]

54.      Deutsche Bank's U.S. headquarters are in New York.[25] Its New York branch ("Deutsche Bank AG, New York Branch") is located in this District at 60 Wall Street, New York, NY 10005. Deutsche Bank AG, New York Branch is licensed, supervised, and regulated by the NYSDFS to do business in this state. Deutsche Bank is also registered with the Board of Governors of the Federal Reserve System. Deutsche Bank AG, New York Branch has more than 1,700 employees and total assets exceeding $152 billion. Deutsche Bank is a registered swap dealer with the CFTC. From 2006 through 2011, Deutsche Bank operated its Global Finance and Foreign Exchange ("GFFX") desk—which includes its Global Finance FX Forwards ("GFF") and foreign exchange ("FX") units —from several offices around the world, including in New York.[26] Its GFF unit engaged in pool trading and MMD throughout the Class Period.

55.     Among Deutsche Bank's U.S. operations is a significant OTC Interest Rate Derivatives business that transacts in a wide range of interest rate derivatives. This interest rate derivatives business operates across several Deutsche Bank entities including Deutsche Bank AG, New York Branch and U.S. based subsidiaries of Deutsche Bank AG.[27] Deutsche Bank AG,

---

[24] Deutsche Bank Resolution Plan, Section 1 Public Section, at 4-5 (June 29, 2012), available at https://www.federalreserve.gov/bankinforeg/resolution-plans/deutsche-bank-1g-20120702.pdf.

[25] United States Department of Justice, Criminal Division, Fraud Section Non-Prosecution Appendix A Statement of Facts with Deutsche Bank Group Services UK Limited at 8 ("DB Group DOJ Statement of Facts").

[26] Deutsche Bank DOJ Statement of Facts at 8.

[27] Deutsche Bank Resolution Plan, Section 1 Public Section, at 10 (June 29, 2012), available at https://www.federalreserve.gov/bankinforeg/resolution-plans/deutsche-bank-1g-20120702.pdf.

New York Branch is the primary client-facing entity and the majority of U.S. dollar-denominated interest rates derivative transactions are booked by Deutsche Bank AG, New York Branch."[28]

56.     Deutsche Bank manipulated Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives from within this District during the Class Period. On April 23, 2015, Deutsche Bank and Deutsche Bank AG, New York Branch paid a $600 million fine to the NYSDFS, admitting that between 2005 and 2010, Deutsche Bank AG, New York Branch manipulated LIBOR for several currencies, including Swiss franc LIBOR.[29] Deutsche Bank's submitters, traders, desk managers, and at least one of its senior managers engaged in systemic and pervasive manipulation through its New York office.[30]

57.     Defendant DB Group Services (UK) Limited ("DB Group Services") is a wholly-owned subsidiary of Defendant Deutsche Bank.  DB Group Services is incorporated and operates its principal place of business in the United Kingdom.  DB Group Services settled with the DOJ, admitting that it employed many of Deutsche Bank's London-based pool and MMD traders that were responsible for manipulating the LIBOR benchmarks, including Swiss franc LIBOR.[31]  DB Group Services also pled guilty to felony wire fraud in the District of Connecticut for its involvement in Deutsche Bank's LIBOR manipulation scheme.[32]

58.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[28] *Id.*

[29] *See* Deutsche Bank NYSDFS Consent Order at 6.

[30] Deutsche Bank CFTC Order at 2-3.

[31] DB Group Services DOJ Statement of Facts at 8.

[32] *See United States v. DB Group Services UK Ltd.*, Plea Agreement, No. 15-cr-62, ECF No. 4.



59. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

60. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████ █████████████████████

███████████████████████████████████████

█████████████████████████████████████ █

61. ███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

███████████████

████████████████████████████████

---

[33] *See* Deutsche Bank CFTC Order at 33.

[34] *See* DB Group Services DOJ Statement of Facts at 35.



62.     During the Class Period, Deutsche Bank directly transacted Swiss franc LIBOR-based derivatives with U.S. counterparties, including Plaintiff CalSTRS, at artificial prices proximately caused by Defendants' manipulative conduct as alleged herein.

### C.  Defendant JPMorgan

63.     Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware financial holding company with its headquarters in this District at 270 Park Avenue, New York, New York. JPMorgan provides businesses, institutions, and individuals with investment banking, treasury and securities, asset management, private banking, and commercial banking services. Its U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[36] JPMorgan is registered with the Board of Governors of the Federal Reserve System. During the Class Period, JPMorgan was a BBA Swiss franc LIBOR contributor panel bank.

---

[35] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[36] *See* Federal Reserve Bank of New York 2007 Survey, *April 2007*, at 12, 16-17 (JPMorgan participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction.").

64.     In addition to participating in a cartel to fix the bid-ask spread on Swiss franc

LIBOR-based derivatives with Defendants UBS, RBS, and Credit Suisse,[37] the EC found that

from at least March 2008 through at least July 2009 RBS and JPMorgan conspired to "distort the

normal course of pricing of interest rate derivatives denominated in Swiss franc" by

manipulating Swiss franc LIBOR.[38] The EC found that RBS and JPMorgan discussed their future

Swiss franc LIBOR submissions, exchanged information regarding their Swiss franc LIBOR-

based derivative trading positions, as well as the "intended prices" at which they would fix these

derivatives.[39] JPMorgan was fined more than $130 million for its role in this anticompetitive

combination but paid only $78.2 million, after receiving a 40% discount from the EC for

participating in its leniency program.[40]

65.     During the Class Period, JPMorgan directly transacted Swiss franc LIBOR-based

derivatives with U.S. counterparties, including with Plaintiff CalSTRS, at artificial prices

proximately caused by Defendants' manipulative conduct as alleged herein.

**D.  Defendant RBS**

66.     Defendant Natwest Markets  plc, formerly known as The Royal Bank of Scotland

plc ("RBS"), is a British banking and financial services company headquartered in the United

Kingdom. RBS has an office located at 340 Madison Avenue, New York, NY 10173. RBS's

New York branch is licensed, supervised, and regulated by the NYSDFS to do business in this

state. RBS also has a branch located at 600 Washington Boulevard, Stamford, CT 06901. The

Connecticut branch is a registered foreign bank with the Connecticut Department of Banking

---

[37] *See* EC Bid-Ask Spread Cartel Settlement, *supra* note 3.

[38] *Id*.

[39] *Id*.

[40] *Id*.

("DOB"). RBS is also licensed and supervised by the Board of Governors of the Federal Reserve

System. RBS is a Clearing Firm on several of the CME Group's Exchanges, including the CME,

NYMEX, CBOT, and COMEX, as well as a registered swap dealer with the CFTC. As of June

30, 2010, RBS was ranked among the fourteen largest broker/dealers of interest-rate derivatives.

During the Class Period, RBS was a BBA Swiss franc LIBOR contributor panel bank.

     67.     Defendant RBS has long had significant ties to the U.S., as illustrated by its

massive investment in its Connecticut offices, which housed what was the largest trading floor in

the world.[41] RBS's Co-Heads of Global Banking & Markets for the Americas, Michael

Lyublinsky & Robert McKillip, are also based in Connecticut.[42]

     68.     RBS's contacts with the U.S. were so pervasive that, for at least some years

during the Class Period, RBS's investment bank made more money in the U.S. than it did in the

U.K., its supposed headquarters.[43]

     69.     In 2004, RBS merged the derivatives group of its New York branch with the

derivatives group of RBS Greenwich Capital (an affiliate that RBS had acquired).[44] This resulted

in a U.S. based interest rate derivatives group, "backed by [RBS's] balance sheet and credit

rating."[45] This interest rate derivatives group operated "as the North American arm of The Royal

---

[41] Robert Winnett and Tracy Corrigan, "RBS was 'disaster waiting to happen'", telegraph.co.uk (March 21, 2009), http://www.telegraph.co.uk/finance/recession/5025315/RBS-was-disaster-waiting-to-happen.html.

[42] *See* Louise Story, "R.B.S.'s Shining Star in Connecticut", The New York Times (Feb. 18, 2010), http://www.nytimes.com/2010/02/18/business/18rbs.html.

[43] Ben Wright, "What's Next for RBS's U.S. Trading Arm?", wsj.com (Feb. 21, 2014), https://blogs.wsj.com/moneybeat/2014/02/21/whats-next-for-rbss-u-s-trading-arm/ ("In 2011, RBS's investment bank (then called global banking and markets) made 36% of its money in the U.S. (compared to only 27% in the U.K.), according to an investor presentation in March 2012.").

[44] Derivates, RBS Greenwich Capital, rbsgc.com (Jan. 1, 2007), available at https://web.archive.org/web/20070101151500/http://www.rbsgc.com:80/RBSGCConnect/Derivatives.aspx.

[45] *Id.*

Bank of Scotland's Global Rates business."[46] During the Class Period, RBS Greenwich Capital's "Interest Rate Derivatives business [wa]s ranked in the top five in the US."[47]

70.     According to the FSA, RBS's Swiss franc LIBOR-related misconduct was "widespread" and involved at least twenty-one derivatives traders and LIBOR submitters located in London, Tokyo, and the United States.[48] RBS's derivatives traders communicated in Bloomberg chat rooms where "they compared their respective trading positions (which were often the same) and discussed strategies for trading products that fixed off of Swiss franc LIBOR and for influencing Swiss franc LIBOR rates to benefit their positions."[49]

71.     RBS's U.S.-based dealers trade in the over-the-counter foreign exchange and interest rate derivatives markets, which include interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[50] RBS transacted in Swiss franc LIBOR-based derivatives directly with U.S.-based counterparties, including Plaintiff CalSTRS, during the Class Period at artificial prices proximately caused by Defendants' manipulative conduct as alleged herein.

72.     As part of its Deferred Prosecution agreement with the DOJ, RBS admitted that "RBS entered into interest rate derivatives transaction tied to . . . Swiss franc LIBOR . . . with various counterparties, some of which were located in the United States. U.S. counterparties included banks and other financial institutions in the United States or located abroad with

---

[46] *Id.*

[47] RBS 2007 Annual Report and Accounts, at 4, available at http://investors.rbs.com/~/media/Files/R/RBS-IR/annual-reports/rbs-group-accounts-2007.pdf.

[48] *See* Financial Services Authority Final Notice against The Royal Bank of Scotland plc, FSA Ref. No. 121882 (Feb. 6, 2013) at 11 ¶48 (hereinafter "RBS FSA Final Notice").

[49] *Id.* at 17.

[50] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (RBS participated in the survey by submitting data on its U.S.-based transactions in Swiss franc LIBOR-based derivatives).

branches in the United States. Those counterparties also included, among others, asset management corporations, business corporations, insurance companies, universities, and non-profit organizations."[51]

73.     RBS has also admitted that beginning in approximately 2007 and continuing until at least 2009, RBS's Swiss franc LIBOR submitters frequently received and accommodated requests from RBS's Swiss franc derivatives traders to alter RBS's Swiss franc LIBOR submissions to financially benefit their Swiss franc LIBOR-based derivatives positions.

74.     On October 21, 2014, RBS entered into two settlements with the EC related to the manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives. First, RBS admitted that from March 2008 through July 2009, RBS and JPMorgan participated in an illegal cartel to manipulate Swiss franc LIBOR and fix the prices of Swiss franc LIBOR-based derivatives.[52] Under the EC's leniency program, RBS avoided a €110 million fine, approximately $140 million, by revealing this anticompetitive organization and settling at an early stage.[53] In its second settlement, RBS admitted to participating in a cartel with UBS, JPMorgan, and Credit Suisse to fix the bid-ask spread on Swiss franc LIBOR-based derivatives.[54] RBS received 100% leniency in this settlement as well, avoiding a fine by turning in some of its co-conspirators and agreeing to settle with the EC.[55]

75.     In its settlement with RBS, the CFTC found that during the Class Period RBS

---

[51] *See* United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Deferred Prosecution Agreement and Attachment A Statement of Facts with The Royal Bank of Scotland plc, (Feb. 6, 2013) at 38 ¶79 (hereinafter "RBS DOJ Statement of Facts").

[52] *See* EC RBS-JPMorgan Cartel Settlement, *supra* note 39.

[53] *Id*.

[54] *See* EC Bid-Ask Spread Cartel Settlement, *supra* note 3.

[55] *Id*.

conspired with "Bank E" to manipulate Swiss franc LIBOR on a "near daily" basis.[56]

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████  ██████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████ ██

---

[56] RBS CFTC Order at 27.

[57] *See* Liam Vaughan, Gavin Finch & Andrea Tan, *RBS Managers Condoned Libor Manipulation During Expansion*, BLOOMBERG L.P., (Sept. 25, 2012).

[58] Communications cited in this Complaint from RBS's CFTC Order and other government settlements will continue to refer to traders using the pseudonyms given to those individuals by the government to maintain consistency.

**May 14, 2009**

RBS Swiss Franc Trader: we are good!

Bank E Swiss Franc Trader: yes[,] look at it now[,] low libor[,] and chf libor good too

RBS Swiss Franc Trader: [RBS Primary Submitter] did be a big favor today[,] he set 41 and 51

Bank E Swiss Franc Trader: sweet

RBS CFTC Order at 29.



76. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**December 13, 2007**

External Trader B: make sure you tell your guy to set low LIBOR . . .

Derivatives Trader A: I have told him but not sure how low he will go

RBS FSA Final Notice at 16-17.



77.     According to RBS's FSA Final Notice, "External Trader B" ███████ was "Derivatives Trader A" ████████ "predecessor at RBS."[59] ███████ "kept in close touch with ████] after he left RBS and the two participated in Bloomberg chats during which they compared their respective trading positions (which were often the same) and discussed strategies for trading products that fixed off CHF LIBOR and for influencing CHF LIBOR rates to benefit those positions."[60]

78.     ████ employment at RBS is also confirmed by the FCA's Financial Services Register, which shows that he worked as a derivatives trader for RBS in London beginning in at least April 2005.[61]

### E. Defendant UBS

79.     Defendant UBS AG ("UBS") is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland. UBS provides investment banking, asset management, and wealth management services for private, corporate, and institutional clients worldwide. UBS maintains branches in several U.S. states, including Connecticut, Illinois, Florida, and New York, with its U.S. headquarters in New York and Stamford, Connecticut. UBS is registered with the Office of the Comptroller of the Currency ("OCC"), the DOB, and the CFTC as a swap dealer. UBS is also licensed and supervised by the Board of Governors of the Federal Reserve System. Its U.S.-based dealers trade in the over-the-counter foreign exchange market.[62]

---

[59] RBS FSA Notice at 17.

[60] *Id.*

[61] ███████████████████████████████

[62] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (indicating UBS participated in the survey based on its U.S.-based transactions).

80.     Defendant UBS AG (together with its subsidiaries) conducted significant operations in the U.S. through its investment bank and other business units.[63]

81.     Defendant UBS AG's U.S. operations consisted of several core business lines, including:

>  a.   The "Fixed Income, Currency and Commodities Macro-FX" unit, which housed "the foreign exchange, money market and interest rate sales and trading businesses, as well as cash and collateral trading." These "[i]nterest rate activities include standardized rate-driven products and services such as interest rate derivatives trading, underwriting, and trading of government and agency securities."[64]
>
>  b.   The "Linear Interest Rates – Short End" unit, which "makes markets and provides clients with liquidity in G10, money markets, overnight index swaps, FX swaps, forward rate agreements, short-dated interest rate swaps, interest rate and bond futures, bank notes and precious metals."[65]

82.     Defendant UBS filed a Resolution Plan with the Federal Reserve in 2014 in which it acknowledged that it is a global institution with the majority of its operations located in Switzerland, the United Kingdom, and the United States.[66] UBS's shares are registered as Global Registered Shares on the NYSE.

---

[63] UBS AG Resolution Plan, Public Section, at 3 (July 2, 2012), available at https://www.federalreserve.gov/bankinforeg/resolution-plans/ubs-1g-20120702.pdf.

[64] *Id.* at 4-5.

[65] *Id*.

[66] 2014 UBS US Resolution Plan, Public Section, at 4 (July 1, 2014), available at https://www.federalreserve.gov/bankinforeg/resolution-plans/ubs-1g-20140701.pdf.

83.     During the Class Period, UBS's Rates Division and Short-Term Interest Rate ("STIR") desk transacted in interest rate derivatives, such as interest rate swaps whose value depended on LIBOR, including Swiss franc LIBOR.[67] The STIR desk also managed UBS's interest rate risk and short-term cash position by engaging in interest rate derivative transactions and transactions in the money markets for each currency, including the Swiss franc, through traders located in Stamford, Connecticut.[68]

84.     UBS also employed John Meyer as its Global Head of FX Derivatives and based this role in Connecticut, which further illustrates UBS's efforts to target the U.S. markets and U.S.-based investors.[69]

85.     UBS has admitted to manipulating Swiss franc LIBOR as early as 2001, "rounding" its submissions up or down to benefit its Swiss franc LIBOR-based derivatives positions on a daily basis.[70] Additionally, from at least January 2005 through at least September 2009, UBS's Swiss franc LIBOR trader-submitters who were responsible for making UBS's Swiss franc submissions, as well as making UBS profits on Swiss franc LIBOR-based derivatives positions, regularly adjusted UBS's Swiss franc LIBOR submissions to benefit UBS's trading positions. UBS's Swiss franc LIBOR trader-submitters also accommodated UBS's Swiss franc LIBOR-based derivatives traders' requests, adjusting UBS's submissions to financially benefit their Swiss franc LIBOR-based derivative positions. As a result of this manipulative conduct, UBS recently pled guilty to charges of wire fraud in the District of

---

[67] UBS CFTC Order at 8-9.

[68] *Id.* at 9.

[69] Federal Reserve Bank of New York FX Committee 2006 Annual Report, Membership Section (2006), available at https://www.newyorkfed.org/medialibrary/microsites/fxc/files/annualreports/fxcar06.pdf.

[70] United States Department of Justice, Criminal Division, Fraud Section Non-Prosecution Agreement and Appendix A Statement of Facts with UBS AG (Dec. 18, 2012) at 30 (hereinafter "UBS DOJ Statement of Facts").

Connecticut.[71]

86.     UBS's strategy of LIBOR manipulation was implemented at the institutional level. Holger Seger, a UBS trader and manager who focused on trading Swiss franc LIBOR-based derivatives, directed employees responsible for making Swiss franc LIBOR submissions to consult with Swiss franc LIBOR-based derivatives traders so that UBS's LIBOR submissions could be skewed in a direction that benefited their trading books.

87.     During the Class Period, UBS directly transacted Swiss franc LIBOR-based derivatives with U.S. counterparties, including the FrontPoint Entities, which were located in Greenwich, Connecticut

### F.   The TP ICAP Defendants

88.     Defendant TP ICAP plc ("TP ICAP") is the world's largest interdealer broker. TP ICAP is incorporated in London, United Kingdom and has principal offices in three locations— New Jersey, London, and Singapore—where it handles transactions for fixed income securities and derivatives, interest rate derivatives, treasury products, equities, and commodities.[72]

89.     TP ICAP was formed following the combination of two interdealer brokers: Tullett Prebon plc and ICAP plc.[73] Tullett Prebon plc acquired ICAP's global broking and information business on December 30, 2016.[74] Following the acquisition, Tullet Prebon changed its name to TP ICAP plc.[75]

---

[71] *See United States v. UBS AG,* Plea Agreement, No. 15-cv-76.

[72] "Contact Us", tpicap.com, https://www.tpicap.com/contact-us.

[73] *See Interdealer Brokers Consolidate to Survive*, RISK.NET (Sept. 9, 2016) https://www.risk.net/rankings/2470260/interdealer-brokers-consolidate-to-survive.

[74] TP ICAP plc 2016 Annual Report, at 4, available at https://www.tpicap.com/~/media/Files/T/TP-ICAP/documents/TP-ICAP-2016-Annual-Report.pdf (hereinafter "TP ICAP 2016 Annual Report").

[75] Plaintiffs believe that ICAP plc no longer exists based on publicly available information about this acquisition. Accordingly, Plaintiffs have not named ICAP plc as a Defendant in this Complaint. Plaintiffs reserve the right to name ICAP plc should discovery or other information reveal that they are still in existence at a later date.

90.     ICAP plc was a leading broker in a wide range of asset classes including rates, FX, commodities, emerging markets, credit, and equities during the Class Period[76] with extensive operations in the United States prior to its acquisition by Tullett Prebon. For example, during the Class Period, ICAP plc's principal offices were in New Jersey, London, and Singapore, and it operated from additional locations in Chicago, Illinois, Durham, North Carolina, El Segundo, California, and New York, New York.[77]

91.     Defendant Tullett Prebon Americas Corp (formerly Tullett Prebon Holdings Corp.)[78] is a wholly owned subsidiary of TP ICAP plc.[79] Tullett Prebon Americas Corp. is incorporated in the State of Delaware and has offices in: Vestavia Hills, AL; Westlake Village, CA; Chicago; Norwalk, CT; Boca Raton, FL; Jersey City, NJ; and New York.[80]

92.     Defendant Tullett Prebon (USA) Inc. is incorporated in Delaware and was a wholly owned subsidiary of Tullett Prebon plc (which is now TP ICAP plc).[81] Defendant Tullett Prebon (USA) Inc. was principally involved in derivative and cash broking.[82] ████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████ ██

---

[76] "What We Do", Icap.com, http://www.icap.com/what-we-do/global-broking.aspx

[77] "Contact Us", Icap.com, http://www.icap.com/contact-us.aspx

[78] Tullett Prebon plc 2009 Annual Report, at 80, available at https://www.tpicap.com/~/media/Files/T/TP-ICAP/investor-docs/results-and-presentations/reports/rep20100414.pdf.

[79] TP ICAP plc 2016 Annual Report, at 152, available at https://www.tpicap.com/~/media/Files/T/TP-ICAP/documents/TP-ICAP-2016-Annual-Report.pdf.

[80] "Contact Us – Americas", TullettPrebon.com, https://www.tullettprebon.com/about/contact-americas.aspx (last visited Oct. 25, 2017).

[81] Tullett Prebon plc 2008 Annual Report, at 86, available at http://www.annualreports.com/HostedData/AnnualReportArchive/t/LSE_TLPR_2008.pdf.

[82] Id.
██ ████████████████████████████

93.     Defendant Tullett Prebon Financial Services LLC (formerly Tullett Liberty Securities LLC)[84] is a wholly owned subsidiary of Defendant Tullett Prebon Americas Corp.[85] and an indirect wholly owned subsidiary of TP ICAP plc.[86] Defendant Tullett Prebon Financial Services LLC is headquartered in New Jersey.[87]

94.     Defendant Tullett Prebon (Europe) Limited is a wholly owned subsidiary of TP ICAP plc and is incorporated and headquartered in the United Kingdom.[88] Defendant Tullett Prebon (Europe) Limited has branches in numerous locations including Paris, Tokyo, Luxembourg, and Spain.[89] Defendant Tullett Prebon (Europe) Limited conspired with Defendants to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives during the Class Period. ███████████████

████████████████████████████████████████

████████████████████████

95.     Defendant ICAP Europe Limited is a wholly owned subsidiary of TP ICAP plc and is incorporated in the United Kingdom.[91] Defendant ICAP Europe Limited was a leading

---

[84] Tullett Prebon plc 2009 Annual Report, at 80, available at https://www.tpicap.com/~/media/Files/T/TP-ICAP/investor-docs/results-and-presentations/reports/rep20100414.pdf.

[85] "Tullett Prebon Financial Services LLC", Broker Check by FINRA, https://brokercheck.finra.org/firm/summary/28196 (last visited Oct. 26, 2017).

[86] TP ICAP plc 2016 Annual Report, at 152, available at https://www.tpicap.com/~/media/Files/T/TP-ICAP/documents/TP-ICAP-2016-Annual-Report.pdf.

[87] "Tullett Prebon Financial Services LLC", Broker Check by FINRA, https://brokercheck.finra.org/firm/summary/28196 (last visited Oct. 26, 2017).

[88] TP ICAP plc 2016 Annual Report, at 137, available at https://www.tpicap.com/~/media/Files/T/TP-ICAP/documents/TP-ICAP-2016-Annual-Report.pdf.

[89] Id. at 145-49.

[90] ████████████████████████████████████████
████████████████████████

[91] TP ICAP plc 2016 Annual Report, at 137, available at https://www.tpicap.com/~/media/Files/T/TP-ICAP/documents/TP-ICAP-2016-Annual-Report.pdf.

broker in foreign exchange and interest rate products.[92] Defendant ICAP Europe Limited was one of the primary brokers used by ██████████████████████████████ ████████████

96.      Defendant ICAP Securities USA LLC ("ICAP Securities") is a Delaware LLC with its principal place of business in New Jersey. ICAP Securities is a wholly owned subsidiary of TP ICAP plc.[94]

97.      ICAP brokers, including those employed by ICAP Europe Limited, ICAP Securities USA LLC, and/or ICAP plc, directly participated in Defendants' conspiracy to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives in the United States. ██████████████████████████████████

██████ to disseminate false Swiss franc LIBOR-based derivatives pricing information to the market. *See e.g.* ¶¶ 299-301, *infra*.[95] The CFTC found that ICAP brokers engaged in identical misconduct when they conspired with traders at the same Contributor Bank Defendants to manipulate the Yen-LIBOR benchmark interest rate.[96]

---

[92] ██████████████████████████████████████

[93] ████████████████████████

[94] ICAP Securities USA LLC (and Subsidiaries) Notes to Unaudited Consolidated Statement of Financial Condition (June 30, 2017), available at http://www.icap.com/~/media/Files/I/ICAP-Corp-V3/documents/2017-August/ICAP-Securities-USA-LLC-and-Subsidiaries-Jun-2017-BS-ONLY.pdf.

[95] ████████████████████████████████████████

[96] Order Instituting Proceedings, In the Matter of: ICAP Europe Limited, CFTC Docket No. 13-38 (Sept. 25, 2013), available at http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enficaporder092513.pdf.

98.     Defendant Cosmorex AG ("Cosmorex") is a wholly owned subsidiary of Defendant TP ICAP plc[97] and is a leading broker for Swiss Franc foreign exchange and interest rate products.[98]

99.     Cosmorex was responsible for calculating the Tom-Next Overnight Indexed Swap rate ("TOIS") throughout the Class Period.[99] As explained below, TOIS is supposed to indicate the rate at which banks lend Swiss francs to each other overnight and is used as the reference rate for the floating leg of Overnight Index Swaps denominated in Swiss francs.

100.    Defendant Cosmorex directly participated in Defendants' conspiracy to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives in the United States. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Cosmorex also conspired with Defendants to manipulate the difference between Swiss franc LIBOR and TOIS to increase the profitability of spread positions that were based on those rates.

### G.  The NEX Group Defendants

101.    Defendant NEX Group Limited (f/k/a NEX Group plc) ("NEX Group"), succeeded ICAP following Tullet Prebon's acquisition of ICAP's broking and information business.[100] Statements made in TP ICAP's 2016 annual report indicate that NEX Group

---

[97] "About Cosmorex: Legal & Compliance", Cosmorex.ch, available at http://www.cosmorex.ch/index.php?&active=f_4 (last viewed Oct. 25, 2017).

[98] "TP Group", tulletprebon.com, https://www.tullettprebon.com/tpgroup/.

[99] "Fixings", Cosmorex.ch, available at http://www.cosmorex.ch/index.php?&active=f_41 (last viewed Oct. 25, 2017).

[100] While the transaction details are private, according to the prospectus regarding the acquisition of ICAP plc's brokerage business, ICAP plc engaged in an intragroup reorganization in which a new entity, IGBHL, was formed to hold the assets of ICAP plc's global brokering business. Existing ICAP plc shareholders then exchanged their ICAP

transferred the "activities and business" of certain ICAP entities to Tullet but retained ownership of the entities themselves.[101] Accordingly, TP ICAP has taken the position in its annual report that NEX Group is the proper party responsible for ICAP brokers' misconduct in other benchmark rate manipulation cases, including those related to the manipulation of the ISDA Fix benchmark interest rate.[102]

102.    Defendant Intercapital Capital Markets LLC (formerly ICAP Capital Markets LLC) is a Delaware limited liability company with its headquarters in New York.[103] Intercapital Capital Markets is a wholly-owned subsidiary of Nex Group.[104] Notably, due to ongoing investigations into Defendant Intercapital Capital Markets LLC at the time of Tullett Prebon plc's acquisition of ICAP plc's broking business, Intercapital Capital Markets LLC was not transferred to TP ICAP plc and remained a subsidiary of Nex Group plc.[105] These investigations related to Defendant Intercapital Capital Markets LLC's role in the manipulation of ISDA Fix.[106]

103.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████

---

plc shares for shares in a separate entity ICAP NewCo, which subsequently became NEX Group plc. Tullet Prebon plc then purchased 100% of IGBHL. *See* Prospectus – proposed acquisition of ICAP plc's global hybrid voice broking and information business,
https://www.tullettprebon.com/announcements/investor/dealnews/2015/DN20160301b.PDF.

[101] *See* TP ICAP 2016 Annual Report, at 131 ("Pursuant to the terms of the sale and purchase agreement between the Company and NEX it was agreed that [ICAP Capital Markets LLC] would transfer its activities and business to the Company but that ICM would not be transferred to the Company's ownership at completion. It was further agreed that in the event of any claims or losses arising in relation to ISDA Fix, these would be for the account of NEX.").

[102] *Id.*

[103] "Intercapital Capital Markets LLC", NFA.org,
https://www.nfa.futures.org/BasicNet/Details.aspx?entityid=lPupl6kAHZ8%3D (last visited Oct. 26, 2017).

[104] Nex Group plc 2017 Annual Report, at 131, available at
http://www.nex.com/~/media/Files/N/NEX/annual%20reports/2017/21179_NEX_AR2017_Online.pdf.

[105] TP ICAP plc 2016 Annual Report, at 131, available at https://www.tpicap.com/~/media/Files/T/TP-ICAP/documents/TP-ICAP-2016-Annual-Report.pdf.

[106] *Id.*



### H.  Defendant Gottex

104.    Defendant Gottex Brokers SA ("Gottex") is headquartered in Lausanne,

Switzerland[109] and is a leading interdealer broker for OTC Swiss franc interest rate derivative

products.[110]

105.    Defendant Gottex conspired with Defendants to manipulate Swiss franc LIBOR

and the prices of Swiss franc LIBOR-based derivatives during the Class Period.



---

[109] "Company Overview of Gottex Brokers SA", Bloomberg.com, https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=247044387 (last visited Oct. 26, 2017).

[110] "Gottex in Switzerland", GottexBrokers.com, http://www.gottexbrokers.com/switzerland (last visited Oct. 26, 2017); *see also* Gottex Brokers (@GottexBrokers), Twitter, https://twitter.com/gottexbrokers?lang=en (last visited Oct. 26, 2017).

[111]

### I.  Defendant Velcor

106.    Defendant Velcor SA ("Velcor") is headquartered in Switzerland[112] and is a leading Swiss interest rate broker with a focus on Swiss franc interest rate derivative products, including foreign exchange forwards, FRAs, TOIS swaps, and Interest Rate Swaps.[113]

107.    Defendant Velcor conspired with Defendants to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives during the Class Period. ▮▮▮▮



Each act was done in furtherance of Defendants' conspiracy to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.

108.    TP ICAP plc, Tullett Prebon Americas Corp., Tullett Prebon (USA) Inc., Tullett Prebon Financial Services LLC, Tullett Prebon (Europe) Limited, Cosmorex AG, ICAP Europe Limited, ICAP Securities USA LLC, NEX Group, Intercapital Capital Markets LLC, Gottex Brokers SA, and Velcor SA are collectively referred to as the "Broker Defendants."

### J.  John Doe Defendants

109.    John Doe Defendants Nos. 1-50 are other entities or persons, including banks, interdealer brokers, cash brokers, and other co-conspirators whose identities are currently unknown to Plaintiffs. The John Doe Defendants participated in, furthered, and/or combined,

---

[112] "Contact", Velcor.ch, http://www.velcor.ch/main.php?active=m60 (last visited Oct. 26, 2017).

[113] *See* "About Us", Velcor.ch, http://www.velcor.ch/main.php?active=m10 (last visited Oct. 26, 2017); "Products", Velcor.ch, http://www.velcor.ch/main.php?active=m20 (last visited Oct. 26, 2017).

[114] ▮▮▮▮▮▮▮▮

[115] ▮▮▮▮▮▮▮▮

conspired or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.

### K.  U.S. Market Activity

110.    Each Defendant engaged in foreign exchange and interest rate derivatives transactions from within the United States throughout the Class Period. Every three years, the Federal Reserve Bank of New York conducts a survey of the over-the-counter interest rate derivatives and foreign exchange market.[116] This survey measures the "turnover," or volume of transactions, in foreign exchange and interest rate derivatives within the United States. The Federal Reserve Bank of New York survey only includes data from dealers located within the United States and transactions that are located within the United States. Dealers located outside of the United States report their figures to the central bank where they are located. Defendants Credit Suisse, Deutsche Bank, JPMorgan, RBS, and UBS, each participated in the Federal Reserve Bank of New York's survey of foreign exchange and interest rate derivatives dealers throughout the Class Period, indicating that they entered into foreign exchange and interest rate derivatives transactions from within the United States.

111.    To conduct business within the United States, each branch of a foreign banking organization must be licensed by the state banking authority of the state it is located in or by the OCC.[117] Because Defendants Credit Suisse, RBS, and UBS are registered as foreign branches with the OCC, DOB, and NYSDFS, their New York and Connecticut branches are considered

---

[116] For the latest survey, *See The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2013*, Federal Reserve Bank of New York (Sept. 5, 2013), http://www.newyorkfed.org/markets/pdf/2013triennialreport.pdf (hereinafter "Federal Reserve Bank of New York 2013 Survey").

[117] *See Examination Manual for U.S. Branches and Agencies of Foreign Banking Organizations*, Federal Reserve, at 1, available at http://www.federalreserve.gov/boarddocs/supmanual/us_branches/usbranch.pdf.

legal and operational extensions of their parent organizations, and as such, may conduct a full range of U.S.-based banking activities, including trading, investment, and foreign exchange activities.[118] Thus, as a result of Credit Suisse Group AG's, The Royal Bank of Scotland plc's, and UBS AG's registration with these government regulators, each of these parent organizations operate from within this forum.

## FACTUAL ALLEGATIONS

### I.   Swiss Franc LIBOR

112.   Swiss franc LIBOR is a benchmark interest rate "based on offered inter-bank deposit rates."[119] Swiss franc LIBOR is intended to reflect the cost of borrowing Swiss francs in the inter-bank money market based on the amount of interest that banks offer to pay each other in exchange for making short term deposits of Swiss francs.[120]

113.   Swiss franc LIBOR is calculated using interest rate quotes that a select group of twelve panel banks submit. All five Contributor Bank Defendants were Swiss franc LIBOR panel members throughout the Class Period; collectively, they controlled 42% of the submissions used to calculate Swiss franc LIBOR.

---

[118] *See Who We Supervise*, New York State Department of Financial Services, available at http://www.dfs.ny.gov/about/whowesupervise.htm#foreignbranch; *see also Annual Report of the Banking Commissioner for the year ending December 31, 2008*, STATE OF CONN. DEPARTMENT OF BANKING, at 19, available at http://www.ct.gov/dob/lib/dob/2008_banking_annual_report.pdf; *see generally* Conn. Gen. Stat. § 36a-425 *et al* and N.Y. Bnk. Law § 200 *et al.*

[119] *See e.g.*, *The BBA LIBOR Fixing and Definition*, BBA (archived version from Sept. 30, 2008) https://web.archive.org/web/20080930203457/http://www.bba.org.uk/bba/jsp/polopoly.jsp?d=225&a=1413&artpage =all.

[120] Deposit rates represent the cost of borrowing funds in the inter-bank market because one-way banks borrow money is by issuing certificates of deposit ("CDs"). A CD functions as a short-term loan to the bank. Money is deposited for a certain period of time and is returned to the depositor with interest at maturity. *See* Timothy Q. Cook and Robert K. Laroche, *Instruments of the Money Market*, FEDERAL RESERVE BANK OF RICHMOND, 2 (available at https://www.richmondfed.org/publications/research/special_reports/instruments_of_the_money_market/).

114.     According to BBA guidelines, on each trading day, the twelve contributor panel banks submit the rate of interest at which they could borrow Swiss francs, *i.e.*, how much interest they would have to pay, by asking for and then accepting competitive offers for deposits from other banks in a reasonable market size just prior to 11:00 A.M. London time. Thomson Reuters compiles and organizes these quotes, acting as an agent for the BBA in administering LIBOR.

115.     Each panel bank submits interest rate quotes for 15 different "tenors," reflecting the duration or "maturity" of the deposit, from overnight to twelve months. The different tenors exhibit a predictable relationship to each other, following what is known as a "yield curve," where deposits with a longer duration (*e.g.*, twelve months) pay more interest than those maturing in the near term (*e.g.*, overnight or one-month).

116.     Thomson Reuters calculates Swiss franc LIBOR on behalf of the BBA by ranking the contributor banks' submissions for each tenor in numerical order and then averaging the middle 50%, usually six of the twelve submissions, discarding the rest. This average rate becomes the official Swiss franc LIBOR "fix" for each tenor and is distributed to the market electronically, along with each bank's submissions, by Thomson Reuters, Bloomberg, and other financial services platforms into and throughout the United States using U.S. wires.

117.     To ensure that Swiss franc LIBOR reflects the rate of interest paid on inter-bank deposits, BBA guidelines forbid contributor panel banks from considering any factors unrelated to the cost of borrowing Swiss francs, including the value of their Swiss franc LIBOR-based derivatives positions or those of other banks, when determining their Swiss franc LIBOR submissions. However, as alleged below, throughout the Class Period the Contributor Bank Defendants ignored BBA guidelines, routinely making false Swiss franc LIBOR submissions

that did not reflect their cost of borrowing Swiss francs, in order to financially benefit their Swiss franc LIBOR-based derivatives positions and those of their co-conspirators.

## II.   Swiss Franc LIBOR-Based Derivatives

### A.  The Market

118.    A derivative is a security with a price that is dependent upon or derived from one or more underlying assets.

119.    Swiss franc LIBOR-based derivatives are derivatives in which prices and/or payments due between the parties are derived from Swiss franc LIBOR. The Swiss franc LIBOR-based derivatives market is one of the largest derivatives markets in the world and includes over-the-counter instruments, such as interest rate swaps, forward rate agreements, foreign exchange forwards, cross-currency swaps, overnight index swaps, and tenor basis swaps,[121] as well as exchange-traded futures and options, such as the three-month Euro Swiss franc futures contract[122] traded on the NYSE LIFFE Exchange and the Swiss franc currency futures contract[123] traded on the CME.

#### 1.  Exchange-Traded Swiss Franc LIBOR-Based Derivatives

120.    Most exchange-traded Swiss franc LIBOR-based derivatives are futures contracts, standardized bilateral agreements that call for the purchase or sale of an underlying commodity on a certain future date. For example, a June 2015 CME Swiss franc currency futures contract is an agreement for the purchase or sale of CHF 125,000 in exchange for U.S. Dollars on the third

---

[121] *See* RBS CFTC Order at 6 (listing over-the-counter instruments priced based on Swiss franc LIBOR).

[122] *Three Month Euro Swiss franc (EUROSWISS) Futures*, ICE, https://globalderivatives.nyx.com/contract/content/29093/contract-specification.

[123] *Swiss franc Futures Contract Specs*, CME GROUP, http://www.cmegroup.com/trading/fx/g10/swiss-franc_contract_specifications.html.

Wednesday of June 2015.[124] This futures contract is "standardized" and trades in accordance with the rules specified by the CME, a Designated Contract Market pursuant to Section 5 of the CEA (7 U.S.C. § 7). It is also "bilateral" and represents an agreement between two parties, a buyer and a seller of Swiss francs, respectively known as a "long" and a "short."

121.    Each futures contract trades for a certain amount of time and "expires" at some point prior to when the agreed upon purchase or sale takes place. At expiration, the long and short positions' obligations become binding. The longs, as buyers of the contract, are obligated to "take delivery" and pay for CHF 125,000, while the shorts, as sellers of the contract, must "make delivery" and provide CHF 125,000 for sale.

122.    This process of exchanging dollars for Swiss francs is called "settlement." All futures contracts are settled on a certain date following their expiration. CME Swiss franc currency futures contracts are always settled on one of four quarterly International Monetary Market ("IMM") dates, which fall on the third Wednesday of March, June, September, and December of each year. Every CME Swiss franc futures contract specifies the month and year of expiration, *e.g.*, June 2015, so that investors know on which IMM date their obligation to take or make delivery of Swiss francs will become due.

123.    On the settlement date, market participants who cannot (or do not) want to make (or take) delivery of the commodity underlying their futures contract, are given the option to "financially settle" their position by purchasing or selling an offsetting futures contract. Under this method of settlement, an investor with a long position of one CME Swiss franc currency futures contract, *e.g.*, an obligation to buy CHF 125,000, can financially settle that obligation by selling one CME Swiss franc currency futures contract, creating an offsetting obligation to

---

[124] "CHF" is the ISO 4217 code for Swiss franc. *See* http://www.iso.org/iso/home/standards/currency_codes.htm.

deliver CHF 125,000. In financial settlement, the difference between the initial contract price and the price at which the offsetting futures contract is purchased or sold represents the profit or loss on that transaction.

### 2.   Over-The-Counter Swiss Franc LIBOR-Based Derivatives

124.    Other Swiss franc LIBOR-based derivatives are traded "over-the-counter" ("OTC") in transactions between private parties that do not take place on a public exchange. More than $586 billion in Swiss franc LIBOR-based derivatives traded over-the-counter within the United States during the month of April 2007 alone.[125] In total, trillions of dollars in Swiss franc LIBOR-based derivatives were traded over-the-counter within the United States during the Class Period.[126]

125.    Large institutional investors frequently use OTC derivatives because they provide similar functionality to the standardized exchange-traded contracts but with greater flexibility, allowing the parties to customize certain terms such as duration of their agreement, the "notional amount," *i.e.*, total value of the contract, and the settlement date. For example, instead of trading CME Swiss franc currency futures contracts, which exchange a fixed amount of Swiss francs on one of the CME's pre-determined settlement dates, an investor could enter into a Swiss franc foreign exchange forward agreement, the OTC equivalent to a currency futures contract, agreeing to buy or sell a custom amount of Swiss francs at a specified price on a certain date.

126.    The remaining transaction terms are typically standardized pursuant to an International Swap Dealers Association ("ISDA") Master Agreement. ISDA is the leading trade association for derivatives dealers, including the Contributor Bank Defendants. The ISDA

---

[125] *See*, Federal Reserve Bank of New York 2007 Survey, at Annex II.

[126] *See id.* at 10 (explaining that 75% of reporting dealers considered the April 2007 turnover numbers to represent normal activity during the year).

Master Agreement is a form contract developed by the association to facilitate OTC derivatives trading by providing standard terms that apply to each transaction. Contributor Bank Defendants and other derivative dealers require counterparties to enter into an ISDA Master Agreement before they can transact OTC derivatives, imposing the same terms on each trade.

127.    While the parties to a forward contract agree to settle their obligation to each other and exchange payment on a single future settlement date, certain over-the-counter Swiss franc LIBOR-based derivatives adjust their value at specific times over the life of the agreement. These "reset" dates, also known as "fixings," occur throughout the year on a pre-determined schedule agreed to by the parties. For example, an interest rate swap is an over-the-counter Swiss franc LIBOR-based derivative in which one party agrees to pay the other a fixed rate of interest (*e.g.*, 5%) on some underlying notional amount (*e.g*., CHF 1,000,000) in exchange for receiving payments based on a "floating" or "variable" interest rate, *i.e.*, a specific tenor Swiss franc LIBOR. Every fixing date, *e.g.*, once every three months, the fixed interest rate owed by one party is compared to the specific tenor of Swiss franc LIBOR referenced in the contract. If that tenor of Swiss franc LIBOR is greater than the fixed rate of interest (*e.g.*, 5.5%), then the party who is obligated to make floating interest rate payments must pay the other party interest equal to the difference between the two interest rates (*e.g.,* 0.5%); if the fixed rate of interest is higher, then the party obligated to make fixed interest rate payments will pay the other party the difference in the two rates instead. As a result, the value of an interest rate swap changes each fixing depending on which party is obligated to make a payment.

128.    An accurate Swiss franc LIBOR based on honest submissions from contributor panel banks is essential to the normal functioning of the Swiss franc LIBOR-based derivatives market, because when Swiss franc LIBOR is not set in accordance with BBA guidelines, the

Swiss franc LIBOR-based derivatives that Class members purchased and sold do not behave as expected and do not serve their intended purpose.

### B.  Pricing Swiss Franc-LIBOR Based Derivatives

129.    In addition to the interest rate swaps described above, all Swiss franc LIBOR-based derivatives are priced, benchmarked, and/or settled using a mathematical formula that incorporates Swiss franc LIBOR as one of its terms. This includes, for example:

130.    **Three-month Euro Swiss franc futures contracts**: the LIFFE three-month Euro Swiss franc futures contract, which trades on the NYSE LIFFE Exchange, represents the rate of interest paid on a three-month deposit of CHF 1,000,000. The price and settlement values of this futures contract are equal to 100 minus three-month Swiss franc LIBOR.[127] Because of this formulaic pricing relationship, if Swiss franc LIBOR is artificial and does not reflect the rate of interest being paid on three-month inter-bank deposits of Swiss francs, the price of this futures contract will also be artificial. The same is true for other Swiss franc LIBOR-based derivatives that are priced, benchmarked, and/or settled based on Swiss franc LIBOR.

131.    **Swiss franc currency futures contracts & OTC Swiss FX forwards**: both CME Swiss franc currency futures contracts and OTC Swiss franc foreign exchange forwards, are agreements to buy or sell a certain amount of Swiss francs in terms of another currency, *e.g.*, U.S. Dollars, on some future date. The cost of buying or selling Swiss francs in the future is determined using an industry standard formula that incorporates Swiss franc LIBOR.[128]

---

[127] Three Month Euro Swiss franc (Euroswiss) Futures, THE INTERCONTINENTAL EXCHANGE, available at https://www.theice.com/products/37650324/Three-Month-Euro-Swiss-Franc-Euroswiss-Futures.

[128] *See e.g.*, John W. Labuszewski, Sandra Ro & David Gibbs, *Understanding FX Futures*, CME Group, at 3, 8, http://www.cmegroup.com/education/files/understanding-fx-futures.pdf (hereinafter "Understanding FX Futures") (applying pricing formula to both currency futures contracts and forwards).

$$\text{Future Price} = \text{Spot Price} \times \left( \frac{1 + [\text{Rterm} \times (d / 360)]}{1 + [\text{Rbase} \times (d / 360)]} \right)$$

**FIGURE 1**

132.     The formula displayed in Figure 1 applies to both CME Swiss franc futures

contracts and OTC Swiss franc foreign exchange forwards, and involves taking the "spot price"

of Swiss francs for immediate delivery and adjusting it to account for the "cost of carry," *i.e.*, the

amount of interest paid or received on Swiss franc deposits, for the duration of the agreement.[129]

Swiss franc LIBOR, the benchmark rate of interest for Swiss franc deposits, is incorporated into

the formula as either "Rbase" or "Rterm" depending on whether Swiss francs are being

purchased or sold in the transaction.[130] Thus, Swiss franc LIBOR is used to calculate the cost of

carrying Swiss francs over the duration of the foreign exchange forward or futures contract,

indicated by the variable "d." For this reason, the CFTC classifies Swiss franc foreign exchange

forwards as LIBOR-based derivatives.[131] As a result, if Swiss franc LIBOR is artificial so are the

costs of buying or selling Swiss francs in the future and the prices of both CME Swiss franc

currency futures contracts and OTC Swiss franc foreign exchange forwards.

---

[129] *Id.*

[130] Foreign exchange forwards and currency futures transactions involve a currency pair, *e.g.*, CHF/USD. In each pair, the first currency listed is referred to as the "Base Currency" while the other, is referred to as the "Term Currency." As prices are typically quoted "in terms of" units of the Term Currency, *e.g.*, for CHF/USD the number of dollars per one Swiss franc, the currency listed first will depend on which currency is being purchased/sold by the buyer/seller. The variables Rterm and Rbase in Figure 1 refer to the rate of interest paid on deposits of the Term Currency and Base Currency, respectively, and will change depending on the order of the currency pair. *See id.* at 3 n.2-3 (explaining Base and Term Currency use in pricing formula).

[131] *See* RBS CFTC Order at 6 (stating that RBS's "Swiss franc derivatives traders traded various derivatives instruments that were priced based on . . . Swiss franc LIBOR. These products included . . . foreign exchange 'FX' forwards").

133.    Trader communications confirm that Swiss franc LIBOR is a price component for Swiss franc FX forwards and that Defendants' traders used Swiss franc LIBOR to calculate the value of those contracts. ███████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████

**November 15, 2007**

████████████████████████████████████████████████████████

██████████████

████████████████████████████

█████████████████████████

██████████████████████████████████████

██████████████████████████

████████████████████████████████

██████████████████  ███████

134.    ███████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████ Therefore, Defendants' manipulation of Swiss franc LIBOR caused the prices of Swiss franc FX forwards and futures contracts to be artificial during the Class Period.

135.    **Forward rate agreements**: another derivative priced, benchmarked and/or settled based on Swiss franc LIBOR is a forward rate agreement ("FRA"). A FRA is an interest rate forward contract. The contract specifies a fixed and floating rate of interest to be paid or received by each party on a certain principal amount beginning on some future date. FRAs are also known

---

████████████████

as "single period swaps" because they function like an interest rate swap with one reset date; on the settlement date, the party with the larger interest obligation makes an interest rate payment equal to the difference between the fixed and floating rate described in the contract. For example, assume Party A enters into a FRA with Party B in which Party A agrees to receive 0.5% interest on CHF 10,000,000. In return, Party B agrees to receive six-month Swiss franc LIBOR, determined one year in the future, on the same underlying amount. If, after one-year, six-month Swiss franc LIBOR is higher than 0.5% (*e.g.*, 0.6%), Party A must pay Party B the difference in interest (*i.e.*, 0.1%), on the underlying CHF 10,000,000. If six-month Swiss franc LIBOR is lower than 0.5%, Party B must pay Party A the difference in interest.

136. **Cross-currency swaps**: a cross-currency swap is an agreement in which one party borrows currency from, and simultaneously lends an equivalent amount of another currency to, a second party. The amount of repayment due is fixed at the start of the contract based on foreign exchange forward rates. For example, if the spot price of 1 U.S. dollar is CHF 0.97, Party A can enter a one-month cross-currency swap borrowing CHF 970,000.00 from Party B in exchange for simultaneously lending Party B $1,000,000.00. When the contract expires thirty days later, Party A must return the CHF 970,000.00 it borrowed from Party B, plus interest, as represented by the forward price of Swiss francs on the start date of the swap. *See ¶¶* 131-134 *supra* (describing Swiss franc FX forward pricing). Party B does the same, returning the $1,000,000.00 that it borrowed from Party A, plus interest, based on U.S. dollar forward rates. Thus, because a Swiss franc cross-currency swap involves a loan of Swiss francs, the amount of interest paid or received under that loan will be directly impacted by Swiss franc LIBOR.

137. **Tenor basis swaps**: a tenor basis swap is a type of swap contract in which the parties agree to exchange interest rate payments based on two different floating rate tenors (*e.g.*,

three-month and six-month Swiss franc LIBOR) after adjusting one of the rates by some fixed basis (*e.g.*, 0.2%) to account for any discrepancy between the two payment streams. For example, assume Party A enters into a one-year tenor basis swap in which it agrees to make interest payments equal to six-month Swiss franc LIBOR on CHF 10,000,000.00 to Party B in exchange for receiving interest payments equal to three-month Swiss franc LIBOR plus some fixed basis on the same principal amount. At the end of one year, the party with the larger interest rate obligation makes a payment to the other; if three-month Swiss franc LIBOR plus the basis is higher than six-month Swiss franc LIBOR, Party B make an interest payment to Party A, otherwise Party A pays Party B.

138.    **Overnight index swaps**: an overnight index swap ("OIS") is a swap in which one stream of payments is made pursuant to a fixed interest rate, with the other steam of payments made pursuant to a floating overnight index rate. OIS contracts generally involve the exchange of payment streams over a short period of time, for example, from one week up to one year. Swiss franc-denominated OIS trades entered into during the Class Period were indexed to the Tom-Next Overnight Indexed Swap rate ("TOIS").[133]

139.    During the Class Period, TOIS was calculated daily using a fixing process like the one used for Swiss franc LIBOR. To calculate the daily TOIS fix, Broker Defendant Cosmorex collected TOIS submissions from between 20 and 30 banks that were active in the Swiss franc interbank lending market. The daily TOIS fix was then calculated by discarding the three highest and lowest submissions and averaging the rest.

140.    Given the mathematical pricing relationships demonstrated above and the high

---

[133] TOIS is set to be phased out effective December 29, 2017. TOIS is set to be replaced by the Swiss Average Rate Overnight ("SARON"), which is calculated by averaging actual transactions occurring in the market, similar to the method used to calculate the Euro OverNight Index Average ("EONIA").

notional value of Swiss franc LIBOR-based derivatives, small changes in Swiss franc LIBOR

can have a significant positive impact on Defendants' Swiss franc LIBOR-based derivatives

positions and a corresponding negative impact on those of Plaintiffs and the Class.[134]

### C. Defendants Dominated the Market for Swiss Franc LIBOR-Based Derivatives During the Class Period.

141.    Defendants JPMorgan, UBS, RBS, and Credit Suisse collectively dominated the

OTC Swiss franc derivatives market. The documents referenced herein show that Defendants

believed they were the only consistent participants in the Swiss franc LIBOR-based derivatives

market during the Class Period.

142.

---



143.    Defendants' dominance of the Swiss franc LIBOR-based derivatives trading market continued uninterrupted throughout the Class Period.



144.    Documents show that Defendants believed that any one of them could influence the prices for Swiss franc LIBOR-based derivatives shown in the market.



146.    Defendants' ability to manipulate prices in the Swiss franc LIBOR-based

derivatives market is confirmed by Bloomberg chats and emails.



147.





149.



150.

151.



152.    Defendants' collective dominance in the Swiss franc LIBOR-based derivatives

market allowed them to easily manipulate the prices of Swiss franc LIBOR-based derivatives as

noted by

153.    As the dominant players in the Swiss franc LIBOR-based derivatives market,

Defendants' traders developed a mutual understanding that they were better off working together

instead of competing. This understanding was reinforced by regular in-person meetings among

the traders and documented in chat messages.



154.     Defendants' market power gave them the ability to control Swiss franc LIBOR-based derivatives prices during the Class Period and facilitated the manipulative conduct alleged below. It also made that manipulative conduct extremely profitable, and Defendants' large Swiss franc LIBOR-based derivatives positions financially benefited from both their conspiracy to fix the bid-ask spread and their conspiracy to manipulate Swiss franc LIBOR during the Class Period.

**III.   Defendants Agreed to and did Restrain Trade in, and Intentionally Manipulated the Prices Of Swiss Franc LIBOR-Based Derivatives**

155.     To date, the Contributor Bank Defendants have entered into settlement/plea agreements with multiple global regulatory agencies, including the DOJ, CFTC, NYSDFS, FSA, and EC, collectively paying more than $7 billion in fines related to their intentional manipulation of LIBOR, including Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives. Each of these settlement agreements provides examples of Defendants' manipulative conduct during the Class Period. While by no means an exhaustive list, these examples are

instructive and demonstrate how Defendants coordinated their manipulation of Swiss franc

LIBOR-based derivatives prices by (1) fixing the bid-ask spread on Swiss franc LIBOR-based

derivatives; and (2) manipulating Swiss franc LIBOR. These activities caused injury to Plaintiffs

and Class members who, during the Class Period transacted at artificial prices that were directly

and proximately caused by Defendants' manipulative conduct.

**A.** **Bid-Ask Spread Conspiracy: Defendants Agreed to and Did Fix the Bid-Ask Spread on OTC Swiss Franc LIBOR-Based Derivatives, Overcharging Class Members for Purchases and Underpaying Class Members for Sales of Such Derivatives.**

156.    Defendants operated a price-fixing conspiracy designed to generate illicit profits

on both the initial purchase or sale of Swiss franc LIBOR-based derivatives and later when those

same derivatives were priced, benchmarked, and/or settled based on Swiss franc LIBOR at

various times throughout the Class Period.

157.    Implementing the first leg of this scheme, Defendants RBS, UBS, JPMorgan, and

Credit Suisse, some of the largest market makers in the foreign exchange and interest rate

derivatives markets, operated a cartel and agreed to fix the bid-ask spread on Swiss franc

LIBOR-based derivatives for a duration that is currently unknown to Plaintiffs but believed to be

███████████████ including between May and September 2007.[149]

158.    In a scheme akin to the NASDAQ equities market makers' "bid-ask" cartel, the

subject of proceedings in this District in *In re NASDAQ Market-Markers Antitrust Litigation*,[150]

cartel members agreed to quote wider, fixed bid-ask spreads to all non-members for over-the-

counter Swiss franc LIBOR-based derivatives, while agreeing to maintain a narrower bid-ask

spread for trades amongst themselves, reducing transaction costs and increasing liquidity among

---

[149] *See* EC Bid-Ask Spread Cartel Settlement, *supra* note 3; *see also* COMCO Bid-Ask Settlement, *supra* note 4.
[150] MDL No. 1023 (S.D.N.Y.).

the cartel, giving each participant more "ammo" to use in furtherance of their manipulative scheme.[151]

159.    As market makers who both buy and sell Swiss franc LIBOR-based derivatives, Defendants profited from a wider bid-ask spread, because it allowed them to buy derivatives from Class members at an artificially lower bid price and then resell them to other Class members at an artificially higher ask price.[152] Thus, Defendants profited on both sides of *every* transaction, saving money when they purchased derivatives for less than they should have, and making money when they resold them for an inflated price.

160.    While the difference between the bid and ask price in each transaction may be small, *e.g.*, a few cents or even basis points, because the bid-ask spread applied to *every* transaction, even a small increase in the spread generated substantial profits given the volume of transactions in the Swiss franc LIBOR-based derivatives market. For example, more than $586 billion in Swiss franc LIBOR-based derivatives traded within the United States during April 2007 alone. Assuming volume remained the same over the next five months,[153] at least $2.8 *trillion* in Swiss franc LIBOR-based derivatives traded within the United States between May and September 2007, the time period for which the EC Bid-Ask Cartel Defendants have admitted to fixing the bid-ask spread on Swiss franc LIBOR-based derivatives. With a market that large, an increase in the bid-ask spread of just 1 basis point, *i.e.*, one one-hundredth of one percent, would generate millions of dollars in profit for Defendants.

---

[151] EC Bid-Ask Spread Cartel Settlement, *supra* note 3.

[152] The difference between the bid price and ask price does not represent a commission. Market makers, including Defendants RBS, UBS, JPMorgan, and Credit Suisse, do not charge customers commission to transact in Swiss franc LIBOR-based derivatives. Thus, the effect of Defendants' bid-ask spread conspiracy was to manipulate the transactions prices of Swiss franc LIBOR-based derivatives paid or received by their customers.

[153] For the 2007 survey, 75% of reporting dealers reported that the turnover observed during April 2007 represented normal market activity for the rest of the year. *See* Federal Reserve Bank of New York 2007 Survey at 10.

161.    Defendants' manipulative conduct directly harmed competition in the Swiss franc LIBOR-based derivatives market. The EC found that Defendants formed their cartel "to prevent other market players from competing on the same terms."[154] Swiss regulator COMCO confirmed these findings in a later settlement with the same Defendants during December 2016.[155] As an anti-competitive combination among four of the largest and most sophisticated participants in the Swiss franc LIBOR-based derivatives market, Defendants' cartel effectively reduced competition, and generated illicit profits for themselves at the expense of Class members forced to transact at artificial prices.

   i.   *Documents confirm that Defendants conspired to fix the bid-ask spread.*

162.    Documents referenced herein confirm the EC's and COMCO's findings that Defendants conspired to fix the bid-ask spread on over-the-counter Swiss franc LIBOR-based derivatives. However, documents show that Defendants' unlawful agreement to fix the bid-ask spread extended well beyond the four-month period covered by the EC and COMCO settlements



163.    Defendants' agreement to fix the bid-ask spread had also begun well before April 2007. To be sure, the precise terms of the agreement were amended from time to time,

---

[154] *See* EC Bid-Ask Spread Cartel Settlement, *supra* note 3.

[155] *See* COMCO Bid-Ask Settlement, *supra* note 4.



165. ███████████████████████████████████████████

166. ███████████████████████████████████████████



167.

168.



169. ██████████████████████████████████████████████

██████████████████████████████

      ████████████

      ████████████████████████████████████████████████
      ████████████████████████████████████████████████
      ████████████████████████████

      ████████   ████████

170. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

      ████████████

      ████████████████████████████████████████

      ████████████████████████████████████████████████
      ████████████████████████████████

      ████████████████████████████

      ██████

      ████████████████████████████████████████████████
      ████████████████████████████████████

      ████████████████████████████████████████   ██████
      ████████████████████████████  ██

171. ████████████████████████████████████████████

████████████████████████████████████████████



172.     Defendants maintained their agreement to fix the bid-ask spread for Swiss franc

LIBOR-based derivatives by communicating in chatrooms, through email, over the telephone,

and in person.

173.     Defendants took advantage of these in-person meetings to discuss the details of

their conspiracy.

[166] Buddakan is an upscale, Asian fusion restaurant located on Ninth Avenue in Manhattan. *See* buddakannyc.me.



174.    Defendants continued to meet in person to discuss their conspiracy throughout the

Class Period.



175.

176.



177.

178.    Documents also show that Defendants quoted favorable, narrower spreads among

themselves pursuant to the same agreement during 2008:



179.



180.    Defendants' bid-ask spread conspiracy also encompassed Swiss franc FX forward contracts. Defendants agreed to quote artificially wider bid-ask spreads for Swiss franc FX forward transactions and FRAs, as well as interest rate swaps and other Swiss franc LIBOR-based derivatives during the Class Period.

181.



182.    Moreover, the traders that orchestrated the bid-ask spread conspiracy, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ were all Swiss franc

foreign exchange forward traders. ▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████

█████████████████████████████

183.    Swiss franc foreign exchange forwards were also a primary product traded by

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████ Traders often simply refer to "fwds" when describing FX forward

products:

████████████

████████████████████████

███████████████████

████████████████████████

██████████████████

█████████████████

██████████████████████████████

█████████████████████████████

184.    ████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████

██████████████

███

██████

████████████████████



185.



186.

187.    Defendants' manipulation of the bid-ask spread impacted the prices of Swiss

franc LIBOR-based derivatives, directly benefitting Defendants' Swiss franc LIBOR-based

derivatives positions.



188.     Defendants regularly relied upon their ability to manipulate Swiss franc LIBOR-

based derivatives spreads throughout the Class Period.



189.    The ongoing nature of Defendants' bid-ask spread conspiracy is also supported by the continuous contact among JPMorgan, RBS, UBS, and Credit Suisse traders, including through several unrecorded means of communications, such as messages sent using their personal email accounts, text messages, and the private, off-the-record, in person meetings they held throughout the Class Period. *See also* Part III.D, *supra*.

**B.  <u>Swiss Franc LIBOR Manipulation Conspiracy</u>: Defendants Agreed to and Did Manipulate Swiss Franc LIBOR to Artificial Levels for Their Financial Gain and to the Detriment of Plaintiffs and Other Market Participants.**

190.    Defendants operated their bid-ask spread cartel concurrent with a scheme to manipulate Swiss franc LIBOR. These two types of manipulative conduct were complementary. While fixing the bid-ask spread generated increased profits by imposing supracompetitive prices on the Swiss franc LIBOR-based derivatives market, manipulating Swiss franc LIBOR allowed Defendants to control the prices of Swiss franc LIBOR-based derivatives over the lifetime of each financial instrument, generating additional revenue by increasing the value of their Swiss franc LIBOR-based derivatives portfolio. This was especially true on "fixings," *i.e.*, days when Swiss franc LIBOR-based derivatives that Defendants held were priced, benchmarked, and/or settled, based on Swiss franc LIBOR.[184]

---

[184] *See e.g.*, UBS DOJ Statement of Facts at 31 ¶¶ 75-76 (requesting higher one-month Swiss franc LIBOR submission to manipulate large fixing).

191.     To facilitate their scheme, Defendants paired conduct intended to directly manipulate Swiss franc LIBOR, for example, making false Swiss franc LIBOR submissions to the BBA, with supportive conduct intended to enhance the impact of their manipulative efforts, including (a) reorganizing their trading desks to facilitate collusion; (b) intentionally implementing lax compliance standards that would fail to detect any foul play; (c) using their influence over the BBA's rule making process to modify the LIBOR submissions process to their advantage; and (d) making false and misleading statements to government regulators.

### 1.  Requests for False Swiss Franc LIBOR Submissions

192.     The Contributor Bank Defendants made false Swiss franc LIBOR submissions in response to requests from their own Swiss franc LIBOR-based derivatives traders, including traders in the United States, as well as those made by co-conspirator banks, hedge funds, and interdealer brokers, some of which are based in the United States. The goal was always the same: to manipulate the Swiss franc LIBOR fixing for one or more tenors, thereby manipulating and fixing the prices of Swiss franc LIBOR-based derivatives at artificial levels that financially benefited the Defendants' Swiss franc LIBOR-based derivatives positions. A chronological list of publicly available manipulative communications is attached to this Complaint as Appendix A.

193.     Requests for false Swiss franc LIBOR submissions were at times focused on "fixings," days where one or more of the Defendants had a Swiss franc LIBOR-based derivatives position that was going to be priced, benchmarked and/or settled based on Swiss franc LIBOR. By manipulating Swiss franc LIBOR on these fixing days, Defendants specifically intended to manipulate the value of Swiss franc LIBOR-based derivatives for their financial benefit.

194.     Defendants also requested false Swiss franc LIBOR submissions to inject a certain "bias" into the Swiss franc LIBOR fixing, permanently manipulating specific tenors higher or lower by making false submissions over long periods of time. These requests were at

times issued by senior management in the form of standing orders to make false submissions in a particular direction, or a company policy regarding how the bank should determine its Swiss franc LIBOR submissions to guarantee that the daily fixing was skewed in a direction that benefited the bank's Swiss franc LIBOR-based derivative positions and those of co-conspirators.

### a.   Daily Requests for False Submissions

195.   Requests for false Swiss franc LIBOR submissions occurred continuously during Class Period, for example, as often as several times each week at Defendant RBS.[185] The practice was so common that Swiss franc LIBOR-based derivatives traders and Swiss franc LIBOR submitters joked about requests for false submissions. For example, in the conversation below RBS's primary Swiss franc LIBOR submitter pretends that he will not comply with a trader's request for a false submission, only to be persuaded by a bribe of day-old sushi rolls:

**December 4, 2008**:

RBS Swiss Franc Trader: can u put 6m swiss libor in low pls?

RBS Primary Submitter: NO

RBS Swiss Franc Trader: should have pushed the door harder

RBS Primary Submitter: Whats it worth

RBS Swiss Franc Trader: ive got some sushi rolls from yesterday?

RBS Primary Submitter: ok low 6m, just for u

RBS Swiss Franc Trader: wooooooohooooooo[186]

196.   This callous, manipulative conduct occurred at other Contributor Bank Defendants during the Class Period. In the conversation below, Defendant UBS's Swiss franc

---

[185] RBS CFTC Order at 26.

[186] *Id.*

LIBOR-based derivatives trader requested a false one-month Swiss franc LIBOR submission from UBS's Swiss franc LIBOR submitter to manipulate and fix the prices of Swiss franc LIBOR-based derivatives at artificial levels for their financial benefit. For example:

**July 5, 2006**:

UBS Trader: looking for high 1 month fix

UBS Swiss Franc LIBOR Submitter: no problem, will fix 1 month high[187]

197.     This conversation is a typical example of how Defendants manipulated Swiss franc LIBOR during the Class Period. The CFTC found that UBS Trader made the request for a higher one-month Swiss franc LIBOR submission on July 5, 2006, because he was on the "receiving end" of a large fixing, *i.e.*, he was going to be paid by a counterparty based on where one-month Swiss franc LIBOR ended up that day.[188] The higher UBS could manipulate one-month Swiss franc LIBOR on July 5, 2006, the more money UBS Trader would collect from his counterparty, financially benefiting his Swiss franc LIBOR-based derivatives trading book.[189]

198.     On board with the scheme to manipulate Swiss franc LIBOR, UBS Swiss Franc LIBOR Submitter followed through on UBS Trader's request for a high one-month Swiss franc LIBOR submission on July 5, 2006, by raising the bank's 1 month Swiss franc LIBOR submission to 1.43%, 1 basis point higher than the previous day.

199.     Deutsche Bank's Swiss franc LIBOR-based derivatives traders also routinely made requests for false Swiss franc LIBOR submissions during the Class Period.[190] To coordinate these requests, Deutsche Bank used a spreadsheet containing the bank's prior and

---

[187] UBS DOJ Statement of Facts at 31 ¶¶ 75-76.

[188] UBS CFTC Order at 38.

[189] *Id.*

[190] Deutsche Bank DOJ Statement of Facts, at 9; Deutsche Bank CFTC Order at 2.

intended future Swiss franc LIBOR submissions. Deutsche Bank's Swiss franc LIBOR submitters circulated this spreadsheet to its Swiss franc LIBOR-based derivatives traders for approval each day before making their Swiss franc LIBOR submissions.[191]

200.    After reviewing the spreadsheet, Deutsche Bank's pool traders[192] and MMD traders, who both transacted in Swiss franc LIBOR-based derivatives, made adjustments to the proposed future submissions in order to manipulate Swiss franc LIBOR in a particular direction to financially benefit their Swiss franc LIBOR-based derivatives positions.[193]

201.    Deutsche Bank was so methodical in manipulating Swiss franc LIBOR that one submitter, "Submitter-9," programmed the spreadsheet to optimize the bank's submissions for maximum manipulative impact.[194] In an August 19, 2009 telephone call, Submitter-9 bragged to Deutsche Bank "Trader-11" that "**I now have libor contribution simulation in my spreadsheet**,"[195] which could determine exactly how each Swiss franc LIBOR submission would impact the daily Swiss franc LIBOR fixing.[196]

202.    Defendants' false submissions did not even have to be included in the final average calculation to impact the Swiss franc LIBOR fix. At times, Deutsche Bank would intentionally make false submissions that fell in the highest or lowest 25% of contributor panel quotes to guarantee it was excluded from the average calculation. This tactic manipulated the Swiss franc LIBOR fixing by forcing another bank's quote into the middle 50%, driving the final

---

[191] Deutsche Bank DOJ Statement of Facts at 60; Deutsche Bank CFTC Order at 33.

[192] Deutsche Bank's pool traders engaged in cash trading, oversaw the bank's internal funding and liquidity, and traded financial instruments, such as swaps and forward rate agreements tied to LIBOR. Deutsche Bank's pool traders were primarily responsible for formulating and submitting the bank's LIBOR submissions.

[193] Deutsche Bank DOJ Statement of Facts, at 60.

[194] Deutsche Bank CFTC Order, at 33.

[195] Deutsche Bank DOJ Statement of Facts, at 60.

[196] Deutsche Bank CFTC Order, at 33.

average in the same direction as Defendant's submissions, even though its quote was not used in determining the average. In the conversation below, a Deutsche Bank Swiss franc LIBOR-based derivatives trader and Deutsche Bank Swiss franc LIBOR submitter discuss how they planned to manipulate the one-month Swiss franc LIBOR lower by submitting a quote low enough that will be excluded from the average calculation:

> **October 23, 2008**:
>
> Trader-11: where do you see 1m libor today?
>
> Submitter-9: gd question lower again I will go again for 2.50 with a fix at 2.60-.62
>
> Trader-11: can you put a very low 1 month please
>
> Submitter-9: sure wnatever suites u but to be honest 2.50 wud mean we r off the calculation anyway so having no effect on the fix
>
> Trader-11: fine if we are off the calculation **it is always better than we are in To get libor your way you always need to be off the calculation**
>
> Submitter-9: to show direction i totally agree…but in case you have a refix I wud say its better to be in the calc on the low side
>
> Trader-11:  no we had a chat with [Trader 3] about that and we do not think so Maybe he is wrong !!! If you are un means you increase the libor no?[197]

203.    This coordination between Swiss franc LIBOR-based derivative traders and submitters was not only common at Deutsche Bank but encouraged by management. For example, Deutsche Bank's GFFX desk held weekly "Monday Risk Calls" led by Deutsche Bank manager David Nicolls in which traders located in Deutsche Bank's New York, London, Tokyo and Frankfurt offices discussed their derivatives positions, including those based on Swiss franc

---

[197] *See* Deutsche Bank DOJ Statement of Facts at 64 (emphasis added).

LIBOR, with the bank's LIBOR submitters to coordinate manipulation.[198] DB Group Services employed all of Deutsche Bank's London-based pool and MMD traders, who participated on the Monday Risk Calls with traders from Deutsche Bank's New York Branch.[199] These Monday Risk Calls continued throughout the Class Period and were one of multiple means by which Deutsche Bank and DB Group Services manipulated Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.

204.    Requests for false Swiss franc LIBOR submissions became more frequent and pervasive at Deutsche Bank during 2008 when Trader-11 began trading Swiss franc LIBOR-based derivatives products.[200] Trader-11 routinely worked with Submitter-9 to manipulate Deutsche Bank's Swiss franc LIBOR submissions to benefit his Swiss franc LIBOR derivatives positions.[201] In the conversation below, Trader-11 initiates contact with Submitter-9, who indicates that he is willing to make a false Swiss franc LIBOR submission:

<u>**July 25, 2008**</u>:

<u>Trader-11</u>: Hello I trade CHF derivatives in London what are you putting for libors today please?

<u>Submitter-9</u>: Hi mate welcome in one of the most interesting currency market heard out of the market that there is somebody at DB LDN now again trading CHF derivatives didnt check so far but probably going for 27 in the 1mth and 75 in the 3mths **In case you have aynthing special let me know rgds** [Submitter-9][202]

---

[198] Deutsche Bank DOJ Statement of Facts, at 61; *see also* Letter to Deutsche Bank AG Enclosing Audit Report, at pp. 2, 9, Bundesanstalt fur Finanzdienstleistungsaufsicht (BaFin) (May 11, 2015) [Convenience Translation dated May 13, 2015], available at http://graphics.wsj.com/documents/doc-cloud-embedder/?sidebar=0#2167237-deutsche.

[199] DB DOJ DPA, at 27.

[200] DB Group DOJ Statement of Facts, at 35.

[201] *Id.*

[202] *Id.* at 35-36 (alteration in original) (emphasis added).

205.   Later that same day Trader-11 and Submitter-9, who upon information and belief are "Derivatives Trader C" and "Swiss Franc LIBOR Submitter B" in the conversation below, communicated via telephone regarding a specific false Swiss franc LIBOR submission in favor of Deutsche Bank's Swiss franc LIBOR-based derivatives positions:

**July 25, 2008:**

Derivative Trader C: can we have like 76 [2.76] today for three Swissy [CHF]?

Swiss Franc LIBOR Submitter B: Yeah, yeah sure

\* \* \*

Derivative Trader C: just today we have two yards [2 billion] threes so even if you could put six and a half [2.765] that would be nice …Today **for three month, like a high very high three month but then a low one month**, that's very good[203]

206.   Swiss Franc LIBOR Submitter B followed through on Derivative Trader C's requests. On July 25, 2008, Deutsche Bank increased its three-month Swiss franc LIBOR submission to 2.765%, 1.5 basis points higher than the previous day. Deutsche Bank also lowered its one-month Swiss franc LIBOR submission to 2.27%, one basis point lower than the previous day.[204] This matches Derivative Trader C's request for a high three-month and low one-month Swiss franc LIBOR submissions.

207.   At Deutsche Bank, LIBOR manipulation was widespread, extending beyond just Trader-11 and Submitter-9 to include at least 29 managers, derivative traders, and submitters in London, Frankfurt, Tokyo, and New York.[205] For example, in mid-2010, Deutsche Bank appointed Submitter 2 as its primary Swiss franc LIBOR submitter.[206] In accordance with senior

---

[203] Deutsche Bank FCA Final Notice, at 13 (emphasis added).

[204] *Id.*

[205] *Id.* at 12.

[206] Deutsche Bank CFTC Order at 34.

management's communication policy, Submitter 2 often reached out directly to traders to discuss Deutsche Bank's intended Swiss franc LIBOR submissions and determine whether the submissions should be manipulated in favor of Deutsche Bank's derivatives positions.[207]

208.    This practice continued for more than a year after Deutsche Bank initiated its own internal "investigation" of LIBOR-related misconduct, as Submitter 2 regularly received and acted on requests from Deutsche Bank's MMD traders for false Swiss franc LIBOR submissions until at least early 2011. For example, in the conversation below, Submitter 2 agreed to accommodate Trader 2's request for lower one-month, higher three-month, and lower six-month Swiss franc LIBOR submissions, joking that this combination "would perfectly reflect market movements" (which was false) and using a smiley face ":-)" to signify the ridiculous nature of this statement:

> **September 9, 2010:**
>
> London MMD Swiss Franc Trader 2: Hi [Swiss franc Submitter 2], good day to you. just to let you know if you can help..well or at least dont kill on that one pls. **Got quite big fixings today**: I am for: Lower fix in 1m higher fix in 3m lower fix in 6m txs same tomorrow in 6s3s and reverse monday ...the beauty of stupid mismatches
>
> Swiss Franc Submitter 2: only helps you if relative to each other, right? i actually think a higher 3m fixing relative to 1m and 6m would perfectly reflect market movements today, should be no problem       :-)
>
> London MMD Swiss Franc Trader 2: i like your thinking!  tks[208]

209.    Traders working at the Bank Defendants consistently aligned positions across long stretches of the Class Period that benefitted from Swiss franc LIBOR manipulation. ■

---

[207] *Id.*

[208] *Id.*



210.

211.    Despite violating BBA rules which forbid contributor panel banks from basing their LIBOR submission on anything other than their cost of borrowing, Contributor Bank Defendants consistently manipulated Swiss franc LIBOR by making false Swiss franc LIBOR submissions that did not reflect the rate of interest offered on Swiss franc deposits. Defendants knew that making false Swiss franc LIBOR submissions would manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives and, as demonstrated above, expressly engaged in this manipulative conduct to take advantage of that direct pricing relationship, at times targeting days with large fixings to generate increased profits for the bank.

### b.  Long-Term False Reporting

212.    Defendants also used their control over the Swiss franc LIBOR panel to manipulate Swiss franc LIBOR for long periods of time, creating a persistent state of artificiality that skewed the market in a direction beneficial to their entire trading book every day. For example, UBS admitted that "[s]tarting at least as early as 2001, and continuing until at least September 1, 2009, on each trading day on which UBS had Swiss franc trading positions, UBS's Swiss franc LIBOR submitters rounded UBS's Swiss franc LIBOR submissions to benefit UBS's global Swiss franc trading positions."[210]

213.    By "rounding" its Swiss franc LIBOR submissions up or down to reflect the direction that would most benefit its Swiss franc LIBOR-based derivatives positions, UBS intended to skew Swiss franc LIBOR to benefit its entire trading book every day.

214.    Deutsche Bank had a similar policy in place, focused on policing the "spread" or difference between certain tenors of LIBOR, including Swiss franc LIBOR.[211] Much like the

---

[210] UBS DOJ Statement of Facts at 30 ¶73.

[211] *See* Deutsche Bank CFTC Order at 9.

Defendants' fixing of the bid-ask spread in the OTC Swiss franc LIBOR-based derivatives market, Deutsche Bank sought to widen the spread between different tenors of LIBOR for multiple currencies, including Swiss franc LIBOR.[212] Deutsche Bank's traders capitalized on the relationship between tenors by entering into "massive derivatives basis trading positions" which increased in value as the spread between tenors widened.[213]

215.    Deutsche Bank educated its traders and submitters to ensure that this plan was well known and utilized across the various currency desks. Deutsche Bank's Global Senior Manager and other senior traders held weekly meetings where they openly discussed the use of this trading strategy so that everyone involved understood the plan.[214] As a result, the CFTC found that Deutsche Bank's LIBOR submitters, including those who made Swiss franc LIBOR submissions, routinely built this spread "bias" into Deutsche Bank's LIBOR submissions, pushing the spread between different tenors of LIBOR wider, even in the absence of written communications from traders requesting a specific false rate.

216.    These two long-term manipulations, which sought to impact Swiss franc LIBOR every day, not just days when the Defendants had large fixings, rendered the prices of Swiss franc LIBOR-based derivatives artificial throughout the entire Class Period. Plaintiffs and the Class suffered injury when they were forced to transact at artificial prices directly and proximately caused by Defendants' efforts to create a persistent state of artificiality that benefited their own trading books.

---

[212] *Id*.

[213] *Id*.

[214] *Id*.

### 2.  Defendants Coordinated Their Swiss Franc LIBOR Submissions to Maximize Their Impact on the Swiss Franc LIBOR Fix

217.    To maximize their impact on the daily Swiss franc LIBOR fix, Contributor Bank Defendants coordinated their false Swiss franc LIBOR submissions with other Defendants. Coordination among Defendants is currently known to have occurred through two primary means: (1) communications between traders and submitters; and (2) inter-dealer brokers.

### a.  Coordination Through Improper Communications Between Traders and Submitters

218.    To avoid detection by regulators, Defendants' coordination of their false Swiss franc LIBOR submissions relied upon multiple forms of communication for which no written record exists. Defendants JPMorgan, RBS, UBS, and Credit Suisse communicated through, among others, the following means:

a.   in person meetings;[215]

b.   Blackberry, and other, mobile phone calls;

c.   calls through the Reuters terminal;

d.   text messages through Bloomberg, Reuters, and their own phone services;

e.   private emails outside of Bloomberg;

f.   office telephone calls;

g.   Bloomberg emails;

h.   messages transmitted through interdealer brokers; and

i.   in group chatrooms with other Defendants.

---

[215] Testimony from the criminal trial of Tom Hayes, mastermind of UBS's Yen-LIBOR manipulation scheme, demonstrates that traders coordinated manipulative conduct using, *inter alia*, unmonitored person cell phone to escape detection. *See e.g.,* David Enrich, *Former Trader Tom Hayes Told Libor Investigators of 'Collusive' Price Fixing*, The Wall Street Journal, available at http://www.wsj.com/articles/hayes-told-investigators-of-collusive-price-fixing-1433160629.

219.    Communications that occurred in-person, via Blackberry and/or other unmonitored mobile devices, text messages (from mobile phones, Bloomberg, and Reuters), and calls placed through Reuters terminals have not been produced to Plaintiffs ███████████ ███████████ Only a portion of the other types of communications referenced above have been produced to Plaintiffs. Defendants used these means of communications to conduct their most serious unlawful conduct.

220.    The handful of examples of inter-Defendant communications released in the government settlements to date come from transcripts of phone calls and Bloomberg chatrooms, electronic venues where Defendants would meet at times to share information regarding their derivatives positions and coordinate false Swiss franc LIBOR submissions.[216]

221.    The typical conversation involved an exchange of information regarding each trader's Swiss franc LIBOR-based derivatives position, followed by an agreement regarding a false Swiss franc LIBOR submission from each bank's respective Swiss franc LIBOR submitter. For example, in the conversation below, an RBS Swiss franc LIBOR-based derivatives trader requested a false Swiss franc LIBOR submission from RBS's primary LIBOR submitter. The RBS trader made this request following an undisclosed conversation with a Swiss franc LIBOR-based derivatives trader (and former RBS employee) at JPMorgan. Following the initial conversation, RBS Swiss Franc Trader requests that RBS make an artificially higher three-month and artificially lower six-month Swiss franc LIBOR submission:

---

[216] Given the structure of Bloomberg's network, upon information and belief, these electronic communications are located within the United States and were transmitted into the United States, crossing U.S. wires, through servers located in the United States. Bloomberg transport specifications require that all users connect to internet protocol ("IP") addresses located within the United States in order to access Bloomberg's U.S.-based servers, which are used to send messages in addition to accessing financial information. These servers also host the Instant Bloomberg chat rooms Defendants' utilized in their scheme. *See Transport and Security Specifications*, BLOOMBERG L.P. (Nov. 13, 2014) at 7, 12 (listing Bloomberg IP addresses and diagraming network structure with endpoints in New York and New Jersey).

**May 14, 2009**:

RBS Swiss Franc Trader: pls can we get

RBS Swiss Franc Trader: super high 3m

RBS Swiss Franc Trader: super low 6m

RBS Swiss Franc Trader: PRETTY PLEASE!

RBS Primary Submitter: 41 & 51

RBS Swiss Franc Trader: if u did that

RBS Swiss Franc Trader: I would lvoe u forever

RBS Primary Submitter: 41 & 51 then . . .

RBS Swiss Franc Trader: if u did that i would come over there and make love to you

RBS Swiss Franc Trader: your choice

RBS Primary Submitter: 41+51 it is

RBS Swiss Franc Trader: thought so

RBS Primary Submitter: so shallow[217]

222.     In a follow-up conversation later that day, RBS Swiss Franc Trader and his co-conspirator at JPMorgan discuss the success of their Swiss franc LIBOR manipulation:[218]

**May 14, 2009**:

RBS Swiss Franc Trader: we are good!

JPMorgan Swiss Franc Trader: yes[,] look at it now[,] low libor[,] and chf libor good too

RBS Swiss Franc Trader: [RBS Primary Submitter] did be a big favor today[,] he set 41 and 51

---

[217] RBS CFTC Order at 28.

JPMorgan Swiss Franc Trader: sweet[219]

223.    The impact of this manipulative conduct was far reaching, as Defendants agreed to make false Swiss franc LIBOR submissions with the specific intent to fix the prices of many different types of Swiss franc LIBOR-based derivatives, including Swiss franc currency futures contracts and Swiss franc foreign exchange forwards. For example, in the conversation below, RBS Swiss franc Trader and a co-conspirator at JPMorgan discussed the impact that manipulating three-month Swiss franc LIBOR will have on the "fx basis," or the difference between the "spot" price, *i.e.* the price of Swiss francs for immediate delivery, and the price of Swiss francs for delivery on some date in the future, as represented in a Swiss franc currency futures contract or Swiss franc foreign exchange forward:[220]

**April 15, 2008**:

JPMorgan Swiss Franc Trader: you know what i hope[,] that libor 3m is not going up

RBS Swiss Franc Trader: Yes…Should not go up.. Just hang here

JPMorgan Swiss Franc Trader: ok[,] just weird that zurich put it at 2.77 today[221]

RBS Swiss Franc Trader: So fx basis will go negative if 3m usd ever starts to go down

JPMorgan Swiss Franc Trader: you should tell [RBS Primary Submitter][,] if you can[,] the set it at 2.78[222]

224.    On April 15, 2008, consistent with JPMorgan's request, RBS artificially lowered its three-month Swiss franc LIBOR submission to 2.78%, directly impacting the April 15, 2008

---

[219] *Id. See also* RBS-CHF-LIBOR-000509509.

[220] *See* Understanding FX Futures at 8, http://www.cmegroup.com/education/files/understanding-fx-futures.pdf (explaining foreign exchange basis as the relationship between the spot price and future price of a currency pairing).

[221] UBS's Swiss franc LIBOR submission on April 15, 2008 was 2.77%.

[222] RBS CFTC Order at 28.

Swiss franc LIBOR fix and the prices of Swiss franc LIBOR-based derivatives, including Swiss franc currency futures contracts and Swiss franc foreign exchange forwards.

225.    These two communications are a small sample of RBS Swiss Franc Trader's communications with his co-conspirator at Swiss franc LIBOR panel Bank E. The CFTC found that these two traders coordinated their manipulative conduct through "near daily" Bloomberg chats, during which they exchanged proprietary information unavailable to other market participants, including their positions in Swiss franc LIBOR-based derivatives, their preferred Swiss franc LIBOR rates, the amount they could benefit from manipulating Swiss franc LIBOR, and the requests they made to their respective Swiss franc LIBOR submitters.[223]

226.    ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████

████████████████

██████████████████

█████████████████████████████████

██████████████████

████████████████████████

███████████████████

███████████████████

---



227.

228. 

229.



230.



231.



232.



233.    Contributor Bank Defendants also agreed to make false Swiss franc LIBOR submissions based on requests from their clients, including large hedge funds that traded Swiss franc LIBOR-based derivatives. This practice was common throughout the Class Period. As one trader from Barclays, another Swiss franc LIBOR panel bank, explained to the Federal Reserve, large hedge funds, including BlueCrest, lobbied LIBOR panel banks for favorable submissions on a regular basis.[231] Funds that were "on the bandwagon" would call salespersons at each contributor panel bank to request that they move LIBOR higher or lower depending on the fund's derivatives positions.[232]

234.    This solicitation was motivated by greed. Just like the Contributor Bank Defendants, whose traders were compensated based on the performance of their trading book, at BlueCrest, successful money managers typically received twelve percent of the profits from their individual trading books as a bonus at the end of each year.[233] Those who underperformed were

---

[231] *See* Erin Arvedlund, OPEN SECRET: THE GLOBAL BANKING CONSPIRACY THAT SWINDLED INVESTORS OUT OF BILLIONS, at 97-98 (2014).

[232] *Id.*

[233] *See* Westbrook, *supra* note 10.

punished. A loss of just three percent would result in a trader having the size of his book cut in half, substantially reducing the potential amount of profit and, as a result, compensation available to that individual.[234]

235.    The banks, eager to burnish relationships with their best clients, frequently obliged.[235] In the communication below, BlueCrest, one of the largest hedge funds in the world, reached out to Deutsche Bank to request a false one-month Swiss franc LIBOR submission to benefit BlueCrest's Swiss franc LIBOR-based derivatives positions:

**February 10, 2005**:

Can't you ask your fft to contribute **1m chf libor very low today**?? I have 10 yr of fix, 8 of which against ubs, and they're getting on my nerves."[236]

236.    This communication demonstrates that Defendants' coordinated manipulation of Swiss franc LIBOR extended well beyond the Contributor Bank Defendants who sat on the Swiss franc LIBOR panel and included other market participants, including other funds and institutional investors who stood to financially benefit from trading Swiss franc LIBOR-based derivatives.

    i.    *Documents show that Defendants coordinated Swiss franc LIBOR submissions.*

237.    Documents available to Plaintiffs, show that Defendants UBS, RBS, Credit Suisse, and JPMorgan manipulated Swiss franc LIBOR by coordinating their Swiss franc LIBOR submissions, in violation of BBA rules. ██████████████████

████████████████████████████████████████

---

[234] *Id*.

[235] *See* Erin Arvedlund, OPEN SECRET: THE GLOBAL BANKING CONSPIRACY THAT SWINDLED INVESTORS OUT OF BILLIONS, at 97-98 (2014).

[236] Deutsche Bank NYSDFS Consent Order at 10 (emphasis added).



238.



239.    Defendants also coordinated Swiss franc LIBOR submissions by sharing information with co-conspirators about their Swiss franc LIBOR-based derivatives positions so they would know when each co-conspirator needed higher or lower Swiss franc LIBOR fixings.





240.    Additionally, Defendants shared information with one another about their bank's Swiss franc LIBOR submissions, including the exact levels to which those submissions were being manipulated in advance of the fixing.

**April 16, 2008**

241.

242.



243. ████████████████████████████████████

████████████████████████████████████

███████████ ████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████ ███████

244. ████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████ ██

245. ████████████████████████████████████

██████████████████████████████████

████████████

---

[241] Neil Danziger was predominantly a Japanese Yen trader at Defendant RBS. *See* Liam Vaughan, Gavin Finch, & Andrea Tan, *RBS Managers Said to Condone Manipulation of Libor Rates*, Bloomberg.com (Sept. 25, 2012), https://www.bloomberg.com/news/articles/2012-09-24/rbs-managers-said-to-condone-manipulation-of-libor-rates. Danziger is notorious for his participation in a widespread conspiracy to manipulate Yen-LIBOR, including with UBS, Deutsche Bank, JPMorgan and several others. *See,e.g.*, David Enrich & Jean Eaglesham, *Clubby London Trading Scene Fostered Libor Rate-Fixing Scandal*, The Wall Street Journal (May 2, 2013), https://www.wsj.com/articles/SB10001424127887323296504578396670651342096. Danziger was fired from RBS for manipulating LIBOR in 2011. *See* Liam Vaughan, Gavin Finch, & Andrea Tan, *RBS Managers Said to Condone Manipulation of Libor Rates*, Bloomberg.com (Sept. 25, 2012), https://www.bloomberg.com/news/articles/2012-09-24/rbs-managers-said-to-condone-manipulation-of-libor-rates.

[242] *See* https://www.profit-loss.com/articles/news/around-the-world/jpm-hires-ny-forwards-dealer.

██ ████████████████████████



246.

247.

248.

249.

"team."[249] An example screen shot of one of these chat rooms is included below:



250. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████

251. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████

████████████████████████████████
██ ████████████████████████████████████████
██ ██████████████████████████████
██ ██████████████████████████████





256.    Defendants also traded directly to keep the transaction details secret.

257.

258.

259.

260.    This chat is consistent with other communications demonstrating that Defendants frequently manipulated the Swiss franc LIBOR yield curve throughout the Class Period. For example, Defendants manipulated TOIS and the spot-next Swiss franc LIBOR rate at the front



end of the yield curve to financially benefit basis spread positions that were tied to the spread between one-month and three-month Swiss franc LIBOR. Such inter-bank manipulation was facilitated by the same Defendants' participation in the "ChaseScotland and Huck" chatroom and impacted all Swiss franc LIBOR-based derivatives.

261. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. For example, the FSA, in a negotiated settlement with RBS, found that RBS had colluded with other banks who submitted Swiss franc LIBOR to the BBA and firms that employed interdealer brokers between October 2006 and November 2010.[261]

262. Similarly, the CFTC found that from at least January 2005 through at least September 2009, UBS's Swiss Franc Trader-Submitters accommodated the requests of derivatives traders.[262]

263. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



---

[261] RBS FSA Final Notice at ¶6.

[262] UBS CFTC Order at 38.

264.    JPMorgan and RBS also discussed fixing Swiss franc LIBOR-based derivatives

prices on

266. ███████████████████████████████████

███████████████████████████████

████████

█████████████████████

████████████████████

██████████████████████████████████████

███████████████████████████████████

████████████████████████

267.     Credit Suisse also conspired with JPMorgan to fix Swiss franc LIBOR-based derivatives prices during the same time period, ███████████████████████

██████████████

████████

█████████████████████████████████

268.     █████████████████, which occurred while at least three Contributor Bank Defendants were participating in a group chat room, ██████████████████████

████████████████████████████████████

█████████████ Given the small slice of Defendants' communications currently available, Plaintiffs believe that additional instances of group chatrooms among Defendants and corresponding acts of manipulation will be uncovered in discovery.



### b. Coordination Through Interdealer Brokers:
### A Classic Hub and Spoke Conspiracy

269.    Defendants also coordinated their Swiss franc LIBOR submissions with other currently unknown co-conspirators by using "inter-dealer brokers," *i.e.*, intermediaries that typically facilitate transactions between dealer banks in markets where there are no centralized exchanges, such as the over-the-counter market for Swiss franc LIBOR-based derivatives. Because of their natural position as intermediaries in the financial markets, inter-dealer brokers functioned as the "hub" between the Swiss franc LIBOR panel bank "spokes" in a classic hub-and-spoke conspiracy to fix the prices of Swiss franc LIBOR-based derivatives.

270.    The brokers, sitting at the center of the wheel, took requests for false LIBOR submissions from panel banks and other market participants and coordinated the submissions of other panel members to move the market in the agreed upon direction. Brokers were paid for their services with commissions from "wash trades," *i.e.*, transactions with no economic value in which two parties exchange identical financial instruments solely to compensate the broker.[268] The communications below are taken from UBS's non-prosecution agreement with the DOJ:

**February 25, 2009**:

**In an electronic chat with Trader 1. . .**

Trader 1: low 1m and 3m . . . we must keep 3m down . . . try for low on all of em

Broker B: ok ill do my best for those today

**Later that day on a recorded phone call with Bank F. . .**

Broker B: Can I ask you a small favor?

Submitter F: Yeah

---

[268] *See, e.g.*, RBS CFTC Order at 23 (demonstrating that RBS engaged in wash trades with UBS to compensate brokers for assisting with LIBOR manipulation by generating sham commission payments).

Broker B: Where are you going to set your Libor threes today?

Submitter F: Uh, same, .65.

Broker B: Is there any way you might be able to take it down [one basis point] cause I'm getting a big trade out of it? . . . I'm getting someone to do me a big trade if they said I can help 'em sort of get Libors down a bit today

Submitter F: Yeah, okay.

271.     Prior to being contacted by Broker B, Submitter F had already entered the .65 three-month LIBOR submission on a form, which he had passed on to the Swiss franc submitter sitting next to him. However, Submitter F can be heard on the recorded conversation asking the submitter next to him to lower Submitter F's three-month Yen LIBOR submission from .65 to .64 pursuant to Broker B's request.[269]

272.     While the example above involves the coordinated fixing of Yen LIBOR, it is instructive as to how the Defendants in this case used inter-dealer brokers to coordinate their manipulation of Swiss franc LIBOR. The FCA found that inter-dealer brokers made requests for false Swiss franc LIBOR submissions to at least two RBS derivatives traders, one RBS money market trader, and one primary LIBOR submitter.[270] Similar to the conduct described above, RBS's derivatives traders passed the requests on to the relevant primary LIBOR submitter who then made LIBOR submissions in line with the unidentified co-conspirator's requests.[271]

273.     The FSA found that there were at least five requests for Swiss franc LIBOR submissions made by an external trader and inter-dealer brokers that RBS followed during the

---

[269] UBS DOJ Statement of Facts, at 21-22.

[270] *See* RBS FSA Final Notice at 16 ¶61.

[271] *Id.*

Class Period.[272] Cooperation materials confirm that at least some of these requests came from Patrick Bisig, a New York-based Swiss franc LIBOR-based derivatives trader at JPMorgan.

274.    The hub-and-spoke nature of Contributor Bank Defendants' conspiracy is confirmed by the fact that the requests from inter-dealer brokers occurred during the same time period that Contributor Bank Defendants had agreements in place amongst themselves to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.[273]

275.    These agreements, which are detailed in the Contributor Bank Defendants' settlements with government regulators, connect the individual Defendant spokes around the inter-dealer brokers and include, *inter alia,* (a) the EC's finding that between March 2008 and July 2009, RBS and JPMorgan operated a cartel aimed at manipulating Swiss franc LIBOR to "distort the normal pricing of interest rate derivatives denominated in Swiss franc";[274] (b) the EC's finding that Defendants RBS, UBS, JPMorgan, and Credit Suisse participated in a cartel to fix the prices of Swiss franc LIBOR-based derivatives between May and September 2007;[275] and (c) the *near daily* communication of proprietary trading information, including requests for false Swiss franc LIBOR submissions, between RBS and JPMorgan.

     i. *Documents confirm that Defendants conspired with interdealer brokers.*

276.    Documents referenced herein confirm that interdealer brokers played a central role in Defendants' conspiracy to manipulate Swiss franc LIBOR and the prices of Swiss franc

---

[272] *Id*.

[273] *See* RBS CFTC Order at 24-29 (finding that from late 2006 through mid-2009 RBS coordinated its artificial Swiss franc LIBOR submissions with a trader at another bank); RBS FSA Final Notice at 15 (finding that between February 2007 and June 2010, RBS received request from external traders and inter-dealer brokers to manipulate its Swiss franc LIBOR submissions); UBS DOJ Statement of Facts at 30 (finding that UBS began manipulating Swiss franc LIBOR from as early as 2001 until at least September 1, 2009);

[274] *See* EC RBS-JPMorgan Cartel Settlement, *supra* note 31.

[275] *See* EC Bid-Ask Spread Cartel Settlement, *supra* note 2.

LIBOR-based derivatives. Documents show that Contributor Bank Defendants frequently conspired with several interdealer brokers, including Broker Defendants Cosmorex, ICAP, Tullett Prebon, Gottex and Velcor to manipulate Swiss franc LIBOR by disseminating false pricing information to the Swiss franc LIBOR-based derivatives market.

277.    Broker Defendants were compensated for participating in the conspiracy with kickbacks. Defendants directed their Swiss franc LIBOR-based derivatives business to brokers that helped manipulate Swiss franc LIBOR. These brokers received a percentage of every Swiss franc LIBOR-based derivatives transaction they executed as commission. This incentivized brokers to continue manipulating Swiss franc LIBOR because Contributor Bank Defendants were such a large part of the Swiss franc LIBOR-based derivatives market that their business resulted in greater revenue and higher profits. At the same time, Defendants were willing to pay brokers' commission for participating in the conspiracy because they made significantly more on derivatives positions as a result.

278.    Contributor Bank Defendants conspired with Broker Defendants by manipulating the values in pricing "run thrus" sent to Swiss franc LIBOR-based derivatives market participants during the Class Period. A "run thru" is a list of prices that is supposed to reflect a broker's unbiased assessment of the cost for certain financial products based on information gathered from other market participants. Traders rely heavily on broker run thrus in over-the-counter markets—where there are no centralized exchanges—because brokers are in a unique position to collect pricing information as they facilitate transactions between different counterparties.

279.    ████████████████████████████████████

████████████████████████████████████████████



280.    Market participants relied on Cosmorex's "LIBOR CALL" during the Class Period because Cosmorex, Tullett Prebon's Swiss affiliate, was one of the top brokers in the world for Swiss franc LIBOR-based derivatives.[277] For example, Risk Management's Interdealer Broker Rankings listed Tullet Prebon among the top two brokers in every category of Swiss franc denominated financial instruments during 2007 and 2008.[278] Tullett also ranked first overall in Swiss franc overnight index swaps, cross-currency swaps, and currency forwards, a testament to Cosmorex's position in the market.

281.



[277] http://www.cosmorex.ch.

[278] https://www.tullettprebon.com/documents/tp/tullett_risk_0908.pdf



282.

283.



284.    Contributor Bank Defendants exploited the market's reliance on Cosmorex's run

thrus by conspiring with Cosmorex to disseminate false "LIBOR CALL[S]" that financially

benefited Defendants' Swiss franc LIBOR-based derivatives positions.

285.    Documents show that Cosmorex brokers shared their "LIBOR CALL" run thrus

with Contributor Bank Defendants before sending it to the rest of the market. For example, in the



286.    Contributor Bank Defendants used their advance knowledge of Cosmorex's

"LIBOR CALL[S]" to request to brokers alter the run thrus to benefit their derivatives positions.





287.

288.



289.



290. ████████████████████████████████████████

three-month Swiss franc LIBOR decreased by 8.9 basis points from 3.0725% on October 21, 2008, to 2.98333% on October 22, 2008.

291.    Documents also show that Contributor Bank Defendants conspired with Cosmorex to manipulate Swiss franc LIBOR over extended periods of time. ████████████

Packs and bundles are offered by various exchanges such as the Chicago Mercantile Exchange ("CME") or Intercontinental Exchange ("ICE") and are recognized trading strategies that allow traders to easily execute a purchase of a series of futures contracts. This allows traders to gain exposure to longer term interest rates, without the legging risk and cost of trading the individual months. Various colors such as white, red, green,



292. ████████████████████████████████████████████████████

███████████████████████████████████████████████

293.    Contributor Bank Defendants also met with Cosmorex brokers in person to

discuss manipulating Swiss franc LIBOR. ██████████████████████

---

Blue and gold are used to refer to groups of contracts within the pack or bundle expiring during different time periods. Red is used to refer to contracts expiring during the second year. *See, e.g* CME Group, Interest Rates – Understanding Packs and Bundles, available at https://www.cmegroup.com/education/files/understanding-packs-and-bundles.pdf (last accessed Oct. 19, 2017); ICE Futures Europe – Packs and Bundles, available at https://www.theice.com/futures-europe/packs-and-bundles (last accessed Oct. 19, 2017).



294.

295.



296.



297.

298.     Contributor Bank Defendants compensated Cosmorex brokers for manipulating Swiss franc LIBOR by "supporting" them with more Swiss franc LIBOR-based derivatives business, resulting in higher commissions payments. This provided a substantial motivation for Cosmorex brokers to participate in the conspiracy because—according to regulatory filings by Cosmorex's parent company, Tullet Prebon—brokers within Tullet Prebon received on average 56.4% of the revenue they generated during 2007 as compensation.[292]

299.     Bloomberg chats and emails demonstrate the quid pro quo nature of this relationship and how Broker Defendants were willing to engage in manipulative conduct so long as Contributor Bank Defendants paid them commission.



---

[292] Tullet Prebon Group Ltd. – Preliminary Results – for the year ended 31 December 2007, available at, https://www.tullettprebon.com/announcements/investor/rannouncement/2008/RA20080311f.pdf (last accessed Oct. 18, 2017).

300.    Cosmorex brokers were additionally motivated to manipulate Swiss franc LIBOR for Defendants to maintain their high placement in interdealer broker rankings. Cosmorex brokers knew that a high ranking would lead prospective customers to do business with Cosmorex, which would in turn lead to increased commission and higher revenue. ███████████████████

██████████████████████████████████████████████████████

████████████████████████████████

████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████████████████

301.    Contributor Bank Defendants knew the importance that Cosmorex and other Swiss franc LIBOR-based derivatives brokers placed on their rankings and supported those who helped manipulate Swiss franc LIBOR. █████████████████████████████

████████████████████████████████████████████

██████████████████

█████████████████████████████

█████████████████████

█████████████████████████████████

█████████████████████████████████

██████████████████

██████████████████████████████

██████████████████████████████████████████

████████████

██████████████████████████    ████████████

302.     Contributor Bank Defendants also conspired with Broker Defendants to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives by displaying false pricing information on electronic broker pages known as "screens." Below is an example of a screen from Bloomberg displaying bid and ask prices for one-year Swiss franc LIBOR-based swaps, including from ICAP and Cosmorex:

| PCS | Firm Name | CCP | Bid | Ask | BSz(MM) | ASz(MM) | Time |
|-----|-----------|-----|-----|-----|---------|---------|------|
| BLC3 | BloombergCalc | OTC | -0.7750 / -0.7575 | | x | | 18:00 |
| COSZ | COSMOREX | OTC | -0.7725 / -0.7325 | | x | | 11:56 |
| LAST | Last Update | OTC | -0.8000 / -0.7600 | | x | | 11:56 |
| CMPN | Composite(NY) | OTC | -0.7750 / -0.7575 | | x | | 11:15 |
| ICPL | ICAP PLC | OTC | -0.8080 / -0.7580 | | x | | 11:13 |

*CHF SWAP (VS 1M LIB) 1YR — 92) Order Book — 9I) RFS — 97) Settings — All Quotes. 18:11:37 — 95) Receive — 96) Pay — BGL — Filter By All*

303.     Defendants knew that other Swiss franc LIBOR panel banks relied on screens like the one displayed above to calculate their Swiss franc LIBOR submissions. Manipulating the prices displayed not only directly affected Swiss franc LIBOR-based derivatives prices but also caused other banks looking at these screens to make Swiss franc LIBOR submissions at a level

that financially benefited Contributor Bank Defendants' derivatives positions. 

304.



305.

306.    This misconduct occurred frequently and Contributor Bank Defendants conspired

about when to have ICAP brokers move the screen to maximize the impact on Swiss franc

LIBOR-based derivatives prices and thus Defendants' financial benefit. For example:





308.     Because ICAP's screens were available to several, if not all, of the Swiss franc

LIBOR panel members and the submitters used this information at times in determining

submissions, dissemination of false prices had the potential to influence many of the Swiss franc

LIBOR submissions on any given day.



309.     Contributor Bank Defendants also conspired with other brokers to "move the screen" for derivatives prices. ████████████████████████████████

████████████████████████████████████████████████

████████████

██████████████████████████████

███████████████████████████████████████

310.   ████████████████████████████████████████

██████████████████████████████

██████████████

████████████████████████████████████████

███████████████   █████████

311.     Defendant Gottex also moved the screen for Defendants. ██████████████

██████████████████████████████████████████████████

██████████████

██████████████

████████████████████

███████████████████████

█████████████████

██████████████████████

██████████████████

██████████████████████████████

██████████████

_____

██  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬



312.

313.

### 3. Defendants Made Structural Changes to Support the Manipulation of Both Swiss Franc LIBOR and the Prices of Swiss Franc LIBOR-Based Derivatives

314.    Defendants supported the anticompetitive conduct described above by: (1) making structural changes to their money markets and LIBOR-based derivatives trading desks to create an environment where LIBOR manipulation, including the coordination of requests for false submissions between traders and submitters, was encouraged; (2) implementing lax compliance standards that failed to detect any misconduct; (3) using their influence over the



BBA's rule making committees to alter the LIBOR submission requirements to allow for their manipulative conduct; and (4) hiding evidence of wrongdoing from government regulators to thwart their investigations.

### a. Defendants Reorganized Their Money Markets and Derivatives Trading Desks to Create a Culture of Manipulation

315. By restructuring their trading desks, Contributor Bank Defendants sought to place LIBOR submitters next to derivatives traders so that each bank's LIBOR submissions could be manipulated to better serve their trading book. For example, in October 2006, RBS senior management reorganized its trading desks so that derivatives traders and money market traders, who were also LIBOR submitters, shared the same physical location within the firm.[304] The co-location plan, known as the Short-Term Markets Desk ("STM"), was expressly intended to encourage derivatives and money market traders to share market information that could impact trading and funding decisions, including their LIBOR submissions.[305]

316. This new seating arrangement amplified the preexisting conflict of interest between the profit motive of Swiss franc LIBOR-based derivatives traders, whose compensation was directly based on the performance of their trading book, and the responsibility of Swiss franc LIBOR submitters who, according to the BBA rules, were required to submit RBS's true cost of borrowing in the inter-bank market without any reference to its Swiss franc LIBOR-based derivatives positions.[306]

317. RBS's Swiss franc LIBOR-based derivatives traders quickly took advantage of this new arrangement, not only sharing their view of market conditions, but also telling RBS's

---

[304] RBS CFTC Order at 6.

[305] *Id.*

[306] *Id.*

primary LIBOR submitter their derivatives positions and encouraging him to make Swiss franc

LIBOR submissions that would financially benefit those positions.[307]

318.    UBS made similar seating arrangements. From at least January 2005 through

September 2009, derivatives traders on UBS's STIR desk traded short-term interest rate

derivatives and made submissions for all LIBOR currencies, except U.S. Dollar LIBOR and Euro

LIBOR.[308]

319.    The STIR desk managed both UBS's interest rate risk and short term cash

positions, engaging in transactions for interest rate derivatives and cash trading in the money

markets for each currency, including Swiss franc.[309]

320.    On UBS's STIR desk, Swiss franc LIBOR-based interest rate derivatives traders

were not just seated next to Swiss franc LIBOR submitters, but they actually made the

submissions themselves. By placing Swiss franc LIBOR derivatives traders (whose

compensation was directly based on the performance of their trading books) in charge of

determining UBS's Swiss franc LIBOR submissions, UBS created a direct conflict of interest

between the profit motive of these traders and their responsibility to submit Swiss franc LIBOR

quotes that reflected UBS's true cost of borrowing.

321.    Beyond making seating arrangements, UBS's management was aware of and

directly involved in manipulating UBS's Swiss franc LIBOR submissions. For example, at least

one UBS manager who ran the Swiss franc derivatives trading desk was a former LIBOR

submitter and participated in UBS's concurrent scheme to manipulate Yen LIBOR, the

---

[307] *Id*.

[308] UBS CFTC Order at 8.

[309] *Id*.

benchmark interest rate for Japanese Yen, and prices of Yen LIBOR-based derivatives.[310]

322. Deutsche Bank's management also took measures to ensure that Swiss franc LIBOR was manipulated. Starting in 2006, Deutsche Bank merged its pool trading and MMD desks to increase the bank's trading profits by aligning the desks' related trading positions.[311] Its pool traders were responsible for making Swiss franc LIBOR submissions, as well as trading derivatives positions, and its MMD traders were responsible for trading Swiss franc LIBOR-based derivatives.[312]

323. Following the merger, Deutsche Bank's management worked to improve the ability to coordinate trades and false LIBOR submissions among the MMD and pool traders.[313] For example, because most of Deutsche Bank's Swiss franc LIBOR submissions were made by traders in Frankfurt, Germany, Deutsche Bank organized "Monday Risk Calls" to ensure that Swiss franc LIBOR-based derivatives traders across the bank, including in New York, had input into the bank's submissions. Deutsche Bank Global Senior Manager also encouraged the Frankfurt Swiss franc LIBOR submitters to contact the derivatives traders in London *every day* about what false Swiss franc LIBOR submissions they needed to increase their Swiss franc LIBOR-based trading profits.[314]

324. Deutsche Bank also put Swiss franc LIBOR-based derivatives traders, who had a direct stake in the outcome of the Swiss franc LIBOR fixing, in charge of making the bank's Swiss franc LIBOR submissions. For example, in June 2010, Deutsche Bank assigned the

---

[310] *See* UBS DOJ Statement of Facts, at 9.

[311] Deutsche Bank CFTC Order at 8.

[312] Deutsche Bank DOJ Statement of Facts at 9.

[313] Deutsche Bank CFTC Order at 8.

[314] *Id*.

responsibility for making Swiss franc LIBOR submissions to a trader in Frankfurt, Germany, "Trader-16," who traded Swiss franc LIBOR-based derivatives.[315] This created an inherent conflict of interest between Trader-16, who reaped a direct financial benefit if Swiss franc LIBOR benefited his trading positions, and Deutsche Bank, who had a duty as a Swiss franc LIBOR contributor to make accurate Swiss franc LIBOR submissions.

325.    This and other conflicts of interest generally went unnoticed as Deutsche Bank did not have a formal policy about conflicts of interest among traders and submitters relating to its benchmark submissions during the Class Period. In fact, Deutsche Bank did not formalize a conflict policy until February 2013, almost three years after government regulators began their probe into Deutsche Bank's LIBOR-related misconduct.[316]

326.    By merging the responsibilities of trading Swiss franc LIBOR-based derivatives and making Swiss franc LIBOR submissions into the same desk (and sometimes even the same person) the Contributor Bank Defendants intentionally created an environment that provided significant opportunities and incentives to manipulate Swiss franc LIBOR.

**b.  Defendants Intentionally Ignored Manipulative Conduct**

327.    Defendants not only intentionally rearranged their trading operations to facilitate manipulative conduct, but they also used their compliance departments to support the ongoing LIBOR manipulation by imposing meaningless standards that were guaranteed not to detect wrongdoing, at times going so far as to interfere with government investigations.

328.    To conceal its LIBOR-related misconduct, members of Deutsche Bank's compliance department repeatedly refused to conduct internal audits of its LIBOR submission

---

[315] Deutsche Bank DOJ Statement of Facts at 59.

[316] Deutsche Bank CFTC Order at 4.

process. For example, on October 25, 2010, a Deutsche Bank Compliance Supervisor asked

Compliance Officer A to look into the bank's LIBOR-related systems and controls to formally

review the bank's practices in multiple currencies.[317] Compliance Officer A ignored this request

and did not conduct the review because it would negatively impact Deutsche Bank's highly

profitable LIBOR-based derivatives business, explaining to another Deutsche Bank employee

that he thought the Compliance Supervisor's idea of reviewing the LIBOR submission process

was "crazy" and that "the business is going to go completely mental" if any kind of audit ever

took place.[318]

329.    Later that same year, Compliance Officer A struck again, this time in response to

a December 2010 request from the BBA that Deutsche Bank conduct an internal audit of its

LIBOR submission process. Rather than simply conduct the review, Compliance Officer A

signed and submitted a confirmation to the BBA on January 12, 2011, stating that Deutsche

Bank's LIBOR submissions had already been audited. This was a lie—Deutsche Bank's

compliance did not audit the systems and controls in place for LIBOR. Compliance Officer A

further dismissed the BBA's request and his fraudulent statement in an email, stating that the

signed confirmation form was nothing more than "an arse-covering exercise [by the BBA]."

330.    Following the BBA's request, on February 4, 2011, the FCA requested that

Deutsche Bank attest to the systems and controls in place to ensure the integrity of Deutsche

Bank's LIBOR submission process. Once again, the task of completing this review fell on

Compliance Officer A, who conducted only a minimal investigation into Deutsche Bank's

LIBOR submission process. Compliance Officer A found that there were **no LIBOR-specific**

---

[317] Deutsche Bank FCA Final Notice at 23.

[318] *Id.*

**systems and controls** in place to ensure the integrity of the benchmark. He also found that Deutsche Bank's communication monitoring system would not detect any LIBOR-related "buzz words" indicative of manipulative conduct and/or inter-bank coordination.[319]

331.    Despite these findings, on March 18, 2011, Compliance Officer A provided an attestation to Senior Manager I, who signed and returned the following statement to the FCA:

> DB monitors all email and instant messaging communications of all front office staff. The focus of this surveillance is DB's market conduct, such that key words and phrases within the monitoring tool are designed to flag potential market conduct issues. Any potential issues can be escalated and investigated as necessary. In light of the above, I consider, together with the senior management [names of Senior Manager B and Senior Manager C provided] . . . that DB currently has adequate systems and controls in place for the determination and submission of DB's LIBOR fixings.[320]

332.    This statement was blatantly false in three respects, as Compliance Officer A knew that Deutsche Bank: (1) did not have any specific procedure in place governing LIBOR submissions; (2) did not conduct spot checks; and (3) did not monitor communications for LIBOR-specific terms. The FCA found that Deutsche Bank's senior management failed to oversee Compliance Officer A or verify any information contained within the attestation.[321]

333.    UBS also did not have any systems or controls in place to monitor its LIBOR submission process, which permitted its traders and submitters to manipulate LIBOR.[322] When UBS's Compliance department launched an internal review of its LIBOR submission processes and procedures (the "2008 Review"),[323] it chose to limit its 2008 Review solely to U.S. Dollar

---

[319] *Id.* at 30.

[320] *Id.* at 30-31.

[321] *Id.* at 31.

[322] Financial Services Authority Final Notice against UBS AG, FSA Ref. No. 186958, at 34 (Dec. 19, 2012) (hereinafter "UBS FSA Final Notice").

[323] *Id.* at 27.

LIBOR, ignoring the likely possibility that its traders and submitters, whom management placed next to each other on the STIRs desk, were involved in manipulating LIBOR for multiple currencies—a reality confirmed by UBS's guilty plea to wire fraud in connection with its LIBOR-related misconduct.[324]

334.    To ensure the 2008 Review did not uncover LIBOR-related misconduct, UBS's Compliance department placed one of the Bank's own LIBOR submitters in charge. This created a direct conflict of interest, giving the submitter an opportunity to conceal any misconduct that might get him or his friends in trouble. For example, the LIBOR submitter selected to lead the 2008 Review had himself received at least one request for a false LIBOR submission during the relevant period.[325] Proving that the 2008 Review was a sham, the LIBOR submitter found nothing wrong with UBS's USD LIBOR submission process even though he had direct knowledge that UBS's traders were manipulating LIBOR.[326] UBS's Compliance department naïvely terminated its limited inquiry into the LIBOR submitting process at the bank, permitting UBS's LIBOR manipulation to continue without consequence.

335.    To give the appearance that UBS was making a serious effort to end LIBOR-related misconduct, Compliance decided in August 2008 that it was finally time to draft formal procedures and guidelines (the "2008 Guidelines") for UBS's LIBOR submission process. The 2008 Guidelines, like the 2008 Review, were also a sham and were never actually circulated to UBS's employees. UBS's Compliance department only drafted them as a protective measure in the event they were ever questioned about what procedures they had in place.[327] The 2008

---

[324] *United States v. UBS AG*, Plea Agreement, No. 15-cv-76, ECF No. 6, at 1.

[325] UBS FSA Final Notice at 28.

[326] *See*, *e.g., id.* at 28.

[327] *Id.* at 29-30.

Guidelines were illusory, and neglected to address key failures within the bank's LIBOR submission process: the inherent conflicts of interest (*e.g.* assigning trading and submitting responsibilities to the same individual at the STIR desk) and lack of training for LIBOR submitters on how to properly calculate UBS's daily LIBOR submission.

336.    The 2008 Guidelines also created an "exception reporting regime" intended to give the appearance that UBS actively monitored its LIBOR submissions for false reporting. Under this new system, Compliance was to make weekly comparisons of UBS's LIBOR submissions to UBS's actual cost of borrowing and/or the published LIBOR for the day. Large differences would be considered "exceptions" and flagged for further review. While this sounded good on paper, Compliance configured the exception reporting regime to only be triggered by extremely large differences between UBS's LIBOR submission and actual cost of borrowing, effectively neutering the system. As a result, despite UBS's admitted false reporting in multiple LIBOR currencies throughout the Class Period, the exception reporting regime did not detect a single false LIBOR submission while it was in place.[328]

337.    RBS also failed to enact adequate systems and controls for its LIBOR submissions. Because it did not have the necessary systems in place, between September 2008 and August 2009, RBS executed at least 30 wash trades generating a total £211,000 in kickbacks for co-conspirator inter-dealer brokers, even though such trades would have easily been detected by a proper compliance system.[329] By 2010, both the BBA and the FSA were concerned about the integrity of RBS's LIBOR submissions and requested that the bank audit its internal control processes. RBS's Group Internal Audit ("GIA") reviewed RBS's LIBOR-setting processes and

---

[328] *Id.* at 29.

[329] RBS FSA Final Notice at 5.

concluded that there was no monitoring process in place to oversee its LIBOR submissions and that non-Money Market Traders had access to RBS's LIBOR submissions system, creating an immense opportunity for manipulation.[330]

338.    Instead of fully tackling its LIBOR systems and controls problem, RBS took the easy route. It circulated a paper titled "BBA LIBOR Rate Setting Procedures" solely to its Money Market Traders. Then, an RBS Senior Manager signed a letter to the FCA stating that RBS had adequate systems and controls in place for its LIBOR submissions. This letter was completely untrue, as RBS's "BBA LIBOR Rate Setting Procedures" was not even circulated to its Derivatives Traders and LIBOR submitters and there was no training in place for RBS's LIBOR submitters.[331] As a result of these intentional oversights, RBS's traders and submitters could continue their manipulation without internal recourse.

### c. Defendants Used Their Influence Over the BBA to Alter the LIBOR Submission Rules in Their Favor

339.    In addition to their failure to implement a meaningful compliance system within the bank, UBS's Compliance department affirmatively took steps to help UBS's LIBOR manipulation continue. In July and September of 2008, the BBA's Foreign Exchange and Money Markets Committee ("FX & MM Committee"), which is made up of LIBOR panel bank members, including UBS, drafted the LIBOR Terms of Reference for the panel banks to follow proposing that: "[the rate should not be] set in reference to information supplied by any individual or institution outside that area of the contributing bank that has the primary responsibility for managing that bank's cash."[332] UBS's Compliance department objected to these terms because it

---

[330] *Id.* at 27.

[331] *Id.* at 28.

[332] UBS FSA Final Notice at 30 (alteration in original).

knew the bank's cash desk would not, and could not, follow the Terms of Reference as written. Out of fear of removal from its various LIBOR panels (the punishment for breaking the Terms of Reference), which would stop the flow of profits from its LIBOR manipulation business, UBS's Compliance department suggested—and the BBA ultimately implemented—that the term be rewritten so that a cash desk "takes full responsibility for the submitted rate and that this should not be contributed or unduly influenced by other areas of the bank or outside institutions."[333] This standard was far more relaxed, providing cover for UBS's traders and submitters to continue manipulating LIBOR.

340.    Before UBS could sign off on the BBA Terms of Reference, it revised its LIBOR procedures in December of 2009 (the "2009 Procedures"). The 2009 Procedures permitted LIBOR submitters to take into account "general market information and market sentiment provided by STIR desk."[334] This procedure amounted to nothing more than a tool that traders and submitters could use to cover up their collusion, for example, UBS's traders could make a request to manipulate LIBOR, but then disguise the request as "market color" and technically still be in compliance with UBS's internal procedures. Yet again, the 2009 Procedures suffered from the same shortcomings as the 2008 Procedures and UBS's LIBOR manipulation continued without interference from its Compliance department.

341.    As part of the FX & MM Committee's Terms of Reference, the LIBOR contributor banks were supposed to conduct a yearly audit of their LIBOR submissions. UBS's audits were solely done to rubber stamp the bank's LIBOR submission process, rather than to actually detect and reform the inadequacies within the bank's submission process. For example,

---

[333] *Id.*

[334] *Id.* at 31.

between January and May 2009, the UBS Group Internal Audit ("GIA") reviewed UBS's STIR desk. Instead of truly delving into the desk's submission process, UBS's GIA merely did a "walk through," only looking at the 2008 Procedures and some exception reports and then terminating its inquiry.[335] UBS's GIA never even inquired into the STIR desk's submission process for LIBOR.[336] Because UBS's GIA failed to truly conduct a single audit, UBS's submitters continued to manipulate their LIBOR submissions without fear of detection.

342.    The FX & MM Committee's Terms of Reference similarly did not deter Defendant RBS from manipulating its LIBOR submissions. RBS did not even sign the Terms of Reference, even though it was mandatory. As a FX & MM Committee member, RBS was required to have individuals that were responsible for submitting LIBOR for each currency sign and return the procedures. None of RBS's submitters signed.[337] RBS also failed to comply with the Terms of Reference's requirement to conduct yearly internal audits and implement a record retention policy.

### d. Defendants Violated Their Duties as BBA Members by Acting to Keep Swiss Franc LIBOR Susceptible to Manipulation

343.    Defendants JPMorgan, RBS, Credit Suisse, UBS, and Deutsche Bank were horizontal competitors in borrowing, lending, trading, and offering a suite of services related to Swiss francs and Swiss franc LIBOR-based derivatives. In a competitive and unmanipulated market, competitor banks compete with one another to negotiate interest rates with customers for loans, interest rate swaps, forward rate agreements, FX forward contracts, and other Swiss franc LIBOR-based derivatives transactions.

---

[335] *Id.* at 32.

[336] *Id.* at 33.

[337] RBS FSA Final Notice at 26 (Feb. 6, 2013).

344.    However, the Contributor Bank Defendants entered into an agreement or agreements in restraint of trade through the BBA to pool their rate pricing information and to serve on the BBA's Swiss franc panel. Through these agreements, they and the BBA published supposedly competitive market interest rates for Swiss franc denominated loans for various durations or "tenors" offered to other banks in the London interbank market.

345.    The sharing of pricing information by horizontal competitors, especially forward-looking pricing information, raises antitrust concerns. These antitrust concerns include the unreasonable restraint of trade through agreements that publish and fix a non-competitive price that is manipulated to benefit one or more members of the agreement. Contributor Bank Defendants and their horizontal competitors, *i.e.*, other Swiss franc LIBOR panel banks, made daily submissions of such pricing information during the Class Period reflecting the rate at which they could borrow Swiss francs in the London market.

346.    To prevent collusion and to avoid any anticompetitive effects that would render the Contributor Bank Defendants' agreement to participate in fixing Swiss franc LIBOR through the BBA an unreasonable restraint of trade, each Swiss franc LIBOR panel bank's submissions were supposed to be independent and objective. That is, the Swiss franc LIBOR panel banks were supposed to report the actual rate at which they could borrow Swiss francs and were not supposed to speak to one another about their submissions prior to the publication of the Swiss franc LIBOR fix. Failure to follow either of these rules would result in the publication of artificial Swiss franc LIBOR rates.

347.    The BBA FX & MM Committee was responsible for overseeing the LIBOR fixing process for all currencies, including Swiss franc, during the Class Period. The FX & MM

Committee was supposed to monitor the submissions of Swiss franc LIBOR to ensure that it reflected the competitive offered rate for loans in the London market.

348.    Raising further antitrust concerns, the BBA populated the FX & MM Committee with personnel from the panel banks, including business executives, derivatives traders and even LIBOR submitters from UBS, RBS, Deutsche Bank, Credit Suisse and JPMorgan, who had an interest in manipulating the LIBOR fixing. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████████    ██████

████████████████████████████████████████

██████████████████████

349.    As members of the FX & MM Committee, the Contributor Bank Defendants had a duty to monitor and ensure that Swiss franc LIBOR was being objectively and independently fixed each day so that it reflected competitive, non-manipulated London money market rates. This duty was especially important because the Contributor Bank Defendants were the largest participants in the Swiss franc LIBOR-based derivatives market.

350.    Rather than honoring their duty to ensure that Swiss franc LIBOR reflected competitive rates offered in the interbank money market, the Contributor Bank Defendants each engaged in highly unusual, parallel conduct by repeatedly manipulating Swiss franc LIBOR to benefit their Swiss franc LIBOR-based derivatives positions (*see* Part II.B.2.a, *supra*) and acting to mislead and influence the submissions of other Swiss franc LIBOR panel banks. *See, e.g.*, Part

---

[339] *See United States v. Curtler*, 15-cv-670, ECF No. 6 (S.D.N.Y. Oct. 22, 2015) (transcript of plea allocution) (available at https://www.justice.gov/criminal-fraud/file/871191/download).

II.B.2.b, *supra* (describing Defendants' conspiracy with interdealer brokers to "move the screen" and disseminate false run thrus to the Swiss franc LIBOR-based derivatives market).

351.  █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

352.  █████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

353.     Protecting the legitimacy of Swiss franc LIBOR was important to Defendants'

conspiracy because it allowed them to continue to profitably manipulate the rate. ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

354.     Contributor Bank Defendants' violation of the BBA rules, in addition to the

exploitation of their position as panel banks and FX & MM Committee members, rendered their

agreement with the BBA (and the entire Swiss franc LIBOR fixing process) an unlawful

agreement in restraint of trade. Each Contributor Bank Defendant acted to ensure that their

agreement with the BBA and other panel banks would fix and publish artificial Swiss franc

LIBOR rates.

355.     Further, each Contributor Bank Defendant knew that Swiss franc LIBOR was

being manipulated and agreed to act (or not act) so that the BBA continued to publish artificial

Swiss franc LIBOR rates. The Contributor Bank Defendants' interests were aligned in keeping

the Swiss franc LIBOR fixing susceptible to manipulation because the artificially fixed rates, over

time, favored the Contributor Bank Defendants' Swiss franc LIBOR-based derivatives positions

at the expense of counterparties like Plaintiffs and the Class. Thus, each of the Contributor Bank

Defendants knowingly and willfully entered into, participated in, caused and acquiesced in an

agreement or agreements in unreasonable restraint of trade that, they knew, were publishing

artificially fixed and manipulated Swiss franc LIBOR rates.

### e. Defendants Actively Concealed Their Wrongdoing from Government Regulators

356.    To further conceal its wrongdoing, at least one Defendant, Deutsche Bank, repeatedly lied to the FCA during its probe into Deutsche Bank's LIBOR-related misconduct, including Swiss franc LIBOR.

357.    The FCA's Final Notice against Deutsche Bank details how the bank attempted to hide the Federal Financial Supervisory Authority for Germany's ("BaFin") findings from their LIBOR probe. In 2012, BaFin reviewed Deutsche Bank's LIBOR misconduct, producing a report ("The Report") to the bank in August of 2013.[345] Deutsche Bank was unhappy with The Report, which heavily criticized the bank.[346]

358.    In the course of its investigation, the FCA requested that Deutsche Bank provide it a copy of The Report.[347] Deutsche Bank's Senior Management, concerned about disclosing both The Report and BaFin's findings, sought the advice of counsel.[348] Deutsche Bank's lawyers informed them that a failure to disclose The Report would constitute a breach of FCA Principal 11, which broadly covers providing false, misleading or inaccurate information to the FCA, including during an investigation.[349]

359.    Disregarding this advice, Deutsche Bank went on a campaign to suppress the BaFin report. In September 2013, Deutsche Bank's Senior Manager F met with BaFin and expressed concern regarding disclosure of The Report. BaFin took no position, meaning Deutsche Bank was free to provide the report to the FCA.

---

[345] Deutsche Bank FCA Final Notice at 26.

[346] *Id* at 27.

[347] *Id*.

[348] *Id.* at 26.

[349] *Id*. at 27.

154

360.    After the BaFin meeting, on September 6, 2013, Senior Manager F talked to Senior Manager G via telephone. Together, Senior Managers F and G scripted a fabricated response, which they agreed to follow if the FCA asked Deutsche Bank to produce the BaFin report in the future. The script read as follows:

> . . . the BaFin has explicitly stated to DB that it would not approve of DB sharing either copies or details of the contents of the aforementioned documents [including the report] with foreign regulators at this stage.[350]

361.    To provide further cover for Deutsche Bank's actions and support the scripted response above, Senior Manager F met with Legal Manager A later that same day to draft an "attendance note" about the BaFin meeting. The note was intentionally ambiguous and written so that it could be interpreted as stating that BaFin expressly prohibited Deutsche Bank from disclosing The Report to the FCA. Conveniently, this ambiguous document was the only record of the September BaFin meeting.

362.    All the while, Deutsche Bank's management knew that disclosing the report was not prohibited by BaFin. For example, in a September 10 email, a Deutsche Bank Legal Team member wrote that "subject to the [Management] Board agreeing, we would likely inform the other regulators about receipt of the [Report and the other materials] but only be prepared to share the [Report]."[351] This statement was also reflected in papers sent to the management board during a meeting which stated that disclosure of The Report "may be acceptable for the BaFin."

363.    Despite being told by its legal department to disclose The Report to the FCA, Deutsche Bank's management deliberately chose to conceal BaFin's criticisms against the bank. On September 13, 2013, Deutsche Bank conveyed the previously-scripted statement to the FCA's

---

[350] *Id.* (alteration in original).

[351] *Id.* at 28 (alterations in original).

Enforcement and Financial Crime Division. On September 16, Senior Manager E told the FCA's

Supervision Department the same message during a phone call. Deutsche Bank also followed-up

via email on September 16, stating to the FCA:

> DB received several documents from the BaFin in August 2013
> including [the Report]… **The BaFin has indicated to DB that it
> would not approve of DB sharing either copies or details of the
> contents of the documents referred to above with foreign
> regulators at this stage.** In these circumstances, the Bank feels that
> it has no option but to defer to the BaFin's wishes. As discussed, if
> you would like further information, we would therefore ask that you
> speak directly with your contacts at the BaFin.[352]

364.     Collectively, the information Deutsche Bank told the FCA was inaccurate,

misleading, and intentionally crafted to keep the FCA from discovering the criticisms of the

bank, including The Report, that senior management considered unflattering.

365.     On January 30, 2014, the FCA began to investigate Deutsche Bank for its failure

to disclose The Report. Deutsche Bank continued to make misrepresentations to the FCA to

cover-up its investigation-related misconduct. Deutsche Bank Senior Manager H represented to

the FCA that the attendance note of the September meeting with BaFin substantiated the bank's

position that their non-disclosure was reliable and appropriate. Senior Manager H later

determined that the attendance note was misleading, but did not contact the FCA to correct his

misleading statement. The FCA determined that the attendance note was drafted by Legal

Manager A two days after the September meeting, at which he was not present.[353]

---

[352] *Id.* (emphasis added).

[353] *Id.* at 29.

**C. Defendants Conspired to Manipulate Swiss Franc LIBOR and the Spreads Between Different Tenors of Swiss Franc LIBOR to Financially Benefit Their Swiss Franc LIBOR- and TOIS-Based Derivatives Positions.**

366.    A graph of interest rates that apply to different tenors or durations of loans made in an interbank market (as well as other lending markets) is referred to as a "yield curve."

367.    The "spread" between rates of different tenors on the yield curve is simply the difference between the rate for the earlier tenor and the rate for the later tenor. For example, suppose that the interest rate for the spot next Swiss Franc LIBOR tenor was 2.15%, and the interest rate for the one-month Swiss Franc LIBOR tenor was 2.53%. In that case, the "spread" between the spot next Swiss Franc LIBOR and Swiss Franc LIBOR one-month tenor would be 0.38%.  In the terminology used in lending and trading, this is referred to as a "spread of 38 basis points."

368.    The yield curve begins with rates of the shortest duration, *e.g.*, those applicable to overnight lending, and continues to tenors of longer duration, *e.g.*, twelve months. Accordingly, the short-term interest rates that make up the base of the yield curve are important to both the level of later tenors and the spreads between interest rates for loans of longer duration.

369.    During the Class Period, spot-next Swiss Franc LIBOR was the shortest duration Swiss Franc LIBOR rate and represented the amount of interest charged on overnight Swiss franc-denominated loans. The spot-next Swiss franc LIBOR was calculated so that the rate quoted on a given day will value in two days (*i.e.* the day after tomorrow) and mature the day after that. The BBA determined spot-next Swiss Franc LIBOR based on submissions from twelve panel banks, including the Contributor Bank Defendants, pursuant to the LIBOR fixing protocol described above.

370.    Another overnight lending rate used in the Swiss Franc interbank money market was "TOIS," the Tomorrow/Next Overnight Index Swap rate. TOIS is indicative of the interest

rate banks charge each other on overnight loans that are valued the next day and paid back the day after that. ███████████████████████████████████████████

████████████████████████████████████████████████████████████

371.     TOIS rate was calculated daily by Broker Defendant Cosmorex using a method similar to that used by the BBA to calculate Swiss franc LIBOR in which Cosmorex would collect submissions from a minimum of 20 (but no more than 30) panels banks and, after excluding the highest three and the lowest three submissions, average the remaining quotes.

372.     Swiss franc interdealer brokers and traders, including the Broker Defendants and Contributor Bank Defendants, used TOIS in "basis swaps" against Swiss franc LIBOR. A basis swap is a swap contract in which the parties agree to exchange interest rate payments based on two different floating rate tenors, for example, TOIS against Swiss franc LIBOR.

373.     Defendants' Swiss franc LIBOR-based derivatives traders frequently held "spread positions" like basis swaps during the Class Period, which experienced gains or losses based on changes in the spreads between the two different interest rate tenors. For example, the CFTC found that traders in Deutsche Bank's GFFX group entered large positions in overnight index swaps and tenor basis swaps during the Class Period.[355] These positions were part of a "basis spread trading strategy" implemented by Deutsche Bank's Pool Trading and MMD desks, which generated profits by trading the difference between two or more Swiss franc LIBOR tenors.[356]

374.     Defendants knew that the overnight rates TOIS and spot-next Swiss Franc LIBOR, as the base of the Swiss franc yield curve, had a significant impact on Swiss franc

---

██ ███████████████████████████████████████████████████
█████████████████████

[355] DB CFTC Order at 8.
[356] DB CFTC Order at 9.

lending rates at later tenors. As a result, Defendants conspired to manipulate TOIS and spot-next LIBOR to manipulate the level and spread between these overnight rate and later tenors of Swiss franc LIBOR.

375. Defendants also frequently accompanied their manipulation of TOIS and spot-next Swiss franc LIBOR with false submissions in the later tenors of Swiss franc LIBOR. This maximized the impact of Defendants' manipulative conduct, increasing the profitability of their basis swaps and other spread positions, by manipulating both legs of the spread, *e.g.*, TOIS and three-month Swiss franc LIBOR.

376. Defendants were motivated to engage in coordinated misconduct to further increase their impact on Swiss franc LIBOR and therefore the profitability of Swiss franc LIBOR-based derivatives positions held by Defendants. Because of quid pro quo assistance over time, Defendants did not need to have the same trading position on each day in order to benefit from an agreement to help one another manipulate Swiss franc LIBOR. On the contrary, if one Defendant could benefit from making a transaction on a given day, and received help from a Defendant on that day, the quid pro quo reciprocation for that help was exactly to manipulate Swiss franc LIBOR on a different day when that other Defendant had a reset or desire to make a transaction to capture a gain in a Swiss franc LIBOR-based derivative.

377. One example of Defendants' agreed upon and coordinated manipulation to increase the profitability of their spread positions involves the manipulation of spot-next Swiss franc LIBOR and three-month Swiss franc LIBOR between April 15 and April 24, 2008.

378. During April 2008, Defendants RBS, UBS, Credit Suisse, and JPMorgan followed their usual practice of sharing proprietary trading positions, anticipated strategies and views of the market with one another. Plaintiffs believe that these four Defendants had communications

with one another during mid-April 2008 that have not been produced to Plaintiffs. *See* Part III.D,

*supra* (describing unrecorded means of communication).

379.

380. 

381.     In connection with the foregoing and other conversations, Defendants UBS,

Credit Suisse, and RBS agreed to manipulate Swiss franc LIBOR, and Defendant

382.     **Downward manipulative pressure on the overnight rates:** between April 7 and April 16, 2008 some combination of Defendants UBS, Credit Suisse, and Deutsche Bank were either the lowest or tied for the lowest submitter in the spot-next Swiss franc LIBOR. Regression analysis shows that during the Class Period, changes in spot-next Swiss franc LIBOR exhibited a statistically significant relationship to changes in TOIS. Thus, because the spot-next tenor of Swiss franc LIBOR tends to move with the overnight TOIS, this false submission behavior tended to have a depressive effect on the overnight TOIS rate.

383.     Consistent with Defendants' large short positions in TOIS and spot-next Swiss franc LIBOR-based derivatives positions, JPMorgan reduced its submission in the spot-next Swiss franc LIBOR by five basis points on April 16, an additional five basis points on April 17, and an additional 10 basis points on the April 18, 2008.

384.     UBS, like JPMorgan, also reduced its spot-next Swiss franc LIBOR submission by five basis points on April 16, 2008. ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

385.     In contrast all the non-Defendant banks' submissions of spot-next Swiss franc LIBOR (with the lone exception of HSBC) remained unchanged or *increased* on April 17, 2008. Thereafter, the non-Defendant banks continued or began to follow this lead, and substantially reduced their Swiss Franc LIBOR spot-next submission from April 18 through April 24, 2008.

386.     **Manipulative upward pressure on the spread between overnight rates and three-month Swiss franc LIBOR:** on April 15, 2008 after being either the lowest or tied for

lowest submission on the twelve previous submission days in three-month Swiss franc LIBOR, UBS changed directions and raised its three-month Swiss franc submission. From April 15, 2008 forward, UBS led the market by increasing its three-month Swiss franc LIBOR submission by two basis points from 2.75% to 2.77% on April 15, followed by increases of four basis points, one basis point and three basis points on the next three submission days. On the following day, April 21, 2008, UBS made the **highest three-month Swiss franc LIBOR submission**, raising its submission by another four basis points, and remaining the **highest submitter** for another three consecutive submission days through April 24, 2008.

387.    The change in UBS's spot-next Swiss franc LIBOR submissions described above is not consistent with its Credit Default Swap ("CDS") rating during the same time. A CDS is like a tradeable insurance contract that is triggered following a credit event, such as a default or downgrade. CDS prices increase the greater the chance of a credit event occurring, indicating more risk associated with that entity. Accordingly, CDS prices should track a bank's Swiss franc LIBOR submissions closely, as the rate of interest at which a bank can borrow Swiss franc should increase with the likelihood of a default.

388.    For UBS to go from the best credit with the lowest interest rate to the worst credit with the highest interest rate in the three-month Swiss Franc LIBOR tenor in one week is very unusual. This implied extremely substantial deterioration in the credit of UBS is the opposite of the relative change in the credit worthiness of UBS.

389.    CDS prices for UBS when it had the lowest three-month Swiss franc LIBOR submission and, therefore, supposedly the best credit, ranked UBS as the eighth or ninth most creditworthy bank of the twelve Swiss franc LIBOR panel banks. But when UBS was the highest

submission and supposedly had the worst credit, the CDS credit ratings for UBS had improved. UBS was then the fifth or sixth best credit.

390.    That is, UBS's creditworthiness in the market for three-month loans supposedly plummeted from best to worst in one week at a time when the true market rates showed that UBS's creditworthiness was substantially improving. In combination with all the conversations and other facts, this further indicates that the submissions of and conduct by UBS were manipulative and did not reflect competitive market interest rates as required by BBA rules.

391.    UBS's submissions also coincide with an upward manipulation of three-month Swiss franc LIBOR by Defendant RBS. █ █████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████

392.    **Downward manipulative pressure on the overnight rate and manipulative widening of the spread between overnight rate and three-month Swiss Franc LIBOR:** beginning after the conversations on April 16, 2008, Defendant RBS also reduced its spot-next Swiss franc LIBOR submissions and widened the spread between that submission and its three-month Swiss franc LIBOR submissions on April 17, 18, and 21, 2008. During these three days, RBS reduced its spot-next Swiss franc LIBOR submission by 17 basis points and widened the spread between that submission and its three-month Swiss franc LIBOR submission by 23 basis points. Both of these changes were the second highest by any bank.

393.    During those same three days from April 17 through April 21, 2008, the average submissions by the seven non-Defendant banks declined by 14.14 basis points for the spot-next

Swiss franc LIBOR compared to the 17 basis point decline in the same submissions by RBS. During such three-day period, the average spread between the non-Defendant banks' spot-next Swiss franc LIBOR submissions and their three-month Swiss franc LIBOR submissions increased by 17.25 basis points. This compares to 23 basis points for Defendant RBS.

394.    **Downward pressure on the one-month Swiss Franc LIBOR tenor:** During April 16-24, 2008, UBS had also taken the lead in suppressing the one-month Swiss franc LIBOR tenor. UBS made the lowest submission on April 2, 2008 and continued with the lowest or tied for the lowest submissions on all of the submission days through April 24, 2008. That is, at the same time that UBS was becoming the worst credit in the three-month tenor, UBS was supposedly becoming the best credit in the one-month tenor. This further indicates that UBS's behavior, in concert with the other Defendants, was extremely manipulative. Credit Suisse and Deutsche Bank made the other lowest submissions in the one-month tenor through April 24, 2008.

395.    **UBS, Credit Suisse, RBS, and also JPMorgan caused the spread between the overnight rate and the three-month Swiss franc LIBOR rate to increase:** between April 15 and April 24, 2008, inclusive, the spread between the submission by UBS of its spot next Swiss franc LIBOR and its three-month Swiss franc LIBOR submission **increased** by 40 basis points. This was more than any other bank. The similar spread for Credit Suisse during the April 15-24 period, inclusive, **increased** by 37 basis points. The similar spread for RBS during the April 15-24 period, inclusive, increased by 33 basis points. These increases were greater than the increases in spreads for all other banks. During such seven-day period, the average spread between the non-Defendant banks' Swiss franc LIBOR spot-next submissions and their three-

month Swiss franc LIBOR submissions increased by only 26.5 basis points. As previously alleged, JPMorgan substantially reduced its TOIS submissions during April 16-18.

396.    Due to the leadership of Defendants as previously alleged, other banks followed their conduct.

397.    **Defendants' agreement caused an artificial increase in the spread between the Swiss franc overnight rate and three-month Swiss franc LIBOR:** as a result of the foregoing collusive, manipulative behavior, the spread between TOIS and three-month Swiss franc LIBOR increased by 35.1 basis points from April 15, 2008, the last day prior to the manipulation period, to April 24, 2008, the last day of the manipulation period.

398.    This extreme widening of the spread was, compared to the behavior of the same spread during the prior five years, statistically significant.

399.    Plaintiffs' economist performed Autoregressive Integrated Moving Average ("ARIMA") time series regressions of the movement in the TOIS to three-month Swiss franc LIBOR spread over the five years ending April 24, 2008. Based upon these regressions, the estimated averaged inflation in the spread during the manipulation period from April 16, 2008 to April 24, 2008 ranged between 25 and 27 basis points. These spread inflation estimates were significantly different from zero with p-values all less than 0.05. A p-value of 0.05 is regarded as a statistically significant change.[359]  The p-values of some of the spread inflation estimates were as low as .0002.

400.    **The statistical significance of the artificiality in the spread here is 250 times greater than the threshold level for statistical significance:** a p-value of 0.01, or .99

---

[359] *See* Reference Manual of Scientific Evidence, Third Edition, pp.291-292.

confidence level, is regarded as highly statistically significant.[360] The p-value here of 0.0002, or

a confidence level of .9998, is 50 times less likely to occur by chance than the 0.01 threshold for

the highly statistically significant designation, and 250 times less likely to occur by chance than

the 0.05 threshold for the statistically significant designation. No fundamental news could

remotely explain this change.

401.    The spread between spot-next and three-month Swiss franc LIBOR follows the

same pattern as the TOIS and three-month LIBOR spread. The spread between spot-next and

three-month Swiss franc LIBOR increased by 30.8 basis points from April 15, 2008, the last day

prior to the manipulation period, to April 24, 2008 the last day of the manipulation period.

402.    In fact, the change in the spot-next and three-month Swiss Franc LIBOR tenors

was in the opposite direction of the change in the spread between the overnight EONIA and

three-month Euribor, the corresponding rates for the Euro, the currency for the Eurozone that

surrounds Switzerland. The EONIA and three-month Euribor spread narrowed from 98 basis

points to 81 basis points.

403.    Plaintiffs have good grounds to believe and do allege as follows: the change in the

spread between the spot-next Swiss franc LIBOR rate and the three-month Swiss franc rate

between April 15 and April 24, 2008 was not the product of an unmanipulated competitive

market operating free of collusion. On the contrary, such extraordinary widening of this spread

further indicates that Defendants collusively manipulated rates between April 15 and 24, 2008.

404.    Plaintiffs' economist performed ARIMA time series regressions of the movement

in the spot-next Swiss franc LIBOR to three-month Swiss franc LIBOR rate spread over the five

years ending April 24, 2008. Estimated averaged inflation in the spread during the manipulation

---

[360] *Id.*

period from April 15, 2008 to April 24, 2008 ranged between 10 and 18 basis points. This is based on spread inflation estimates that were significantly different from zero with p-values below 0.05, with the lowest p-value being 0.003. This statistically significant anomaly further indicates that the changes in the spreads between April 15 and April 24, 2008 were the product of collusive manipulation rather than a competitive market operating free of collusion.

405.    Chats also show that Contributor Bank Defendants manipulated TOIS to financially benefit TOIS-Swiss franc LIBOR basis swap positions. A TOIS-Swiss franc LIBOR basis swap is a derivative in which one stream of payments is based on the TOIS rate and the other is tied to Swiss franc LIBOR. Accordingly, the value of a TOIS-Swiss franc LIBOR basis swap position depends on the relationship between the two rates.



406. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬

▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬ ▬▬▬

407. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬ Contributor Bank Defendants regularly requested that Broker Defendants,

such as ICAP, adjust the levels they displayed on their screens to other market participants. ▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬

▬▬▬▬▬▬▬▬

▬▬▬▬▬▬

▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬

▬ ▬▬▬▬▬▬



408.



409.    Contributor Bank Defendants knew ICAP would adjust the screen at their request

to benefit Defendants' positions.

410.    Contributor Bank Defendants continued to conspire with Broker Defendants to manipulate TOIS and Swiss franc LIBOR levels displayed on broker screens throughout the Class Period to financially benefit their derivatives positions. █████████████

███████████████████████████████████████████████████████

████████

████████████

███████████████

███████████████████████████

█████████████████████

██████████████████████████████████████

██████████████████████████

████████████████████████

███████████████████

██████████████████████

████████████████████████████████

███████████████

██████████████████████████████████████

█████████████████████████

████████████████████

██████████████████████████

█████████████████████████

████████████████

███████████████████████

411.    The example communications above further demonstrate Defendants' conspiracy to manipulate Swiss franc LIBOR and their coordination with interdealer brokers to fix Swiss franc LIBOR-based derivatives prices. None of these chats were previously disclosed in Defendants' government settlements. Plaintiffs are confident that additional examples of such manipulation will be revealed in discovery.

### D.  Defendants Had a High Degree of Interfirm Communication and Conspired to Fix Swiss Franc LIBOR-Based Derivatives Prices Using Unrecorded Means.

412.    The documents referenced herein show that Defendants not only had a high degree of interfirm communication during the Class Period but that they also kept their manipulation of Swiss franc LIBOR and the bid-ask spread secret by avoiding venues monitored by compliance and government regulators. To this end, Defendants traveled long distances to meet with each other, organized telephone conferences on unmonitored lines, called each other using their private cell phones, and sent text messages or used other unmonitored chat apps to discuss manipulative conduct.



413.    Defendants also arranged numerous in-person meetings, including in the United States, to coordinate their manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives off-the-record.

414.     Documents consistently show that these in-person meetings were not mere social gatherings but were used to share information and develop trading strategies among Defendants' traders.

415.



416.

417.

████████████████████████  ██████

418.    Defendants also used in-person meetings to develop and maintain relationships

with Broker Defendants ICAP and Cosmorex as part of their conspiracy to manipulate Swiss

franc LIBOR. As discussed in Part II.B.2.b above, interdealer broker Cosmorex's daily run thrus

had a substantial impact on Swiss franc LIBOR during the Class Period. Contributor Bank

Defendants therefore met regularly—in the United States[373] and Europe—with Cosmorex

brokers to maintain a relationship that would allow them to request false Swiss franc LIBOR run

thrus at levels that financially benefited Defendants' Swiss franc LIBOR-based derivatives. ████

████████████████████████████████████████████████

████████████████████████████

████████  ▬

██████████████████████████

██████████████████████████████████

████████████████████████████

██████████████████████████████████

██████  ██████

419.    The express purpose of Defendants' in-person meetings was to further their

manipulation of Swiss franc LIBOR. ████████████████████████

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

_____

██  ████████████████████

██  ██████████████████████████████████

██  ███

██  ████████████████████

420.    Contributor Bank Defendants also conspired with ICAP brokers to manipulate

Swiss franc LIBOR at in-person meetings.

421.    These conversations, where traders seek to entertain brokers, represent extremely unusual behavior that is indicative of collusion. In the financial markets, it is typically the brokers—who need traders to send them deals so they can earn commission—that pay to take traders out for dinner, drinks, and entertainment as they try to win their business.[377] ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

422.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████

████████████████████████████████

████████████████

████████████████████████████████████████████████████████

██████████

████████████████████████

███

██████████████████

██████████████████

████████████████████████

████████████████████



423.     Defendants also used their private cell phones and text messages to coordinate

trading strategies and plan manipulative conduct in secret. ███████████████████

████████████████████████████████████████████████████

██████████████████

424.     At other times Defendants either initiated contact with one another through a

means of communication other than chatrooms or, as alleged above, blatantly stated in a chat that

they should talk in a different venue. ███████████████████████

████████████████████████████████████████████████

█████████████████████████████

425.    ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

426.    ███████████████████████████████

███████████████████████████████

██████████████

███████████████████████

████████████████████████

██████████████████████████  ████████

427.    ████████████████████████████████

█████████████████████████████████████

██████████████

█████████████████████████████████████

███████████████████████

██████████████████

██████████████



428. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

429.   Finally, these four Contributor Bank Defendants had frequent telephone calls with one another which provided yet another avenue of non-written communications about manipulations. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



430.    The foregoing are only examples of the numerous meetings and telephone

conferences that these Contributor Bank Defendants and Broker Defendants had. ████████

████████████████████████████████████████████████████████████

Plaintiffs believe that these four banks communicated daily throughout the Class Period about

Swiss franc LIBOR rates and Swiss franc LIBOR derivatives rates and prices.

**E.  Defendants Shared Proprietary Information About Their Swiss Franc LIBOR-Based Derivatives Positions to Align Financial Interests**

431.    Contributor Bank Defendants each had an economic interest during the Class

Period in keeping information about their Swiss franc LIBOR-based derivatives positions and

future trading strategies secret to avoid being exploited by other banks or financial institutions.

432.    The documents referenced herein show that Contributor Bank Defendants

regularly acted against their individual economic interest by divulging information about their Swiss franc LIBOR-based derivatives positions and anticipated strategies to horizontal competitors, including each of the other Defendants. These documents are consistent with the FSA's finding that RBS and JPMorgan "compared their respective trading positions" and "discussed strategies for trading products that fixed off CHF LIBOR" so frequently that their Swiss franc LIBOR-based derivatives positions "were often the same."[387]



433.    Sharing proprietary information about pricing is evidence of an unlawful agreement among Defendants to fix Swiss franc LIBOR-based derivatives prices because it is an

---

[387] RBS FSA Notice at 17.

action that only makes economic sense in the context of a conspiracy, where it facilitates: (a) the alignment of trading positions among co-conspirators; (b) the coordination of misconduct, like the manipulation of Swiss Franc LIBOR, to make those trading positions more profitable; and (c) the avoidance of conflicting manipulations by co-conspirators.[389] Thus, by regularly sharing proprietary information about their Swiss franc LIBOR-based derivatives positions and related trading strategies, Defendants increased the profitability of and avoided losses from each other's ongoing manipulation of Swiss franc LIBOR.

434.

435.



<hr>

[389] *See, e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement").



436. ███████████████████████████████

437. Defendants exchanged information frequently, ███████████████████



438.

439.

440.



441.    Defendants' traders also advised each other about which Swiss franc LIBOR-based derivatives trades they should enter.

442.

443.    Contributor Bank Defendants coordinated their trading positions by sharing information about the price at which they entered Swiss franc LIBOR-based derivatives transactions among the group.



444.

445.



446.    Contributor Bank Defendants shared information to align their Swiss franc LIBOR-based derivatives positions throughout the Class Period.



447.   These chats represent only a small fraction of the instances in which Defendants shared proprietary information about their Swiss franc LIBOR-based derivatives positions and trading strategies with each other, in writing, as reflected by the documents referenced herein. Given the high frequency of interfirm communication through in-person meetings, private emails, text messages, and using unrecorded phone lines, the amount of coordination is substantially higher and will only be revealed by discovery about Defendants Swiss franc LIBOR-based derivatives trading and positions during the Class Period.

**IV.   Defendants' Pervasive Conspiratorial And Manipulative Conduct Deprived Class Members Of The Benefit Of Competition And Rendered Swiss Franc LIBOR And The Prices Of Swiss Franc LIBOR-Based Derivatives Artificial During The Class Period**

448.   Based on the manipulative conduct described above, Plaintiffs analyzed the Swiss franc LIBOR fixings, contributor panel bank submissions, and market data for various Swiss franc LIBOR-based derivatives. These analyses uncovered that: (1) at least the one-month, three month, and six-month tenors of Swiss franc LIBOR were artificial throughout the Class Period;

and (2) the prices of Swiss franc LIBOR-based derivatives were manipulated to artificial levels during the Class Period.

### A.   Swiss Franc LIBOR was Artificial Throughout the Class Period

449.    According to the BBA guidelines, Swiss franc LIBOR is supposed to be "based on offered inter-bank deposit rates," *i.e.*, the amount of interest that banks offer to pay each other for deposits of Swiss francs.[403] As alleged above and admitted by Defendants in their settlements with multiple government regulators, the Contributor Bank Defendants consistently made false Swiss franc LIBOR submissions that did not reflect the rate of interest being offered on inter-bank deposits and instead were intended to benefit their Swiss franc LIBOR-based derivatives positions throughout the Class Period.

450.    To estimate when Swiss franc LIBOR was manipulated to artificial levels during the Class Period, Plaintiffs compared the results of the daily one-month, three-month, and six-month Swiss franc LIBOR fixings to a benchmark rate, compiled by Bloomberg L.P. from actual money market transactions, reflecting the amount of interest being offered on Swiss franc denominated deposits with the same maturities (hereinafter the "Swiss Franc Deposit Rate").

451.    Plaintiffs calculated the spread between Swiss franc LIBOR and the Swiss Franc Deposit Rate on each day during the Class Period by subtracting the Swiss Franc Deposit Rate from Swiss franc LIBOR for the same tenor. Because both Swiss franc LIBOR and the Swiss Franc Deposit Rate measure the amount of interest paid on Swiss franc deposits, the spread between these two rates should be very close to if not equal to zero. This is true even during "macroeconomic events," like the financial crisis or even natural disasters, because Swiss franc

---

[403] *See e.g.*, *The BBA LIBOR Fixing and Definition*, BBA (last visited Sept. 30, 2008) https://web.archive.org/web/20080930203457/http://www.bba.org.uk/bba/jsp/polopoly.jsp?d=225&a=1413&artpage=all.

LIBOR and the Swiss Franc Deposit Rate, which both represent the rate of interest being paid on

Swiss franc deposit, should react to these occurrences in the same way. Thus, the spread between

these Swiss franc LIBOR rates and the Swiss Franc Deposit Rate represents the amount of

artificiality that Defendants caused by making false Swiss franc LIBOR submissions.



**FIGURE 2**

452.    Figure 2 displays the spread between three-month Swiss franc LIBOR and the

three-month Swiss Franc Deposit Rate between January 1, 2001 and December 31, 2011. Far

from zero, the spread between three-month Swiss franc LIBOR and the three-month Swiss Franc

Deposit Rate was, on average, seven basis points throughout the Class Period, reaching almost

120 basis points or 1.2% during 2011. As far back as 2001, when UBS admitted that it started

making false Swiss franc LIBOR submissions, the spread between three-month Swiss franc

194

LIBOR and the three-month Swiss Franc Deposit Rate reaches more than 20 basis points. This consistent large spread between three-month Swiss franc LIBOR and the three-month Swiss Franc Deposit Rate indicates that three-month Swiss franc LIBOR was artificial and did not reflect the actual rate of interest being offered on Swiss franc deposits during the Class Period.



**FIGURE 3**

453.    Figure 3 displays the spread between six-month Swiss franc LIBOR and the six-month Swiss Franc Deposit Rate between January 1, 2001 and December 31, 2011. As with the comparison of three-month tenors, the spread between six-month Swiss franc LIBOR and the six-month Swiss Franc Deposit Rate was, on average, eight basis points throughout the Class Period, reaching more than 120 basis points or 1.2% during 2011. Even as far back as 2001, the spread between six-month Swiss franc LIBOR and the six-month Swiss Franc Deposit Rate

reaches more than 60 basis points. The consistent large spread between six-month Swiss franc

LIBOR and the six-month Swiss Franc Deposit Rate indicates that six-month Swiss franc

LIBOR was artificial and did not reflect the actual rate of interest being offered on Swiss franc

deposits during the Class Period.



**FIGURE 4**

454.    Figure 4 displays the spread between one-month Swiss franc LIBOR and the one-

month Swiss Franc Deposit Rate between January 1, 2001 and December 31, 2011. On average,

the spread between one-month Swiss franc LIBOR and the one-month Swiss Franc Deposit Rate

is more than four basis points throughout the Class Period, reaching more than 110 basis points

or 1.1% at times during 2011. As far back as 2002, the spread between one-month Swiss franc

LIBOR and the one-month Swiss Franc Deposit Rate reaches more than 30 basis points. The

consistent large spread between one-month Swiss franc LIBOR and the one-month Swiss Franc Deposit Rate indicates that one-month Swiss franc LIBOR was artificial and did not reflect the actual rate of interest being offered on Swiss franc deposits during the Class Period.

455.    The large spread between Swiss franc LIBOR and the Swiss Franc Deposit Rate displayed in Figures 2 through 4 above indicates that Swiss franc LIBOR was artificial throughout the Class Period, as it did not reflect the actual rate of interest being offered on Swiss franc deposits in the money market.  This artificiality was caused by Defendants' manipulative conduct. By making false Swiss franc LIBOR submissions beginning at least as early as 2001, Defendants manipulated Swiss franc LIBOR to artificial levels, at times more than 120 basis points away from the actual rate of interest being offered on Swiss franc deposits. This manipulative conduct caused the prices of Swiss franc LIBOR-based derivatives, which are priced, benchmarked, and/or settled based on Swiss franc LIBOR to be artificial during the Class Period, injuring Plaintiffs and Class members.

**B.  Defendants Manipulated the Prices of Swiss Franc LIBOR-Based Derivatives to Artificial Levels During the Class Period**

456.    By manipulating Swiss franc LIBOR, Defendants manipulated the prices of all financial instruments that were priced, benchmarked, and/or settled based on Swiss franc LIBOR to artificial levels during the Class Period.

457.    As explained in Part II(B) above, Swiss franc LIBOR-based derivatives are priced, benchmarked, and/or settled based on mathematical formulae. Each formula includes Swiss franc LIBOR as one of its terms. As a result, if Swiss franc LIBOR is manipulated to an artificial level, the output of each pricing formula and thus the price of corresponding derivatives are rendered artificial.

458.     Defendants knew of and exploited this mathematical pricing relationship with the specific intent of financially benefiting their own Swiss franc LIBOR-based derivatives positions, including Swiss franc currency futures contracts and Swiss franc foreign exchange forwards. In the conversation below, which was previously quoted at ¶ 223, RBS and JPMorgan discuss the impact that a change in Swiss franc LIBOR will have on the foreign exchange, or "fx," basis, which is difference between the spot price and future price of Swiss francs as represented by a currency futures contract or foreign exchange forward.[404]

> **April 15, 2008**:
>
> JPMorgan Swiss Franc Trader: you know what i hope[,] that libor 3m is not going up
>
> RBS Swiss Franc Trader: Yes…Should not go up.. Just hang here
>
> JPMorgan Swiss Franc Trader: ok[,] just weird that zurich put it at 2.77 today[405]
>
> RBS Swiss Franc Trader: So **fx basis will go negative if 3m usd ever starts to go down**
>
> JPMorgan Swiss Franc Trader: you should tell [RBS Primary Submitter][,] if you can[,] the set it at 2.78[406]

459.     The formula in Figure 1, validates RBS Swiss Franc Trader's statements, demonstrating that Defendants used the same pricing formula and Swiss franc LIBOR to value their Swiss franc currency futures contracts and Swiss franc foreign exchange forward agreements. Applying the formula to a long CME Swiss franc currency futures contract, which is an agreement to buy 125,000 Swiss francs in terms of U.S. Dollars on some future date,[407] Swiss franc LIBOR will be the Base Rate, Rbase, and U.S. Dollars the Term Rate, Rterm, as

---

[404] *See* Understanding FX Futures at 8 (defining foreign exchange basis as the futures price minus the spot price of a currency pair).

[405] UBS's Swiss franc LIBOR submission on April 15, 2008, was 2.77%.

[406] RBS CFTC Order at 28.

[407] *See Swiss franc Futures Contract Specs*, CME GROUP, http://www.cmegroup.com/trading/fx/g10/swiss-franc_contract_specifications.html.

represented in Figure 1. As Rterm decreases so will the future price of purchasing Swiss francs

in terms of U.S. Dollars. Because fx basis is equal to the difference between the future price and

the spot price, as the future price decreases with Rterm fx, basis "will go negative," as stated by

RBS Swiss franc Trader, once the future price becomes less than the spot price.

460.    Because of the formulaic relationship between Swiss franc LIBOR and the prices

of Swiss franc LIBOR-based derivatives, there is a direct, observable impact on the prices of

these financial instruments on days where Defendants manipulated Swiss franc LIBOR. For

example, below is a conversation between an RBS Swiss franc Trader and a co-conspirator at

JPMorgan.

**October 21, 2008**:

RBS Swiss Franc Trader: we need that libor down fast

JPMorgan Swiss Franc Trader: yes[,] exactly

RBS Swiss Franc Trader: and [Primary Submitter] says he will set lower[408]

461.    Figure 5 below shows the three-month Swiss franc LIBOR submissions for all

Contributor Bank Defendants between October 10 and October 23, 2008. Figure 5 demonstrates

that on October 21, 2008, consistent with RBS Swiss Franc Trader's request to the JPMorgan

Swiss Franc Trader that "we need that libor down fast," four Defendants, Deutsche Bank, RBS,

Credit Suisse, and JPMorgan, all lowered their three-month Swiss franc LIBOR submissions

from the previous day, with Credit Suisse, JPMorgan, and RBS all moving *to the same level* on

October 21, 2008.

---

[408] RBS CFTC Order at 28.



**FIGURE 5**

200



**FIGURE 6**

462.     By lowering their three-month Swiss franc LIBOR submissions, Defendants

caused three-month Swiss franc LIBOR to be artificially lower. Figure 6 displays three-month

Swiss franc LIBOR between October 19 and October 23, 2008. Figure 6 shows that in response

to the Defendants' lower three-month Swiss franc LIBOR submissions, three-month Swiss franc

LIBOR decreased by almost two basis points, from 3.09167% on October 20, 2008, to 3.0725%

on October 21, 2008.



**FIGURE 7**

463.    This decrease in three-month Swiss franc LIBOR had a direct impact on the prices of Swiss franc LIBOR-based derivatives. Figure 7 displays the daily settlement price of three-month Euro Swiss futures contracts between October 19 and October 23, 2008. The prices of LIFFE three-month Euro Swiss franc futures contracts are determined by the formula 100 minus three-month Swiss franc LIBOR. Consistent with this formula, the prices of three-month Euro Swiss franc futures contracts increased on October 21, 2008, in response to the lower three-month Swiss franc LIBOR.

464.     The decrease in three-month Swiss franc LIBOR also impacted the value of other Swiss franc LIBOR-based derivatives, including Swiss franc currency futures contracts and foreign exchange forwards. As explained in ¶¶ 131-34 above, the price of a CME Swiss franc currency futures contract represents the cost of buying or selling CHF 125,000 in terms of U.S. Dollars on certain future date. Following the formula in Figure 1, as three-month Swiss franc LIBOR decreases, lowering the Rbase term, the future cost of purchasing Swiss francs should increase.

465.     This is exactly the response observed in both the Swiss franc currency futures and Swiss franc foreign exchange forwards markets on October 21, 2008. As the Contributor Bank Defendants lowered their three-month Swiss franc LIBOR submissions, the price of the CME Swiss franc currency futures contract increased from 87.02 on October 20, 2008, to 87.06 on October 21, 2008. Simultaneously, the cost of purchasing one Swiss franc three months in the future, according to actual dealer quotes compiled by Bloomberg L.P., increased from $1.1473 on October 20, 2008, to $1.1485, on October 21, 2008. These price changes demonstrate that the Contributor Bank Defendants' concerted false reporting of Swiss franc LIBOR on October 21, 2008, directly impacted the prices of both Swiss franc currency futures contracts and Swiss franc foreign exchange forwards.

### C.   The Conspiracy to Fix the Bid-Ask Spread on the OTC Swiss Franc LIBOR-Based Derivatives, and the Conspiracy to Manipulate Swiss Franc LIBOR Furthered One Another and Worked Together to Injure Competition

466.     Each of the foregoing conspiracies rendered artificial the prices of the Swiss franc LIBOR-based derivatives that Plaintiffs transacted in. Each increased the profits of Defendants. Each substantially damaged Plaintiffs and Class Members. Each conditioned the market. Each reduced competition and the quality of services in the markets. Each aided and furthered the

other in anti-competitively perpetuating artificial prices and otherwise injuring competition in such markets.

## V.   Plaintiffs Transacted In Swiss Franc LIBOR-Based Derivatives At Artificial Prices Proximately Caused By Defendants' Manipulative Conduct

467.    While Defendants' manipulative conduct during the Class Period financially benefited their Swiss franc LIBOR-based derivatives positions, given the mathematical nature in which these financial instruments are priced, it caused injury to Plaintiffs and Class members by causing them to pay more or receive less in exchange for Swiss franc LIBOR-based derivatives than they should have in an unmanipulated market.

### A.  Sonterra

468.    Sonterra entered into U.S.-based transactions for Swiss franc LIBOR-based derivatives during the Class Period, including Swiss franc foreign exchange forwards, at artificial prices proximately caused by Defendants' manipulative conduct and suffered injury. For example, on January 16, 2009, Sonterra entered into a Swiss franc foreign exchange forward, agreeing to buy CHF 850,035.79 on February 27, 2009, for the price of $950,000.00.

469.    Communications released as part of RBS's settlement with the CFTC demonstrate that on the same day Sonterra agreed to buy a Swiss franc foreign exchange forward, Defendants were engaged in manipulating Swiss franc LIBOR:

**January 16, 2009**:

Swiss franc Trader: high 3m libor pls!!!!!!

Swiss franc Trader: lower 6m libor pls!!!!!!![409]

---

[409] *Id.* at 26.

470.     As alleged in ¶¶ 131-34, demonstrated in Figure 1 above, and acknowledged by

RBS in its settlement with the CFTC,[410] Swiss franc foreign exchange forwards are one of

several Swiss franc LIBOR-based derivatives priced based on Swiss franc LIBOR. As a result,

Sonterra suffered injury when it entered into a Swiss franc foreign exchange forward on January

16, 2009 at an artificial price proximately caused by Defendants' manipulative conduct.

### B.  FrontPoint Entities

471.     The FrontPoint Entities engaged in U.S.-based transactions for Swiss franc

LIBOR-based derivatives during the Class Period at artificial prices proximately caused by the

Defendants' manipulative conduct and suffered injury. Many of their transactions occurred

directly with one of the Defendants. Collectively, the FrontPoint Entities entered into hundreds

of Swiss franc foreign exchange forwards during the Class Period with Defendants UBS and

Credit Suisse. These transactions, which together have a notional value in the billions of dollars,

were all priced based on Swiss franc LIBOR.

472.     Additionally, more than 100 of these Swiss franc foreign exchange forwards were

entered into with UBS between May 1, 2007 and September 30, 2007, the time period during

which the EC found that UBS, RBS, Credit Suisse and JPMorgan operated a cartel to fix the

prices of Swiss franc LIBOR based derivatives by artificially increasing the bid-ask spread.

473.     Because of Defendants' manipulative conduct, the FrontPoint Entities paid more

for or received less than they should have for Swiss franc foreign exchange forwards in an

unmanipulated market. For example, on July 5, 2006, FrontPoint Healthcare Enhanced entered

into a Swiss franc foreign exchange forward with UBS, agreeing to sell CHF 370,661.00 to UBS

for $303,211.58 on September 20, 2006. FrontPoint Financial Horizons also entered into a Swiss

---

[410] *Id.* at 6.

franc foreign exchange forward, agreeing to sell CHF 1,001,990.00 for $819,994.65 on
September 20, 2006.

474.    Communications released as part of UBS's settlements with both the CFTC and
DOJ demonstrate that on July 5, 2006, at least UBS was engaged in manipulating Swiss franc
LIBOR higher in order to benefit its own Swiss franc LIBOR-based derivatives positions:

**July 5, 2006**:

Swiss Franc Trader: looking for high 1 month fix

Swiss Franc LIBOR Submitter: no problem, will fix 1 month high[411]

475.    UBS Swiss Franc LIBOR submitter complied with this request, increasing UBS's
one-month Swiss franc LIBOR submission from 1.42% on July 4, 2006 to 1.43% on July 5,
2006. As a result of this manipulative conduct, on July 5, 2006, one-month Swiss franc LIBOR
was fixed artificially higher at 1.42%; both three-month and six-month Swiss franc LIBOR also
increased from the previous day.

476.    Following the pricing formula in Figure 1, as Swiss franc LIBOR increased on
July 5, 2006, the cost of purchasing Swiss francs in terms of U.S. dollars three months forward
decreased from 1.21958 on July 4, 2006, to 1.21564 on July 5, 2006. As a result, both FrontPoint
Healthcare Enhanced and FrontPoint Financial Horizons were damaged and suffered injury when
they agreed to sell Swiss franc foreign exchange forwards, including to UBS, on September 20,
2006, at an artificially lower price resulting from Defendants manipulative conduct.

477.    Similarly, on October 21, 2008, FrontPoint European entered into a Swiss franc
foreign exchange forward with UBS agreeing to buy CHF 141,000.00 from UBS for
$122,141.37 on June 18, 2008.

---

[411] *See* UBS CFTC Order at 38; UBS DOJ Statement of Facts at 31.

478.    Communications released as part of RBS's settlement with the CFTC demonstrate that on October 21, 2008, Defendants were engaged in manipulating Swiss franc LIBOR lower to financially benefit their Swiss franc foreign exchange forwards and Swiss franc currency futures positions:

**October 21, 2008**:

RBS Swiss Franc Trader: we need that libor down fast

JPMorgan Swiss franc Trader: yes[,] exactly[…]

RBS Swiss Franc Trader: and [Primary Submitter] says he will set lower[412]

479.    Consistent with the requests of RBS Swiss Franc Trader and his co-conspirator at JPMorgan for lower LIBORs, RBS lowered its three-month Swiss franc LIBOR submission by three basis points from 3.08% on October 20, 2008, to 3.05% on October 21, 2008 and its six-month Swiss franc LIBOR submission by two basis points, from 3.15% on October 20, 2008, to 3.13% on October 21, 2008. As demonstrated earlier in Figure 5, Defendants JPMorgan, Deutsche Bank, and Credit Suisse also lowered their submissions. In response to this decrease in RBS's Swiss franc LIBOR submissions and those of its co-conspirators, the one-month, three-month, and six-month tenors of Swiss franc LIBOR all decreased from the previous day.

480.    This decrease in Swiss franc LIBOR artificially increased the cost for FrontPoint European to purchase Swiss franc foreign exchange forwards from UBS on June 18, 2008. Following the pricing formula in Figure 1, and the decrease in the one-month, three-month, and six-month tenors of Swiss franc LIBOR observed on October 21, 2008, the cost of purchasing Swiss francs in terms of U.S. dollars three months forward increased from 1.14733 on October 20, 2008, to 1.1486 on October, 21, 2008. As a result, FrontPoint European was damaged and

---

[412] RBS CFTC Order at 28.

suffered injury when it agreed to purchase Swiss franc foreign exchange forwards from UBS on June 18, 2008 at an artificially inflated price resulting from Defendants' manipulative conduct.

481.    Similarly, on May 14, 2009, FrontPoint European entered into a Swiss franc foreign exchange forward with UBS, agreeing to sell CHF 220,900.00 to UBS for $200,054.34 on June 17, 2009. FrontPoint Financial Services also entered into a Swiss franc foreign exchange forward, agreeing to sell CHF 4,537,733.00 for $4,112,127.78 on June 17, 2009. Additionally, FrontPoint Financial Horizons entered into a Swiss franc foreign exchange forward, agreeing to sell CHF 1,299,844.00 for $1,177,928.41 on June 17, 2009.

482.    Communications released as part of RBS's settlement with the CFTC demonstrate that on the same day the FrontPoint Plaintiffs agreed to engage in Swiss franc foreign exchange forward transactions, Defendants including JPMorgan (*see* ¶ 221) and RBS were engaged in manipulating Swiss franc LIBOR:

> **May 14, 2009**:
>
> RBS Swiss Franc Trader: pls can we get
>
> RBS Swiss Franc Trader: super high 3m
>
> RBS Swiss Franc Trader: super low 6m
>
> RBS Swiss Franc Trader: PRETTY PLEASE!
>
> RBS Primary Submitter: 41 & 51
>
> RBS Swiss Franc Trader: if u did that
>
> RBS Swiss Franc Trader: I would lvoe u forever
>
> RBS Primary Submitter: 41 & 51 then . . .
>
> RBS Swiss Franc Trader: if u did that i would come over there and make love to you
>
> RBS Swiss Franc Trader: your choice

RBS Primary Submitter: 41+51 it is

RBS Swiss Franc Trader: thought so

RBS Primary Submitter: so shallow[413]

483.    Consistent with the communication, the three-month Swiss franc LIBOR increased from 0.40167% on May 13, 2009 to 0.40333% on May 14, 2009, and the six-month Swiss franc LIBOR decreased from 0.538333% on May 13, 2009 to 0.535% on May 14, 2009.

484.    As alleged in ¶¶ 131-134, demonstrated in Figure 1 above, and acknowledged by RBS in its settlement with the CFTC,[414] Swiss franc foreign exchange forwards are one of several Swiss franc LIBOR-based derivatives priced based on Swiss franc LIBOR. As a result, the FrontPoint Entities suffered injury when they entered into a Swiss franc foreign exchange forward on May 14, 2009 at an artificial price proximately caused by Defendants' manipulative conduct.

485.    Additionally, on March 16, 2009, FrontPoint Entities entered into six Swiss franc foreign exchange forwards: FrontPoint Healthcare Horizons agreed to buy CHF 7,475,027.00 from Credit Suisse for $6,316,034.64 on March 18, 2009; FrontPoint Healthcare Flagship agreed to buy CHF 9,495,121.00 from Credit Suisse for $8,022,915.93 on March 18, 2009; FrontPoint Healthcare Enhanced agreed to buy CHF 22,271,080.00 from Credit Suisse for $18,817,980.60 on March 18, 2009; FrontPoint European agreed to buy CHF 10,801,539.00 from UBS for $9,109,073.20 on March 18, 2009; FrontPoint Financial Horizons agreed to buy CHF 6,728,172 for $5,693,637.98 on June 17, 2009; and FrontPoint Financial Services agreed to buy CHF 26,866,828 for $22,735,743.40 on June 17, 2009.

---

[413] RBS CFTC Order at 28.

[414] *Id.* at 6.

486.    Communications released as part of RBS's settlements with the DOJ and the FSA demonstrate that on the same day the FrontPoint Entities agreed to engage in Swiss franc foreign exchange forward transactions, Defendants were engaged in manipulating Swiss franc LIBOR:

**March 16, 2009:**

Trader-7: can we pls get a very very low very low 3m and 6m fix today pls.

Trader-7: we have rather large fixings!

Submitter-1: perfect, if that's what u want

Trader-7: and then from tomorrow . . . we need them through the roof!!!!![415]

487.    Consistent with this communication, the Defendants succeeded in manipulating the three-month and six-month Swiss franc LIBOR fixes artificially lower on March 16, 2009.

| Swiss franc LIBOR fix | 3/13/09 | 3/16/09 |
|---|---|---|
| Three-month | 0.415% | 0.405% |
| Six-month | 0.58667% | 0.575% |

488.    Following the pricing formula in Figure 1, as Swiss franc LIBOR decreased on March 16, 2009, the cost of purchasing Swiss francs in terms of U.S. dollars three months forward increased. As a result, FrontPoint Healthcare Horizons, FrontPoint Healthcare Flagship, FrontPoint Healthcare Enhanced, FrontPoint European, FrontPoint Financial Horizons, and FrontPoint Financial Services were damaged and suffered injury when they agreed to buy Swiss francs foreign exchange forwards, including from Credit Suisse and UBS, on March 16, 2009, at an artificially higher price resulting from Defendants' manipulative conduct.

489.    On August 25, 2010, FrontPoint European entered into a Swiss franc foreign exchange forward with UBS in which FrontPoint European agreed to buy CHF 334,589 in exchange for $325,888 on September 15, 2010.

---

[415] RBS DOJ Statement of Facts at 35; RBS FSA Final Notice at 12.

490.    As alleged above in ¶¶ 209-10 and Figure 2, UBS was simultaneously manipulating Swiss franc LIBOR artificially lower in August 2010 along with its co-conspirators.

491.    Following the pricing formula in Figure 1, as Swiss franc LIBOR decreased in August 2010, the cost of purchasing Swiss francs in terms of U.S. dollars increased as a result of an artificially lower Swiss franc LIBOR. Accordingly, FrontPoint European was damaged and suffered legal injury when it agreed to buy Swiss francs from UBS at an artificially higher price resulting from Defendants' manipulative conduct.

### C.  Hunter Entities

492.    The Hunter Entities engaged in U.S.-based transactions of Swiss franc LIBOR-based derivatives during the Class Period at artificial prices proximately caused by the Defendants' manipulative conduct. For example, on December 13, 2007, several Hunter Entities entered into Swiss franc foreign exchange forwards to buy Swiss francs on December 17, 2007; Hunter Global I agreed to purchase CHF 1,017,607.00, Hunter Global SRI agreed to purchase CHF 20,675.00, and Hunter Global Offshore I agreed to purchase CHF 1,766,090.00.

493.    On December 13, 2007, communications revealed in RBS's FSA final notice demonstrate that RBS and at least one other Swiss franc LIBOR panel bank conspired to manipulate Swiss franc LIBOR artificially lower:

**December 13, 2007**:

JPMorgan Swiss franc Trader: make sure you tell your guy to set low LIBOR

RBS Derivatives Trader A: I have told him but not sure how low he will go.[416]

---

[416] RBS FSA Final Notice at 16-17. *See also* JPM_SONTERRA_CHF_00028010.

494.     Consistent with this request, RBS lowered its three-month Swiss franc LIBOR submission by three basis points, from 2.81% on December 12, 2007, to 2.78% on December 13, 2007, the largest decrease of all Swiss franc LIBOR panel banks relative to the previous day.[417]

495.     Following the formula in Figure 1, a decrease in Swiss franc LIBOR, the Base Interest Rate, increases the future cost of purchasing Swiss francs in terms of U.S. dollars. As a result of Defendants' manipulative conduct, Hunter Global I, Hunter Global SRI, and Hunter Global Offshore I all were damaged and suffered injury when they agreed to purchase Swiss franc foreign exchange forwards at an artificially inflated price on December 13, 2007.

496.     Additionally, on November 29, 2007, several Hunter Entities entered into Swiss franc foreign exchange forwards to buy Swiss francs on December 3, 2007: Hunter Global I agreed to purchase CHF 9,464,823.00, Hunter Global SRI agreed to purchase CHF 178,104.00, and Hunter Global Offshore I agreed to purchase CHF 14,297,012.00.

497.     Chats show that Defendants were manipulating at least six-month Swiss franc LIBOR artificially lower during November 2007 when the Hunter Entities entered into these Swiss franc LIBOR-based derivatives transactions:



---

[417] Five banks lowered their Swiss franc LIBOR submissions on December 12, 2007, Defendant RBS, Defendant UBS, Defendant Deutsche Bank, Société Généralé and Bank of Tokyo Mitsubishi.

498.    Consistent with this communication, the six-month Swiss franc LIBOR fix decreased between November 9 and November 30, 2007:

| Date | Six-month Swiss franc LIBOR Fix |
|------|--------------------------------|
| 11/9/07 | 2.855% |
| 11/20/07 | 2.85333% |
| 11/21/07 | 2.84667% |
| 11/22/07 | 2.83333% |
| 11/23/07 | 2.81833% |
| 11/26/07 | 2.81833% |
| 11/27/07 | 2.81167% |
| 11/28/07 | 2.805% |
| 11/29/07 | 2.80333% |
| 11/30/07 | 2.80333% |

499.    Following the formula in Figure 1, a decrease in Swiss franc LIBOR, the Base Interest Rate, increases the future cost of purchasing Swiss francs in terms of U.S. dollars. As a result of Defendants' manipulative conduct, Hunter Global I, Hunter Global SRI, and Hunter Global Offshore I all were damaged and suffered injury when they agreed to purchase Swiss franc foreign exchange forwards at an artificially inflated price on November 29, 2007.

500.    Furthermore, on August 11, 2008, several Hunter Entities entered into Swiss franc foreign exchange forwards to buy Swiss francs on August 13, 2008: Hunter Global I agreed to purchase CHF1,075,671.00, Hunter Global SRI agreed to purchase CHF 19,579.00, and Hunter Global Offshore I agreed to purchase CHF 1,691,100.00.

501.    ████████████████████████████ several defendants were conspiring with Broker Defendant Cosmorex to manipulate at least the three-month Swiss franc LIBOR artificially lower on Monday, August 11, 2008:

████████████

████████████████████████

213



502.     ███████████████████████████ three-month Swiss franc LIBOR dropped 0.166 basis points from 2.74833% on August 8, 2008 to 2.74667% on August 11, 2008.

503.     Following the formula in Figure 1, a decrease in Swiss franc LIBOR, the Base Interest Rate, increases the future cost of purchasing Swiss francs in terms of U.S. dollars. As a result of Defendants' manipulative conduct, Hunter Global I, Hunter Global SRI, and Hunter Global Offshore I all were damaged and suffered injury when they agreed to purchase Swiss franc foreign exchange forwards at an artificially inflated price on August 11, 2008.

504.     Additionally, on December 19, 2008, several Hunter Entities entered into Swiss franc foreign exchange forwards to buy Swiss francs on December 23, 2008; Hunter Global I agreed to purchase CHF 942,765.00, Hunter Global SRI agreed to purchase CHF 17,853.00, Triton agreed to purchase CHF 36,802.00, and Hunter Global Offshore I agreed to purchase CHF 1,691,100.00.

505.     ██████████████████ demonstrate that Defendants successfully manipulated the three-month Swiss franc LIBOR down and shared information that three-month Swiss franc LIBOR would continue to be fixed at an artificially lower rate.



506.     ███████████████████████, the three-month Swiss-franc LIBOR fix

decreased between December 18 and December 23, 2008:

| Date | Three-month Swiss franc LIBOR Fix |
|:---:|:---:|
| 12/18/08 | 0.74667% |
| 12/19/08 | 0.73833% |
| 12/22/08 | 0.71917% |
| 12/23/08 | 0.71% |

507.     Following the formula in Figure 1, a decrease in Swiss franc LIBOR, the Base

Interest Rate, increases the future cost of purchasing Swiss francs in terms of U.S. dollars. As a

result of Defendants' manipulative conduct, Hunter Global I, Hunter Global SRI, and Hunter

Global Offshore I all were damaged and suffered injury when they agreed to purchase Swiss

franc foreign exchange forwards at an artificially inflated price on December 19, 2008.

**D.  Plaintiff Dennis**

508.     Plaintiff Dennis engaged in U.S.-based transactions for thousands of CME Swiss

Franc futures contracts during the Class Period, between August 2006 and December 2011, at

artificial prices proximately caused by Defendants' manipulative conduct. For example, on

January 11, 2008, Plaintiff Dennis initiated a short position by selling ninety-six March 2008

CME Swiss Franc futures contracts. Plaintiff Dennis subsequently liquidated that position on

January 15, 2008 by buying ninety-six March 2008 CME Swiss Franc futures contracts for a loss

of approximately $130,000.00. Additionally, on January 3, 2011, Plaintiff Dennis initiated a long

position by purchasing fifty-two March 2011 CME Swiss Franc futures contracts. Plaintiff

Dennis subsequently liquidated that position on January 4, 2011 by selling fifty-two March 2011

CME Swiss Franc futures contracts for a loss of approximately $92,600.00. These losses were

directly and proximately caused by Defendants' manipulative conduct. For example, the CFTC

found that from at least 2005 through early 2011, Deutsche Bank made knowingly false Swiss

franc LIBOR submissions to financially benefit its Swiss franc LIBOR-based derivatives

positions. Deutsche Bank CFTC Order at p. 32 ("During the relevant period [at least 2005

through early 2011], Deutsche Bank, through its submitters and traders, routinely made false

submissions for Swiss Franc LIBOR…").

509.    Additionally, the U.K. Financial Conduct Authority determined that "[b]etween

October 2006 and November 2010", RBS made knowingly false Swiss franc LIBOR

submissions to financially benefit its Swiss franc LIBOR-based derivatives positions. *See* RBS

FSA Final Notice at p. 2, ¶¶ 6-7, 46 ("Derivatives Traders often made requests to Primary

Submitters with the goal of influencing RBS's JPY and CHF LIBOR submissions between

October 2006 and November 2010.").

510.    As a result of Defendants' manipulative conduct, Plaintiff Dennis was damaged

and suffered injury, including a net loss, when he paid more for and/or received less than he

otherwise should have for CME Swiss Franc LIBOR futures contracts during the Class Period.

### E. Plaintiff CalSTRS

511.    Plaintiff CalSTRS engaged in U.S.-based transactions for Swiss franc-LIBOR

based derivatives during the Class Period at artificial prices proximately caused by Defendants'

unlawful manipulation and restraint of trade as alleged herein, and as a consequence thereof was

damaged and suffered injury when it was overcharged and/or underpaid in those transactions.

CalSTRS transacted hundreds of Swiss franc-based derivatives within the United States during

the Class Period, including directly with the Defendants. For example, CalSTRS engaged in

transactions for: dozens of Swiss franc foreign exchange forwards with Defendant Credit Suisse

between January 12, 2011 and September 20, 2011; dozens of Swiss franc foreign exchange

forwards with Defendant Deutsche Bank between December 31, 2007 and December 16, 2011;

dozens of Swiss franc foreign exchange forwards with Defendant JPMorgan between September

216

14, 2010 and December 14, 2011; and dozens of Swiss franc foreign exchange forwards with Defendant RBS between October 31, 2006 and July 29, 2011. These transactions, which together have a notional value in the millions of dollars, were all priced based on Swiss franc LIBOR.

512.    Because of Defendants' manipulative conduct, CalSTRS paid more for or received less than it should have for Swiss franc foreign exchange forwards in an unmanipulated market.

513.    For example, on April 18, 2011, CalSTRS entered into a foreign exchange forward with Deutsche Bank agreeing to buy CHF 5,057,625.00 from Deutsche Bank for $5,629,904.83 on May 11, 2011.

514.    Communications released in Deutsche Bank's CFTC Order demonstrate that Defendants manipulated Swiss franc LIBOR on April 18, 2011:

**April 18, 2011:**

Swiss franc Submitter 2 (email to several Pool and MMD traders):
hihi, chf libors unchanged please.

515.    Consistent with this communication, Deutsche Bank's one-month, three-month and six-month Swiss franc LIBORs remained unchanged on April 18, 2010:

| Deutsche Bank Swiss franc LIBOR Submissions | 4/15/11 | 4/18/11 |
|---|---|---|
| One-month | 0.17% | 0.17% |
| Three-month | 0.22% | 0.22% |
| Six-month | 0.28% | 0.28% |

516.    Actual Swiss franc money market transaction data compiled by Bloomberg L.P., shows that Deutsche Bank's Swiss franc LIBOR submissions on April 18, 2011 were artificially low. For example, on April 18, 2011, Deutsche Bank's one-month, three-month, and six-month Swiss franc LIBOR submissions were significantly lower than the rate offered on Swiss franc deposits of the same tenor:

| Swiss franc Deposit Rates | 4/15/11 | 4/18/11 |
|---|---|---|
| One-month deposit | 0.32% | 0.26% |
| Three-month deposit | 0.38% | 0.37% |
| Six-month deposit | 0.56% | 0.5% |

517.    In fact, all Contributor Bank Defendants similarly made unchanged, artificially lower Swiss franc LIBOR submissions on April 18, 2011. For example:

| Defendant | Swiss Franc LIBOR Submission | | | | | |
|---|---|---|---|---|---|---|
| | One-month | | Three-month | | Six-month | |
| | 4/15/11 | 4/18/11 | 4/15/11 | 4/18/11 | 4/15/11 | 4/18/11 |
| **Credit Suisse** | 0.14% | 0.14% | 0.16% | 0.16% | 0.24% | 0.24% |
| **JPMorgan** | 0.14% | 0.14% | 0.18% | 0.18% | 0.26% | 0.26% |
| **RBS** | 0.15% | 0.15% | 0.18% | 0.18% | 0.25% | 0.25% |
| **UBS** | 0.12% | 0.12% | 0.165% | 0.165% | 0.23% | 0.23% |

518.    Contributor Bank Defendants' artificially low Swiss franc LIBOR submissions on April 18, 2011, manipulated the one-month, three-month, and six-month Swiss franc LIBOR fixing to artificially lower levels on that date. This caused injury to CalSTRS. Following the formula in Figure 1, an artificially lower Swiss franc LIBOR (the Base Interest Rate or "Rbase"), increased the cost for CalSTRS to purchase Swiss francs in terms of U.S. dollars on May 11, 2011. As a result of Defendants' manipulative conduct on April 18, 2011, CalSTRS was damaged and suffered injury when it agreed to purchase Swiss franc foreign exchange forwards from UBS at an artificially inflated price on May 11, 2011.

519.    Plaintiff CalSTRS entered into at least 70 foreign currency forwards, worth millions of dollars in notional value, directly with Defendant Deutsche Bank between December 31, 2007 and December 16, 2011. According to the Deutsche Bank CFTC Order, Deutsche Bank had a policy in place during this time which sought to widen the spread between different tenors of LIBOR for multiple currencies, including Swiss franc LIBOR.[421] Much like the policy at

---

[421] *See* Deutsche Bank CFTC Order at 9.

UBS, Deutsche Bank's policy sought to benefit the trading positions of its traders and submitters at the expense of counterparties in trades. As a result of Defendant Deutsche Bank's long-term spread widening to benefit their own trading positions, CalSTRS was damaged and suffered injury when it was overcharged or underpaid in transactions for Swiss franc foreign exchange forwards entered into directly with Deutsche Bank at an artificially price.

### F.  All Plaintiffs

520.    In addition to transacting at artificial prices on the limited number of days for which Defendants' communications have been released to the public, Plaintiffs also were damaged and suffered injury on their other Swiss franc LIBOR-based derivatives positions because Defendants' manipulative conduct rendered Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives artificial throughout the entire Class Period.

521.    Far from intermittent and episodic, the persistent nature of Defendants' manipulative conduct is well documented in their settlements with government regulators. During the Class Period, RBS coordinated its Swiss franc LIBOR submissions on a near daily basis with at least JPMorgan."[422] JPMorgan operated an illegal cartel with RBS aimed at manipulating Swiss franc LIBOR to "distort the normal course of the pricing of interest rate derivatives denominated in Swiss francs," for at least a year and a half.[423] UBS manipulated its Swiss franc LIBOR submissions "on a regular basis" for years.[424] Deutsche Bank worked to inject a "bias" into the spread between LIBOR tenors[425] at the same time that requests for

---

[422] RBS CFTC Order at 27.

[423] *See* EC RBS-JPMorgan Cartel Settlement, *supra* note 31.

[424] *See* UBS CFTC Order at 38; *see also* UBS DOJ Statement of Facts at 30 (indicating that UBS rounded its Swiss franc LIBOR submissions from at least 2001 until at least September 1, 2009, to financially benefit its Swiss franc LIBOR-based derivatives positions).

[425] Deutsche Bank CFTC Order at 9.

artificial Swiss franc LIBOR submissions occurred frequently at RBS, as often as several times a week, impacting multiple tenors of Swiss franc LIBOR.[426] This occurred while all Defendants formed a cartel to fix the bid-ask spread on Swiss franc LIBOR based derivatives, ensuring that no one else could compete on their terms.[427]

522.    Defendants also recognized the persistent, long-term impact of their artificial Swiss franc LIBOR submissions on the prices of Swiss franc LIBOR-based derivatives. For example, on July 5, 2006, UBS Swiss franc Derivatives Trader told UBS Swiss franc Trader-Submitter that he needed an artificially higher one-month Swiss franc LIBOR submission today because he was on the receiving end of a large fixing weeks later *at the end of July*.[428] Acknowledging that artificial Swiss franc LIBOR submission impacts the calculation of Swiss franc LIBOR weeks (if not more) into the future, UBS Swiss franc Trader-Submitter complied with this request, raising UBS's one-month Swiss franc LIBOR submission from 1.42% on July 4, 2006, to 1.43% on July 5, 2006.

523.    Defendants' relentless efforts to manipulate and fix both Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives, including fixing the bid-ask spread on OTC Swiss franc LIBOR-based derivatives, combined with the long-term, persistent impact of this conduct, rendered Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives artificial throughout the entire Class Period. As a result, Plaintiffs were damaged and suffered injury when they engaged in transactions for Swiss franc LIBOR-based derivatives at artificial prices proximately caused by Defendants' manipulative conduct.

---

[426] RBS CFTC Order at 25-26.

[427] *See* EC RBS-JPMorgan Cartel Settlement, *supra* note 31.

[428] *See* UBS CFTC Order at 38.

## TRADE AND COMMERCE

524.    Beginning in at least January 1, 2001 and continuing until at least December 31, 2011, Defendants engaged in a continuing contract, conspiracy or combination in restraint of trade in violation of the Sherman Act.

525.    During the Class Period, Defendants sold substantial quantities of Swiss franc LIBOR-based derivatives in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which Defendants produced Swiss franc LIBOR-based derivatives.

526.    The Defendants' business activities that are subject to this Complaint were within the flow of and substantially affected interstate trade and commerce.

527.    During the Class Period, the Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## CLASS ACTION ALLEGATIONS

528.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representative of the following Class:[429]

> All persons or entities that engaged in U.S.-based transactions in financial instruments that were priced, benchmarked, and/or settled to Swiss franc LIBOR at any time from at least January 1, 2001, through at least December 31, 2011 (the "Class").

> Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States Government.

---

[429] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, membership criteria and the Class Period.

529.    The Class is so numerous that individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically dispersed Class members transacted in Swiss franc LIBOR-based derivatives worth trillions of dollars during the Class Period.

530.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

531.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are adequate representatives of the Class and have no interest which is adverse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including commodities manipulation and antitrust litigation.

532.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

      a.    whether Defendants and their co-conspirators engaged in a combination or conspiracy to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives in violation of the Sherman Act;

      b.    the identity of the participants in the conspiracy;

      c.    the duration of the conspiracy;

      d.    the character and nature of the acts performed by the Defendants in furtherance of their conspiracy;

e.  whether Defendants' unlawful conduct caused injury to the business and property of Plaintiffs and the Class;

f.  whether Defendants were unjustly enriched at the expense of Plaintiffs and the Class;

g.  whether Defendants' unlawful acts violate RICO;

h.  whether Defendants' unlawful conduct caused cognizable legal injury under the Commodity Exchange Act; and

i.  the appropriate measure of damages sustained by Plaintiffs and Class members.

533.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigations would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

534.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRADULENT CONCEALMENT

535.    The applicable statute of limitations relating to the claims for relief alleged in ¶¶ 539-633 herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct. Plaintiffs disclaim any need

to plead due diligence in order to establish Defendants' fraudulent concealment or equitable tolling. To the extent that any due diligence is required, Plaintiffs acted with due diligence. Among other things, Plaintiffs generally followed public news, the markets, and financial developments.

536.    Affirmative acts of concealment by Defendants used to hide their violations of law from Plaintiffs and the Class include, *inter alia,* (a) knowingly submitting (or causing to be submitted) Swiss franc LIBOR quotes that were false, misleading, or inaccurate because they were based in whole or in part on impermissible and illegitimate factors, such as which rate would financially benefit Defendants' Swiss franc LIBOR-based derivatives positions and/or the Swiss franc LIBOR-based derivatives positions of their co-conspirators; (b) representing that these submissions were a reliable and truthful assessment of borrowing costs in the inter-bank money market; and (c) suppressing documents and information from government regulators during their ongoing investigations into the Defendants' Swiss franc LIBOR-related misconduct.

537.    Many, if not all, of these affirmative acts of concealment were also inherently self-concealing. Defendants engaged in a form of price fixing, which is inherently self-concealing and could not be detected by Plaintiffs or other members of the Class.[430] The secret nature of Defendants' conspiracy—which relied on non-public methods of communication, including private instant messages, to conceal their agreements to manipulate Swiss franc LIBOR—prevented Plaintiffs from uncovering Defendants' unlawful conduct.[431]

---

[430] *See In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, No. 00 CIV 7804 (LMM), 2004 U.S. Dist. LEXIS 3892, at *4 (S.D.N.Y. Mar. 12, 2004) (recognizing that bid-rigging and price-fixing conspiracies are inherently self-concealing) (citing *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir. 1988)).

[431] *See e.g.*, *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 514 (S.D.N.Y. 2003) ("[a]mong the principal allegations against Defendants are assertions that they reported false trade data to entities that collect that information for public dissemination. . . Such activities are inherently self-concealing").

538.     As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence prior to the time when there were public disclosures reporting Swiss franc LIBOR manipulation. Plaintiffs thus assert the tolling of the applicable statutes of limitations affecting the rights of the claims for relief asserted by Plaintiffs. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(For Violation of Section 1 of the Sherman Act by Colluding to Widen the Bid-Ask Spread for Swiss franc LIBOR-based Derivatives Products)**

**15 U.S.C. § 1, *et seq.***

**Against All Defendants**

539.     Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

540.     Defendants competed among themselves and others in the market for Swiss franc-based derivatives. However, during the Class Period, the Defendants replaced the competitive prices determined by normal forces of supply and demand with an agreement, combination and conspiracy to fix the prices of Swiss franc LIBOR-based derivatives. Defendants agreed among themselves to fix prices of Swiss franc LIBOR-based derivatives to counterparties by agreeing to keep the spread between bids (offers to buy) and asks (offers to sell) supracompetitively wide.

541.     During the Class Period, Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade to fix the prices of Swiss franc LIBOR-based derivatives in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

542.     Such contracts, combination and conspiracy included a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained or made artificial the prices of Swiss franc LIBOR-based derivatives. Defendants' price-fixing conspiracy is a *per se* violation of the federal antitrust laws and are, in any event, unreasonable and unlawful restraints of trade.

543.     Defendants' conspiracy and resulting impact on the prices of Swiss franc LIBOR-based derivatives occurred in and had direct, substantial and reasonably foreseeable effects on U.S. interstate commerce. Defendants' conspiracy overcharged U.S.-based counterparties on each Swiss franc LIBOR-based derivative transaction they entered into with these counterparties at the moment these transactions were consummated. No third party or other intervening circumstance stood between Defendants' collusion and the resulting impact on Swiss franc LIBOR-based derivatives counterparties' overcharge resulting therefrom.

544.     The Defendant Swiss franc LIBOR-based derivative dealers were supposed to be horizontal competitors in the market for Swiss franc LIBOR-based derivative offerings. Instead of competing with one another for counterparty business by offering competitive spreads, Defendants supplanted competition with collusion by agreeing not to compete with one another beyond a certain "bid-ask" spread. The collusion directly interfered with the salutary and price-reducing effects of the marketplace.

545.     This price fixing scheme was complete at the moment of agreement to quote wide spreads; the offense was committed in the Swiss franc LIBOR-based derivatives market and was not dependent upon these same Defendants' additional scheme to collusively misrepresent Swiss franc LIBOR. In essence, the "bid-ask" collusion was designed to, and did, rob counterparties of money upon entering into a Swiss franc LIBOR-based derivatives transaction while the

misreporting collusion outlined in Count II, herein, was designed to, and did, rob these same counterparties of money upon reset or exit of these positions. In this way, Defendants committed two antitrust violations – one on the way in (Count I) and one on the way out (Count II). Both schemes related to the same overarching conspiracy to charge supracompetitive prices to Swiss franc LIBOR-based derivatives counterparties.

546.     As a proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property. Without limiting the generality of the foregoing, Plaintiffs and members of the Class paid artificial and non-competitive prices for Swiss franc LIBOR-based derivatives as a proximate result of Defendants' anticompetitive conduct. Plaintiffs and the other members of the Class were also deprived of the benefits of free and open competition in transacting in Swiss franc LIBOR-based derivatives.

547.     Plaintiffs and members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

## SECOND CLAIM FOR RELIEF

### (Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act)

### 15 U.S.C. § 1, *et seq.*

### Against All Defendants

548.     Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

549.     Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

227

550. During the Class Period, Defendants entered into a series of agreements in violation of § 1 of the Sherman Act which were designed to create profit, or limit liabilities amongst themselves by coordinating their manipulation of the prices and settlement value of Swiss franc LIBOR and Swiss franc LIBOR-based derivatives, coordinating their submissions to the BBA, and engaging in other activities designed to artificially suppress, inflate, maintain, or otherwise alter Swiss franc LIBOR.

551. This conspiracy to manipulate the prices of Swiss franc LIBOR-based derivatives caused injury to Plaintiffs and members of the Class because they were deprived of the benefit of a legitimate and accurate Swiss franc LIBOR that reflected actual market conditions. Plaintiffs and members of the Class also were deprived of the ability to accurately price Swiss franc LIBOR-based derivatives entered into during the Class Period and to accurately determine the settlement value of Swiss franc currency forward agreements and other Swiss franc LIBOR-based derivatives by reference to an accurate Swiss franc LIBOR. Plaintiffs and members of the Class received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts taken in furtherance thereof.

552. Defendants' conspiracy and agreements constitute a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in various markets, including the over-the-counter and exchange traded Swiss franc LIBOR-based derivatives markets. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pretextual or could have been achieved by less restrictive means.

553.    As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and members of the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

554.    Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act under § 4 of the Clayton Act.

555.    Plaintiffs and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## THIRD CLAIM FOR RELIEF

**(Manipulation in Violation of the Commodity Exchange Act)**

**7 U.S.C. §§ 1, *et seq.***

**Against JPMorgan, Deutsche Bank, Credit Suisse and RBS**

556.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

557.    Each Defendant is liable under §§ 6(c), 9, and 22 of the CEA, codified at 7 U.S.C. §§ 9, 13, and 25 respectively, as well as CFTC Rules 180.1 and 180.2, for the manipulation of Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives that were priced, benchmarked, and/or settled based on Swiss franc LIBOR.

558.    Defendants had the ability to manipulate Swiss franc LIBOR and Swiss franc LIBOR-based derivatives. Defendants, through the instrumentalities of interstate commerce, knowingly submitted or caused to be submitted artificial rate quotes to the BBA. These submissions were used to determine the official published Swiss franc LIBOR. By virtue of the Swiss franc LIBOR methodology, the Defendants had the ability to influence and affect the rates that would become the official Swiss franc LIBOR fix. Further, because of their market power as major dealers of Swiss franc LIBOR-based derivatives, the Defendants had the ability to

influence the actual prices of Swiss franc LIBOR-based derivatives through manipulative trading strategies.

559.    Plaintiffs disclaim the need to plead specific intent. Plaintiffs allege that Defendants agreed knowingly to cause false Swiss franc LIBOR rates and prices to be issue, and that this satisfies scienter for the purposes of this claim. To the extent that more is required, Plaintiffs allege as follows. As evidenced by communications revealed to the DOJ, CFTC, and FSA, and additional facts disclosed by the EC, the Defendants fully, intentionally, and systematically manipulated Swiss franc LIBOR and Swiss franc LIBOR-based derivatives prices to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) of dollars in illegitimate profits on Swiss franc LIBOR-based derivatives held by themselves or other co-conspirators, the prices of which (and thus profits or losses) were priced, benchmarked, and/or settled based on Swiss franc LIBOR. As a specifically intended and direct consequence of Defendants' knowingly unlawful conduct, the prices of Plaintiffs' Swiss franc LIBOR-based derivatives, and those traded by Class members, were manipulated to artificial levels by Defendants.

560.    During the Class Period, Swiss franc LIBOR and the prices of derivatives that were priced, benchmarked, and/or settled based on Swiss franc LIBOR were artificial and did not result from legitimate market information, competition, or supply and demand factors. Defendants directly caused artificial Swiss franc LIBOR and artificial prices of Swiss franc LIBOR-based derivatives by, *inter alia*, executing manipulative trades among themselves, quoting artificial bid and ask prices for Swiss franc LIBOR-based derivatives, and submitting artificial Swiss franc LIBOR quotes to the BBA.

561.     As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered actual damages and injury in fact due to artificial Swiss franc LIBOR and prices of derivatives that were priced, benchmarked, and/or settled to Swiss franc LIBOR.

## FOURTH CLAIM FOR RELIEF

### (Principal-Agent Liability in Violation of § 2 of the Commodity Exchange Act)

### Against JPMorgan, Deutsche Bank, Credit Suisse and RBS

562.     Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

563.     Each Defendant is liable under § 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of its agents, representatives, and/or other persons acting for it in the scope of their employment.

564.     Plaintiffs and members of the Class seek the actual damages they sustained in Swiss franc LIBOR-based derivatives for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

### (Aiding and Abetting Liability in Violation of § 22 of the Commodity Exchange Act)

### Against JPMorgan, Deutsche Bank, Credit Suisse and RBS

565.     Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

566.     Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's manipulation of Swiss franc LIBOR and willfully intended to assist these manipulations, which resulted in artificial Swiss franc LIBOR-based derivatives prices during the Class Period in violation of § 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

567.   Plaintiffs and members of the Class seek the actual damages they sustained in Swiss franc LIBOR-based derivatives for the violations of the CEA alleged herein.

<u>SIXTH CLAIM FOR RELIEF</u>

**(Violation of the Racketeer Influenced and Corrupt Organizations Act)**

**18 U.S.C. §§ 1961 *et seq*.**

**Against All Defendants**

568.   Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

**A.  Defendants Engaged in Conduct Actionable Under RICO**

569.   18 U.S.C. §1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

570.   18 U.S.C. § 1962 (d), in turn, makes it "unlawful for any person to conspire to violate any provision of subsection (a), (b), or (c) of this section."

571.   Under 18 U.S.C. §1961 (1), and as applicable to Section 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. §1343 (relating to wire fraud).

572.   18 U.S.C. §1961(5) provides that, to constitute a "pattern of racketeering activity", conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

573.   18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. §1961(4) defines "enterprise" as

"any individual, partnership, corporation, association, or legal entity, and any union or group of individuals associated in fact although not a legal entity."

574.    18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C. §1961(1) as RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

575.    At all relevant times, an association-in-fact consisting of Defendants, Defendants' employees and agents who conducted Defendants' affairs through illegal acts including the transmission of false Swiss franc LIBOR submissions or directing other employees and agents to intentionally manipulate Swiss franc LIBOR rates by wire communications, and the BBA were an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

576.    At all relevant times, Defendants were "person[s] within the meaning of 18 U.S.C. §1961(3).

## B. Defendants Conducted the Affairs of a RICO Enterprise

577.    Defendants' association-in-fact through their frequent and routine communications with each other, their organization of a hub-and-spoke conspiracy through interdealer brokers, their association with the BBA, and their participation together as members in the Swiss franc LIBOR panel, constitute a RICO enterprise. Defendants acted with a common purpose by systematically colluding to manipulate Swiss franc LIBOR to increase their Swiss Franc LIBOR-based derivatives profits.

578.    Defendants conducted the affairs of the enterprise through a pattern of

233

racketeering activity by using U.S. wires to transmit or cause to be transmitted false and artificial Swiss franc LIBOR submissions throughout the Class Period in furtherance of their scheme to defraud victims of money or other property.

579.    Within the United States, Defendants would, on a regular basis, communicate through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce.

580.    Defendants coordinated their daily Swiss franc LIBOR submissions and their Swiss franc LIBOR-based derivatives trading positions in electronic chats routed through electronic servers located in the United States.

581.    Defendants transmitted or caused to be transmitted false and artificial Swiss franc LIBOR quotes that were relied on by Thomson Reuters and the BBA in collecting, calculating, publishing, and/or disseminating the daily Swiss franc LIBOR submissions of each Defendant and the daily Swiss franc LIBOR fix that was transmitted, published, and disseminated in the United States or while crossing U.S. boarders through electronic servers located in the United States.

582.    Defendants did so in order to generate illicit profits at the expense of other market participants in the United States.

583.    Defendants UBS and Deutsche Bank have both pleaded guilty to felony wire fraud and admitted their role in manipulating the LIBOR. As alleged above, all Defendants engaged in the same or substantially the same behavior as the already guilty parties.

584.    The CFTC has already concluded that Defendant Deutsche Bank, through its

submitters and traders some of whom were located in New York, routinely made false submissions for Swiss franc LIBOR. They did so by acting "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ."[432] Defendant Deutsche Bank admitted that between 2005 and 2010, it manipulated LIBOR for several currencies, including Swiss Franc.[433] It engaged in systematic and pervasive manipulation through its New York office.[434]

585.    In addition to phone conversations, the CFTC found that Defendant Deutsche Bank employees would routinely communicate using Bloomberg chat terminals and in internal Deutsche Bank electronic messaging system to discuss and receive preferential Swiss franc LIBOR requests.[435] ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

586.    Furthermore, the Defendants, through the BBA, made agreements with the CME, in the United States, which helped them to further their illegal acts. To increase interest in Swiss

---

[432] Deutsche Bank CFTC Order at 36 (*quoting* 7 U.S.C. § 13(a)(2) (2006)).

[433] *See* Deutsche Bank NYSDFS Consent Order at 6.

[434] Deutsche Bank CFTC Order at 2-3.

[435] *Id*. at 8.

franc futures contracts, the Chicago-based CME proposed that the BBA allow them to use the

BBA's LIBOR calculation as the basis for the Futures contracts. Since 2005, New York-based

Thomson Reuters has been the BBA's agent for determining and distributing LIBOR. This

change was approved by the CFTC and trading, both in the exchange's Chicago trading pits and

through the CME's Globex electronic exchange,[436] encouraged the exponential global growth of

trading in Swiss franc futures contracts.

587.    For example, the CME's agreement with the BBA permitted the Exchange to use

BBA LIBOR as the basis for settling Swiss franc futures contracts and to refer to BBA LIBOR in

connection with creating, marketing, trading, clearing, settling and promoting Swiss franc futures

contracts.[437]

588.    Defendants, who were part of the BBA Swiss franc LIBOR panel, knew that the

BBA benefited financially from this relationship with the CME. This contract between the BBA

and CME for LIBOR rates, a contract in interstate commerce, underscores the strength of the

causal connection between the pricing of LIBOR and the pricing of Swiss franc futures and

shows that Defendants knew that their manipulation of LIBOR rates would manipulate Swiss

franc futures in turn.

589.    The licensing of LIBOR by the BBA to the CME also constitutes a contract for

LIBOR in interstate commerce.

590.    By transmitting or causing false and artificial Swiss franc LIBOR submissions to

---

[436] CME RULEBOOK, Chapters 254 and 254(a) (Chicago Mercantile Exchange, Inc.), available at
http://www.cmegroup.com/rulebook/CME/III/250/254/254.pdf.

[437] *CME* 2012 *Annual Report*, at 8 ("We currently have a licensing and membership agreement with BBA
Enterprises Limited and the British Bankers' Association (collectively, BBA) for the use of LIBOR to settle several
of our interest rate products, including our Eurodollar contract. For the license, we paid an upfront fee and pay an
annual fee. Based on the ongoing review of LIBOR, we expect LIBOR to be reformed rather than replaced and to
continue as a regulated benchmark. Depending upon the outcome of the reform efforts, we may need to enter into a
new license agreement with BBA or the organization appointed to administer the benchmark").

be transmitted electronically to Thomson Reuters and the BBA, and by exchanging Swiss franc

LIBOR-based derivative positions and prices, Defendants conducted the affairs of an enterprise

through a pattern of racketeering activity which artificially fixed and affected the prices of Swiss

franc LIBOR-based derivatives, directly resulting in Defendants reaping hundreds of millions, if

not billions, in illicit trading profits on their Swiss franc LIBOR-based derivative positions.

Defendants conducted the affairs of the enterprise through a pattern of racketeering activity,

including the use of electronic communication to affect the values of futures contracts, such as

the Swiss franc Futures Contracts traded in Chicago, for the purpose of defrauding innocent

counterparties with whom Defendants traded.

### C. Defendants Have Conducted the Affairs of an Enterprise Through a Pattern of Racketeering Activity

591.    Defendants each committed far more than two predicate acts of wire fraud. As

alleged in detail herein, Defendants engaged in at least the following predicate acts of wire fraud:

    a.  electronic chats between U.S.-based money markets traders and Swiss franc LIBOR submitters;

    b.  electronic communications between U.S. based traders and traders and submitters at other Defendant banks;

    c.  telephone communications between United States based money market traders;

    d.  subsequent false Swiss franc LIBOR submission from the defendant to Thomson Reuters;

    e.  subsequent publication of a Swiss franc LIBOR rate through international and interstate wires;

    f.  sharing by electronic means proprietary pricing information on instruments traded by U.S. market participants;

    g.  sending by electronic means (e-mail, message, telephonic, facsimile) trade confirmations based on manipulated, false, and artificial LIBOR rates to counterparties in the United States; and

     h.   maintaining U.S. bank accounts where profits incurred as part of the conspiracy were held.

592.    The conduct of every party involved in the scheme is not an isolated occurrence. The pattern of racketeering activity herein alleged involved not isolated occurrences but constituted related acts which amounted to a threat of continued criminal activity throughout the Class Period. Each Defendant shared a common purpose in increasing their profits from trading in instruments priced from Swiss franc LIBOR, and also had a common method of conducting the affairs of the enterprise through a pattern of racketeering activity through use of the wires in transmitting false Swiss franc LIBOR reports and placing trades in conformity therewith.

593.    Defendants acted in a uniform way to conduct the affairs of the enterprise through daily submission and electronic communication of their collusive and artificial Swiss franc LIBOR submissions to the BBA and Thomson Reuters following uniform procedures used in virtually an identical way every day. As alleged herein, the predicate acts had a closed-ended continuity involving a closed period of repeated conduct in colluding to set Swiss franc LIBORs, reporting the false Swiss franc LIBORs, and trading to benefit therefrom throughout the Class Period.

**D.  The Pattern of Racketeering Activity was Directed to, and did Affect, Interstate Commerce**

594.    Through the racketeering scheme described above, Defendants conducted the affairs of the enterprise through a pattern of activity to illegally increase their profits to the detriment of investors in Swiss franc LIBOR based derivatives residing throughout the United States, and/or transacting in Swiss franc LIBOR based derivatives within the United States.

595.    Plaintiffs' allegations herein arise out of, and are based on, Defendants' use of the Internet and/or the wires across state lines as well as agreements between entities in different

states to manipulate Swiss franc LIBOR and the price of Swiss franc LIBOR-based derivatives. Using those interstate channels to coordinate the scheme and transmit fraudulent statements to Plaintiffs across state lines satisfies RICO's requirement of an effect on interstate commerce. Defendants' racketeering acts had a direct effect on interstate commerce.

596.    The predicate acts affected and made artificial the price of futures contracts which were traded on the CME. These contracts are traded in an open outcry form in Chicago and also electronically on the CME's GLOBEX platform.

597.    The primary purpose of Defendants' racketeering activity was to benefit the Defendants' derivatives trading positions, including the positions in their United States entities.

### E. Plaintiffs Suffered Injury Proximately Caused by the Pattern of Racketeering Activity

598.    As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct. Plaintiffs' and the Class' injures were the direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed depriving Plaintiffs and the Class of their money relative to their Swiss franc LIBOR-based derivatives contracts was the very purpose of the Defendants' scheme.

599.    Plaintiffs and members of the Class seek treble damages for the injuries they have sustained, as well as restitution, cost of suit, and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

600.    As a direct and proximate result of the subject racketeering activities, Plaintiffs and members of the Class seek an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

### F. Defendants Racketeering Activity Was Domestic In Nature

601.    Every essential element of the wire fraud occurred in the United States.

Defendants used domestic and interstate wires to accomplish their fixing and manipulation of Swiss franc LIBOR and to transmit or cause to be transmitted false and artificial Swiss franc LIBOR rates aimed towards U.S. market participant transacting in Swiss franc LIBOR-based derivatives in order to generate illicit profits at the expense of these market participants. Some conduct further contributing to the violation occurred outside the United States.

602.    Defendants, through their submitters and traders, some of whom were located in New York using U.S. domestic or interstate wires or through servers located in the United States reported false Swiss franc LIBOR submissions.

603.    Defendants used U.S. domestic or interstate wires or through servers located in the United States, coordinated their Swiss franc LIBOR submission and their Swiss franc LIBOR-based derivatives trading positions. They did so by communicating this information via telephone calls, internal messaging systems, and Bloomberg chat terminals to coordinate their Swiss franc LIBOR submissions and to share proprietary trading strategies and pricing behavior to the detriment of U.S. market participants. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████

604.    Defendants traded Swiss franc LIBOR-based derivatives with U.S.-based counterparties based on false and artificial Swiss franc LIBOR rates which they submitted using U.S. domestic or interstate wires. Defendants then used U.S. domestic or interstate wires to transfer moneys and other collateral paid or received on these contracts.

605.    Each Transaction that Defendants executed with a Plaintiff or other Class member pursuant to an ISDA Master Agreement had several steps that each occurred within the United States and/or used U.S. domestic or interstate wires and caused domestic injury.

606.    First, in an over-the-counter derivatives transaction, the customers contacted the Defendants by phone or using an electronic platform such as Reuters or Bloomberg to discuss the terms of the trade.

607.    After agreeing on the transaction details, payment instructions to a custodian bank which holds assets including cash, derivatives, and other financial instruments on its behalf, are communicated over interstate wires.

608.    Defendants often designated U.S.-based agents to act as custodians for moneys and other collateral paid or received on these contracts and to accept notices and demands. The U.S.-based custodian banks would then use the assets in the Defendants' accounts to carry out the payment instructions to settle the trade with the counterparties' U.S.-based agent bank. As a result, Defendants directly caused United States investors to pay money across U.S. domestic wires into their U.S. bank accounts or to the U.S.-based bank accounts of their agents and caused their U.S.-based agents to transfer money to the U.S.-based agents of their counterparties. For example, Defendant Credit Suisse entered into at least one ISDA Master Agreement with FrontPoint that designated Credit Suisse Securities (USA) LLC as its process agent and as the custodian for both parties. Defendant Deutsche Bank entered into multiple ISDA Master Agreements with Frontpoint which designated Deutsche Bank AG's New York Branch as its custodian and Defendant UBS entered into ISDA Master Agreements with Frontpoint which designated UBS Securities LLC, a New York-based corporation, as its custodian. Further, Defendant RBS also individually negotiated an ISDA Master Agreement with Plaintiff CalSTRS,

which entered into transactions pursuant to those ISDA master agreements using custodian bank accounts that were located in the United States.

609.    These agreements provided that U.S. bank accounts were to receive payments for trades based on manipulated, false, and artificial LIBOR rates. U.S. domestic or interstate wires were used to facilitate the exchange of money to and from these U.S.-based bank accounts.

610.    Defendants knowingly transmitted or caused to be transmitted false and artificial Swiss franc LIBOR rates within the United States. Defendants did so by aiming their false and artificial Swiss franc LIBOR submissions and confirmations for collusive transactions intended to impact Swiss Franc LIBOR to Thomson Reuters which is located in the United States and on a daily basis published the final averaged Swiss franc Libor rates, as well as the individual contributor banks submissions. Thomson Reuters disseminated these rates to U.S. investors using U.S. wires through Bloomberg and other financial services. Thomson Reuters transmitted these rates to three data centers for worldwide publication, including one such data center in Hauppauge, New York. Furthermore, although the BBA is a foreign entity, Defendants' false submissions were directed to the United States and the elements of wire fraud were completed in the United States as the BBA had various agreements with the CME and Defendants participated in multiple phone conversations, electronic chats, and electronic mail from within the United States, and submitted false rates to Thomson Reuters in New York. Defendants knowingly schemed to defraud U.S.-based market participants who would transact based upon the false and artificial LIBOR submissions disseminated by the BBA.

## SEVENTH CLAIM FOR RELIEF

**(Violation of the Racketeer Influenced and Corrupt Organizations Act)**

**18 U.S.C. §§ 1961 *et seq*.**

**Against All Defendants**

611.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

612.    In addition to conducting the affairs of the enterprise through a pattern of racketeering activity, Defendants conspired to violate RICO in violation of 18 U.S.C. § 1962(d).

613.    Defendants organized and implemented the scheme alleged herein, which required their agreement to report their borrowing rates falsely and to benefit their trading positions and ensured that it continued uninterrupted by concealing their violations and the prices of Swiss franc LIBOR-based derivatives from Plaintiffs and the Class.

614.    Defendants knew and intended that their racketeering acts would injure participants in the Swiss franc LIBOR-based derivatives market, yet each Defendant remained a participant despite the racketeering nature of their conduct. At any point while the scheme had been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence. Rather than stopping the scheme, however, the Defendants chose to continue it, to the direct detriment of Swiss franc LIBOR-based derivatives investors such as Plaintiffs and members of the Class.

615.    As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct. Plaintiffs' and the Class' injuries to their property were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, such effects were precisely the reason why the scheme was concocted.

616.    Plaintiffs and members of the Class are entitled to recover treble the damages they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

617.    As a direct and proximate result of the racketeering activities alleged herein, Plaintiffs and members of the Class are entitled to an Order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment in Violation of Common Law)

### Against Defendants Credit Suisse, Deutsche Bank, RBS, JPMorgan and UBS

618.    Plaintiffs incorporate by reference and re-allege the preceding allegations, as though fully set forth herein.

619.    To the extent required, this claim is pled in the alternative to Plaintiffs' Ninth Claim for Relief under FED. R. CIV. P. 8(d).

620.    Defendants and members of the Class, including Plaintiffs, entered into Swiss franc LIBOR-based derivatives transactions. These transactions were either directly priced, benchmarked, and/or settled based on Swiss franc LIBOR, which was supposed to reflect actual market conditions. Rather than competing honestly and aggressively with each other, Defendants colluded to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives to ensure they had an unfair advantage in the marketplace.

621.    Defendants financially benefited from their unlawful acts described herein, including but not limited to, coordinating the manipulation of Swiss franc LIBOR by taking advantage of the BBA submission process, manipulating the bid-ask spread quoted on Swiss franc LIBOR-based derivatives, and/or other activities designed to artificially suppress, inflate, maintain, or otherwise alter Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives. These unlawful and inequitable acts caused Plaintiffs and Class members to suffer injury, lose money, and otherwise be deprived of the benefit of accurate Swiss franc LIBOR reflecting actual market conditions, as well as the ability to accurately price, benchmark, and/or

244

settle Swiss franc LIBOR-based derivatives transactions. As a result, Plaintiffs and Class members received, upon execution or settlement of their trades, less in value than they would have received absent Defendants' wrongful conduct. Plaintiffs and the Class' losses correspond to Defendants' unlawful gains.

622.    Plaintiff CalSTRS transacted Swiss franc LIBOR-based derivatives during the Class Period directly with Defendants Credit Suisse, Deutsche Bank, JPMorgan, and RBS.

623.    Plaintiff FrontPoint transacted Swiss franc LIBOR-based derivatives during the Class Period directly with Defendants Credit Suisse and UBS.

624.    It is unjust and inequitable for Defendants (and/or their subsidiaries or affiliates) to have enriched themselves in this manner at the expense of Plaintiffs CalSTRS and FrontPoint and similarly situated members of the Class, and the circumstances are such that equity and good conscience require the Defendants to make restitution.

625.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

626.    Plaintiffs and members of the Class seek restoration of the monies of which they were unfairly and improperly deprived as described herein.

### NINTH CLAIM FOR RELIEF

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

**Against Defendants Credit Suisse, Deutsche Bank, RBS, JPMorgan and UBS**

627.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

628.    To the extent required, this claim is pled in the alternative to Plaintiffs' Eighth Claim for Relief under FED. R. CIV. P. 8(d).

629.    FrontPoint entered into binding and enforceable Swiss franc LIBOR-based derivatives contracts ("contracts") with Defendants Credit Suisse and UBS. For example, FrontPoint Entities entered into over 400 Swiss franc currency forwards with Credit Suisse and over 1,300 Swiss franc currency forwards with UBS.

630.    Plaintiff CalSTRS entered into binding and enforceable contracts with Defendants Credit Suisse, Deutsche Bank, JPMorgan, and RBS. For example, CalSTRS engaged in transactions for dozens of Swiss franc foreign exchange forwards with Defendant Credit Suisse between January 12, 2011 and September 20, 2011; dozens of Swiss franc foreign exchange forwards with Defendant Deutsche Bank between December 31, 2007 and December 16, 2011; dozens of Swiss franc foreign exchange forwards with Defendant JPMorgan between September 14, 2010 and December 14, 2011; and dozens of Swiss franc foreign exchange forwards with Defendant RBS between October 31, 2006 and July 29, 2011. These transactions, which together have a notional value in the millions of dollars, were all priced based on Swiss franc LIBOR.

631.    Each of the contracts includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

632.    Defendants Credit Suisse, Deutsche Bank, JPMorgan, RBS, and UBS breached this duty and, without reasonable basis and with improper motive, acted in bad faith by, among other things: (i) intentionally submitting false and artificial Swiss-franc LIBOR submissions to Thomson Reuters for the express purpose of obtaining ill-gotten profits from their Swiss franc LIBOR-based derivatives positions; (ii) disseminating false market information; and (iii)

colluding directly with employees at other Contributor Banks, either directly or through brokers, to manipulate Swiss franc LIBOR and the prices of Swiss franc LIBOR-based derivatives.

633.    As a direct and proximate cause of Defendants' breach of the implied covenant of good faith and fair dealing and of Defendants' frustration of the purposes of these contracts, Plaintiffs CalSTRS and FrontPoint, and similarly situated members of the Class, have been damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs demands relief as follows:

A.    That the Court certify this lawsuit as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives, and that Plaintiffs' counsel be appointed as Class counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate § 1 of the Sherman Act, 15 U.S.C. § 1;

C.    That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 15 U.S.C. § 26;

D.    That the Court award Plaintiffs and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.    That the unlawful conduct alleged here in be adjudged and decreed to be an unlawful enterprise in violation of RICO;

F.    For a judgment awarding Plaintiffs and the Class damages against Defendants for their violation of RICO, in an amount to be trebled in accordance with such laws;

G.      That the Court award Plaintiffs and the Class damages against Defendants for their violations of the Commodity Exchange Act;

H.      That the Court order Defendants to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiffs and members of the Class;

I.      That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

J.      That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

K.      That the Court direct such further relief as it may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: _____                          Respectfully submitted,
White Plains, New York


                                        LOWEY DANNENBERG, P.C.

                                         By: _____
                                           Vincent Briganti
                                           Geoffrey M. Horn
                                           Peter St. Philip
                                           Raymond Girnys
                                           Christian P. Levis
                                           Margaret C. MacLean
                                           Roland R. St. Louis
                                           44 South Broadway
                                           White Plains, NY 10601
                                           Tel.: (914) 997-0500
                                           Fax: (914) 997-0035
                                           Email: vbriganti@lowey.com
                                             ghorn@lowey.com
                                             pstphilip@lowey.com
                                             rgirnys@lowey.com
                                             clevis@lowey.com

mmaclean@lowey.com
rstlouis@lowey.com

*Interim Lead Class Counsel*


Christopher Lovell
Gary S. Jacobson
Benjamin M. Jaccarino
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Tel.: 212-608-1900
Fax: 212-719-4677
clovell@lshllp.com
gsjacobson@lshllp.com
bjaccarino@lshllp.com

Joseph J. Tabacco
Todd A. Seaver (*pro hac vice*)
BERMAN TABACCO
One California Street, Suite 900
San Francisco, CA 94111
Tel.: 415-433-3200
Fax: 415-433-6282
jtabacco@bermantabacco.com
tseaver@bermantabacco.com

Patrick T. Egan
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel.: 617-542-8300
Fax: 617-542-1194
pegan@bermantabacco.com

David E. Kovel
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022
Tel.: 212-371-6600
Fax: 212-751-2540
dkovel@kmllp.com

Brian P. Murray

Lee Albert (*pro hac vice* to be filed)
GLANCY PRONGAY & MURRAY LLP
122 East 42nd Street, Suite 2920
New York, NY 10168
Tel.: 212-682-5340
Fax: 212-884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

*Additional Counsel for Plaintiffs*

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. 15-cv-0871 (SHS)

## CHRONOLOGICAL APPENDIX OF SWISS FRANC LIBOR INSTANT MESSAGES, EMAILS AND OTHER COMMUNICATIONS REVEALED IN DEFENDANTS' GOVERNMENT SETTLEMENTS

| DATE | STATEMENT | DEFENDANTS IDENTIFIED | SOURCE |
|---|---|---|---|
| February 2005 | UBS Swiss Franc LIBOR Submitter: [I]ts our natural right to reflect our interest in the libor fixing process based on our maturity schedule. Any other bank will do the same. In the case we overdo, we will fall off the fixing process anyway. | UBS | UBS DOJ Statement of Facts at 31. |
| February 10, 2005 | BlueCrest Capital Employee (To Deutsche Bank director): Can't you ask your fft to contribute 1m chf libor very low today?? I have 10yr of fix, 8 of which against ubs, and they're getting on my nerves | BlueCrest Capital and Deutsche Bank | Deutsche Bank NYSDFS Consent Order at 10. |
| July 5, 2006 | UBS Swiss Franc Derivatives Trader told UBS Swiss Franc Trader-Submitter that he was on the receiving end of a large fixing tied to one-month Swiss Franc LIBOR at the end of July, and, therefore, wanted a high one-month fixing. The Trader-Submitter agreed to make the submission high.<br><br>Swiss Franc Trader: looking for high 1 month fix<br><br>Swiss Franc LIBOR Submitter: no problem, will fix 1 month high | UBS | UBS DOJ Statement of Facts at 31; UBS CFTC Order at 38. |
| March 26, 2007 | London MMD Swiss Franc Trader 1: hello sir, welcome back, you missed nothing, not sure if matches with you but my int is for a lower fixing, thanks<br><br>Swiss Franc Submitter 1: HI [London MMD Swiss Franc Trader 1], NOTED N LET U KNOW….NO PROBL CIAOOO | Deutsche Bank | Deutsche Bank CFTC Order at 33. |
| July 4, 2007 | Swiss Franc Trader: (To Bank E Swiss Franc Trader) yes.. they called 3m libor unchanged this morn[,] so i complained[,] so its all moved | RBS<br>Bank E | RBS CFTC Order at 27. |

1

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. 15-cv-0871 (SHS)

| July 24, 2007 | Bank E Swiss Franc Trader: 1m libor not a bit high? | RBS<br>Bank E | RBS CFTC Order<br>27-28. |
|---|---|---|---|
| | Swiss Franc Trader: yes it s ajoke. im so annoyed | | |
| | Bank E Swiss Franc Trader: This is shitt[,] With a fwd of 29.2 should be pretty much same as yesterday no? | | |
| | Swiss Franc Trader: yep [...] 1m libor should not be higher | | |
| | Bank E Swiss Franc Trader: I told them | | |
| | Swiss Franc Trader: what they say? i moaned too.. they had 6m libor at 85.. i was gonna lose 1.25 bps on 2k futs | | |
| | Bank E Swiss Franc Trader: Where should 6m be then? I need it low | | |
| | Swiss Franc Trader: well 6m 3s irs is 86.4.. so you will still make 0.4 ag fix | | |
| September 17, 2007 | Swiss Franc Submitter 1: LET ME KNOW ON THE FIXINGS IN CASE U NEED SOMETHG SPECIAL | Deutsche Bank | Deutsche Bank<br>CFTC Order at 33. |
| | London MMD Swiss Franc Trader 1: i have been trying to run as little as possible in the tn (as it was just costing me money).. another nice low 3m tom would be nice | | |
| December 13, 2007 | External Swiss Franc Trader B: make sure you tell your guy to set low LIBOR . . . . | RBS<br>Panel Bank 2 | RBS FSA Final<br>Notice at 16-17. |
| | RBS Derivatives Trader A: I have told him but not sure how low he will go | | |

2

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. 15-cv-0871 (SHS)

| | | | |
|---|---|---|---|
| April 15, 2008 | Bank E Swiss Franc Trader: you what I hope[,] that libor 3m is not going up | RBS<br>Bank E | RBS CFTC Order at 28. |
| | [...] | | |
| | Swiss Franc Trader: Yes.. Should not go up.. Just hang here | | |
| | Bank E Swiss Franc Trader: ok[,] just weird that zurich put it at 2.77 today | | |
| | Swiss Franc Trader: So fx basis will go negative if 3m usd ever starts to go down | | |
| | [...] | | |
| | Bank E Swiss Franc Trader: you should tell [Primary Submitter][,] if you can[,] the set it at 2.78 | | |
| | [...] | | |
| | Swiss Franc Trader: I ask him for low today[,] 3m and 6m | | |
| | Bank E Swiss Franc Trader: hahah[,] 'yes ok mate I am heading out for a run[,] enjoy[,] talk tom[,] get those fixings down | | |
| July 25, 2008 | Derivatives Trader C: ...can we have like 76 [2.76] today for three Swissy [CHF]? | Deutsche Bank | Deutsche Bank FCA Final Notice at 13. |
| | Submitter B: Yeah, yeah sure | | |
| | Derivatives Trader C: just today we have two yards [2 billion] threes | | |

3

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. 15-cv-0871 (SHS)

| | | | |
|---|---|---|---|
| | so even if you could put six and a half [2.765] that would be nice. . .Today for three month, like a high very high three month but then a low one month, that's very good<br><br>Submitter B confirmed he would do as requested | | |
| July 25, 2008 | Trader-11: Hello I trade CHF derivatives in London what are you putting for libors today please?<br><br>Submitter-9: Hi mate welcome in one of the most interesting currency market heard out of the market that there is somebody at DB LDN now again trading CHF derivatives didnt check so far but probably going for 27 in the 1mth and 75 in the 3mths In case you have aynthing special let me know rgds [Submitter-9] | Deutsche Bank | Deutsche Bank DOJ Statement of Facts at 61-62; DB Group DOJ Statement of Facts at 35-36. |
| September 25, 2008 | Submitter-9: hi gd morning mate…in case it helps u my libor forecast: 1m 2.63 2m 2.70 3m 2.82 6m 2.98 9m 3.10 12m 3.235<br><br>Trader-11: ok many thanks can you put a high 3m please?<br><br>Submitter-9: sure 83?<br><br>Trader-11: many thanks really need low 1 month today . . .just for tpday . . .<br><br>Submitter-9: wud do 61 if u agree . . . problem is not to quote too low to be deleted in the calculation process…?? Crazy these markets…..hope ur fine with the fixing<br><br>Trader-11: yes it is perfect was paying a lot of 1m today glad it is out of the way am short 3m but want to rec 3s now | Deutsche Bank | Deutsche Bank DOJ Statement of Facts at 62-63;<br>DB Group DOJ Statement of Facts at 36-37;<br>Deutsche Bank CFTC Order at 33;<br>Deutsche Bank NYSDFS Consent Order at 6. |

4

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. 15-cv-0871 (SHS)

| | | | |
|---|---|---|---|
| October 21, 2008 | Swiss Franc Trader: we need that libor down fast<br><br>Bank E Swiss Franc Trader: yes[,] exactly<br><br>[…]<br><br>Swiss Franc Trader: and [Primary Submitter] says he will set lower | RBS<br>Bank E | RBS CFTC Order at 28. |
| October 23, 2008 | Trader-11: where do you see 1m libor today?<br><br>Submitter-9: gd question lower again I will go again for 2.50 with a fix at 2.60-62<br><br>Trader-11: cam you put a very low 1 month please<br><br>Submitter-9: sure wnatever suits u but to be honest lower than 2.50 wud mean we r off the calculation anyway so having no effect on the fix<br><br>Trader-11: fine if we are off the calculation it is always better than we are in To get libor your way you always need to be off teh calculation<br><br>Submitter-9: to show the direction i totally agree….but in case u have a refix i wud say its better to be in the calc on the low side<br><br>Trader-11: no we had a chat with [Trader-3] about that and we do not think so Maybe he is wrong!!! If you are un menas you increase the libor no? | Deutsche Bank | Deutsche Bank DOJ Statement of Facts at 63-65; DB Group DOJ Statement of Facts at 37-39. |

5

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. 15-cv-0871 (SHS)

|  |  |  |  |
|---|---|---|---|
| | Submitter-9: it depends what u expect all the other to quote….on the day of ur refix its better to be the lowest in the calc to bring libor down, no? But to make sure risk on the 1m libor today clearly on the downside, means coming more down to 2.50 area . . maybe all the banks quoting unchgd high 1m libor yesterday might go down quite a lot today<br><br>Trader-11: good<br><br>Submitter-9: will go 38 in thw 1m fixing<br><br>Trader-11: Thank you | | |
| November 28, 2008 | Senior Yen Trader-Submitter: can we leave 1m unchanged tuesday? sorry until tuesday also will check dbgf sorry about that . . .<br><br>Swiss Franc Submitter 1: sure no probl will quote unchgd 1.00 for 1,2 and 3 mths if ok<br><br>Senior Yen Trader-Submitter : many Thanks | Deutsche Bank | Deutsche Bank CFTC Order at 33-34. |
| December 3, 2008 | Swiss Franc Submitter 1: morning mate….do you still need high 1m fix, rite?<br><br>Senior Yen Trader-Submitter: Hi [Swiss France Submitter 1] no gig axe all out<br><br>Swiss Franc Submitter 1: ok gr8 in that case i will lower our quote | Deutsche Bank | Deutsche Bank CFTC Order at 34. |
| December 4, 2008 | Swiss Franc Trader: can you put 6m swiss libor low pls? | RBS | RBS DOJ |

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. **15-cv-0871 (SHS)**

| | | | Statement of Facts at 34-35; RBS CFTC Order at 25-26. |
|---|---|---|---|
| | Primary Submitter: NO | | |
| | Swiss Franc Trader: should have pushed the door harder | | |
| | Primary Submitter: Whats it worth | | |
| | Swiss Franc Trader: ive got some sushi rolls from yesterday? | | |
| | Primary Submitter: ok low 6m, just for u | | |
| | Swiss Franc Trader: wooooooohooooooo[,] 0.01%? thatd be awesome | | |
| | Primary Submitter: 1.33 | | |
| | Swiss Franc Trader: perfect[,] u r a nice man | | |
| December 31, 2008 | Swiss Franc Trader: High 3m libor pls!!!!!! | RBS | RBS CFTC Order at 26. |
| | Primary Submitter: ok if i must | | |
| | Swiss Franc Trader: Yes pls | | |
| | [. . .] | | |
| | Swiss Franc Trader: U the man | | |
| January 16, 2009 | (To Primary Submitter) | RBS | RBS CFTC Order at 26. |
| | Swiss Franc Trader: high 3m libor pls!!!!!! | | |

7

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al., Docket No. 15-cv-0871 (SHS)*

| | | | |
|---|---|---|---|
| January 30, 2009 | Swiss Franc Trader: low 6m libor pls!!!!!! | | |
| | Swiss Franc Trader: high 3m libors pls!!!!! | RBS | RBS DOJ Statement of Facts at 35; RBS CFTC Order at 26-27; RBS FSA Final Notice at 12-13. |
| | Primary Submitter: 0.50?? | | |
| | Primary Submitter: 0.51 | | |
| | Primary Submitter: 0.52 | | |
| | Primary Submitter: 0.53 | | |
| | Swiss Franc Trader: 0.54 | | |
| | Swiss Franc Trader: 0.54 | | |
| | Swiss Franc Trader: 0.54 | | |
| | Swiss Franc Trader: 0.54 | | |
| | Swiss Franc Trader: 0.54 | | |
| | Swiss Franc Trader: 0.54 | | |
| | Swiss Franc Trader: 0.54 | | |
| | Swiss Franc Trader: 0.54 | | |
| | Swiss Franc Trader: and low 6m | | |

8

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. **15-cv-0871 (SHS)**

| | | | |
|---|---|---|---|
| | Primary Submitter: Ok i get ya | | |
| | Swiss Franc Trader: 0.65 | | |
| | Swiss Franc Trader: 0.65 | | |
| | Swiss Franc Trader: 0.65 | | |
| | Swiss Franc Trader: 0.65 | | |
| | Primary Submitter: ok | | |
| | Primary Submitter: libors as requested | | |
| | Swiss Franc Trader: you a top dog | | |
| February 11, 2009 | Junior Money Markets Trader: chf libors anything special? | RBS | RBS CFTC Order at 27; RBS FSA Final Notice at 12. |
| | Swiss Franc Trader: high 3m pls[,] 6m neutral[,] hanks thanks | | |
| March 2, 2009 | Swiss Franc Trader-8: (in chat room containing at least Trader-7 and Submitter-1) can you fix 3mth libor as high as possible today, thanks. | RBS | RBS DOJ Statement of Facts at 36. |
| March 16, 2009 | Trader-7: can we pls get a very very low very low 3m and 6m fix today pls. | RBS | RBS DOJ Statement of Facts at 35; RBS FSA Final Notice at 12. |
| | Trader-7: we have rather large fixings! | | |
| | Submitter-1: perfect, if that's what u want | | |
| | Trader-7: and then from tomorrow . . . we need them through the | | |

9

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. 15-cv-0871 (SHS)

| | roof!!!! | | |
|---|---|---|---|
| March 17, 2009 | Swiss Franc Trader: we need a few days unch<br><br>Bank E Swiss Franc Trader: yes<br><br>Swiss Franc Trader: i ask [Primary Submitter] now to fix unch every day | RBS<br>Bank E | RBS CFTC Order at 28. |
| March 19, 2009 | Swiss Franc Trader: hello mr [Primary Submitter][,] can we go unch for libors again pls? 42 54? Or any lower in 6m would make u the best guy ever<br><br>Primary Submitter: 40 52<br><br>Swiss Franc Trader: can we make the 3m higher pretty pretty please? How about 41 53?<br><br>Primary Submitter: ok you win<br><br>Swiss Franc Trader: u r the man | RBS | RBS CFTC Order at 27. |
| April 9, 2009 | Swiss Franc Trader 7: (in chat with at least Junior Money Markets Trader) can we go 41 and 52 today pls guys?<br><br>Junior Money Markets Trader: sure guys<br><br>Junior Money Markets Trader: thats in | RBS | RBS DOJ Statement of Facts at 37. |
| May 5, 2009 | Swiss Franc Trader: can we get high 3m, low 6m pls! | RBS | RBS DOJ Statement of Facts |

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. 15-cv-0871 (SHS)

| | | | |
|---|---|---|---|
| | Primary Submitter: maybe<br><br>Swiss Franc Trader: PPPPLLLLLEEEEAAAAASSSSEEEEE<br><br>Primary Submitter: ok 41 52<br><br>Swiss Franc Trader: perfect perfect | | at 35; RBS CFTC Order at 27. |
| May 14, 2009 | Swiss Franc Trader: [Primary Submitter] pls can we get super high 3m[,] super low 6m<br><br>Swiss Franc Trader: PRETTY PLEASE!<br><br>Primary Submitter: 41 & 51<br><br>Swiss Franc Trader: if u did that[,] i would lvoe [sic] u forever<br><br>Primary Submitter: 41 & 55 then…<br><br>Swiss Franc Trader: if u did that i would come over there and make love to you[,] your choice<br><br>Primary Submitter: 41+51 it is<br><br>Swiss Franc Trader: thouht [sic] so<br><br>Primary Submitter: so shallow | RBS | RBS DOJ Statement of Facts at 36; RBS CFTC Order at 28-29. |
| May 14, 2009 | Swiss Franc Trader: we are good!<br><br>Bank E Swiss Franc Trader: yes[,] look at it now[,] low | RBS<br>Bank E | RBS CFTC Order at 29. |

11

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. 15-cv-0871 (SHS)

| | | | |
|---|---|---|---|
| | libor[,] and chf libor good too [...]<br><br>Swiss Franc Trader: [Primary Submitter] did me big favour today[,] he set 41 and 51<br><br>Bank E Swiss Franc Trader: sweet | | |
| July 2, 2009 | Non-Euro Desk Manager: Hi morning mate! Do you have any special requests for the libor?<br><br>Senior Yen Trader-Submitter: keep 1m, 3m and 6m where they are please<br><br>Non-Euro Desk Manager: ok will be done mate | Deutsche Bank | Deutsche Bank CFTC Order at 34. |
| March 10, 2010 | Senior Yen Trader-Submitter: what ahppened withyour 6m libor<br><br>Swiss franc Submitter 1: sh.......did u have a refix?<br><br>Senior Yen Trader-Submitter: no not today back to 1 please<br><br>Swiss franc Submitter 1: sure will take care tom | Deutsche Bank | Deutsche Bank CFTC Order at 34. |
| September 9, 2010 | London MMD Swiss Franc Trader 2: Hi [Swiss Franc Submitter 2], good day to you, just to let you know if you can help...well or at least dont kill on that one pls. Got quite big fixings today: I am for: Lower fix in 1m higher fix in 3m lower fix in 6m txs  same tomorrow in 6s3s and reverse monday ...the beauty of stupid mismatches<br><br>Swiss Franc Submitter 2: only helps you if relative to each other, right?  i actually think a higher 3m fixing relative to 1m and 6m would perfectly reflect market movements today, should be no | Deutsche Bank | Deutsche Bank CFTC Order at 34-35. |

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.*, Docket No. 15-cv-0871 (SHS)

| | | | |
|---|---|---|---|
| | problem          :-)<br><br>London MMD Swiss Franc Trader 2: i like your thinking!  tks<br><br>Swiss Franc Submitter 2: won't have any effect though I'm just realizing. my fixings are among the highest, they are not counting into the average right now anyway<br><br>London MMD  Swiss Franc Trader 2: haha, ok<br><br>Swiss Franc Submitter 2: sorry.  I'm long  :-) | | |
| September 22, 2010 | Swiss franc Submitter 2 (email to several Pool and MMD traders): hi! libors unchanged today. | Deutsche Bank | Deutsche Bank CFTC Order at 35. |
| October 4, 2010 | London MMD Swiss Franc Trader 2: hello hello, so have u sorted when u coming around? also, we re not the highest in fixings anymore, do you think you could increase your 3m slightly from tomorrow on if suits obviously....bloody cs moved lower today and i m paid for the next 3 weeks or so | Deutsche Bank | Deutsche Bank CFTC Order at 35. |
| April 18, 2011 | Swiss franc Submitter 2 (email to several Pool and MMD traders): hihi, chf libors unchanged please. | Deutsche Bank | Deutsche Bank CFTC Order at 35. |

13