## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUND LIQUIDATION HOLDINGS LLC as assignee and successor-in-interest to SONTERRA CAPITAL MASTER FUND LTD., FRONTPOINT EUROPEAN FUND, L.P., FRONTPOINT FINANCIAL SERVICES FUND, L.P., FRONTPOINT HEALTHCARE FLAGSHIP ENHANCED FUND, L.P., FRONTPOINT HEALTH FLAGSHIP FUND, L.P., FRONTPOINT HEALTHCARE HORIZONS FUND L.P., FRONTPOINT FINANCIAL HORIZONS FUND, L.P., FRONTPOINT UTILITY AND ENERGY FUND L.P., HUNTER GLOBAL INVESTORS FUND I, L.P., HUNTER GLOBAL INVESTORS OFFSHORE FUND LTD., HUNTER GLOBAL INVESTORS SRI FUND LTD., HG HOLDINGS LTD., HG HOLDINGS II LTD., RICHARD DENNIS, and the CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM on behalf of themselves and all others similarly situated, <br><br>Plaintiffs,<br><br>v.<br><br>CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, JPMORGAN CHASE & CO., NATWEST MARKETS PLC, UBS AG, DEUTSCHE BANK AG, DB GROUP SERVICES UK LIMITED, TP ICAP PLC, TULLETT PREBON AMERICAS CORP., TULLETT PREBON (USA) INC., TULLETT PREBON FINANCIAL SERVICES LLC, TULLETT PREBON (EUROPE) LIMITED, COSMOREX AG, ICAP EUROPE LIMITED, ICAP SECURITIES USA LLC, NEX GROUP LIMITED, INTERCAPITAL CAPITAL MARKETS LLC, GOTTEX BROKERS SA, VELCOR SA AND JOHN DOE NOS. 1-50,<br><br>Defendants. | Case No. 15-cv-00871 (SHS)<br><br>Hon. Sidney H. Stein<br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 5

    A.    Plaintiffs and Assigning Entities ............................................................... 5

    B.    Defendants ................................................................................................. 7

    C.    CHF LIBOR and the LIBOR Process ...................................................... 8

    D.    Procedural History .................................................................................... 8

        1.    The First Amended Complaint and *Sonterra I* ........................... 8

        2.    The Second Amended Complaint and *Sonterra II* ...................... 9

        3.    The Appeal .................................................................................. 10

        4.    The Third Amended Complaint .................................................. 11

ARGUMENT ........................................................................................................ 12

I.    PLAINTIFFS LACK ARTICLE III STANDING BECAUSE FLH WAS NEVER ASSIGNED THE CLAIMS ASSERTED IN THIS ACTION. ....................................... 12

    A.    FLH Lacks Article III Standing to Bring Claims on Behalf of the Dissolved Funds. ............................................................................................... 12

        1.    The Sonterra APA Failed to Assign the Relevant Claims to FLH. .......... 13

        ██████████████████████████████████████████████████████████

        3.    The FrontPoint APA Excludes Assignment of the Relevant Claims........ 16

        4.    Any Alleged Assignment of Claims Would Violate New York's Prohibition on Champerty. .......................................................................... 18

    B.    CalSTRS and Dennis Lacked Standing to Belatedly Join This Action. ............... 18

II.    PLAINTIFFS' ANTITRUST CLAIMS BASED ON BID-ASK SPREAD CONDUCT SHOULD BE DISMISSED BECAUSE PLAINTIFFS DID NOT TRANSACT IN THE INSTRUMENTS ALLEGEDLY MANIPULATED................... 19

III.    PLAINTIFFS' ANTITRUST CLAIMS BASED ON THE ALLEGED CONSPIRACY TO MANIPULATE CHF LIBOR SHOULD BE DISMISSED............ 22

A.      Plaintiffs' "New" Factual Allegations Do Not Impact the Reasoning Behind This Court's Prior Decision That Plaintiffs Fail to Allege a Plausible Conspiracy to Manipulate CHF LIBOR. ............................................................... 23

B.      Plaintiffs Lack Antitrust Standing Because They Are Not Efficient Enforcers of the Antitrust Laws and They Fail to Plausibly Allege Antitrust Injury.............................................................................................................................. 28

      1.     Plaintiffs Are Not Efficient Enforcers of the Antitrust Laws Because All Four Factors Weigh Against Plaintiffs. .............................................. 28

      2.     Plaintiffs Fail to Allege Antitrust Injury Because FX Forwards and CME Futures Have No Direct Relationship to CHF LIBOR. .................. 34

C.      Plaintiffs' Antitrust Claims Are Time-Barred. ....................................................... 35

IV.     PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED BECAUSE THE CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL AND PLAINTIFFS FAIL TO PLEAD ESSENTIAL ELEMENTS. ............................................................... 37

A.      Plaintiffs' RICO Claims Are Extraterritorial Because Plaintiffs Still Allege a Foreign Scheme That Lacks Domestic Core Conduct. ...................................... 37

B.      Plaintiffs Fail to Plead Proximate Cause Because Plaintiffs Fail to Allege Any Direct Dealings Between Defendants and Most Plaintiffs............................ 39

C.      Plaintiffs Fail to Plead Essential Elements of a RICO Claim. .............................. 40

      1.     Plaintiffs Fail to Plead a RICO Enterprise Because Plaintiffs Still Fail to Plead That Defendants Shared a Common Purpose to Conspire to Manipulate CHF LIBOR. ...................................................... 41

      2.     Plaintiffs Fail to Plead the Requisite Predicate Acts of Wire Fraud Because the TAC Lacks Specific Allegations of False CHF LIBOR Submissions Involving UBS or the Brokers. ............................................. 42

      3.     Plaintiffs Fail to Plead a Pattern of Racketeering Activity Because They Do Not Plausibly Allege Interfirm Collusion. .................................. 44

D.      Plaintiffs Fail to State a RICO Conspiracy Claim. ................................................ 44

E.      Plaintiffs' RICO Claims Are Time-Barred. ............................................................ 45

V.      PLAINTIFFS' STATE LAW CLAIMS AGAINST UBS SHOULD BE DISMISSED BECAUSE THEY CANNOT PLAUSIBLY ALLEGE HARM OR STANDING. ..................................................................................................................... 46

VI.     THE FOREIGN DEFENDANTS ARE NOT SUBJECT TO PERSONAL

JURISDICTION. ........................................................................................... 48

    A.    The Foreign Defendants Are Not Subject to General Jurisdiction. ..................... 49

    B.    The Foreign Defendants Are Not Subject to Specific Jurisdiction...................... 49

        1.    Plaintiffs Do Not Allege "Purposeful Availment"—*i.e.*, Suit-Related Conduct Within the United States. ............................................. 51

        2.    Plaintiffs Do Not Allege "Purposeful Direction"—*i.e.*, Foreign Suit-Related Conduct "Expressly Aimed at the Forum." ................................. 57

    C.    Plaintiffs Cannot Rely on "Conspiracy Jurisdiction." ........................................... 59

        1.    Plaintiffs Fail to Plausibly Plead Any Conspiracy.................................... 60

        2.    Plaintiffs Fail to Satisfy the Long-Arm Statute. ....................................... 62

    D.    CONSIDERATION OF FAIR PLAY AND SUBSTANTIAL JUSTICE SUPPORT DISMISSAL OF THE FOREIGN DEFENDANTS ........................ 63

VII.    PLAINTIFFS FAIL TO ALLEGE PROPER VENUE UNDER THE CLAYTON ACT AS TO THE FOREIGN BROKERS.......................................................................... 64

CONCLUSION.................................................................................................... 65

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
  2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir.
  2019) ...................................................................................................................52, 58

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
  771 F. App'x 498 (2d Cir. 2019) .......................................................................33

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
  944 F.2d 971 (2d Cir. 1991)...............................................................................15

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*,
  651 F. Supp. 2d 155 (S.D.N.Y. 2009)................................................................47

*Alaska Dep't of Revenue, Treasury Div. v. Manku*,
  2021 WL 3027170, (2d Cir. July 19, 2021) (summary order)..............................24

*In re Aluminum Warehousing Antitrust Litig.*,
  90 F. Supp. 3d 219 (S.D.N.Y. 2015)...................................................................61

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)............................................................................................40

*Aquiline Cap. Partners LLC v. FinArch LLC*,
  861 F. Supp. 2d 378 (S.D.N.Y. 2012).................................................................56

*Aretakis v. Caesars Entm't*,
  2018 WL 1069450 (S.D.N.Y. Feb. 23, 2018)......................................................18

*Armstrong v. McAlpin*,
  699 F.2d 79 (2d Cir. 1983).................................................................................36

*Asahi Metal Indus. Co. v. Super. Ct.*,
  480 U.S. 102 (1987)............................................................................................64

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)................................................................................28, 33, 34

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  171 F.3d 779 (2d Cir. 1999)...............................................................................57

*Bascuñán v. Elsaca*,
  927 F.3d 108 (2d Cir. 2019)............................................................................4, 38

*Baur v. Veneman,*
    352 F.3d 625 (2d Cir. 2003).................................................................................19

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).................................................................................28, 58

*Berkshire Bank v. Lloyds Banking Grp. plc,*
    2022 WL 569819 (2d Cir. Feb. 25, 2022).................................................59, 63

*Boyle v. United States,*
    556 U.S. 938 (2009).................................................................................41

*Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.,*
    137 S. Ct. 1773 (2017).................................................................................52

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977).................................................................................34

*Charles Schwab Corp. v. Bank of Am. Corp.,*
    883 F.3d 68 (2d Cir. 2018).................................................53, 59, 60, 61

*In re Chocolate Confectionary Antitrust Litig.,*
    801 F.3d 383 (3d Cir. 2015).................................................................................26

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,*
    187 F.3d 229 (2d Cir. 1999).................................................................................44

*Contant v. Bank of Am. Corp.,*
    2018 WL 5292126 (S.D.N.Y. Oct. 25, 2018).................................................14

*Copperweld Corp. v. Indep. Tube Corp.,*
    467 U.S. 752 (1984).................................................................................26

*Cruz v. FXDirectDealer, LLC,*
    720 F.3d 115 (2d Cir. 2013).................................................................................39

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014).................................................................48, 49, 64

*Daniel v. Am. Bd. of Emergency Med.,*
    428 F.3d 408 (2d Cir. 2005).................................................................................64

*David v. Fed. Elec. Comm'n,*
    554 U.S. 724 (2008).................................................................................12

*DeFalco v. Bernas,*
    244 F.3d 286 (2d Cir. 2001).................................................................................42

*Dennis v. JPMorgan Chase & Co.*,
   343 F. Supp. 3d 122 (S.D.N.Y. 2018) ................................................................. 64

*DNAML Pty, Ltd. v. Apple Inc.*,
   2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015) ....................................................... 15

*Empire Merchs., LLC v. Reliable Churchill LLP*,
   902 F.3d 132 (2d Cir. 2018) ................................................................................. 39

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
   40 F.4th 56 (2d Cir. 2022) .................................................................................... 50

*FD Prop. Holding, Inc. v. U.S. Traffic Corp.*,
   206 F. Supp. 2d 362 (E.D.N.Y. 2002) ................................................................. 45

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
   639 F.3d 557 (2d Cir. 2011) ................................................................................. 14

*Fetet v. Altice USA, Inc.*,
   2021 WL 2941917 (S.D.N.Y. July 12, 2021) ....................................................... 47

*Fire & Police Pension Ass'n of Co. v. Bank of Montreal*,
   368 F. Supp. 3d 681 (S.D.N.Y. 2019) ................................................................. 36

*First Nationwide Bank v. Gelt Funding Corp.*,
   820 F. Supp. 89 (S.D.N.Y. 1993) ........................................................................ 42

*Fisher v. Aurora Health Care, Inc.*,
   558 F. App'x 653 (7th Cir. 2014) ........................................................................ 32

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021) .......................................................................... 49, 50, 51, 55

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ..................................................... 61

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ............................................... 54, 58

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
   2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018) ........................................................ 11

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
   991 F.3d 370 (2d Cir. 2021) ........................................................................ *passim*

*Fund Liquidation Holdings LLC v. Citibank, N.A.*,
   399 F. Supp. 3d 94 (S.D.N.Y. 2019), *vacated and remanded sub nom. Fund*
   *Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370 (2d Cir. 2021) ... 11, 15, 17, 46

*Fund Liquidation Holdings LLC v. UBS AG*,
    2021 WL 4482826 (S.D.N.Y. Sept. 30, 2021) .................................................... *passim*

*Gates v. Wilkinson*,
    2003 WL 21297296 (S.D.N.Y. June 4, 2003) .......................................................64

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016) .......................................................................... *passim*

*Georgia Malone & Co. v. Ralph Rieder*,
    86 A.D.3d 406 (1st Dep't 2011) .............................................................................46

*GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*,
    67 F.3d 463 (2d Cir. 1995).......................................................................................44

*Gucci Am. Inc. v. Bank of China*,
    768 F.3d 122 (2d Cir. 2014)...............................................................................49, 63

*Hadami, S.A. v. Xerox Corp.*,
    272 F. Supp. 3d 587 (S.D.N.Y. 2017)......................................................................46

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).................................................................................................18

*Hill v. HSBC Bank plc*,
    207 F. Supp. 3d 333 (S.D.N.Y. 2016)......................................................................57

*HSH Nordbank AG N.Y. Branch v. Street*,
    2012 WL 2921875 (S.D.N.Y. July 18, 2012) ..........................................................56

*In re Inclusive Access Court Materials Antitrust Litig.*,
    2021 WL 2419528 (S.D.N.Y. June 14, 2021) .........................................................27

*In re Interest Rates Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. July 28, 2017).........................................................37

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2d Cir. 2019)......................................................................................33

*Jerome M. Sobel & Co. v. Fleck*,
    2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) .........................................................45

*Justinian Cap. SPC v. WestLB AG*,
    28 N.Y.3d 160 (2016)...............................................................................................18

*Koch v. Christie's Intern. PLC*,
    699 F.3d 141 (2d Cir. 2012).............................................................................45, 46

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
   2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) ............................................................54, 55, 59

*Laydon v. Cooperatieve Rabobank U.A.*,
   55 F.4th 86 (2d Cir. 2022) ................................................................ *passim*

*Laydon v. Mizuho Bank, Ltd.*,
   2015 WL 1515358 (S.D.N.Y Mar. 31, 2015) ...................................................53, 58

*Laydon v. Mizuho Bank, Ltd.*,
   2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015) .....................................................38

*Leasing Control Inc. v. 500 Fifth Ave., Inc.*,
   142 N.Y.S.3d 807 (1st Dep't 2021) .................................................................18

*Lehman Bros. Comm. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
   179 F. Supp. 2d 159 (S.D.N.Y. 2001) ...............................................................14

*In re Lehman Bros. Inc.*,
   533 B.R. 362 (S.D.N.Y. 2015) .........................................................................14

*Lerman v. Joyce Int'l Inc.*,
   10 F.3d 106 (3d Cir. 1993) ..............................................................................15

*Levy v. BASF Metals Ltd.*,
   755 F. App'x 29 (2d Cir. 2018) ......................................................................35

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ................................................ *passim*

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   673 F.3d 50 (2d Cir. 2012) ..............................................................................56

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ..............................................................51, 56, 57

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................12, 19

*Maranga v. Vira*,
   386 F. Supp. 2d 299 (S.D.N.Y. 2005) ...............................................................57

*Masters v. Wilhelmina Model Agency, Inc.*,
   473 F.3d 423 (2d Cir. 2007) ............................................................................18

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ............................................................................26

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)....................................................................................................18

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)......................................................................................64

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993)....................................................................................43

*Mindspirit, LLC. v. Evalueserve Ltd.*,
    346 F. Supp. 3d 552 (S.D.N.Y. 2018)....................................................................47

*In re N. Sea Brent Crude Oil Futures Litig.*,
    2017 WL 2535731 (S.D.N.Y. June 8, 2017) ..........................................................48

*Nat'l Grp. for Commc'ns & Computs Ltd. v. Lucent Techs. Inc.*,
    420 F. Supp. 2d 253 (S.D.N.Y. 2006)....................................................................45

*Nypl v. JPMorgan Chase & Co.*,
    2018 WL 1472506 (S.D.N.Y. Mar. 22, 2018) ........................................................53

*PDK Labs, Inc. v. Friedlander*,
    103 F.3d 1105 (2d Cir. 1997)..................................................................................48

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
    609 F.3d 30 (2d Cir. 2010)......................................................................................48

*Petroleos Mexicanos v. SK Eng'g & Constr. Co.*,
    572 F. App'x 60 (2d Cir. 2014) ....................................................................37, 38, 39

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*,
    2020 WL 1285783 (S.D.N.Y. Mar. 18, 2020), *aff'd sub nom. Phoenix Light*
    *SF DAC v. U.S. Bank Nat'l Ass'n*, 2021 WL 4515256 (2d Cir. Oct. 4, 2021) ........18

*In re Platinum & Palladium Antitrust Litig.*,
    2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ........................................................59

*In re Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020)....................................................................58

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980)................................................................................32, 33

*Rio Tinto PLC v. Vale*,
    2015 WL 7769534 (S.D.N.Y. Nov. 20, 2015) ........................................................45

*RJR Nabisco, Inc. v. Eur. Cmty.*,
    579 U.S. 325 (2016)................................................................................................37

*Roth v. CitiMortgage Inc.*,
   756 F.3d 178 (2d Cir. 2014)......................................................................13

*Rudersdal v. Harris*,
   2022 WL 263568 (S.D.N.Y. Jan. 28, 2022) ................................................63

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
   22 F.4th 103 (2d Cir. 2021) ............................................................. *passim*

*Sejin Precision Indus. Co., Ltd. v. Citibank, N.A.*,
   2017 WL 4350323 (S.D.N.Y. June 28, 2017) ...........................................47

*Set Cap. LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021)........................................................................18

*Simmons v. Reich*,
   2021 WL 5023354 (2d Cir. Oct. 29, 2021)...............................................45

*SL-x IP S.á.r.l. v. Bank of Am. Corp.*,
   2021 WL 4523711 (S.D.N.Y. Sept. 30, 2021).........................................36

*United States ex rel. Smith v. N.Y. Presbyterian Hosp.*,
   2007 WL 2142312 (S.D.N.Y. July 18, 2007) ...........................................47

*Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,
   366 F. Supp. 3d 516 (S.D.N.Y. 2018)................................................ *passim*

*Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,
   403 F. Supp. 3d 257 (S.D.N.Y. 2019)..............................................2, 15, 17, 46

*Sonterra Cap. Master Fund v. Credit Suisse Grp. AG*,
   409 F. Supp. 3d 261 (S.D.N.Y. 2019)................................................ *passim*

*Sonterra Capital Master Fund v. Credit Suisse Group AG*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017)................................................ *passim*

*Spool v. World Child Intern. Adoption Agency*,
   520 F.3d 178 (2d Cir. 2008)......................................................................44

*In re SSA Bonds Antitrust Litig.*,
   420 F. Supp. 3d 219 (S.D.N.Y. 2019)..............................................54, 62

*Sullivan v. Barclays PLC*,
   2017 WL 685570 (S.D.N.Y. Feb. 21, 2017).....................................34, 38, 39, 58

*Sunward Elecs., Inc. v. McDonald*,
   362 F.3d 17 (2d Cir. 2004)........................................................................48

*Top Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998) .................................................................47

*Ulit4less, Inc. v. Fedex Corp.*,
    871 F.3d 199 (2d Cir. 2017) ...............................................................41

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ...............................................................27

*United States v. Connolly*,
    24 F.4th 821 (2d Cir. 2022) ...............................................................43

*Viropro, Inc. v. Pricewaterhousecoopers Advisory Servs. Sdn Bhd*,
    2016 WL 225686 (S.D.N.Y. Jan. 19, 2016) .......................................56

*Walden v. Fiore*,
    571 U.S. 277 (2014) ..........................................................48, 49, 51, 57

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016) ...............................................50, 55, 56

**Statutes**

15 U.S.C. § 15b ...................................................................................35

15 U.S.C. § 22 .....................................................................................64

18 U.S.C. § 1961(4) .............................................................................41

18 U.S.C. § 1962(c) .............................................................................40

18 U.S.C. § 1964(c) .............................................................................39

N.Y. Judiciary Law § 489 ...................................................................18

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ............................................14

**Rules**

Federal Rule of Civil Procedure 4(k)(1)(C) ........................................63

Federal Rule of Civil Procedure 4(k)(2) .............................................63

N.Y. C.P.L.R. § 302(a)(1) ..............................................................56, 57

## PRELIMINARY STATEMENT

This is Plaintiffs' fourth attempt to state a claim for relief, but Plaintiffs have *still* not cured the myriad deficiencies the Court identified in *Sonterra I* and *II*.[1]  In *Sonterra I*, the Court dismissed all claims, holding that Plaintiffs lacked standing to bring their bid-ask spread manipulation claims; Plaintiffs presented an implausible theory of antitrust conspiracy; Plaintiffs that did not allege direct transactions lacked antitrust standing; and Plaintiffs' RICO claims were impermissibly extraterritorial.  Since that time, Plaintiffs' case has only worsened as the Second Circuit and other judges in this District have issued decisions that confirm this Court's reasoning.

Plaintiffs' failure is all the more remarkable because they have had ample time and material to develop a pleading that passes muster.  This case was remanded on September 21, 2021, but Plaintiffs did not file the Third Amended Complaint ("TAC") until November 23, 2022.  Dkt. 401.  Plaintiffs thus had more than a year to "incorporate factual allegations ███████ ████████████████████████████████████████████████████████████████████ ████████████████  TAC ¶ 13.  Yet it is clearer than ever that Plaintiffs have no plausible claims to assert against UBS or the remaining defendant Brokers.[2]

Indeed, to dismiss the entirety of Plaintiffs' case again, the Court need only reach a limited set of issues that are already well-grounded in caselaw:

> 1. The entities that purchased their purported CHF LIBOR financial instruments from third parties (and not Defendants) lack antitrust standing because those entities are not efficient enforcers under the "first step" rule.  *Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 98-99 (2d Cir. 2022); *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 116 (2d Cir.

---

[1] References to *Sonterra I* and *II* are to the Court's prior decisions in this case, *Sonterra Capital Master Fund v. Credit Suisse Group AG*, 277 F. Supp. 3d 521 (S.D.N.Y. 2017) and 409 F. Supp. 3d 261 (S.D.N.Y. 2019).  Unless otherwise stated, the motion adopts the abbreviations Plaintiffs use in the TAC.

[2] The "Brokers" are TP ICAP plc ("TP ICAP"), Tullett Prebon Americas Corp., Tullett Prebon (USA) Inc., Tullett Prebon Financial Services LLC, Tullett Prebon (Europe) Limited ("TPEL"), Cosmorex AG ("Cosmorex"), Gottex Brokers SA ("Gottex"), and Velcor SA ("Velcor").

2021) ("*Schwab II*"); *Sonterra I*, 277 F. Supp. 3d at 558-59.

2. The few entities that alleged direct transactions with banks—certain FrontPoint funds—did not effectively assign their claims to FLH, the Plaintiff suing in their name, and thus FLH lacks standing. *Fund Liquidation Holdings LLC v. UBS AG*, 2021 WL 4482826, at *4 (S.D.N.Y. Sept. 30, 2021) ("*Yen LIBOR*"); *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257, 264-65 (S.D.N.Y. 2019) ("*Sterling II*").

3. Plaintiffs' RICO claims are extraterritorial because Plaintiffs allege a conspiracy by banks "based abroad" to manipulate quotes "submitted from abroad to a banking association located abroad" for a "foreign currency" interest rate benchmark. *Sonterra I*, 277 F. Supp. 3d at 582; *see Laydon*, 55 F.4th at 96-98 (finding CEA claim "impermissibly extraterritorial").

4. Plaintiffs' state law claims are an improvident exercise of pendent jurisdiction in the absence of a viable federal claim. *Sonterra I*, 277 F. Supp. 3d at 584.

Dismissal is thus merited for even stronger (and narrower) reasons than in *Sonterra I*.

There are also multiple additional reasons to dismiss each of Plaintiffs' claims. *First*, the Court lacks subject matter jurisdiction because none of the named Plaintiffs has Article III standing. FLH purports to sue in the name of three sets of dissolved investment funds: Sonterra, Hunter, and FrontPoint (the "Dissolved Funds"). The Dissolved Funds do not (and cannot) sue in their own names because they no longer exist. Instead, the Dissolved Funds purportedly assigned their claims to FLH. But none of the Asset Purchase Agreements ("APAs") conveyed the right to bring claims arising out of FX forwards, the only instrument the Dissolved Funds claim to have traded. And the FrontPoint APA only assigned to FLH the ability to participate in a "securities class action," which this case is decidedly not. FLH's lack of standing, due to its lack of any claims, is also fatal to the only other two Plaintiffs, CalSTRS and Dennis. CalSTRS and Dennis first appeared in the Second Amended Complaint ("SAC") in December 2017. However, "it is well-understood that amended pleadings [like the SAC] may cure jurisdictional allegations," but they cannot cure "defective jurisdiction itself." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 388-89 (2d Cir. 2021) ("*SIBOR*").

2

*Second*, as the Court held in *Sonterra I*, Plaintiffs still lack Article III standing to bring claims based on alleged collusive manipulation of the "bid-ask" spread, which is distinct from the alleged conspiracy to manipulate CHF LIBOR.  *Compare* TAC ¶¶ 156-160 *with* TAC ¶¶ 190-191.  Plaintiffs' bid-ask spread claims are entirely based on settlements with the European Commission ("EC") and Swiss Competition Commission ("COMCO"), and some related chats, but Plaintiffs have not alleged, as they must, "that they transacted in any of the specific types of derivatives covered by" those settlements.  *Sonterra I*, 277 F. Supp. 3d at 545.  Plaintiffs attempt to wedge their FX forward trades into the "bid-ask" box, but those efforts amount to the unremarkable proposition that banks trade FX forwards in addition to other types of derivatives.

*Third*, Plaintiffs' antitrust claims based on an alleged conspiracy to manipulate CHF LIBOR warrant dismissal on the same grounds as found in *Sonterra I*.  In the more than five years since that decision, Plaintiffs still offer no "coherent explanation" of how Defendants (including the Brokers, who do not transact for their own accounts) could share a common motive to engage in bidirectional manipulation of CHF LIBOR.  277 F. Supp. 3d at 556.  As the Court observed, "[s]uch a scenario is hardly plausible" because, among other reasons, banks do not hold the same trading positions.  *Id.* at 555.  Indeed, Plaintiffs still fail to point to *any* evidence—any chat, any email, anything at all—that shows UBS or the Brokers participated in the alleged conspiracy by either soliciting or receiving a request from another bank to manipulate CHF LIBOR.  ████████████████████████████████████████████████████████████████████████████████████████ TAC ¶ 13.  Yet Plaintiffs' "smoking gun," *id.*, is nowhere to be found.

As the Court held in *Sonterra I*, Plaintiffs' antitrust claims should also be dismissed because Plaintiffs lack antitrust standing.  Since *Sonterra I*, the Second Circuit has confirmed

3

that plaintiffs who did not directly transact with defendants are not efficient enforcers of the antitrust laws. *Laydon*, 55 F.4th at 98-100; *Schwab II*, 22 F.4th at 115-19. None of the Plaintiffs transacted with the Brokers (nor could they have), and only two of the Dissolved Funds (FrontPoint Healthcare Enhanced and FrontPoint European) claim transactions with UBS, both in FX forwards. Thus, the vast majority of Plaintiffs have no standing. But even the FrontPoint entities' claims should be dismissed because there is a highly attenuated chain of causation that separates alleged manipulation of CHF LIBOR from any impact on the prices of FX forwards.

*Fourth*, the Court should repeat its dismissal of Plaintiffs' RICO claims as impermissibly extraterritorial because here, too, the Court's reasoning in *Sonterra I* has been confirmed by the Second Circuit. Plaintiffs still allege a foreign-focused scheme—a conspiracy by banks "based abroad" to manipulate quotes "submitted from abroad to a banking association located abroad" for a "foreign currency" interest rate benchmark, *Sonterra I*, 277 F. Supp. 3d at 582—that lacks the essential domestic "core" for a RICO claim predicated on wire fraud, *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019). Plaintiffs also still fail to adequately plead both the essential elements of a RICO claim and proximate causation because their alleged injuries are "several steps removed" from the alleged manipulation of CHF LIBOR. *Laydon*, 55 F.4th at 101.

*Fifth*, Plaintiffs' state law claims against UBS warrant dismissal because they cannot plausibly allege harm or standing. In any event, in the absence of a viable federal claim, the Court may once again decline to exercise supplemental jurisdiction.

*Finally*, Plaintiffs fail to establish a *prima facie* basis for the exercise of personal jurisdiction over UBS and the foreign Brokers. Most significantly, Plaintiffs fail to establish that the Foreign Defendants purposely availed themselves of the forum and fail to plead plausibly any domestic conspiracy that might supply a basis for the assertion of conspiracy jurisdiction.

## BACKGROUND

### A.      Plaintiffs and Assigning Entities

The TAC lists 16 entities on the side of plaintiffs, consisting of three Plaintiffs and 13 assignors.  The 13 assignors are the Dissolved Funds:  Sonterra, seven FrontPoint funds,[3] and five Hunter funds.[4]  The three Plaintiffs are FLH, a Delaware limited liability company first named as a party in the TAC; CalSTRS, a retirement fund; and Dennis, an individual.  TAC ¶¶ 24, 41-42.  Plaintiffs allege a class period from "at least January 1, 2001 through at least December 31, 2011." *Id.* ¶ 528.

Sonterra, the sole original plaintiff, was an investment fund that dissolved on December 28, 2012, years before it purportedly filed this action in 2015.  Harris Aff. ¶¶ 9, 11 & Exs. A-1, A-8.[5]  According to the TAC, "Sonterra unconditionally and irrevocably assigned and transferred all rights, title, and interests in certain of its assets" to FLH, on August 3, 2012.  TAC ¶ 24.  Plaintiffs assert generally that Sonterra transacted in CHF LIBOR-based derivatives "including Swiss franc foreign exchange forwards," *id.* ¶ 468, but allege no specific transactions.

FrontPoint consists of seven dissolved limited partnership funds.  TAC ¶¶ 25-31.  Certificates of cancellation were filed on behalf of FrontPoint European (on March 9, 2012); FrontPoint Utility (April 26, 2013); FrontPoint Financial Horizons (November 7, 2014); FrontPoint Healthcare Horizons (December 17, 2015); and FrontPoint Healthcare Flagship (December 17, 2015).  Kurtzberg Decl. Exs. B-F.  FrontPoint Financial Services and FrontPoint Healthcare Enhanced dissolved on October 3, 2014 and January 27, 2016, respectively.  Harris

---

[3] FrontPoint European, FrontPoint Financial Services, FrontPoint Healthcare Enhanced, FrontPoint Healthcare Flagship, FrontPoint Healthcare Horizons, FrontPoint Financial Horizons, and FrontPoint Utility ("FrontPoint")

[4] Hunter Global I, Hunter Global Offshore I, Hunter Global SRI, HG Holdings I, and HG Holdings II ("Hunter")

[5] "Harris Aff." refers to the Affidavit of John Michael Harris, Exhibit A to the Declaration of Joel Kurtzberg in Support of Defendants' Motion to Dismiss the SAC, dated February 7, 2018 (Dkt. 226) ("Kurtzberg Declaration").

Aff. ¶¶ 9, 11 & Exs. A-2-A-3, A-9-A-10.  Plaintiffs allege that "each of the FrontPoint Entities

unconditionally and irrevocably assigned and transferred all rights, title, and interests in certain

of their assets to FLH, in July and September 2011."  TAC ¶ 33.

Plaintiffs allege that "UBS directly transacted Swiss franc LIBOR-based derivatives with

U.S. counterparties, including the FrontPoint Entities," *id*. ¶ 87, though the TAC only contains

specific allegations of transactions between UBS and two of the FrontPoint Entities, both in

over-the-counter ("OTC") FX forwards:  (1) FrontPoint European and (2) FrontPoint Healthcare

Enhanced, *id*. ¶¶ 473, 477, 481, 485, 489.  FX forwards are "agreements to buy or sell a certain

amount of Swiss francs in terms of another currency, *e.g.*, U.S. Dollars, on some future date."

*Id*. ¶ 131.  While Plaintiffs allege that "[t]he cost of buying or selling Swiss francs in the future is

determined using an industry standard formula that incorporates Swiss franc LIBOR," *id*., the

exchange rate the parties agree to at the time of the contract is fixed by "highly negotiated

contracts" and not directly linked to CHF LIBOR, *Sonterra Cap. Master Fund, Ltd. v. Barclays

Bank PLC*, 366 F. Supp. 3d 516, 547 (S.D.N.Y. 2018) ("*Sterling I*").

Hunter consists of five dissolved funds.  TAC ¶¶ 34-39.  Hunter Global Offshore I and

Hunter Global SRI dissolved on April 22, 2013; HG Holdings and HG Holdings II did so on

February 20, 2013.  Harris Aff. ¶¶ 9, 11 & Ex. A-4-A-7, A-11-A14.  Hunter Global I voluntarily

wound up its operations and dissolved on December 30, 2011.  TAC ¶¶ 34, 40.  Plaintiffs assert

that "the Hunter Entities unconditionally and irrevocably assigned, and transferred all rights,

title, and interests in certain of their assets to FLH, on January 12, 2012."  *Id*. ¶ 40.  Plaintiffs

allege that Hunter transacted in "Swiss franc LIBOR-based derivatives," including "Swiss franc

foreign exchange forwards," *id*. ¶ 492, but allege no transactions with specific counterparties.

Richard Dennis is a resident of Illinois.  *Id*. ¶ 41.  Plaintiffs assert that Dennis traded CHF

currency futures contracts on the Chicago Mercantile Exchange ("CME").  *Id*. ¶¶ 41, 508.  As the Court explained in *Sonterra I*, "[f]or a futures contract traded on an exchange such as the CME the exchange functions as the intermediary, and there is no identifiable counterparty."  277 F. Supp. 3d at 538.  Prices of CME FX futures are allegedly determined using the same calculation used for FX forwards, but futures are traded on an exchange according to standardized terms.  TAC ¶¶ 119-120, 131-132.  As with FX forwards, the exchange rate is not directly linked to CHF LIBOR; indeed, there is "no direct relationship between [CHF LIBOR] and the price of the products purchased by Plaintiffs."  *Sterling I*, 366 F. Supp. 3d at 547.

CalSTRS is a California teachers' retirement fund.  TAC ¶ 42.  Plaintiffs allege that CalSTRS transacted in "foreign currency forwards" with Deutsche Bank, *id*. ¶ 519, and "Swiss franc foreign exchange forwards" with Credit Suisse, Deutsche Bank, JPMorgan, RBS, and UBS, *id*. ¶¶ 511, 513, 518.  CalSTRS does not assert any claims against UBS.  *Id*. ¶ 42.[6]

## B.    Defendants

The remaining defendants are UBS and eight Brokers.[7]  The other previously named bank defendants—JPMorgan, Deutsche Bank, RBS, and Credit Suisse—settled in 2017 (JPMorgan) and 2022 (all others).  JPMorgan, Deutsche Bank, and RBS produced ████████████ ███████████████████████ pursuant to their settlement agreements.  TAC ¶ 13.  UBS is a Swiss company incorporated in Switzerland with its principal place of business in Switzerland.[8]

---

[6] As part of a settlement with several states' Attorneys General, CalSTRS "release[d]" "any and all claims" against UBS "that have been or could be asserted in" this lawsuit.  UBS Settlement, https://ag.ny.gov/sites/default/files/ubs_settlement_agreement.pdf (last accessed January 25, 2023).

[7] On January 6, 2023, Plaintiffs informed the Court that they had agreed to stay "all litigation proceedings and deadlines" applicable to defendants Nex Group plc, ICAP Capital Markets (n/k/a Intercapital Capital Markets LLC), ICAP Securities USA LLC, and ICAP Europe Limited (collectively, "the ICAP Defendants") pending the anticipated filing of a motion for preliminary approval of Plaintiffs' settlement with the ICAP Defendants.  Dkt. 410.  On that basis, the ICAP Defendants are not participating in this motion.

[8] *See* Declaration of Richard Mumford in Support of UBS AG's Motion to Dismiss ("Mumford Decl."), dated August 15, 2015 (Dkt. 65) ¶ 2.

The supplemental brief filed by the Brokers details each of the eight Broker defendants.[9]

### C.    CHF LIBOR and the LIBOR Process

During the Class Period, CHF LIBOR, an interest rate benchmark, was determined by the British Bankers' Association ("BBA").  TAC ¶¶ 10, 112-113.  Pursuant to BBA guidelines, a group of 12 panel banks contributed submissions that were used in the determination of CHF LIBOR.  *Id.* ¶ 114.  Each trading day, each panel bank submitted the hypothetical rate of interest at which it believed it could borrow unsecured funds denominated in Swiss francs in a "reasonable market size" in the London interbank market just prior to 11 a.m.  *Id.*  Each panel bank submitted interest rate quotes for 15 different "tenors," reflecting different maturities.  *Id.* ¶ 115.  Thomson Reuters used the submission to calculate CHF LIBOR as an interquartile average (discarding the top and bottom three submissions and averaging the remaining six) for each tenor.  *Id.* ¶ 116.  Thomson Reuters then published the daily CHF LIBOR for each tenor.  *Id.*

### D.    Procedural History

#### 1.    The First Amended Complaint and *Sonterra I*

Sonterra filed the original complaint as the only named plaintiff on February 5, 2015. Dkt. 1.  On June 19, 2015, the First Amended Complaint ("FAC") was filed, Dkt. 36, adding FrontPoint and Hunter as plaintiffs, as well as Frank Divitto.  The FAC did not disclose that Sonterra, FrontPoint, and Hunter did not exist or that they had purportedly assigned their claims to FLH.  Plaintiffs alleged that Defendants "conspired to rig the global market" for CHF LIBOR-based derivatives in two ways: "by (1) fixing the bid-ask spread on Swiss franc LIBOR-based derivatives; and (2) manipulating Swiss franc LIBOR."  FAC ¶¶ 1, 90.  As to the former, Plaintiffs alleged that for a five-month period between May and September 2007, Defendants

---

[9] *See* Supplemental Memorandum of Law in Support of the Broker Defendants' Motion to Dismiss the Third Amended Class Action Complaint ("Broker Brief" or "Broker Br.") § I.C.

conspired "to quote wider, fixed bid-ask spreads" for certain CHF LIBOR-based derivatives, "while agreeing to maintain a narrower bid-ask spread for trades amongst themselves." *Id.* ¶¶ 92-93.  With respect to the latter, Plaintiffs alleged that Defendants coordinated "false" CHF LIBOR submissions to the BBA, engaging in bidirectional manipulation "in response to requests" from co-conspirators to benefit their trading positions. *Id.* ¶ 99.

On September 25, 2017, the Court dismissed all claims in the FAC without prejudice. *Sonterra I*, 277 F. Supp. 3d at 555-59, 599-600.  In relevant part, the Court held the following:

1. Plaintiffs lacked standing to bring their bid-ask spread manipulation claims;

2. Plaintiffs presented an implausible theory of antitrust conspiracy (except as to RBS);

3. Plaintiffs that did not allege direct transactions lacked antitrust standing;

4. Plaintiffs' RICO claims were impermissibly extraterritorial;

5. Divitto's claims warranted dismissal because he failed to allege any injury; and

6. Exercising supplemental jurisdiction over the state law claims was improvident.

### 2.      The Second Amended Complaint and *Sonterra II*

On December 8, 2017, Plaintiffs filed the SAC, Dkt. 185, repeating the FAC's antitrust, CEA, RICO, and common law claims.  The SAC added Dennis and CalSTRS as plaintiffs, 12 Brokers as defendants, and ██████████████████████████████████ ██████████████████████████████  The SAC also revealed for the first time—more than two years after filing the suit—that the Dissolved Funds did not exist. *Id.* ¶¶ 24, 33, 40. The SAC asserted that, "[p]rior to voluntarily winding up their operations," the Dissolved Funds each assigned their claims to FLH, which was not a named plaintiff. *Id.*

On September 16, 2019, the Court granted Defendants' motions to dismiss on the basis that it "lacked subject matter jurisdiction over this action since the case's initial filing." *Sonterra II*, 409 F. Supp. 3d at 264.  The Court concluded that (1) the Dissolved Funds did not have

Article III standing because their dissolutions following the "[p]urported[] [a]ssign[ment]" of rights to FLH "result[ed] in a lack of redressable injury"; and (2) the "suit was, and remains, a legal nullity" because "[n]o amendment or substitution can cure this threshold jurisdictional defect." *Id*. at 266-67, 270.  And while the Court's decision "assume[d] *arguendo* that these claims were effectively assigned to FLH," the Court noted that it was "an assumption that is in considerable doubt." *Id*. at 268.

### 3.      The Appeal

On October 16, 2019, Plaintiffs filed a notice of appeal.  *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, No. 19-3367 (2d Cir. 2019).  Plaintiffs moved to hold the appeal in abeyance on November 27, 2019, pending the disposition of the *SIBOR* appeal, because both appeals "raise[d] the issue of whether the legal nullity doctrine dictates that district courts lack subject matter jurisdiction over any action filed in the name of a dissolved party."  *Id*., Dkt. 67 at 1-2.  The Second Circuit granted Plaintiffs' motion on December 4, 2019.  *Id*., Dkt. 71.

On March 17, 2021, the Second Circuit issued its *SIBOR* decision, holding "although the dissolved funds lacked standing at the time the case was commenced, Article III was nonetheless satisfied" because "the real party in interest [FLH] has had standing at all relevant times and may step into the dissolved entities' shoes without initiating a new action from scratch."  991 F.3d at 375.  However, if "the real party in interest either fails to materialize or lacks standing itself," a case should be "dismissed for want of subject-matter jurisdiction."  *Id*. at 386.

The Second Circuit also found that it was "not require[d]" to "resolve whether" FLH "received a valid assignment from FrontPoint because the district court already concluded that [FLH] received such an assignment from Sonterra," and on that basis, the Second Circuit concluded that FLH had Article III standing.  *Id*. at 392.  However, the district court never held that Sonterra validly assigned anything because it dismissed all of Sonterra's claims on efficient-

10

enforcer grounds. *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2018 WL

4830087, at *5-6 (S.D.N.Y. Oct. 4, 2018); *see also Fund Liquidation Holdings LLC v. Citibank,*

*N.A.*, 399 F. Supp. 3d 94, 104 (S.D.N.Y. 2019) ("*SIBOR III*"), *vacated and remanded sub nom.*

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370 (2d Cir. 2021). The Second

Circuit also opined on the FrontPoint APA, stating, "FrontPoint assigned only those claims

arising out of 'any future *securities* class action or lawsuit,'" noting "it was this limitation" that

"caused the district court to conclude" the "assignment was ineffective." *SIBOR*, 991 F.3d at

392 n.15.

On June 24, 2021, the parties filed a joint motion to remand the CHF LIBOR appeal to

this Court for further proceedings because "the *SIBOR* decision renders the full litigation of [the]

appeal unnecessary at this time." *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, No.

19-3367 (2d Cir. 2019), Dkt. 85 at 2. The parties also stipulated that they did "not necessarily

agree" on "further consequences" of *SIBOR* and reserved "the right to make or oppose any or all

arguments in that regard." *Id*. On September 21, 2021, the Second Circuit granted the joint

motion for remand, Dkt. 102, and on October 27, 2021, the mandate was issued, Dkt. 103.

### 4.    The Third Amended Complaint

On November 23, 2022, more than a year after the mandate was issued, Plaintiffs filed

the TAC, adding chats and emails from members of the alleged conspiracy, characterized as

"new direct, 'smoking gun' evidence" ██████████████████████████████████

████████████████████████████ TAC ¶ 13. The other changes are the (1) addition of

FLH and (2) removal of the dismissed CEA claim and CalSTRS' claims against UBS. *Id*. ¶ 42.

11

**ARGUMENT**

I.  **PLAINTIFFS LACK ARTICLE III STANDING BECAUSE FLH WAS NEVER ASSIGNED THE CLAIMS ASSERTED IN THIS ACTION.**

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing their standing to bring claims in federal court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The Article III standing inquiry is "focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *David v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008). Here, the Dissolved Funds are expressly not asserting claims in their names, TAC ¶¶ 24, 33, 40, and cannot do so because they "were no longer in existence when the case was initiated," *SIBOR*, 991 F.3d at 376, 384; *accord Sonterra II*, 409 F. Supp. 3d at 267. FLH may nevertheless pursue the Dissolved Funds' claims as Plaintiffs contend, *if* FLH had standing as the "real party in interest" when the action commenced—but this, in turn, depends on whether the Dissolved Funds validly assigned their claims to FLH. *SIBOR*, 991 F.3d at 386. As explained below, none of the Dissolved Funds did so, meaning FLH never had Article III standing. Accordingly, the Court lacked subject matter jurisdiction, both when this case was filed and when CalSTRS and Dennis tried to join via amendment in December of 2017.

A.  **FLH Lacks Article III Standing to Bring Claims on Behalf of the Dissolved Funds.**

As this Court recognized in *Sonterra II*, a valid "transfer of ownership of the claims would be essential for FLH to have standing to bring suit in dissolved plaintiffs' stead." 409 F. Supp. 3d at 268. The Second Circuit confirmed as much in *SIBOR*, stating that FLH could "step into the dissolved entities' shoes" only because it was the "the real party in interest" as the valid assignee of the entities' claims. *SIBOR*, 991 F.3d at 375. Plaintiffs allege in the TAC that each of the Dissolved Funds assigned their claims to FLH, which is suing in its own name "as assignee and successor-in-interest." TAC at 1. However, none of the Dissolved Funds' APAs

assigns FLH the right to bring the claims in this lawsuit.  Had they done so, the assignments

would be void under New York's prohibition on champerty.

### 1.   The Sonterra APA Failed to Assign the Relevant Claims to FLH.

As Judge Daniels previously held, the plain language of the Sonterra APA[10] makes clear

that FLH lacks Article III standing to bring Sonterra's claims.  *Yen LIBOR*, 2021 WL 4482826,

at *4.  To start, Sonterra's claims are exclusively based on FX forwards, which are derivatives

and the only instrument Sonterra allegedly traded.  TAC ¶ 468.  However, the Sonterra APA did

not assign any rights for FX forwards.[11]  The Sonterra APA instead conveyed only certain

"Assets," concerning "Recovery Rights" with respect to "Future Claims" arising from "Traded

Securities."  Sonterra APA, Arts. I § 1.1, II.  "Recovery Right" is defined as, "with respect to any

Claim, all monetary, legal and other rights held by or accruing to [Sonterra] in respect of such

Claim."  *Id*., Art. II.  "Claim" is defined as "any Existing Claim or Future Claim."  *Id*.[12]  "Future

Claim" is defined as "any and all claims of [Sonterra] to Recovery Rights related to the

ownership of, or any transaction in, any Traded Securities."  *Id*.  And "Traded Securities" are

defined as "all *Securities* that were owned, held, acquired, sold or otherwise disposed of by

[Sonterra] during the Trade Period."  *Id*. (emphasis added).  "Securities" is thus the key

definition—it is the root of what "Future Claims" Sonterra assigned—and it is defined as "*any

debt and/or equity securities* of any kind, type or nature, including, without limitation, stocks,

bonds, options, puts, calls, swaps and similar instruments or rights."  *Id*. (emphasis added).

---

[10] In assessing the sufficiency of the TAC, the Court may consider, among other things, "documents attached to the complaint as an exhibit or incorporated in it by reference," "matters of which judicial notice may be taken," or "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Roth v. CitiMortgage Inc*., 756 F.3d 178, 180 (2d Cir. 2014).

[11] The APAs are exhibits to the Declaration of Jefferson E. Bell, dated January 27, 2023:  the Sonterra APA (Aug. 3, 2012) is Exhibit 1; the FrontPoint APA (July 13, 2011) is Exhibit 2; ███████████████████████████

[12] Because the Sonterra APA was executed in 2012, long before this action was commenced, any claim that was "Existing" at the time of execution is irrelevant; "Future Claim" is the relevant term. *Id*.

The phrase "debt and/or equity securities" does not encompass FX forwards. A "debt security" is defined[13] as "[a] security representing funds borrowed by the corporation from the holder of the debt obligation; esp., a bond, note, or debenture." *Black's Law Dictionary* (11th ed. 2019). "Equity security" is defined as "[a] security representing an ownership interest in a corporation (such as a share of stock) rather than a debt interest (such as a bond)." *Id.* Neither of those come close to resembling OTC FX derivatives, which Plaintiffs have alleged are "agreements to buy or sell a certain amount of Swiss francs in terms of another currency, *e.g.*, U.S. Dollars, on some future date." TAC ¶ 131.

Judge Daniels arrived at the same conclusion in *Yen LIBOR*, holding that the "unambiguous" terms of the Sonterra APA established that it did not convey "claims relating to FX derivatives." 2021 WL 4482826, at *4. Judge Daniels explained that, while "the definition of 'Securities' encompasses a wide variety of financial instruments, it encompasses securities and securities-adjacent instruments"—and that "does not include FX derivatives." *Id.* Judge Daniels is hardly alone in reaching this conclusion.[14] *See, e.g.*, *Contant v. Bank of Am. Corp.*, 2018 WL 5292126, at *9 (S.D.N.Y. Oct. 25, 2018) ("although FX instruments are analogous to securities in some respects, Plaintiffs do not have recourse under federal securities [laws]"); *In re Lehman Bros. Inc.*, 533 B.R. 362, 378 (S.D.N.Y. 2015) (FX forwards do not equate to securities); *Lehman Bros. Comm. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) ("FX transactions do not constitute securities.").

---

[13] "[I]t is common practice for the courts of [New York] to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011).

[14] Plaintiffs newly allege that "[a] derivative is a security with a price that is dependent upon or derived from one or more underlying assets." TAC ¶ 118. However, Plaintiffs' allegation that "a derivative is a security" should not be credited, given it is conclusory, implausible, and contrary to the ordinary meaning of the term. It also neglects the phrase "debt and/or equity" as a limiting term before "securities" in the APA. In any event, if Plaintiffs believed that the derivatives at issue were securities, they would have brought their claims under the securities laws, not the Commodity Exchange Act. *Accord Sonterra I*, 277 F. Supp. 3d at 570.

The Sonterra APA also failed to assign the antitrust and RICO claims that FLH asserts, which is in accord with what Judges Hellerstein and Broderick have found.  *See SIBOR III*, 399 F. Supp. 3d at 102; *Sterling II*, 403 F. Supp. 3d at 265.  An assignment of an antitrust claim must be explicit, "either by making specific reference to the antitrust claim or by making an unambiguous assignment of causes of action in a manner that would clearly encompass the antitrust claim."  *DNAML Pty, Ltd. v. Apple Inc*., 2015 WL 9077075, at *3 (S.D.N.Y. Dec. 16, 2015) (collecting cases).  A RICO claim must also be expressly assigned.  *See id*. (citing *Lerman v. Joyce Int'l Inc*., 10 F.3d 106, 112 (3d Cir. 1993)).  The APA does not refer to the Sherman Act, Clayton Act, or RICO statute, nor does it even reference antitrust or RICO claims generally.  At best, the APA assigns "any and all claims of [Sonterra] to Recovery Rights related to the ownership of, or any transaction in, any Traded Securities."  Sonterra APA, Art. II.  However, such a general assignment of "Recovery Rights" lacks "express language transferring either 'antitrust claims' [or RICO claims] or 'all causes of action.'"  *SIBOR III*, 399 F. Supp. 3d at 102.[15]

The Sonterra APA also failed to assign FLH the right to initiate this lawsuit.  The right to prosecute "accrued causes of action" must be "expressly included in the assignment."  *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991).  Here, the Sonterra APA purports to convey only "Assets," related to "Recovery Rights."  Sonterra APA, Art. II.  "Recovery Right" is defined, in relevant part as, "with respect to any Claim, all monetary, legal and other rights held by or accruing to [Sonterra] in respect of such Claim."  *Id*., Art. II.  The

---

[15] While Judge Daniels held to the contrary in *Yen LIBOR*, 2021 WL 4482826, at *4 (S.D.N.Y. Sept. 30, 2021), Defendants respectfully disagree.  The transfer in the APA is narrow, as evidenced from the series of interlocking definitions set forth above that show the assignment is limited to claims concerning "securities" (which are not at issue in this litigation).  The APA therefore is not the type of broad assignment that would "clearly encompass the antitrust claim" or encompass "claims of any kind."  *DNAML Pty, Ltd.*, 2015 WL 9077075, at *3, 5.

definition makes clear that the APA transferred the right to recover proceeds in connection with certain claims, but *not* the right to initiate or prosecute claims on behalf of Sonterra.[16]



### 3.     The FrontPoint APA Excludes Assignment of the Relevant Claims.

The FrontPoint APA is largely similar to the ▮▮▮▮▮ Sonterra APAs.[17]  The FrontPoint APA does not assign rights concerning claims arising out of FX forwards; it fails to authorize FLH to initiate this lawsuit; and it does not contain the requisite express assignment of the right to bring antitrust and RICO claims.[18]

---

[16] If the Sonterra APA did allow FLH to initiate litigation, it would be champertous.  *See infra* § I.A.4.

[17] *Compare, e.g.*, Sonterra APA, Art. II (defining "Securities" as "any debt and/or equity securities"); *id.* (defining "Recovery Right" as "all monetary, legal and other rights held by or accruing to the applicable Seller in respect of such Claim") *with* FrontPoint APA, Art. II (containing identical definitions of "Securities" and "Recovery Right").

[18] The FrontPoint APA was signed by all of the FrontPoint plaintiffs on July 13, 2011, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The FrontPoint APA also suffers from an additional fatal deficiency:  the FrontPoint APA assigned "Recovery Rights" with respect to "Future Claims," but only those rights to recover from "any future *securities class action lawsuit[s]*."  FrontPoint APA, Arts. I § 1.1, II (emphasis added).  The APA also emphasizes the negative:  "Future Claims *do not* include Recovery Rights in respect of causes of action and interests in any *state or federal common law claim*, [or] any *non-securities related claim*."  *Id*., Art. II (emphases added).  The FrontPoint APA thus unambiguously assigned rights to recover arising from only *securities class actions* and foreclosed the assignment of (1) "any" *non*-securities claims and (2) *state common law claims* altogether.  This case is clearly not a "securities class action," and thus the FrontPoint APA fails to assign the claims that FLH now purports to bring in FrontPoint's name.

Multiple courts have made this point abundantly clear.  In interpreting the very same APA, Judge Broderick held that "a 'securities class action lawsuit' is commonly understood to refer to a lawsuit litigated as a class action based on alleged violations of . . . the Securities Act of 1933 and the Securities Exchange Act of 1934," and the "ordinary meaning" of securities "does not encompass antitrust claims" or RICO claims.  *Sterling II*, 403 F. Supp. 3d at 264-66.  Similarly, Judge Hellerstein held that "the wide scope of securities and securities-adjacent instruments nowhere suggests that 'securities class action lawsuit' should also encompass antitrust claims," and therefore the "unambiguous" terms of the APA did not assign antitrust claims.  *SIBOR III*, 399 F. Supp. 3d at 103.  And in *SIBOR*, the Second Circuit noted that "FrontPoint assigned only those claims arising out of 'any future *securities* class action or lawsuit,'" observing that "it was this limitation to securities class actions that caused [Judge Hellerstein] to conclude that FrontPoint's assignment was ineffective."  991 F.3d at 392 n.15.  Each of these is consistent with the Supreme Court and Second Circuit's use of the phrase

"securities class actions."[19]

### 4. Any Alleged Assignment of Claims Would Violate New York's Prohibition on Champerty.

Even if the Dissolved Funds did convey the right to initiate lawsuits to FLH, FLH still would lack standing because such an assignment would violate New York's law against champerty. An assignment of claims is champertous if made "with the intent and for the purpose of bringing an action or proceeding thereon." N.Y. Judiciary Law § 489; *see also Justinian Cap. SPC v. WestLB AG*, 28 N.Y.3d 160, 168 (2016) (explaining that an assignment is champertous if plaintiffs' "sole purpose in acquiring the notes" at issue was initiating litigation); *Aretakis v. Caesars Entm't*, 2018 WL 1069450, at *10 (S.D.N.Y. Feb. 23, 2018) (granting motion to dismiss where purpose of assignment was "to allow Plaintiff to prosecute this case to obtain a money judgment"). Here, the APAs indicate that the only assets allegedly transferred are rights to recover on legal claims. Sonterra APA, Art. I § 1.1; ███████████████████; FrontPoint APA, Art. I § 1.1. FLH did not receive any underlying financial instruments, and FLH's only apparent use for the alleged assignments was to file lawsuits like this one. That is champerty.[20]

### B. CalSTRS and Dennis Lacked Standing to Belatedly Join This Action.

The Second Circuit held in *SIBOR* that when the original plaintiff (here, Sonterra) lacks standing, that jurisdictional defect may be cured if "a party with standing to prosecute the

---

[19] *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014) (using "securities class action cases" to reference cases arising from laws such as "section 10(b) of the Securities Exchange Act of 1934"); *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 68 (2d Cir. 2021) (describing claims under the Securities Act of 1933 and the Securities Exchange Act of 1934 as a "securities class action lawsuit"); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 82 (2006); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007) (distinguishing between "securities class actions" and "antitrust class actions").

[20] *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 2020 WL 1285783, at *13 (S.D.N.Y. Mar. 18, 2020) ("'[R]eceiv[ing] [a] cause of action . . . absent any related obligations or assets,'" is "evidence of champerty."), *aff'd sub nom. Phoenix Light SF DAC v. U.S. Bank Nat'l Ass'n*, 2021 WL 4515256 (2d Cir. Oct. 4, 2021); *Justinian Cap. SPC*, 28 N.Y.3d at 168 (where lawsuit is "not merely an incidental or secondary purpose of the assignment, but its very essence," the assignment is champertous); *Leasing Control Inc. v. 500 Fifth Ave., Inc.*, 142 N.Y.S.3d 807, 808 (1st Dep't 2021) (affirming dismissal "on grounds of champerty" where "the primary purpose" of an "assignment" of claims "was for plaintiff to pursue litigation").

specific claim in question" steps into the original plaintiff's shoes, but "that party (the real party in interest) . . . must ratify, join, or be substituted into the action within a reasonable amount of time" and must have standing itself "at the time the pleading is filed." 991 F.3d at 386. Neither CalSTRS nor Dennis satisfy those requirements. Unlike FLH, CalSTRS and Dennis are asserting their own claims and do not purport to be stepping into the shoes of an original plaintiff to prosecute its claims. *See, e.g.*, TAC ¶ 41-42. Moreover, CalSTRS and Dennis first appeared in this litigation in the *third* pleading filed in December 2017. That amendment, filed nearly three years after the original complaint in February 2015, does not constitute a "real party in interest" appearing "within a reasonable amount of time." *SIBOR*, 991 F.3d at 386. The Court, therefore, does not have subject matter jurisdiction over CalSTRS' or Dennis's claims. As *SIBOR* recognized, "a plaintiff may cure defective jurisdictional allegations, *unlike defective jurisdiction itself*, through amended pleadings." 991 F.3d at 388-89 (emphasis added).

## II.    PLAINTIFFS' ANTITRUST CLAIMS BASED ON BID-ASK SPREAD CONDUCT SHOULD BE DISMISSED BECAUSE PLAINTIFFS DID NOT TRANSACT IN THE INSTRUMENTS ALLEGEDLY MANIPULATED.

This Court dismissed Plaintiffs' bid-ask spread claims in *Sonterra I* because a plaintiff must allege, and ultimately establish, that he has suffered an Article III "injury-in-fact," *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003), and Plaintiffs failed to do so in the FAC, 277 F. Supp. 3d at 545-46.[21] Specifically, Plaintiffs' bid-ask spread allegations were based on an October 21, 2014 EC settlement that concerned three specific types of derivatives: (1) forward rate agreements; (2) overnight index swaps (or "TOIS"); and (3) interest rate swaps. *Sonterra I*,

---

[21] "An antitrust plaintiff must show both constitutional standing and antitrust standing." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016). To sufficiently plead standing under Article III of the Constitution, a plaintiff must plausibly allege that "he has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief." *Baur*, 352 F.3d at 632. The injury must be "concrete and particularized" and "actual or imminent"—"conjectural or hypothetical" injuries do not suffice. *Lujan*, 504 U.S. at 560.

277 F. Supp. 3d at 545.  As this Court observed, "plaintiffs claim to have transacted in only two types of CHF currency derivatives – Swiss franc FX forwards and Swiss franc currency futures contracts," meaning "plaintiffs have not alleged that they transacted in any of the specific types of derivatives covered by the European Commission settlement," and thus lacked standing.  *Id*.

Plaintiffs attempt to cure this defect with the TAC in three ways, none of which works.  *First*, the TAC now refers to the December 5, 2016, settlement between COMCO and UBS, RBS, JPMorgan, and Credit Suisse.  TAC ¶ 4.  But Plaintiffs do not allege that the COMCO settlement expanded either the time period or the group of relevant instruments beyond the EC settlement.[22]  The Court's prior holding should therefore still govern.  Indeed, Plaintiffs had ample time—more than a year after remand—to add a plaintiff who *did* transact with Defendants in a relevant instrument, but failed to do so.

*Second*, Plaintiffs now claim that Defendants' "bid-ask spread conspiracy also encompassed Swiss franc FX forward contracts," but Plaintiffs have no creditable support.[23]  TAC ¶ 180.  ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

---

[22] The COMCO Press Release similarly does not support an expanded time period or set of instruments at issue.  *See* COMCO Press Release, https://www.admin.ch/gov/en/start/documentation/media-releases.msg-id-65053.html (last accessed Jan. 25, 2023).

[23] Plaintiffs do not even attempt to allege that the bid-ask spread conspiracy encompassed CME futures contracts, the other financial instrument that forms the basis of Plaintiffs' claims.  *See* TAC ¶ 508.

███████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████  Nothing about the chat indicates

an intention to "quote artificially wider bid-ask spreads" for FX forwards, as Plaintiffs allege.  *Id.*

¶ 180.  Plaintiffs' only other claimed support is entirely circular.  █████████████████

████████████████████████████████████████████████

██████████████████████████████████████████  TAC ¶¶

182-183.  However, "mere speculation that defendants' misconduct extended beyond the scope"

of the EC or COMCO settlement "does not satisfy [P]laintiffs' burden" to allege injury-in-fact.

*Sonterra I*, 277 F. Supp. 3d at 545.  ████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

     *Third*, Plaintiffs attempt to connect their bid-ask spread allegations to allegations of

manipulating CHF LIBOR by conceiving of interconnecting schemes that "aided and furthered"

each other to "injur[e] competition."  TAC ¶ 466.  That makes no sense.  As this Court

recognized in *Sonterra I*, the objectives of the two alleged conspiracies were distinct and

logically unconnected.  277 F. Supp. 3d at 545 n.10.  Widening the bid-ask spread may

conceivably permit banks to earn more as market makers, but has no effect on CHF LIBOR.

Similarly, manipulation of CHF LIBOR has no effect on the bid-ask spread.

     Regardless, Plaintiffs' bid-ask claims should be dismissed because Plaintiffs have not

plausibly alleged a decade-long conspiracy among the Defendants.  *See* TAC ¶ 1.  The EC and

COMCO settlements found the alleged bid-ask conduct was limited to a five-month period:  May

to September 2007.  █████████████████████████████████████



Plaintiffs rely on a single chat between JPMorgan's Bisig and Credit Suisse's Schrode from January 2009 to make the remarkable allegation that the alleged bid-ask spread conspiracy lasted for ████████████ *Id.* ¶ 157. But that chat suggests only that those ████████████████████████████

████████████ *Id.* ¶ 186 (emphasis omitted). ████████████

████████████████████████████

████████████ *id.* ¶¶ 177-181, 184, 187. The few communications that even allude to UBS or the Brokers do not support a plausible inference of a decade-long bid-ask spread conspiracy.[25]

## III. PLAINTIFFS' ANTITRUST CLAIMS BASED ON THE ALLEGED CONSPIRACY TO MANIPULATE CHF LIBOR SHOULD BE DISMISSED.

In *Sonterra I*, this Court dismissed Plaintiffs' antitrust claims based on the alleged conspiracy to manipulate CHF LIBOR because (1) Plaintiffs failed to allege a plausible antitrust conspiracy; and (2) Plaintiffs that failed to allege direct transactions lacked antitrust standing. Because the Court's reasoning from 2017 has only been strengthened by developments in the Second Circuit, the Court should dismiss the antitrust claims on the same grounds as *Sonterra I*. Moreover, the two FrontPoint plaintiffs who allege direct transactions with UBS are not efficient enforcers (and have no antitrust injury) because they fail to plausibly allege the requisite link between Defendants' purported manipulation of CHF LIBOR and any impact on the prices of FX



[24] ████████████████████████ *See* TAC ¶¶ 166, 170.

[25] *See, e.g.*, TAC ¶ 179 ████████████████ ¶ 181 ████████████████ ¶ 185 ████████████████

forwards.  Finally, Plaintiffs' antitrust claims are time-barred.

### A.  Plaintiffs' "New" Factual Allegations Do Not Impact the Reasoning Behind This Court's Prior Decision That Plaintiffs Fail to Allege a Plausible Conspiracy to Manipulate CHF LIBOR.

As the Court recognized in *Sonterra I*, Plaintiffs failed to allege a broad interbank conspiracy to manipulate CHF LIBOR over a decade because the basic premise is implausible. Plaintiffs' theory requires the banks' interests to "consistently align such that defendants would all benefit from manipulation in a given direction."  *Sonterra I*, 277 F. Supp. 3d at 555.  But banks are both buyers and sellers of CHF LIBOR financial instruments, so it is not credible that banks would "conspire to gain, as a borrower, profits that would be offset by a parity of losses it would suffer as a lender."  *Id*. at 554 (quoting *Gelboim*, 823 F.3d at 783).  As this Court articulated, even "assuming that an upward or downward shift would provide a net increase in profit . . . one would need to further assume that the same shift would benefit each member of the conspiracy"; so "[u]nless the banks are similarly situated," there would be no "common motive to conspire."  *Id*. at 555.  Indeed, because Plaintiffs do not allege manipulation in any consistent direction, "not only must we assume that conspirators would all benefit from the same change in CHF LIBOR, but that those directions would change for defendants at the same time," and "[s]uch a scenario is hardly plausible."[26]  *Id*.  Nor are there any plausible allegations of a "common motive" among the Brokers to manipulate CHF LIBOR, as they did not transact for their own accounts and thus had nothing to gain from joining such a conspiracy.  *See id.* at 552.[27]

---

[26] For the same reasons, Plaintiffs' half-hearted allegations that Defendants "inject[ed] a certain 'bias' into the Swiss franc LIBOR fixing, permanently manipulating specific tenors higher or lower by making false submissions over long periods of time," TAC ¶ 194, are also implausible.  For example, given that Plaintiffs allege bidirectional, intermittent manipulation, it would be impossible for Defendants to consistently inject a bias in any given direction that would not be undermined by later attempts to "bias" CHF LIBOR the other way.

[27] The only Broker for which Plaintiffs allege anything resembling motive is Cosmorex.  Plaintiffs claim that "Contributor Bank Defendants compensated Cosmorex brokers for manipulating Swiss franc LIBOR by 'supporting' them with more Swiss franc LIBOR-based derivatives business, resulting in higher commissions payments," which "provided a substantial motivation for Cosmorex brokers to participate in the conspiracy." TAC ¶

Because the TAC *still* offers "no reason whatsoever to believe" that Defendants conspired to engage in bidirectional manipulation of CHF LIBOR, *id*. at 555, the Court should once again hold that Plaintiffs failed to allege a plausible antitrust conspiracy.

Given the implausibility of Plaintiffs' theory, it is unsurprising that the TAC utterly fails to plead factual allegations to support an antitrust conspiracy as to UBS and the Brokers.  While the TAC contains examples of RBS and JPMorgan coordinating false CHF LIBOR submissions, *see, e.g.*, ¶¶ 221-222, the TAC is completely devoid of any such chats, emails, or any other *inter*bank communications by the remaining Defendants.  It bears emphasizing:  there is *not one shred* of direct evidence in the TAC that UBS or the Brokers conspired with others to manipulate CHF LIBOR submissions.  While that absence could perhaps be explained away in other circumstances, this is Plaintiffs' *fourth* attempt to plead an antitrust claim since 2015, and Plaintiffs claim to "incorporate [in the TAC] factual allegations █████████████████ █████████████████████████████████████████████████████████ TAC ¶ 13.  While Plaintiffs tout "new direct, 'smoking gun' evidence," *id*., there is nothing whatsoever that puts that gun in the hands of either UBS or the Brokers.  That alone should be dispositive.

What Plaintiffs do allege in the TAC is a hodgepodge of new chats, generally involving JPMorgan and RBS, but they fail to link UBS and the Brokers "individually to specific acts of anticompetitive conduct in furtherance of the conspiracy."  *Alaska Dep't of Revenue, Treasury Div. v. Manku*, 2021 WL 3027170, at *4 (2d Cir. July 19, 2021) (summary order).  Plaintiffs' "new" allegations amount to more of the same—more allegations of unilateral conduct and

---

298. █████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████

vague communications that, even when construed generously, do not suggest a broad-based conspiracy. For example, allegations that UBS's submitters were "directed" "to consult" with UBS derivatives traders to "skew[]" UBS's submissions constitute unilateral conduct, not an antitrust claim. TAC ¶ 86; *see also id.* ¶¶ 10, 84-86, 196, 262. For the same reasons, Plaintiffs' attempts to analyze UBS's submissions in isolation, or by comparison, without more, does nothing to support their claim of any *agreement* to manipulate CHF LIBOR. *See, e.g.*, *id*. ¶¶ 382, 386-391.

Further, Plaintiffs' citations to sporadic communications between *non*-UBS employees as confirmatory evidence of *UBS*'s participation in a conspiracy fare no better. [28] But more importantly, even assuming the truth of every chat, they do not support the broad conspiracy Plaintiffs have alleged.

*id.* ¶ 153,

—but there is no request to or from UBS to change a CHF LIBOR submission, nor is there any suggestion that UBS agreed to coordinate CHF LIBOR submissions with any other bank (or any reason to believe that Defendants' financial interests were aligned). *See also id*. ¶¶ 142-46, 244, 266.

, there is no indication that wrongful acts were discussed or that such discussions even occurred. *See id.* ¶¶ 237-238.

The few communications that do involve a UBS employee likewise do not move the

---

[28] Indeed, COMCO conducted an investigation of JPMorgan and RBS concerning a purported "*bilateral* cartel with the aim of influencing the Swiss franc LIBOR benchmark"—the fact that UBS was *not* a party to this investigation is telling. *See* COMCO Press Release, https://www.weko.admin.ch/weko/en/home/medien/press-releases/nsb-news.msg-id-65050.html (last accessed Jan. 25, 2023).

needle.  While Plaintiffs make much of the fact that █████████████████████████

████████████████████████████████████████████████████ *see id.* ¶

248, ████████████████████████████████████████████████████

████████████████████████████████████████████, *see id.* ¶¶ 251, 253, 258, 440.

███████████████████████████████████████████████████████████████

███████████████████████████████ *id.* ¶ 252—"social contacts between competitors

without more are not unlawful."  *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383,

406 (3d Cir. 2015). ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████



    The dearth of plausible allegations is consistent with the fact that, after extensive

regulatory investigations of CHF LIBOR, the regulators' findings were limited to *intra*bank

conduct as to UBS.  *See* UBS CFTC Order, Sullivan Decl. Ex. 10 at 38.[29]  The absence of

interbank collusion is dispositive because, as this Court recognized in *Sonterra I*, it is well settled

that "collusion within a bank will not support a claim pursuant to Section 1 of the Sherman Act."

277 F. Supp. 3d at 552 (quotation marks omitted); *see Copperweld Corp. v. Indep. Tube Corp.*,

467 U.S. 752, 771 (1984); *Gelboim*, 823 F.3d at 781 ("proof of joint or concerted action is

required; proof of unilateral action does not suffice"); *Mayor & City Council of Baltimore, Md.*

*v. Citigroup, Inc.*, 709 F.3d 129, 139-40 (2d Cir. 2013) (affirming dismissal where most

communications were "internal to individual defendants").

    Nor does the TAC support the contrived theories that the Brokers participated in a

---

[29] "Sullivan Decl." refers to the Declaration of Peter Sullivan in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint, dated August 18, 2015 (Dkt. 77).

"horizontal" and a "hub-and-spoke" price-fixing conspiracies to manipulate the CHF LIBOR rate. *See* TAC ¶¶ 274, 343. First, the Brokers are not "horizontal competitors," they are "intermediaries that typically facilitate transactions between dealer banks." *Id.* ¶ 269. Second, Plaintiffs' hub-and-spoke theory does not match their factual allegations. A hub-and-spoke conspiracy arises when "an entity at one level of the market structure, the 'hub,' coordinates a[] [horizontal] agreement among competitors at a different level, the 'spokes.'" *In re Inclusive Access Court Materials Antitrust Litig.*, 2021 WL 2419528, *11 (S.D.N.Y. June 14, 2021) (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015)). None of the specific allegations of Broker misconduct involve the Brokers' participation in—much less coordination of—a horizontal conspiracy between or among two or more banks. *See id.* at 325 (holding hub-and-spoke liability appropriate "where the vertical organizer has not only committed to vertical agreements, but has also agreed to participate in the horizontal conspiracy").

The allegations in the TAC against Cosmorex related to its practice of distributing daily predictions of CHF LIBOR rates—or "run thrus"—fare no better because they do not plausibly allege whether and how Cosmorex's "run thrus" affected CHF LIBOR. 

TAC ¶ 281, but nowhere in the TAC is this supposed r

explained or described. Nor do Plaintiffs allege that Cosmorex engaged in any misconduct.

*See id.* ¶¶ 281-299, 497. And the TAC does not contain allegations that UBS solicited or received any run thrus from a Cosmorex broker (or any Broker for that matter).

27

The remaining statements that Plaintiffs add to the TAC are riddled with conclusory allegations that need not be credited.  *See, e.g.*, TAC ¶ 218 (alleging that "no written record exists" of coordinated submissions "[t]o avoid detection"); *id.* ¶ 348 (vaguely asserting that the presence of "personnel from the panel banks" on the FX and Money Markets Committee "rais[ed] further antitrust concerns"); *id.* ¶ 583 (stating that UBS has pled guilty to wire fraud and "admitted" its "role in manipulating the LIBOR," without specifying a currency).  While Plaintiffs try to cast doubt on the reality that there was no interfirm collusion, it is axiomatic that generalized allegations are inadequate to "nudge[]" Plaintiffs' theory "across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## B.   Plaintiffs Lack Antitrust Standing Because They Are Not Efficient Enforcers of the Antitrust Laws and They Fail to Plausibly Allege Antitrust Injury.

To assert an antitrust claim, a plaintiff must show that (1) he is an "efficient enforcer[]" of the antitrust laws" and (2) he has "suffered antitrust injury."  *Gelboim*, 823 F.3d at 772.  Courts evaluate four factors to determine whether a plaintiff is an efficient enforcer:  (a) the "chain of causation" and the "indirectness of the asserted injury"; (b) whether "more direct victims" exist; (c) whether damages are "highly speculative"; and (d) the need to avoid "the risk of duplicate recoveries" or "complex apportionment of damages."  *Id.* at 778-79 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 540-45 (1983)).  Because Plaintiffs are not efficient enforcers and fail to plausibly allege an antitrust injury, they lack standing to bring their antitrust claims.

### 1.   Plaintiffs Are Not Efficient Enforcers of the Antitrust Laws Because All Four Factors Weigh Against Plaintiffs.

#### (i)   Plaintiffs' Alleged Injuries Are Too Indirect.

To determine whether an alleged violation of the antitrust laws is a "direct or remote cause" of an alleged injury, courts assess the "chain of causation linking" the alleged conduct to

28

the asserted injury.  *Gelboim*, 823 F.3d at 772.  The Second Circuit has made clear that, for

"antitrust standing, proximate cause is determined" by the "first-step rule," under which "injuries

that happen at the first step following the harmful behavior are considered proximately caused by

that behavior."  *Schwab II*, 22 F.4th at 116; *see also Laydon*, 55 F.4th at 98.  The rule "require[s]

drawing a line between those whose injuries resulted from their direct transactions with [the

defendants] and those whose injuries stemmed from their deals with third parties."  *Schwab II*,

22 F. 4th at 116.

Consistent with this rule and this Court's holding in *Sonterra I*, the Court should again

dismiss the antitrust claims of Plaintiffs that do not allege direct transactions with Defendants:

FLH on behalf of Sonterra, all Hunter entities, and five of the seven FrontPoint funds.[30]  *Accord*

*Schwab II*, 22 F.4th at 116-17 (emphasizing that decisions by non-parties "snap the chain of

causation").  CalSTRS is slightly different in that it does allege specific direct transactions with

UBS, but CalSTRS expressly brings no claims against UBS.  TAC ¶ 42.  And, no Plaintiff

transacted with the Brokers, because they did not trade—they brokered between dealers.  That

leaves only Dennis and two FrontPoint entities:  FrontPoint Healthcare Enhanced and FrontPoint

European.

Dennis allegedly transacted in CHF futures contracts on the CME.  TAC ¶ 508.  As this

Court explained, "[f]or a futures contract traded on an exchange such as the CME the exchange

functions as the intermediary, and there is no identifiable counterparty, as there would be for an

---

[30] To spell out the FrontPoint situation:  FrontPoint Financial Services and FrontPoint Financial Horizons Fund do not allege any transactions with Defendants.  FrontPoint Healthcare Flagship, FrontPoint Healthcare Horizons, and FrontPoint Utility make conclusory allegations that they transacted with UBS, TAC ¶¶ 28-29, 31, but do not allege any specific transactions, and thus should be treated no differently.  But even had they made such allegations, their claims would fail for the same reasons set forth below.  FrontPoint Healthcare Enhanced, FrontPoint Healthcare Flagship, and FrontPoint Healthcare Horizons allege direct transactions in FX forwards with Credit Suisse, *id*. ¶ 485, but lack antitrust standing just as UBS's alleged counterparties do.

'over the counter' ('OTC') transaction." *Sonterra I*, 277 F. Supp. 3d at 538-39.  In *Laydon*, the Second Circuit confirmed that plaintiffs who traded futures contracts on an exchange did so "with unknown third parties" and therefore cannot plausibly allege that their injury "was proximately caused by Defendants."  55 F.4th at 98.  That ends Dennis's standing inquiry at the "first step."  While the Court suggested in *Sonterra I* that "control of an exchange-based market may be viewed as a proxy for the question of direct causation," 277 F. Supp. 3d at 561 (quotation marks omitted), there is no such credible allegation here. ███████████████████████████

███████████████████████████████ TAC ¶¶ 145, 153, but the relevant inquiry is what portion of the market Defendants actually controlled, *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *16-17 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*").  Plaintiffs' conclusory allegations that Defendants' "market power gave them the ability to control . . . prices," TAC ¶ 154, and that Defendants "collectively dominated the OTC Swiss franc derivatives market," *id*. ¶ 141, are not *facts* that plausibly suggest "Defendants controlled the . . . futures contract that Plaintiff purchased" as required, *Laydon*, 55 F.4th at 98.  Indeed, Plaintiffs alleged that only five of the 12 CHF LIBOR panel banks conspired to manipulate CHF LIBOR.  TAC ¶ 5.  It is implausible to presume that a minority of the panel controlled the CME market for CHF futures contracts.

The remaining named plaintiffs—FrontPoint Healthcare Enhanced and FrontPoint European—do allege specific transactions with UBS in FX forwards.  Their alleged injuries nevertheless occurred far from the "first step" following Defendants' conduct and were not "proximately caused" by Defendants.  *See Schwab II*, 22 F. 4th at 116.  That is because FX forwards are not expressly linked to CHF LIBOR.  FX forwards are bilateral, negotiated trades of U.S. Dollars for Swiss francs (or vice versa) on an agreed future date, and parties make the

independent decision on whether and to what extent to rely on CHF LIBOR in pricing those transactions. *See Sterling I*, 366 F. Supp. 3d at 547 (finding "no direct relationship" between Sterling LIBOR and FX forwards). Accordingly, the non-fixed, "negotiated components of FX forwards render the effect of [benchmark] manipulation speculative." *Yen LIBOR*, 2021 WL 4482826, at *7. Put differently, because FX forwards "incorporated LIBOR only implicitly through a complex formula involving numerous other causal factors," the "causal relationship is too indirect to support the causation element of the efficient enforcer prong." *Sterling I*, 366 F. Supp. 3d at 546. Indeed, since *Sonterra I*, the Second Circuit has discredited allegations that benchmarks "exerted a kind of gravitational force" on all trading prices, which are "clearly insufficient to establish antitrust standing." *Schwab II*, 22 F.4th at 118 n.6.[31]

But even if the Court credited Plaintiffs' allegations of a link between CHF LIBOR manipulation and FX futures prices, Plaintiffs have still not shown the requisite "causal chain linking Plaintiffs' harm to Defendants' misconduct." *Schwab II*, 22 F.4th at 109. Plaintiffs' claims depend on a multi-step causal chain that "separate[s] Defendants' conduct and [Plaintiffs'] purported injury." *Laydon*, 55 F.4th at 98. At best, Plaintiffs assert that

1. Five of the 12 panel banks agreed to manipulate CHF LIBOR;

2. The five co-conspirators submitted artificial rates to the BBA each day of the eleven-year conspiracy for each of the 15 tenors of CHF LIBOR;

3. The *five* artificial submissions impacted the calculation of the published CHF LIBOR for each tenor, despite a trimmed mean calculation in which *six* of the *twelve* submissions were excluded;

4. One of the 15 manipulated tenors of CHF LIBOR was a maturity that affected Plaintiffs' pricing of FX forwards[32]; and

---

[31] Similar logic applies to Dennis's alleged transactions in CHF futures contracts on the CME, TAC ¶ 508, which are standardized agreements "for the purchase or sale of CHF . . . in exchange for U.S. Dollars," *id*. ¶ 120; *accord Sterling I*, 366 F. Supp. 3d at 547 (finding "no direct relationship" between Sterling LIBOR and CME futures contracts).

[32] *See infra* § III(B)(2).

5. Plaintiffs suffered harm from the impact of manipulation on their transactions even though (a) the manipulation was bidirectional, impacting trading prices in both directions, and (b) Plaintiffs are both buyers and sellers who "may well have benefited" from any alleged manipulation, *LIBOR VI*, 2016 WL 7378980, at *18.

Where, as here, Plaintiffs' claims rely on the actions of "innumerable individual decision-makers," including panel banks and traders, all reacting to macroeconomic developments and a myriad of other factors, Plaintiffs cannot credibly assert that their purported injury was directly caused by Defendants.[33]  *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980).  Indeed, it is "not enough that a plaintiff suffered a loss in some manner that might conceivably be traced" to Defendants' conduct; the law requires direct causation.  *Schwab II*, 22 F.4th at 116.

### (ii)  More Direct Victims Exist.

The vast majority of Plaintiffs' claims arise from entities that did not directly transact with a Defendant and "should be categorized as less direct victims," as this Court found in *Sonterra I*, 277 F. Supp. 3d at 563.  Indeed, these Plaintiffs implicate "the very concern of damages disproportionate to wrongdoing" that antitrust-standing doctrine aims to prevent. *Gelboim*, 823 F.3d at 779.  However, even the two Plaintiffs that allegedly transacted with UBS are less direct victims because the relationship between CHF LIBOR and the FX forwards is "more attenuated" than the "relationship between LIBOR" and "LIBOR-denominated" instruments (such as interest rate swaps that fix payment obligations directly to LIBOR). *Sterling I*, 366 F. Supp. 3d at 545-46.  The latter are "directly affected by a rise in prices or reduction in output" and are therefore considered more direct victims.  *Fisher v. Aurora Health Care, Inc.*, 558 F. App'x 653, 655-56 (7th Cir. 2014).

---

[33] Plaintiffs' claims against the Brokers require even more remote chains of causation; for example, that information disseminated by a Broker Defendant somehow led through all of the steps above to a manipulated CHF LIBOR rate.

### (iii)   Plaintiffs' Damages Are Highly Speculative.

Plaintiffs' damages are unduly speculative, "a sign" that they are "inefficient engine[s] of enforcement." *Gelboim*, 823 F.3d at 779.  As this Court recognized, calculating antitrust damages "always entails the reconstruction of a hypothetical market absent the unlawful manipulation"—but "the task in this case would be particularly daunting." *Sonterra I*, 277 F. Supp. 3d at 563.  Most Plaintiffs here allege transactions with third parties.  In such cases, "[t]he decision to incorporate CHF LIBOR absent any participation by defendants not only arguably breaks the chain of causation and leads to disproportionate damages, but it also makes it even harder to determine what role, if any, LIBOR played in the ultimate price." *Id*. at 564.

Even for the two Plaintiffs who allege direct transactions in FX forwards with UBS, calculating damages would "still [be a] difficult effort" because it is "not clear" how the Court would "determine the effect of defendants' alleged manipulation." *Id*. at 564 n.21.  As the Second Circuit recognized, calculating damages from transactions in instruments not directly "pegged to LIBOR," like the FX forwards here, "would require speculation about how each of the [12] LIBOR panel banks would have answered the LIBOR question," followed by "speculat[ion about] how the hypothetical LIBOR would have affected" the instruments at issue. *7 W. 57 St. Realty Co. v. Citigroup, Inc.*, 771 F. App'x 498, 502-03 (2d Cir. 2019).  Indeed, Plaintiffs' theory of damages rests on "multiple layers of speculation" that "essentially would require the creation of an alternative universe," *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 67 (2d Cir. 2019), and "independent factors" beyond the defendant's conduct, *AGC*, 459 U.S. at 542-43, that "would engage the court in hopeless speculation," *Reading*, 631 F.2d at 13-14.

### (iv) There Is a Substantial Risk of Duplicative Recoveries and Complex Apportionment.

Plaintiffs' claims raise a serious "risk of duplicative recoveries" and "the danger of complex apportionment of damages," confirming that they are not efficient enforcers. *AGC*, 459 U.S. at 543-44.  As the Court observed, "[w]here, as here, plaintiffs' injuries appear likely to be extraordinarily difficult to calculate and could lead to benumbing damages amounts that far exceed the aggregate harm to third parties, it is appropriate to consider whether the alleged misconduct would be better redressed and deterred through regulatory action."  *Sonterra I*, 277 F. Supp. 3d at 565-66.  Indeed, Plaintiffs continue to "essentially piggyback[] on regulatory settlements" and they "are manifestly not uncovering misconduct that went . . . unaddressed by public enforcement."  *Id*. at 566 n.22.

But even setting aside the fact that Defendants' alleged LIBOR manipulation has already "led to over $7 billion in [regulatory] fines," *id*. at 565, the risk of duplicative recovery is significant.  Because Plaintiffs allege that manipulations impacted trading prices in *both* directions, it would be "extraordinarily complex" to account for offsetting positions, *Gelboim*, 823 F.3d at 780, and "it may not even be apparent which party profited and which party was injured" by the alleged misconduct, *Sullivan v. Barclays PLC*, 2017 WL 685570, at *19 (S.D.N.Y. Feb. 21, 2017); *see LIBOR VI*, 2016 WL 7378980, at *18.

### 2. Plaintiffs Fail to Allege Antitrust Injury Because FX Forwards and CME Futures Have No Direct Relationship to CHF LIBOR.

To have antitrust standing, Plaintiffs must allege an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Plaintiffs' assertion that their injuries flowed from Defendants' alleged manipulation of CHF LIBOR is untenable because the financial instruments they transacted in—FX forwards and CME futures—have "no

direct relationship" to CHF LIBOR.  *Sterling I*, 366 F. Supp. 3d at 547; *supra* § III.B.1(i).  FX forwards are bilateral, negotiated trades, whereas CME FX futures are traded "on the exchange according to standardized terms"—but neither are directly linked to CHF LIBOR.  *Sterling I*, 366 F. Supp. 3d at 520.  Plaintiffs' theory of harm also fails because it is based on bidirectional, episodic manipulation of CHF LIBOR that "may well have benefited" Plaintiffs.  *LIBOR VI*, 2016 WL 7378980, at *18.

Regardless of those flaws, Plaintiffs also rely on the implausible assumption that manipulation of one CHF LIBOR tenor (*e.g.*, one month) directly impacts an instrument with a different maturity (*e.g.*, three months).  In fact, not one of the contracts described in the TAC has a maturity equal to a CHF LIBOR tenor that Plaintiffs allege Defendants manipulated. ███

███████████████████████████████████████████████████

████████████████████████████████████████████████ TAC

¶¶ 473-476.  But Plaintiffs do not explain how or why manipulation of a 30-day benchmark would affect—even indirectly—an instrument maturing in 77 days.  The closest Plaintiffs come is stating that "three-month and six-month Swiss franc LIBOR also increased from the previous day," but Plaintiffs do not allege that Defendants manipulated either tenor or how 90-day or 120-day lending benchmarks impact their agreement to trade Dollars for Swiss francs in 77 days.  *Id*. ¶ 475.  The same mismatch holds true for *all* of Plaintiffs' other alleged trades with UBS.[34]

### C.    Plaintiffs' Antitrust Claims Are Time-Barred.

The statute of limitations period for Plaintiffs' antitrust claims is four years, 15 U.S.C. § 15b, and the limitations period runs from the date of Plaintiffs' alleged injury, *Levy v. BASF*

---

[34] *See also id*. ¶¶ 477, 480 (FrontPoint European entered into an eighteen-week FX forward, allegedly injured by manipulation of one-month, three-month, and six-month CHF LIBOR); ¶¶ 481-484 (same with five-week FX forward and three-month and six-month CHF LIBOR); ¶¶ 485-488 (same with three-day FX forward and three-month and six-month CHF LIBOR); ¶¶ 489-490 (same with three-week FX forward but no specific tenor reference).

*Metals Ltd.*, 755 F. App'x 29, 30 (2d Cir. 2018). ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████    The Court recognized in *Sonterra II* that the four-

year period had "long-since expired," 409 F. Supp. 3d at 270 & n.10, though in *Sonterra I*, the

Court also found that the limitations period was tolled based on fraudulent concealment, 277 F.

Supp. 3d at 568.  Respectfully, Defendants submit that Plaintiffs' antitrust claims are untimely.

        *First*, Plaintiffs are not entitled to tolling based on fraudulent concealment, which

requires pleading "with particularity" that, *inter alia*, Plaintiffs' purported ignorance of their

claim "was not attributable to a lack of diligence on [their] part."  *SL-x IP S.á.r.l. v. Bank of Am.

Corp.*, 2021 WL 4523711, at *8 (S.D.N.Y. Sept. 30, 2021).  While the Court found the alleged

conduct inherently self-concealing, *Sonterra I*, 277 F. Supp. 3d at 567, Plaintiffs only vaguely

alleged that they "generally followed public news, the markets, and financial developments,"

TAC ¶ 535.  That does not suffice to plead diligence under Rule 9(b).  *See Armstrong v.

McAlpin*, 699 F.2d 79, 88-89 (2d Cir. 1983) (affirming dismissal for failure to plead reasonable

diligence); *Fire & Police Pension Ass'n of Co. v. Bank of Montreal*, 368 F. Supp. 3d 681, 703-04

(S.D.N.Y. 2019) ("[d]ue diligence is not adequately pled if plaintiffs" fail to allege "any specific

inquiries of defendants, or detail when such inquiries were made, to whom, regarding what, and

with what response").

        *Second*, although the Court found in *Sonterra I* that Defendants referenced only one

article (the June 2008 Dow Jones Capital Markets report), there were numerous public reports of

alleged artificiality in benchmark rates, including CHF LIBOR, beginning in mid-2008.  *See*

Kurtzberg Decl. Ex. G.  Public economic data was also available, which Plaintiffs use liberally.

*See, e.g.*, TAC  ¶¶ 451-455.  Plaintiffs cannot insist that they were ignorant for years while

simultaneously contending that economic data was "unnatural and contrary to expectations . . . suggesting conspiratorial manipulation." *In re Interest Rates Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 489 (S.D.N.Y. July 28, 2017).[35]

    *Third*, as set forth in the Brokers' supplemental brief, the statute of limitations had indisputably run when the Brokers were joined to this case in the SAC.

## IV.   PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED BECAUSE THE CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL AND PLAINTIFFS FAIL TO PLEAD ESSENTIAL ELEMENTS.

    In *Sonterra I*, this Court held that Plaintiffs' RICO claims are impermissibly extraterritorial because all of the relevant conduct occurred abroad. This Court also held that Plaintiffs did not adequately plead the necessary predicate acts of wire fraud. Because the TAC fails to cure these deficiencies, and fails to adequately plead any of its claims against the Defendants, the RICO claims should be dismissed again.

### A.   Plaintiffs' RICO Claims Are Extraterritorial Because Plaintiffs Still Allege a Foreign Scheme That Lacks Domestic Core Conduct.

    Plaintiffs' RICO claims are predicated on violations of the wire fraud statute, TAC ¶ 591, which does not apply extraterritorially, *Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014). Plaintiffs, therefore, must show that their "case involves a domestic application of the statute." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). This Court held in *Sonterra I* that the FAC had failed to allege a "sufficient connection between the alleged acts of wire fraud and the United States." 277 F. Supp. 3d at 576. Emphasizing the inadequacy of Plaintiffs' allegations of domestic conduct, the Court observed, "[D]efendants are based abroad, their allegedly manipulated quotes were submitted from abroad to a banking

---

[35] Defendants respectfully acknowledge the Court's observation that "unreliability is not necessarily indicative of manipulation," *Sonterra I*, 277 F. Supp. 3d at 568, but Plaintiffs allege the opposite: the spread between CHF LIBOR and the deposit rate "*indicates* that Swiss franc LIBOR was artificial," TAC ¶ 455 (emphasis added).

association located abroad, and the LIBOR rate at issue is the LIBOR rate for a foreign currency." *Id*. at 582.

The Court's decision in *Sonterra I* has been proven correct, both by the Second Circuit's recent precedent and by Plaintiffs' failure to allege any additional facts in the TAC that would change the Court's conclusion.  In *Bascuñán*, the Second Circuit held that a claim "predicated on mail or wire fraud" involves "sufficient domestic conduct" only when "the use of the mail or wires was a *core component* of the scheme to defraud," rather than "merely incidental."  927 F.3d at 122 (emphasis added).  The TAC, like the FAC, fails to plead more than "incidental" domestic contacts let alone that domestic wires were a "core component" of the alleged conspiracy.  *Id.*  Defendants are still based abroad, their allegedly manipulated quotes were submitted to the BBA, a foreign association, and the LIBOR rate at issue is still a benchmark concerning a foreign currency.  *Sonterra I*, 277 F. Supp. 3d at 582; *see also Laydon v. Mizuho Bank, Ltd*., 2015 WL 1515487, at *8-9 (S.D.N.Y. Mar. 31, 2015) (RICO claim based on "alleged actions of foreign and international institutions that submitted false information to the BBA and JBA, located in London and Tokyo, respectively," did not sufficiently allege domestic conduct).

While Plaintiffs' TAC points to ancillary domestic activity, none of it suffices to "support a claim of domestic application" of RICO.  *Petroleos Mexicanos*, 572 F. App'x at 61.  ███████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████  TAC ¶ 603; *see also id*. ¶¶ 220 n.216; 606-607.  Multiple district courts, including this one, have found that such allegations plead only a "minimal" "nexus" to the United States.  *See, e.g.*, *Sullivan*, 2017 WL 685570, *33. In *Sonterra I*, this Court described the idea that chats were "being routed through computer

servers into New York" as nothing more than "happenstance."  277 F. Supp. 3d at 582.  And Judge Broderick found the use of U.S. wires, "at most, incidental," even where plaintiffs alleged "weekly" calls to discuss trading strategies and positions between traders based abroad and in New York.  *Sullivan*, 2017 WL 685570, at *34.

Plaintiffs' other attempts to tie the scheme to the U.S. also fall flat.  Plaintiffs again rely on the notion that Defendants "aim[ed]" their "false and artificial Swiss franc LIBOR submissions and confirmations" at the U.S. via interactions with Thomson Reuters.  TAC at ¶ 610.  But the essence of the alleged misconduct here is that banks in Europe misreported CHF LIBOR to the BBA.  Thomson Reuters' mere "disseminat[ion]" of these allegedly false LIBOR submissions in the U.S., TAC ¶ 581, "create only a minimal nexus to the United States," as this Court already found, *Sonterra I*, 277 F. Supp. 3d at 581.  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████  TAC ¶¶ 608-609.  Those allegations are merely repackaged versions of Plaintiffs' already rejected claim that UBS and other banks transacted with U.S. counterparties, which fail to allege that Defendants' "scheme" was directed from (or to) the United States.  *Accord Petroleos Mexicanos*, 572 F. App'x at 61.

### B.   Plaintiffs Fail to Plead Proximate Cause Because Plaintiffs Fail to Allege Any Direct Dealings Between Defendants and Most Plaintiffs.

The RICO claims should also be dismissed for failure to plead proximate cause.  A civil RICO action requires a plaintiff to show he was "injured in his business or property by reason of a [RICO] violation."  18 U.S.C. § 1964(c); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013).  The predicate act must be the proximate cause of the injury to plaintiff's business or property.  *Empire Merchs., LLC v. Reliable Churchill LLP*, 902 F.3d 132, 141 (2d Cir. 2018).  The "central question" is "whether the alleged violation led *directly* to the plaintiff's injuries."

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added).

Plaintiffs' RICO claims fail because Defendants did not "directly" cause Plaintiffs' alleged injuries, much as the Second Circuit recently found in *Laydon*.  There, the Second Circuit found that Plaintiff had failed to allege that wire fraud acts proximately caused his injuries because "not only" had the plaintiff failed to allege any "direct dealings with defendants," but his alleged injury, "a change in the value of his domestically traded Euroyen TIBOR futures contract," was "several steps removed" from Defendants' alleged manipulation of the benchmark rate.  55 F.4th at 100-01.  Here, no Plaintiff alleges transactions with the Brokers and, while FrontPoint Healthcare Enhanced and FrontPoint European allege FX forward transactions with UBS, their alleged injury is "several steps removed" from Defendants' alleged submission of "fraudulent" CHF LIBOR rates to the BBA, just as with Plaintiffs' antitrust claim.  *See Laydon*, 55 F.4th at 101; *supra* § III.B.2.  Finally, Dennis allegedly transacted in CME CHF currency futures, but fails to plausibly allege either that his futures were priced on CHF LIBOR or that his transactions were with Defendants as opposed to another CME market participant.  *See supra* § III.B.1(i).

### C.     Plaintiffs Fail to Plead Essential Elements of a RICO Claim.

In order to allege a RICO claim under § 1962(c), a plaintiff must plausibly allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."  18 U.S.C. § 1962(c).  In *Sonterra I*, this Court found that, even if Plaintiffs' RICO claims were not impermissibly extraterritorial, the claims also failed because Plaintiffs did not adequately allege (1) an association-in-fact RICO enterprise; (2) two predicate acts of wire fraud; or (3) a pattern of racketeering activity.  The same holds true for the TAC.

1.      **Plaintiffs Fail to Plead a RICO Enterprise Because Plaintiffs Still Fail to Plead That Defendants Shared a Common Purpose to Conspire to Manipulate CHF LIBOR.**

An "enterprise" under the RICO statute is "a union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An association-in-fact enterprise is a "continuing unit that functions with a common purpose."  *Boyle v. United States*, 556 U.S. 938, 948 (2009).  In *Sonterra I*, this Court found that Plaintiffs had failed to plead that Defendants (other than RBS) "shared a common purpose to conspire to manipulate CHF LIBOR" for two reasons:  (1) while the FAC alleged that CHF LIBOR was "manipulated sometimes upward and other times downward," it failed to explain "why each defendant would profit from manipulation in the same direction at the same time," and (2) the FAC contained "specific allegations of inter-defendant collusion only against RBS."  277 F. Supp. 3d at 577.

The TAC offers no reason to revisit those findings.  To start, Plaintiffs again fail to explain how each Defendant would have benefited from the manipulation of CHF LIBOR in the same direction at the same time.  Plaintiffs do not allege a conspiracy to manipulate CHF LIBOR in any consistent direction and instead allege a conspiracy to "suppress, inflate, maintain, or otherwise alter Swiss franc LIBOR."  TAC ¶ 550.  Such multidirectional manipulation renders the "case of a shared motive" or common purpose not just "weak[]," but "hardly plausible."  *Sonterra I*, 277 F. Supp. 3d at 555; *see also supra* § III.A.

Further, none of the newly added communications in the TAC are interbank communications involving UBS or the Brokers with the alleged conspiracy to manipulate CHF LIBOR.  *See supra* § III.A.  In fact, several of the interbank communications in the TAC suggest that traders in the alleged conspiracy were guessing at each other's motives and trading strategies, not that the "various associates function[ed] as a continuing unit."  *Ulit4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 n.8 (2d Cir. 2017).  ██████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████

Finally, while the TAC attempts to link the Brokers with disconnected instances of

supposed manipulation, *see* TAC ¶¶ 285-89, the sporadic nature of the allegations defeats

Plaintiffs' claims because a "series of discontinuous independent frauds" does not constitute a

RICO enterprise, *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y.

1993). In fact, rather than showing that the Brokers and UBS functioned as a unit with a

common fraudulent purpose, Plaintiffs' allegations suggest, at most, isolated understandings

between a single bank (JPMorgan or RBS but not UBS) and a single Broker acting in its own

independent interest. *See* TAC ¶¶ 294-295, 299, 300, 312. "Conclusory allegations," such as

those found in the TAC, suggesting that "disparate parties were associated in fact by virtue of"

their involvement in the CHF LIBOR market are "insufficient to sustain a RICO claim, absent

allegations as to how the members were associated together in an 'enterprise.'" *First Nationwide

Bank*, 820 F. Supp. at 98.

> ## 2. Plaintiffs Fail to Plead the Requisite Predicate Acts of Wire Fraud Because the TAC Lacks Specific Allegations of False CHF LIBOR Submissions Involving UBS or the Brokers.

The RICO statute also requires Plaintiffs to plausibly allege that each Defendant

committed at least two predicate acts, which, in this case, are wire fraud. *DeFalco v. Bernas*,

244 F.3d 286, 306 (2d Cir. 2001). Allegations of wire fraud are subject to the heightened

pleading standard of Rule 9(b), meaning Plaintiffs have to plead "the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent."  *Mills v. Polar Molecular Corp*., 12 F.3d 1170, 1176 (2d Cir. 1993).

At bottom, Plaintiffs allege that Defendants committed predicate acts of wire fraud by transmitting or causing to be transmitted "false and artificial Swiss franc LIBOR submissions" and by "coordinating their daily Swiss franc LIBOR submissions and . . . trading positions." TAC ¶¶ 578-580, 591 (summarizing alleged predicate acts).  However, Plaintiffs nowhere alleged specific false submissions to the BBA by the remaining Defendants, *i.e.*, specific daily CHF LIBOR submissions that are untrue.  That is a critical miss.  The Second Circuit in *United States v. Connolly* made clear that no "one true interest rate" prevails in the context of LIBOR submissions.  24 F.4th 821, 837 (2d Cir. 2022).  If the rate "submitted" by a bank is "one that the bank could request, be offered, and accept, the submission, irrespective of motivation," the submission is "not false."  *Id*. at 835.  Plaintiffs offer no evidence to suggest that the CHF LIBOR rates submitted by UBS did not "reflect rates at which [UBS] *could* have borrowed."  *Id.* at 839 (emphasis added).

Plaintiffs likewise fail to allege specific communications by UBS or the Brokers to coordinate the supposed conspiracy.  Indeed, in *Sonterra I*, this Court held that the FAC failed to plead "at least two specific instances" in which Defendants "manipulate[ed] CHF LIBOR" through "inter-defendant collusion."  277 F. Supp. 3d at 578.  The same is true in the TAC. There are *no* communications in the TAC where UBS or the Brokers solicited or accepted requests from other banks to manipulate CHF LIBOR.  ██████████████████

████████████████████████████████████████████

██ ████████████████████████████.  *See supra* § III.A.  Absent multiple specific

allegations of manipulative conduct for *each* Defendant, Plaintiffs' RICO claims cannot proceed.

### 3.      Plaintiffs Fail to Plead a Pattern of Racketeering Activity Because They Do Not Plausibly Allege Interfirm Collusion.

A "pattern" of racketeering activity requires at least two predicate acts that are "related" and have sufficient "continuity." *Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  In *Sonterra I*, this Court found that the FAC failed to adequately allege that Defendants, with the exception of RBS, engaged in such a pattern.  277 F. Supp. 3d at 579.  As to RBS, the FAC plausibly alleged a pattern of racketeering activity only because Plaintiffs plausibly alleged that the "two specific instances of collusion" between RBS and JPMorgan cited were "merely a 'small sample'" of their CHF LIBOR manipulation.  *Id.* (quoting FAC ¶ 128).  There are no such allegations as to UBS or the Brokers. ███████████████████ ████████████████████████████████████████████████████ and more than a year to put together the TAC.  That Plaintiffs still cannot link UBS or the Brokers to any instances of interbank collusion—soliciting or agreeing to manipulate CHF LIBOR—is telling. *See GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467-69 (2d Cir. 1995) (concluding that the alleged racketeering activities "involved only a handful of participants" and did not plead the "sort of 'long-term . . . conduct' that Congress sought to target in RICO").

### D.      Plaintiffs Fail to State a RICO Conspiracy Claim.

To state a RICO conspiracy claim, a plaintiff must allege "the existence of an agreement to violate RICO's substantive provisions"—that is, that defendants "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 244 (2d Cir. 1999).  A RICO conspiracy claim "must necessarily fail" where Plaintiffs do not plead a substantive violation.

*Jerome M. Sobel & Co. v. Fleck*, 2003 WL 22839799, at *13 (S.D.N.Y. Dec. 1, 2003).  As in

*Sonterra I*, 277 F. Supp. 3d at 579, Plaintiffs have failed to plead a substantive RICO violation

against Defendants for the reasons above, and thus Plaintiffs have no RICO conspiracy claim.

Plaintiffs' RICO conspiracy also fails on the merits.  All of the interbank communications

cited in the TAC are "entirely conclusory" and do not explain "how each of the [D]efendants,

through words or actions, reached an agreement" to conspire.  *Nat'l Grp. for Commc'ns &*

*Computs Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006).  As explained

*supra* § III.A, Plaintiffs' allegations in the TAC, consisting of unilateral conduct and vague

communications largely between RBS and JPMorgan, do not suggest a broad-based conspiracy

involving UBS and the Brokers.  The TAC utterly fails to state with specificity "what the

agreement was, who entered into the agreement, when the agreement commenced, and what

actions were taken in furtherance of it."  *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F.

Supp. 2d 362, 373 (E.D.N.Y. 2002).

### E.    Plaintiffs' RICO Claims Are Time-Barred.

RICO claims are subject to a four-year limitations period, which starts when Plaintiffs

were on actual or inquiry notice of their alleged injuries.  *Simmons v. Reich*, 2021 WL 5023354,

at *2 (2d Cir. Oct. 29, 2021).  The standard does not require notice of the alleged conspiracy.

*Koch v. Christie's Intern. PLC*, 699 F.3d 141, 149 (2d Cir. 2012) ("[D]iscovery of the injury, not

discovery of the other elements of a claim, is what starts the clock."); *Rio Tinto PLC v. Vale*,

2015 WL 7769534, at *7 (S.D.N.Y. Nov. 20, 2015) (clock "begins to run" when plaintiff

"learn[s] of his or injury, not" when plaintiff learns his injury "resulted from racketeering").

Although the Court equated Plaintiffs' RICO and antitrust claims for tolling purposes in

*Sonterra I*, 277 F. Supp. 3d at 583, respectfully, the analyses differ.  The Court observed that the

Sherman Act "requires a showing of inter-defendant collusion," and therefore, "[e]ven supposing

notice" of "manipulated LIBOR rates, that would not necessarily establish an antitrust conspiracy." *Id.* at 568.  By contrast, inquiry notice for RICO claims only requires discovery of the alleged injury.  *Koch*, 699 F.3d at 149.  Thus, for the RICO claim, the clock began to run no later than June 19, 2008, when the Dow Jones Capital Markets report was published and Plaintiffs were put on notice of an alleged injury.  *See* Kurtzberg Decl. Ex. G.  The statute of limitations thus expired in mid-2012, almost three years before this suit was filed on February 5, 2015, and long before the Brokers were joined in the SAC in 2017.

## V.   PLAINTIFFS' STATE LAW CLAIMS AGAINST UBS SHOULD BE DISMISSED BECAUSE THEY CANNOT PLAUSIBLY ALLEGE HARM OR STANDING.

Plaintiffs' claims against UBS for breach of the implied covenant of good faith and fair dealing and unjust enrichment should be dismissed.[36]  To start, Plaintiffs' state law claims are premised on a counterparty relationship.  *Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017) ("[T]he duties imposed by the implied covenant . . . arise as a result of . . . a contractual relationship between the parties."); *Georgia Malone & Co. v. Ralph Rieder*, 86 A.D.3d 406, 408 (1st Dep't 2011) (Unjust enrichment requires "a connection or relationship" that "could have caused reliance or inducement.").  Because only FrontPoint European and FrontPoint Healthcare Enhanced allege counterparty relationships with UBS, TAC ¶¶ 473, 477, 481, 485, 489, the state law claims of all other Plaintiffs are not viable.[37]  FLH's claims on behalf of the two FrontPoint entities still fail, however.  The FrontPoint APA expressly excludes "any state or federal common law claim" from the "Future Claims" that were assigned to FLH.  FrontPoint APA, Art. II.  Other courts reviewing the FrontPoint APA have held the same:  FLH cannot bring state law claims on FrontPoint's behalf.  *SIBOR III,* 399 F. Supp. 3d at 102; *Sterling*

---

[36] Plaintiffs do not specify the applicable law for their claims or even allege sufficient facts to determine what law likely applies.  For purposes of this motion, Defendants assume New York law governs Plaintiffs' claims.

[37] CalSTRS alleges a contractual relationship with UBS, but does not assert claims against UBS.  TAC ¶¶ 42, 518.

*II*, 403 F. Supp. 3d at 266.

In any event, an implied covenant claim "does not survive a motion to dismiss" where, as here, "it is based only on generalized allegations and grievances." *United States ex rel. Smith v. N.Y. Presbyterian Hosp.*, 2007 WL 2142312, at *16 (S.D.N.Y. July 18, 2007).  Plaintiffs fail to provide the "specific allegations as to the agreement between [UBS and the FrontPoint entities], the terms of that agreement, and what provisions of the agreement were breached as a result of the acts at issue." *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 183 (S.D.N.Y. 2009).  And Plaintiffs "may not recover in unjust enrichment where," as here, "the parties have entered into a contract that governs the subject matter" of their dispute. *Fetet v. Altice USA, Inc.*, 2021 WL 2941917, at *7 (S.D.N.Y. July 12, 2021).

Plaintiffs' state law claims should also be dismissed in part as untimely.  The limitations period for an unjust enrichment claim in New York is three years where, as here, the plaintiff seeks monetary damages. *Sejin Precision Indus. Co., Ltd. v. Citibank, N.A.*, 2017 WL 4350323, at *6 (S.D.N.Y. June 28, 2017).  The period begins to run "upon the occurrence of the wrongful act giving rise to a duty of restitution." *Mindspirit, LLC. v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 596 (S.D.N.Y. 2018).  Because the latest alleged manipulation of CHF LIBOR was on April 18, 2011, TAC ¶ 514, Plaintiffs were required to file their unjust enrichment claims by April 18, 2014.  Plaintiffs are not entitled to tolling, *see supra* § III.C, and in any event still waited until February 5, 2015 to file the original complaint.

Finally, in the absence of a viable federal claim, the Court should once again decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. *See Sonterra I*, 277 F. Supp. 3d at 584; *Top Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 103 (2d Cir. 1998).

## VI.   THE FOREIGN DEFENDANTS ARE NOT SUBJECT TO PERSONAL JURISDICTION.

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  Personal jurisdiction may be general, where a defendant is "at home" in the forum, *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014), or specific, where a defendant's conduct creates a "substantial connection with the forum," *Walden v. Fiore*, 571 U.S. 277, 283-86 (2014).  Plaintiffs have failed to meet their burden of pleading facts that would establish either general or specific personal jurisdiction over UBS or Brokers TP ICAP, TPEL, Cosmorex, Gottex, and Velcor (the "Foreign Brokers," and collectively with UBS, the "Foreign Defendants").

Indeed, the jurisdictional inquiry is ordinarily defendant-specific, *id.* at 284, and claim-specific, *Sonterra I*, 277 F. Supp. 3d at 588-89; *see also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004).  But here, the inquiry is even more exacting because Plaintiffs allege two separate conspiracies:  (1) manipulation of the bid-ask spread and (2) manipulation of CHF LIBOR itself.  *Sonterra I*, 277 F. Supp. 3d at 546 n.11.  Plaintiffs must, therefore, plausibly allege a *prima facie* case of personal jurisdiction as to each alleged conspiracy, in addition to each claim, against each Defendant.  *Id.* at 586.  Because Plaintiffs have failed to allege a substantial connection between the alleged conspiracies and the relevant forums,[38] and because the Foreign Defendants are clearly not at home in the United States, the case against the Foreign

---

[38] Where the relevant federal statute provides for nationwide service of process, the exercise of personal jurisdiction extends "to the limit permitted by the Due Process Clause."  *See In re N. Sea Brent Crude Oil Futures Litig.*, 2017 WL 2535731, at *11 n.12 (S.D.N.Y. June 8, 2017); *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1110 (2d Cir. 1997).  Because the RICO statute and the Clayton Act provide for nationwide service, the Foreign Defendants' jurisdictional arguments focus on whether the exercise of personal jurisdiction comports with due process.  New York's long-arm statute, however, is still relevant and addressed to the extent that it informs the jurisdictional analysis as to antitrust claims against the Foreign Defendants.

Defendants must be dismissed in its entirety for lack of personal jurisdiction.

**A.      The Foreign Defendants Are Not Subject to General Jurisdiction.**

A court may exercise general jurisdiction over a foreign corporation only where it is "essentially at home" in the forum. *Daimler*, 571 U.S. at 122. The Foreign Defendants— incorporated and headquartered in Europe, with their principal places of businesses in Europe— are not "at home" in the U.S. In fact, in *Sonterra I*, the Court declined to exercise general personal jurisdiction over UBS, finding, first, that it had not consented to general personal jurisdiction by registering under the International Banking Act of 1978. 277 F. Supp. 3d at 587. Second, the Court held that operation of a "branch office" in a forum "is not constitutionally sufficient to general jurisdiction." *Id.* (citing *Gucci Am. Inc. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014)). Nothing in the TAC calls into question those holdings. Similarly, Plaintiffs do not assert that the Foreign Brokers are subject to general jurisdiction, and even if they did, any such argument would fail because, like UBS, the Foreign Brokers are "at home" in Europe.[39] Thus, none of the Foreign Defendants are subject to the general personal jurisdiction of the Court.

**B.      The Foreign Defendants Are Not Subject to Specific Jurisdiction.**

The Foreign Defendants are not subject to the specific jurisdiction of this Court because they fail to plausibly allege the requisite "relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 284. The exercise of specific jurisdiction is proper only where a defendant's "suit-related conduct . . . create[s] a substantial connection with the forum State." *Sonterra I*, 277 F. Supp. 3d at 588-89 (quoting *Walden*, 571 U.S. at 284). The suit must either be caused by or "relate to" the defendant's contacts with the forum. *Ford Motor Co. v. Mont.*

---

[39] Facts related to the Brokers are more fully set forth in the Supplemental Memorandum of Law in Support of the Broker Defendants' Motion to Dismiss the Third Amended Class Action Complaint, which is incorporated herein by reference as support for arguments concerning the Brokers.

*Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).  "In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum."  *Id*.  Critically, "the exercise of personal jurisdiction must comport with constitutional due process principles."  *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 69 (2d Cir. 2022).

As discussed further below, Plaintiffs do not plausibly allege that (1) the Foreign Defendants engaged in suit-related conduct *within* the United States such that they "purposefully availed [themselves] of the privilege of doing business" here or (2) the Foreign Defendants engaged in suit-related conduct *outside* the United States that was "expressly aimed at the forum."  *Sonterra I*, 277 F. Supp. 3d at 589.  Plaintiffs also cannot establish specific jurisdiction through conspiracy jurisdiction because Plaintiffs have not plausibly alleged that the Foreign Defendants participated in any conspiracy, or that any alleged co-conspirator acted in furtherance of CHF LIBOR manipulation in the relevant forums.  The Court has also already found that Plaintiffs may not assert specific personal jurisdiction over any Foreign Defendant on the basis of the bid-ask spread claims, which continues to be the correct conclusion.  *Id*. at 546 n.12.[40]

Foreign Defendants are mindful that the Court held in *Sonterra I* that it could exercise personal jurisdiction over UBS based on allegations that it "manipulated CHF LIBOR for the purpose of profiting from transactions for CHF LIBOR-based derivatives within the forum."  277 F. Supp. 3d at 595.  However, respectfully, the Court (which had already dismissed Plaintiffs' claims on other grounds) did not address how jurisdiction could exist over UBS when no

---

[40] The Court previously held that personal jurisdiction could not be based on Plaintiffs' bid-ask spread theory because Plaintiffs lacked Article III standing to bring claims on that basis.  *Sonterra I*, 277 F. Supp. 3d at 546 n.12. Similarly, because Plaintiffs did not trade the relevant instruments, *see supra* § II, Plaintiffs cannot meet their burden to allege any connection, let alone the requisite "substantial connection" required by *Walden* and *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016), between the forum, Plaintiffs' claims, and the alleged bid-ask spread misconduct.

underlying conspiracy to manipulate CHF LIBOR was adequately alleged as to UBS.  The Court

also declined to rule on whether Plaintiffs had satisfied the "effects test" as to UBS.  *Id.* at 594

n.35.  As to the Foreign Brokers, the case is much simpler:  the Court's September 25, 2017,

decision in *Sonterra I* pre-dated the Foreign Brokers' being added to this action in the November

6, 2017, SAC.

### 1.    Plaintiffs Do Not Allege "Purposeful Availment"—*i.e.*, Suit-Related Conduct Within the United States.

Plaintiffs do not allege that the Foreign Defendants engaged in suit-related conduct

within the U.S. sufficient to establish specific jurisdiction under a "purposeful availment" theory.

Foreign Defendants alleged "in-forum activity" does not "sufficiently reflect[] the defendant's

'purposeful availment' of the privilege of carrying on its activities here" to establish "minimum

contacts."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013)

("*Licci IV*"); *see Ford*, 141 S. Ct. at 1024; *Sonterra I*, 277 F. Supp. 3d at 594 n.35.

### (i)    UBS AG

Plaintiffs have failed to plausibly allege a "substantial connection" between UBS's

alleged conduct, Plaintiffs' claims, and the forum.  *See Walden*, 571 U.S. at 284.  Specifically,

Plaintiffs have failed to allege plausibly that (1) UBS engaged in collusive manipulation of CHF

LIBOR and the prices of CHF LIBOR derivatives; (2) the alleged manipulation was for the

purpose of profiting from transactions with U.S. counterparties; or (3) Plaintiffs' claims arise

from or relate to UBS's conduct.

Although Plaintiffs allege that UBS has personnel and trading operations in the U.S., *see,

e.g.*, TAC ¶¶ 79-81, 83-84, they fail to connect UBS's general presence in the U.S. through

routine business activities to suit-related conduct:  the alleged collusive manipulation of CHF

LIBOR.[41]  *See Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) ("For specific jurisdiction, a defendant's general connections with the forum are not enough."); *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 2015 WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019) ("Plaintiff must demonstrate that the [f]oreign [b]anks' *suit-related* conduct creates minimum contacts with New York . . . not simply that [those b]anks have a presence here or conduct business activities here in general.").  Plaintiffs fail to allege that *any* UBS employee based in the United States was responsible for determining or submitting CHF LIBOR rates to the BBA.  To the contrary, any such employees were based in *Zurich* or *London*.[42]  And the Court correctly found in *Sonterra I* that all of the conduct related to allegedly improper manipulation of CHF LIBOR occurred outside the U.S.:  "defendants are based abroad, their allegedly manipulated quotes were submitted from abroad to a banking association located abroad, and the LIBOR rate at issue is the LIBOR rate for a foreign currency."  *Sonterra I*, 277 F. Supp. 3d at 582.  Nothing in the alleged conspiracy relies on a U.S.-based connection.  Indeed, respectfully, there are no plausible allegations that UBS, a Swiss corporation, conspired to "manipulate[] CHF LIBOR for the purpose of profiting from transactions for CHF LIBOR-based derivatives within" New York or the U.S.  *Id.* at 595.  What is more, Plaintiffs failed to plausibly allege that UBS engaged in *any* "inter-defendant collusion."  *Id.* at 578.  The TAC does nothing to correct these fatal flaws.

> **(ii)     The Foreign Brokers (TP ICAP, TPEL, Cosmorex, Gottex, and Velcor)**

The Foreign Brokers were not CHF LIBOR submitters, do not have employees in the U.S., and are not alleged to have transacted CHF LIBOR-based derivatives in the U.S. or

---

[41] The arguments set forth herein also apply to Plaintiffs' bid-ask spread claims.  As explained above, the Court should once again find that Plaintiffs cannot assert specific personal jurisdiction on the basis of these claims.
[42] *See* Mumford Decl. ¶¶ 7-8.

anywhere else.[43]  As brokers, they do not trade for their own account, and the TAC does not

allege otherwise.  The Foreign Brokers are, therefore, in the same jurisdictional position as

former defendants DB Group Services and Bluecrest, both of which were dismissed on personal

jurisdiction grounds in *Sonterra I* because Plaintiffs had "fail[ed] to plausibly allege that [they]

transacted in CHF LIBOR-based derivatives within the United States."  277 F. Supp. 3d at 596.

The TAC also fails to establish specific jurisdiction as to TP ICAP, which is a non-

operational U.K. holding company with no presence in the U.S.; it could not have engaged in any

suit-related conduct to form a basis for jurisdiction.  *See* Broker Br. § I.C.[44]  It is not surprising,

therefore, that the TAC contains no substantive allegations against TP ICAP aside from

identifying it as a party in the TAC.  Plaintiffs only include TP ICAP in group-pled allegations

against other affiliate and subsidiary broker defendants.  *See, e.g.*, TAC ¶¶ 108, 276-278.  Group

pleading, however, is insufficient to form a basis for personal jurisdiction.  *See Charles Schwab

Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018) ("*Schwab I*") (personal jurisdiction

cannot be established where parent and subsidiary "collapse[d] into one"); *Nypl v. JPMorgan

Chase & Co.*, 2018 WL 1472506, at \*6 (S.D.N.Y. Mar. 22, 2018) (dismissing foreign exchange

price-fixing claims against "foreign parent holding companies" where the complaint "contain[ed]

no allegations of suit-related conduct specific to the holding compan[ies]").

The TAC also fails to establish specific jurisdiction over TPEL, Cosmorex, and Gottex,

as Plaintiffs do not assert that their alleged conduct—disseminating false CHF LIBOR pricing

information through "run thrus" and electronic screens—occurred in the U.S.  *See* TAC ¶¶ 276,

302, 350.  Indeed, the TPEL, Cosmorex, and Gottex brokers identified in the TAC worked in

---

[43] *See* Broker Br. § I.C.

[44] In *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515358 (S.D.N.Y Mar. 31, 2015), Judge Daniels held that a foreign non-operating holding company had no "direct ties to the United States outside of select subsidiaries" and that it was, therefore, not subject to specific jurisdiction under any theory.  *Id*. at \*4-5.

either London or Switzerland, and they did not have any U.S.-based employees during or after the Class Period.  *See* Broker Br. § I.C.  The electronic broker screens at issue for TPEL and Gottex were located and operated outside the U.S., and the run thrus sent by Cosmorex were sent from Switzerland.  *Id*.  The TAC does not allege otherwise.

███████████████████████████

██████████████████████████████

████████████████████████████

███████████████████████████

█████████████████████████████████

███████████████████████████

The *only* allegations of U.S.-based conduct by the Foreign Brokers are a few social meetings in New York between traders on the one hand, and Cosmorex's ██████████ ████████████████████  *See* TAC ¶¶ 107, 293-297, 418-419.  But the communications cited in the TAC as evidence of those meetings do not support Plaintiffs' speculation that the purported meetings were connected to the manipulation CHF LIBOR.  *See supra* § III.A; *see also In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 233 (S.D.N.Y. 2019) (allegations that trips were used to plan bond manipulation were conclusory and insufficient to establish personal jurisdiction); *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *6 (S.D.N.Y. Aug. 18, 2017) (conduct not "suit-related" where "[p]laintiffs fail to allege . . . how these trades were collusive, or how they related to the alleged fixing of the SIBOR and SOR rates"); *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080, at *4 (S.D.N.Y. Mar. 10, 2017) (no "substantial connection" to U.S. where plaintiffs "plead no facts to support their allegation" that trip to Las Vegas by broker employee was used to plan manipulation of financial

benchmarks).

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████ The electronic

transmission of "run thrus" to U.S. recipients as part of a blast to the global market does not

constitute "suit-related" conduct for purposes of conferring jurisdiction because Plaintiffs have

not plausibly alleged that Cosmorex's "run thrus" were "false," that they actually affected CHF

LIBOR rates, or that their receipt by U.S. recipients led to an artificial change in the CHF

LIBOR rates. *See Waldman*, 835 F.3d at 335 ("Suit-related conduct" means conduct that "could

have subjected [the defendant] to liability."); *see also Ford*, 141 S. Ct. at 1026. According to

Plaintiffs, Cosmorex's "false" "run thrus" were intended to affect CHF LIBOR rates by

misleading panel bank submitters, but Plaintiffs do not allege that any of those submitters were

located in the United States. In fact, the defendant panel banks filed jurisdictional declarations

confirming that their CHF LIBOR submitters were located abroad. *See* Dkts. 65 (UBS), 66

(Credit Suisse), 70 (Deutsche Bank), 71 (RBS). Thus, the *only* "run thrus" that could have

affected CHF LIBOR rates were those sent to panel bank submitters located abroad, and any run

thrus sent to recipients in the U.S. "could [not] have subjected [Cosmorex] to liability."

*Waldman*, 835 F.3d at 335; *see also Laydon*, 2017 WL 1113080, at *3 ("The fact that . . .

recipients of [allegedly false 'run thrus'] were located in the United States[] is insufficient to

establish minimum contacts with the United States.").

Plaintiffs' allegations regarding the Foreign Brokers' electronic communications with



fare no better.[45]

None of ▮▮▮▮ communications with ▮▮▮▮ reveal conspiratorial or manipulative conduct that could be considered "suit-related conduct."  The Foreign Defendants' alleged suit-related conduct was exclusively foreign, and "allegation[s] of a few electronic or telephonic communications with New York is not enough" to establish specific jurisdiction.  *Viropro, Inc. v. Pricewaterhousecoopers Advisory Servs. Sdn Bhd*, 2016 WL 225686, at *6 (S.D.N.Y. Jan. 19, 2016); *Aquiline Cap. Partners LLC v. FinArch LLC*, 861 F. Supp. 2d 378, 391 (S.D.N.Y. 2012) ("sporadic" emails and faxes sent to New York in response to solicitation of business in Belgium were not sufficient to establish specific jurisdiction); *see also Licci IV*, 732 F.3d at 170 (courts must consider the "quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test"); *Waldman*, 835 F.3d at 335.

To the extent ▮▮▮ asked the Foreign Brokers to do anything, he was asking them to do something abroad, not in the U.S.  Courts in the Second Circuit have analyzed similar communications under New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), which requires a showing of "purposeful availment" that is "coterminous" with that of the constitutional due process analysis.[46]  Those courts have consistently held that a foreign defendant's

---

[46] *HSH Nordbank AG N.Y. Branch v. Street*, 2012 WL 2921875 at *4 n.3 (S.D.N.Y. July 18, 2012); *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir. 2012) ("*Licci II*") ("[T]he overriding criterion

communications with a New York resident will confer personal jurisdiction under § 302(a)(1) only if, by virtue of those communications, the defendant "project[ed] itself into New York to participate in . . . activities localized in the state."[47]  Because the sole alleged purpose of ███ communications with the Foreign Brokers was to influence their conduct abroad, those communications cannot fairly be understood as having "projected" the Foreign Brokers into New York or that they "purposefully availed" themselves of the privilege of doing business here.  To hold otherwise would improperly elevate the Foreign Brokers' contacts "with persons who reside" in the forum over their contacts "with the forum State itself."  *Walden*, 571 U.S. at 285.

### 2.      Plaintiffs Do Not Allege "Purposeful Direction"—*i.e.*, Foreign Suit-Related Conduct "Expressly Aimed at the Forum."

In both their bid-ask manipulation claims and their CHF LIBOR manipulation claims, Plaintiffs have also failed to allege that the Foreign Defendants "expressly aimed [their] conduct at the [U.S.]" to cause "in-forum effects harmful to the plaintiff," which precludes any reliance on a "purposeful direction" theory of specific jurisdiction.  *Sonterra I*, 277 F. Supp. 3d at 589 (quoting *Licci IV*, 732 F.3d at 173).  Plaintiffs attempt to establish purposeful direction by generally alleging that the Foreign Defendants should have known their overseas conduct would have affected the price for CHF LIBOR-based derivatives across the globe, including prices in the U.S.  *See* TAC ¶ 21.  But as the Supreme Court explained in *Walden*, foreseeable harm in the forum is an insufficient basis for jurisdiction, because it fails to connect a defendant's own

---

necessary to establish a transaction of business [under § 302(a)(1)] is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York[.]"); *id.* at 61, & n.11 ("Th[e] similarity of state-law and constitutional standards appears particularly evident with respect to N.Y. C.P.L.R. § 302(a)(1)[.]").

[47] *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 788 (2d Cir. 1999) (concluding that Puerto Rican defendant's communications with plaintiff in New York did not confer jurisdiction under § 302(a)(1)); *see also Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339 (S.D.N.Y. 2016) ("[A] foreign defendant's communications with a party in New York . . . are not sufficient to establish personal jurisdiction without the defendant having 'projected' himself into New York for the purposes of conducting business there."); *Maranga v. Vira*, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) (same).

conduct to the forum "in a meaningful way." 571 U.S. at 289-90; *see also FrontPoint Asian Event Driven Fund, L.P.*, 2017 WL 3600425, at *7 ("[I]t is bedrock law that merely foreseeable effects of defendants' conduct do not support personal jurisdiction.").[48]

This Court previously distinguished this case from *Waldman*, where the attacks at issue were not expressly aimed at the United States but "indiscriminate," on the ground that the connection to the U.S. here is stronger because Foreign Defendants were motivated by increased profits, and therefore incentivized to manipulate trading positions in the U.S. *Sonterra I*, 277 F. Supp. 3d at 594 n.35.[49] Respectfully, however, the allegations in the TAC do not support such a distinction. First, Plaintiffs' allegations that Defendants manipulated CHF LIBOR are insufficient under *Waldman* (and *Walden*) to confer jurisdiction because Plaintiffs fail to link Defendants' alleged conduct to the forum to cross "the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiffs do not allege that the CHF LIBOR manipulation or bid-ask spread conspiracy was directed at a U.S. party (let alone Plaintiffs) or otherwise expressly aimed at the U.S., nor do they allege that the brunt of any alleged harm was felt in the U.S. Plaintiffs' trading also did not involve the instruments that were the subject of the alleged bid-ask spread manipulation. Moreover, the very premise is flawed. As explained above, Foreign Defendants had no reason to believe that alleged manipulation of CHF LIBOR would affect the prices of Plaintiffs' FX forwards, which do not reference CHF LIBOR at all. *See supra* § III.B.1(i). That

---

[48] *See, e.g.*, *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 322 (S.D.N.Y. 2020) ("Although it may have been foreseeable that this conduct would cause harm in the United States, [m]ere foreseeability is insufficient under the effects test." (alteration in original)); *Sullivan*, 2017 WL 685570, at *44-45 (finding no basis for personal jurisdiction where plaintiffs failed to adequately allege the "existence, causation or intent to manipulate the Euribor on the part of [defendant] had its 'nucleus' or 'focal point' in the United States"); *7 W. 57th St. Realty Co.*, 2015 WL 1514539, at *11 ("[T]he fact that harm [from alleged USD LIBOR manipulation] in [New York] is foreseeable is insufficient for the purpose of establishing specific personal jurisdiction over a defendant."); *Laydon*, 2015 WL 1515358, at *2 ("foreseeability is not the standard for recognizing personal jurisdiction; the actions must instead be 'expressly aimed'" at the forum).

[49] *Sonterra I* did not rule on the question of whether UBS was subject to jurisdiction under the causal effects test. 277 F. Supp. 3d at 558.

Plaintiffs allege that they believe "all Swiss franc LIBOR-based derivatives are priced, benchmarked, and/or settled using a mathematical formula that incorporates Swiss franc LIBOR as one of its terms," TAC ¶ 129, says nothing about *Defendants*' expectations of how the U.S. would be affected.  *Accord Schwab I*, 883 F.3d at 87 (Even "[t]he foreseeability of causing injury in another State, however, will not suffice [to satisfy the 'effects test'].").

Any claim of purposeful direction is even weaker as to the Foreign Brokers, as they did not trade for their own account, and therefore cannot be said to have an interest in profiting from trading in CHF LIBOR-based derivatives in the U.S.  *See In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *45  (S.D.N.Y. Mar. 28, 2017) ("[G]eneral allegations of price manipulation abroad alone do not establish that a foreign defendant expressly aimed its conduct at the U.S."); *accord Sonterra I*, 277 F. Supp. 3d at 596 ("[B]y failing to plausibly allege that DB Group Services or BlueCrest transacted in CHF LIBOR-based derivatives within the United States, the Complaint has failed to plausibly allege that profiting from such transactions was the purpose of any manipulation by them."); *Laydon*, 2017 WL 1113080, at *4 ("Plaintiffs plead no facts to suggest that [broker] ICAP expressly aimed the effects of their alleged manipulative conduct at the United States.").

### C.      Plaintiffs Cannot Rely on "Conspiracy Jurisdiction."

Plaintiffs cannot rely on conspiracy allegations to confer jurisdiction over the Foreign Defendants.  To do so, Plaintiffs must, at a minimum, allege "that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Berkshire Bank v. Lloyds Banking Grp. plc*, 2022 WL 569819, at *2 (2d Cir. Feb. 25, 2022) (quoting *Schwab I*, 883 F.3d at 87).  While Plaintiffs need not demonstrate that the defendant "directed, controlled, and/or supervised the co-conspirator who carried out the overt

acts," *Schwab II*, 22 F.4th at 124, "due process demands that courts assess [e]ach defendant's contacts . . . individually," based on its own alleged conduct, and not the alleged conduct of unaffiliated co-defendants or subsidiaries, *Schwab I*, 883 F.3d at 84 (noting that plaintiff had improperly "collapse[d] into one" two separate defendants—"a parent and a wholly owned subsidiary").

### 1.   Plaintiffs Fail to Plausibly Plead Any Conspiracy.

"The first step in evaluating personal jurisdiction in a conspiracy case is to define the scope of the conspiracy, because only acts taken pursuant to that conspiracy are jurisdictionally relevant." *LIBOR VI*, 2016 WL 7378980, at *3.  As discussed above, Plaintiffs have failed to plausibly allege their wide-ranging bid-ask spread conspiracy or a conspiracy to manipulate CHF LIBOR.  Moreover, even if Plaintiffs had plausibly alleged a conspiracy (and they do not), Plaintiffs fail to create the requisite connection between the purported conspiracies and the U.S. or New York.

### (i)   UBS AG

While Plaintiffs allege that at least one member of the alleged conspiracy, a JPMorgan trader, sat in New York, Plaintiffs cannot establish conspiracy jurisdiction without first plausibly alleging participation in the purported conspiracy.  And the TAC still offers "no reason whatsoever to believe" that UBS shared a common motive with other banks to engage in bidirectional manipulation of CHF LIBOR.  *See supra* § III.A.  The TAC also fails to point to *any* evidence that UBS participated in a multi-year, multi-party conspiracy, let alone one extending into New York and the U.S.  *See supra* § VI.B.1(i).  While the TAC contains numerous chats involving JPMorgan and RBS, the TAC does not cite to any solicitation by UBS, or receipt by UBS, of a request from another bank to manipulate CHF LIBOR.  UBS's unilateral overseas activities are irrelevant to conspiracy jurisdiction.

60

(ii)     The Foreign Brokers

Plaintiffs also fail to connect any of the Foreign Brokers to the alleged conspiracies.  The communications quoted in the TAC raise the inference that the Brokers were intentionally *excluded* from any communications purportedly related to Plaintiffs' bid-ask spread claims.  *See* Broker Br. § II.C.1.  In regards to the CHF LIBOR-manipulation claims, Plaintiffs lump together a handful of allegations concerning several different Brokers in an effort to call the Brokers' conduct into question.  But a pleading must contain specific allegations as to each defendant based on its own alleged conduct to establish conspiracy jurisdiction.  *Schwab I*, 883 F.3d at 84.

In particular, TP ICAP is a holding company that has no presence in the U.S. and no operations.  Plaintiffs attempt to hide this by including TP ICAP in group-pled allegations with its affiliates and subsidiaries.  *See, e.g.*, TAC ¶¶ 108, 276-278.  Group pleading, however, is insufficient to serve as a basis for personal jurisdiction.  *See Schwab I*, 883 F.3d at 84; *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 1268267, at *7 (S.D.N.Y. Mar. 31, 2016) (rejecting personal jurisdiction over a parent corporation); *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 232 (S.D.N.Y. 2015) (same).

Plaintiffs likewise have failed to establish conspiracy jurisdiction over the remaining Foreign Brokers—Cosmorex, Gottex, Velcor, and TPEL—because they have not plausibly alleged that they participated in any conspiracy.  Construed liberally, the TAC's allegations against these Foreign Brokers' are limited to isolated, narrow one-on-one discussions between individual Foreign Brokers and individual traders at banks (but not UBS), one of whom sat in New York, to "disseminat[e] false pricing information."  TAC ¶ 276; *see Sonterra I*, 277 F. Supp. 3d at 566-67 ("[P]laintiffs can only base their antitrust claims on narrower acts of collusion for which there are detailed supporting allegations."). ████████████

61



The TAC's vague reference to a possible in-person meeting between ████████████ █████████████████████████████████ also does not establish a connection to

the alleged conspiracies, particularly as the underlying communications provides no indication as

to whether the meeting went forward, who attended, where it occurred, and whether the meeting

had anything to do with manipulation or CHF LIBOR.  *See* TAC ¶¶ 107, 153.  Communications

that "merely show opportunistic attempts at collusion by individual traders [] are not evidence of

an overarching conspiracy."  *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d at 239.

### 2. Plaintiffs Fail to Satisfy the Long-Arm Statute.

Plaintiffs have also failed to satisfy New York's long-arm statute.  As this Court

explained, to assess personal jurisdiction over a foreign defendant in a federal-question case,

"[t]he Court first looks to whether jurisdiction will lie under the law of the forum state."

*Sonterra I*, 277 F. Supp. 3d at 588.  Specifically, to establish conspiracy-based personal

jurisdiction pursuant to New York's long arm statute, a plaintiff must—after making a *prima*

*facie* showing of a conspiracy—plausibly allege that: "(a) the defendant had an awareness of the

effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the

benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at

the direction or under the control, or at the request of or on behalf of the out-of-state defendant."

*Berkshire Bank*, 2022 WL 569819, at *3 (emphasis omitted).

Plaintiffs satisfy none of these requirements.  As discussed above, Plaintiffs have not alleged that the Foreign Defendants were aware of any alleged "effects" of the purported conspiracies on CHF LIBOR-based transactions in New York.  Nor have Plaintiffs plausibly alleged that any of the alleged co-conspirators' in-forum activity benefitted the Foreign Brokers, who had nothing to gain from CHF LIBOR manipulation, or UBS, which did not share a "common motive to conspire" with the other banks.  *See Sonterra I*, 277 F. Supp. 3d at 552. Finally, Plaintiffs have not alleged that ███████████—or any other putative co-conspirator—acted at the direction of UBS or the Foreign Brokers, either at their request or on their behalf with "awareness of the torts being committed . . . in New York."  *Berkshire Bank*, 2022 WL 569819, at *3.  Accordingly, Plaintiffs cannot impute the conduct of ███ (or anyone) to the Foreign Defendants.[50]

### D.   CONSIDERATION OF FAIR PLAY AND SUBSTANTIAL JUSTICE SUPPORT DISMISSAL OF THE FOREIGN DEFENDANTS

Even if Plaintiffs made a *prima facie* showing of jurisdiction, the Court would still be required to consider whether exercising jurisdiction "would comport with fair play and substantial justice."  *Gucci*, 768 F.3d at 137.  As part of this determination, courts look to: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive

---

[50] Plaintiffs also cannot establish conspiracy jurisdiction—or any form of personal jurisdiction, for that matter—under Federal Rules 4(k)(2) or 4(k)(1)(C) for the same reasons that the TAC fails to satisfy *Schwab I*'s standard for finding "minimum contacts" under a conspiracy jurisdiction theory.  *See supra* § VI.C.1; *Rudersdal v. Harris*, 2022 WL 263568, at *10 (S.D.N.Y. Jan. 28, 2022) (applying *Schwab I* to Rule 4(k)(2) and finding plaintiff's allegations insufficient to serve as minimum contacts for jurisdictional purposes).

social policies." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).

The exercise of jurisdiction over the Foreign Defendants would not comport with fair play and substantial justice. First, the alleged misconduct occurred entirely abroad and the Supreme Court has emphasized that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 115 (1987); *see also Daimler*, 571 U.S. at 141-42. Second, exercising jurisdiction would threaten international comity because it would subject the Foreign Defendants to litigation in a forum where they had no suit-related contacts. Third, the Foreign Brokers did not profit from alleged CHF LIBOR manipulation anywhere in the world, let alone in the U.S. Similarly, it is not credible that UBS would "conspire to gain, as a borrower, profits that would be offset by a parity of losses it would suffer as a lender." *Sonterra I*, 277 F. Supp. 3d at 554 (quoting *Gelboim*, 823 F.3d at 783).

## VII.   PLAINTIFFS FAIL TO ALLEGE PROPER VENUE UNDER THE CLAYTON ACT AS TO THE FOREIGN BROKERS.

To assert personal jurisdiction under the Clayton Act, a plaintiff must plead venue under Section 12. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 422-25 (2d Cir. 2005); 15 U.S.C. § 22. In *Dennis v. JPMorgan Chase & Co.*, Judge Kaplan held that plaintiffs' failure to allege that foreign defendants—including two affiliates of TP ICAP—"transacted any business in New York" meant that "the venue provision of Section 12 of the Clayton Act is not satisfied and the federal antitrust claims will be dismissed for lack of jurisdiction." 343 F. Supp. 3d 122, 199 (S.D.N.Y. 2018). Here, Plaintiffs do not allege that the Foreign Brokers are "found" or "transact[] business" of a "substantial character" in the Southern District of New York, and thus Plaintiffs fail to adequately plead venue.[51] *Gates v. Wilkinson*, 2003 WL 21297296, at *1

---

[51] *See* TAC ¶¶ 88-89 (TP ICAP); ██████████████████████████████

(S.D.N.Y. June 4, 2003).  Plaintiffs' antitrust claims against the Foreign Brokers should be dismissed on this ground alone.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the TAC with prejudice and grant such other and further relief as the Court deems just and proper.

Dated: January 27, 2023
      New York, New York

Respectfully submitted,

*/s/ Jefferson E. Bell*
Eric J. Stock
Jefferson E. Bell
Kathryn N. Salvaggio
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  (212) 351-4000
estock@gibsondunn.com
jbell@gibsondunn.com
ksalvaggio@gibsondunn.com

*Attorneys for Defendant UBS AG*

*/s/ Shari A. Brandt*
Shari A. Brandt
H. Rowan Gaither IV
PERKINS COIE LLP
1155 Avenue of the Americas
New York, New York 10036-2711
Telephone:  (212) 262-6900
Fax:  (212) 977-1649
sbrandt@perkinscoie.com
rgaither@perkinscoie.com

*Attorneys for Defendants TP ICAP plc, Tullett Prebon Americas Corp., Tullett Prebon (USA) Inc., Tullett Prebon Financial Services LLC, Tullett Prebon (Europe) Limited, Cosmorex AG, Gottex Brokers SA, and Velcor SA*

65